| | | |
|---|---|---|
| Dennis F. Dunne | Gregory Bray | Aaron L. Renenger |
| Evan R. Fleck | MILBANK LLP | MILBANK LLP |
| MILBANK LLP | 2029 Century Park East, | 1850 K Street NW, |
| 55 Hudson Yards | 33rd Floor | Suite 1100 |
| New York, New York 10001 | Los Angeles, CA 90067 | Washington, D.C. 20006 |
| Telephone: (212) 530-5000 | Telephone: (424) 386-4000 | Telephone: (202) 835-7500 |
| Facsimile: (212) 530-5219 | Facsimile: (213) 629-5063 | Facsimile: (202) 263-7586 |

*Counsel for Debtors and
Debtors-In-Possession*

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------------x
In re:                                                           :
                                                                 :   Chapter 11
AVIANCA HOLDINGS S.A., et al.,                                   :
                                                                 :   Case No. 20-11133 (MG)
                                    Debtors.¹                     :
                                                                 :   (Jointly Administered)
_____                :
                                                                 :
AVIANCA HOLDINGS S.A., et al.,                                   :
                                                                 :
                                    Plaintiffs.                   :
                                                                 :
            v.                                                   :   Adv. Proc. _____
                                                                 :
USAVFLOW LIMITED,                                                :
                                                                 :
                                    Defendant.                    :
-----------------------------------------------------------------x
```

---

¹ The Debtors in these cases, and each Debtor's federal tax identification number (to the extent applicable), are as follows: Avianca Holdings S.A. (N/A); Aero Transporte de Carga Unión, S.A. de C.V. (N/A); Aeroinversiones de Honduras, S.A. (N/A); Aerovías del Continente Americano S.A. Avianca (N/A); Airlease Holdings One Ltd. (N/A); America Central (Canada) Corp. (00-1071563); America Central Corp. (65-0444665); AV International Holdco S.A. (N/A); AV International Holdings S.A. (N/A); AV International Investments S.A. (N/A); AV International Ventures S.A. (N/A); AV Investments One Colombia S.A.S. (N/A); AV Investments Two Colombia S.A.S. (N/A); AV Taca International Holdco S.A. (N/A); Avianca Costa Rica S.A. (N/A); Avianca Leasing, LLC (47-2628716); Avianca, Inc. (13-1868573); Avianca-Ecuador S.A. (N/A); Aviaservicios, S.A. (N/A); Aviateca, S.A. (N/A); Avifreight Holding Mexico, S.A.P.I. de C.V. (N/A); C.R. Int'l Enterprises, Inc. (59-2240957); Grupo Taca Holdings Limited (N/A); International Trade Marks Agency Inc. (N/A); Inversiones del Caribe, S.A. (N/A); Isleña de Inversiones, S.A. de C.V. (N/A); Latin Airways Corp. (N/A); Latin Logistics, LLC (41-2187926); Nicaraguense de Aviación, Sociedad Anónima (Nica, S.A.) (N/A); Regional Express Américas S.A. (N/A); Ronair N.V. (N/A); Servicio Terrestre, Aereo y Rampa S.A. (N/A); Servicios Aeroportuarios Integrados SAI S.A.S. (92-4006439); Taca de Honduras, S.A. de C.V. (N/A); Taca de México, S.A. (N/A); Taca International Airlines S.A. (N/A); Taca S.A. (N/A); Tampa Cargo S.A.S. (N/A); Technical and Training Services, S.A. de C.V. (N/A). The Debtors' principal offices are located at Avenida Calle 26 # 59 – 15 Bogotá, Colombia.

## COMPLAINT

1.      Plaintiffs, the above-captioned debtors (the "Debtors"), bring this action against USAVflow Limited ("USAV") and allege as follows:

## NATURE OF THE ACTION

2.      In December 2017, the Debtors engaged in a series of agreements involving USAV (collectively, the "USAV Transaction") that purportedly constituted a sale of the Debtors' receivables under certain credit card processing agreements in exchange for cash.  In substance and reality, however, the USAV Transaction was a disguised secured financing.  Accordingly, the Debtors seek to recharacterize the USAV Transaction as such.[2]

3.      To the extent the USAV Transaction is recharacterized as a disguised secured financing, the Debtors also seek a declaration that USAV has no security interest in certain postpetition credit card receivables and related collateral (the "Credit Card Receivables") pursuant to section 552 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq*. (as amended, the "Bankruptcy Code").

## JURISDICTION AND VENUE

4.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This adversary proceeding constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(A), (E), and (K).

5.      Venue is proper pursuant to 28 U.S.C. § 1409(a).

6.      Pursuant to Rule 7008 of the Federal Rules of Bankruptcy Procedure, the Debtors consent to the entry of final orders or judgment by the bankruptcy court.

---

[2]     Simultaneously herewith, the Debtors are filing a motion to reject the contracts memorializing the USAV Transaction under section 365 of the Bankruptcy Code.  In the event such motion is granted, the Debtors intend to withdraw this Complaint.

**THE PARTIES**

7.      The Debtors are the second-largest airline group in Latin America.  Avianca is the largest airline in the Republic of Colombia (the third largest Latin American economy), a code-share partner of United Airlines, and a member of the Star Alliance which, with 26 members, is the world's largest global airline alliance.

8.      Upon information and belief, Defendant USAV is an exempted company incorporated and registered under the laws of the Cayman Islands.  USAV is a special purpose vehicle established to "purchase" credit card receivables from the Debtors and to pledge those receivables in order to obtain financing.

**FACTS**

9.      The Debtors operate an extensive network of routes from their primary hubs in Bogotá and San Salvador (in addition to other focus markets) and offer passenger services on more than 5,350 weekly flights to more than 76 destinations in 27 countries.  With approximately 18,900 employees and approximately $3.9 billion in annual revenues, the Debtors play a key role in the Latin American airline market.

10.      On March 20, 2020, the Republic of Colombia, consistent with what numerous other governments around the world have done, announced that it would close its airspace to address the spread of COVID-19.  As a result of the restrictions imposed by the Colombian government, as well as similar measures in various other of the Debtors' primary markets, on March 24, 2020 the Debtors announced that they were suspending all scheduled passenger flights from March 25, 2020.  This suspension is ongoing as of the time of this filing.

11.      On May 10, 2020 (the "Petition Date"), the Debtors filed voluntary petitions in this Court for relief under chapter 11 of the Bankruptcy Code.  The Debtors remain in possession

of their properties and continue to operate and manage their businesses as debtors-in-possession pursuant to 11 U.S.C. §§ 1107 and 1108.

12.    In 2017, Avianca retained an investment banker to assist it in securing new debt financing. The USAV Transaction was the result of these efforts.

13.    On December 12, 2017, the Debtors and USAV entered into that certain Contract Rights and Receivables Sale, Purchase and Servicing Agreement (the "RSPA").[3] The RSPA is governed by the laws of Colombia. *See* Ex. A at § 9.09.

14.    On its face, the RSPA purports to memorialize a sale of credit card receivables and related contract rights of the Debtors under card processing agreements with (i) American Express Travel Related Services Company, Inc. and American Express Payment Services Limited (the "AMEX Agreement") and (ii) BAC International Bank Inc. and its subsidiaries (the "Credomatic Agreement" and, together with the AMEX Agreement, the "Credit Card Processing Agreements") related to the purchases in the United States of airline tickets and related services with American Express, Visa, and MasterCard credit cards. *See* Ex. A at Recitals & § 2.01. The aggregate "purchase price" for the purported "sale" of the credit card receivables was (i) $150 million as an advance payment (the "Advance Payment") and (ii) future credit card receivables generated in any payment period less a reserved amount generally equal to the amount required for USAV's monthly amortization payments (the "Additional Purchase Price") under the USAV Loan Agreement (as defined below). *See* Ex. A at § 3.01(a).

---

[3]    A true and correct copy of the RSPA is attached to this Complaint as Exhibit A.

15.     Contemporaneously with the execution of the RSPA, USAV entered into a loan agreement (the "USAV Loan Agreement") with certain lenders (the "Lenders"), certain Debtors as Guarantors, and Citibank, N.A. as Administrative Agent and Collateral Agent (in such capacities, "Citibank").[4]  At the same time, Avianca, USAV, and Citibank entered into that certain Cash Management Agreement (the "Cash Management Agreement"), which governs the distribution of the proceeds of the credit card receivables.[5]

16.     Under the USAV Loan Agreement, the Lenders advanced to USAV $150 million—the same amount USAV used to make the Advance Payment under the RSPA.  *See* Ex. C at § 2.1.1.  To repay this loan, USAV retains a portion of the collections on credit card receivables—funneled through a New York-based bank account—sufficient to make the required amortization payments under the USAV Loan Agreement.  Any surplus above what is required to be repaid or reserved under the USAV Loan Agreement is remitted to the Debtors.  *See* Ex. A at § 2.01; Ex. C at § 2.02.

---

[4]  A true and correct copy of the USAV Loan Agreement is attached to this Complaint as Exhibit B. The USAV Loan Agreement is governed by New York law.  *See* Ex. B at § 8.9.1.

[5]  A true and correct copy of the Cash Management Agreement is attached to this Complaint as Exhibit C.  The Cash Management Agreement is also governed by New York law.  *See* Ex. C at § 3.08(a).

17.    To aid this Court in understanding the structure of the USAV Transactions,

the Debtors provide Figure 1 below:



**Figure 1**

18.    The RSPA lists a number of events that constitute a "Trigger Event"

thereunder.  *See* Ex. A at § 6.01.  Importantly, however, USAV's only recourse under the RSPA

during a "Trigger Event" is to demand payment from the Debtors of the outstanding balance under

the USAV Loan Agreement as liquidated damages (plus administrative costs associated with

unwinding the transaction).  *See* Ex. A at § 6.02.  The RSPA provides that once the outstanding

balance under the USAV Loan Agreement is paid, the purported "sale" will be unraveled, and the

rights to the credit card receivables will revert back to Avianca.  *Id.* ("Once the Liquidated Damages

is paid in full as provided for hereunder, the Purchaser may proceed to unwind the purchase and

sale by transferring back to the Seller the Contract Rights, the Receivables, and all Collections

derived therefrom.").

19.     In apparent recognition of the possibility that the transaction could be recharacterized as a secured financing, the Debtors, as grantor, and USAV, as secured party, entered on December 12, 2017 into that certain Pledge Over Contract Rights and Future Revenues governed by Colombian law (the "Colombian Back-Up Security Agreement") and that certain Costa Rican Back-Up Security Agreement governed by Costa Rican law (the "Costa Rican Back-Up Security Agreement") as prophylactic security agreements (the "Security Agreements").   The Security Agreements granted USAV a security interest in the credit card receivables in the event a court were to recharacterize the USAV Transaction as a financing rather than a sale.[6]   The security interest under the Colombian Back-Up Security Agreement extends to the Contract Rights under the Credit Card Processing Agreements, future revenues and collections derived therefrom, and "Proceeds" of the foregoing.  *See* Ex. D at § 2.01.  In contrast, the Costa Rican Back-Up Security Agreement does *not* state that the security interest extends to proceeds of the collateral listed therein.  *See* Ex. E.

20.     On May 11, 2020—a day after the Petition Date—Citibank issued "at the direction of the Required Lenders" a Notice of Retention Event to Avianca and USAV pursuant to section 2.09(b) of the Cash Management Agreement.[7]   Under the RSPA and the Cash Management Agreement, when a Retention Event has been declared, the Debtors are not entitled to receive the Additional Purchase Price.[8]   As a result, none of the credit card receivables are currently flowing to the Debtors as Additional Purchase Price.

---

[6]    True and correct copies of the Colombian Back-Up Security Agreement and Costa Rican Back-Up Security Agreement are attached to this Complaint as Exhibits D and E, respectively.  Nothing in this Complaint should be construed as an admission that the Security Agreements created valid, perfected liens under applicable laws. The Debtors reserve all rights to challenge the validity and/or perfection of any such liens.

[7]    A true and correct copy of the Notice of Retention Event is attached to this Complaint as Exhibit F.

[8]    *See* Ex. A at § 3.01(a)(ii) ("[N]o Additional Purchase Price shall be paid during the continuance of a Retention Event.").

## COUNT ONE
## (RECHARACTERIZATION OF THE USAV TRANSACTION)

21.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

22.     Under both Colombian and New York law, the economic substance of the USAV Transaction was that of a financing, and not a sale, because (among other reasons):

- Once USAV has repaid the loan outstanding under the USAV Loan Agreement in full, the right to receive and retain the credit card receivables reverts to Avianca.

- USAV incurred debt under the USAV Loan Agreement expressly for the purpose of "purchasing" the credit card receivables and, as a special purpose vehicle, lacked the economic capacity, without incurring such debt, to purchase the credit card receivables.

- The only benefit USAV received from the USAV Transaction was the repayment of the loan under the USAV Loan Agreement.

- The parties filed prophylactic security agreements recognizing that the USAV Transaction may be recharacterized as a financing.

- USAV's only remedy upon the occurrence of a "Trigger Event" under the RSPA is to demand the payment of USAV's outstanding loan balance, plus administrative costs.

23.     Accordingly, whether the Court applies New York or Colombian law, the economic reality of the USAV Transaction was not that of a sale, but that of a secured financing.

24.     Accordingly, the Court should recharacterize the USAV Transaction as a financing.

## COUNT II
## (DECLARATION THAT DEFENDANT HAS NO INTEREST IN
## ESTATE PROPERTY PURSUANT TO SECTION 552)

25.     Plaintiffs restate and reallege the allegations in the preceding paragraphs as if fully set forth herein.

26.     An actual controversy has arisen and now exists between USAV and the

Debtors as to whether USAV's prepetition security interests extend to the Credit Card Receivables.

*See* 28 U.S.C. § 2201.

27.     Section 552 of the Bankruptcy Code mandates that property acquired by the

debtor's estate after the commencement of a bankruptcy case is not subject to a prepetition lien

unless the property constitutes proceeds, products, offspring, or profits of the prepetition collateral.

Section 552(a) states, in relevant part:

> Except as provided in subsection (b) of this section, property acquired by
> the estate or by the debtor after the commencement of the case is not subject
> to any lien resulting from any security agreement entered into by the debtor
> before the commencement of the case.

11 U.S.C. § 552(a).  Section 552(b) states, in relevant part:

> . . . if the debtor and an entity entered into a security agreement before the
> commencement of the case and if the security interest created by such
> security agreement extends to property of the debtor acquired before the
> commencement of the case and to proceeds, products, offspring, or profits
> of such property, then such security interest extends to such proceeds,
> products, offspring, or profits acquired by the estate after the
> commencement of the case to the extent provided by such security
> agreement and by applicable nonbankruptcy law, except to any extent that
> the court, after notice and a hearing and based on the equities of the case,
> orders otherwise.

11 U.S.C. § 552(b).

28.     The Credit Card Receivables (and any proceeds thereof) constitute property

acquired by the Debtors' estate after the commencement of these chapter 11 cases.  In accordance

with section 552 of the Bankruptcy Code, USAV has no security interest in the Credit Card

Receivables unless USAV was granted a security interest in the proceeds, products, offspring, or

profits of the prepetition collateral, and unless the Credit Card Receivables constitute proceeds,

products, offspring, or profits of the prepetition collateral.

29.     In the case of the Costa Rican Back-Up Security Agreement, USAV was not granted a secured interest in any proceeds.   Thus, section 552(b) of the Bankruptcy Code is inapplicable.

30.     Although the Colombian Back-Up Security Agreement grants a security interest in "Proceeds" of the collateral listed therein, "Proceeds" is not defined therein.   Therefore, what constitutes "Proceeds" is determined by Colombian law.   Under Colombian Law 1676 of 2013, which regulates guarantees over moveable assets in Colombia, a grantor can pledge any assets or money received from the substitution, transformation, or transfer of the assets that are pledged as collateral (*bienes derivados y atribuibles*).   Thus, Colombian law recognizes that proceeds are limited to situations in which collateral is transformed into another form of property.   Here, the collateral pledged under the Colombian Back-Up Security Agreement is not being substituted or transformed into another form of property.   Rather, *new* property is being created through the Debtors' labor in generating Credit Card Receivables.   Thus, section 552(b) is inapplicable.

31.     For these reasons, the Court should declare that USAV does not have any security interest in the Credit Card Receivables (and the proceeds thereof) pursuant to section 552 of the Bankruptcy Code.

## **RELIEF REQUESTED**

**WHEREFORE**, Plaintiffs respectfully request that the Court enter a judgment: (i) recharacterizing the USAV Transaction as a secured financing; and (ii) declaring, pursuant to section 552(a) of the Bankruptcy Code, that USAV has no security interest in the Credit Card Receivables.

Dated:  June 23, 2020

**MILBANK LLP**

*/s/ Evan R. Fleck*
Dennis F. Dunne
Evan R. Fleck
55 Hudson Yards
New York, NY 10001-2163
Telephone:   (212) 530-5000
Facsimile:    (212) 530-5219

-and-

Gregory A. Bray
2029 Century Park East, 33rd Floor
Los Angeles, CA 90067
Telephone: (424) 386-4000
Facsimile:  (213) 629-5063

-and-

Aaron L. Renenger
1850 K Street NW, Suite 1100
Washington, D.C. 20006
Telephone:  (202) 835-7500
Facsimile:    (202) 263-7586

*Counsel for Debtors and*
*Debtors-In-Possession*

**EXHIBIT A**

EXECUTION VERSION

# WHITE & CASE

**Dated 12/12/2017**

# Contract Rights and Receivables Sale, Purchase and Servicing Agreement

among

## Aerovías del Continente Americano S.A. Avianca
as the Seller and the Servicer

and

## USAVflow Limited
as the Purchaser

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

# Table of Contents

**Page**

Article I Definitions and interpretation ........................................................................................ 2
Section 1.01    Definitions ........................................................................................................ 2
Section 1.02    Other Interpretive Provisions ........................................................................ 16

Article II Purchase, Sale and transfer ......................................................................................... 17
Section 2.01    Purchase, Sale and Transfer of the Contract Rights and Receivables ........... 17
Section 2.02    Effective Date .................................................................................................. 19
Section 2.03    Third Party Liability ....................................................................................... 20
Section 2.04    Restrictions on Sales, etc ................................................................................ 21
Section 2.05    Waiver of Rights ............................................................................................. 22
Section 2.06    Property Rights ............................................................................................... 22
Section 2.07    Nonpetition Covenant ..................................................................................... 22
Section 2.08    Languages ........................................................................................................ 22

Article III Consideration ............................................................................................................. 22
Section 3.01    Purchase Price ................................................................................................. 22
Section 3.02    Surcharge ......................................................................................................... 23
Section 3.03    Break Costs ...................................................................................................... 23
Section 3.04    Maintenance of Records .................................................................................. 23
Section 3.05    Payments to the Seller ..................................................................................... 24
Section 3.06    Payments by the Seller .................................................................................... 24

Article IV Representations and Warranties ................................................................................. 24
Section 4.01    Representations and Warranties of the Seller .................................................. 24
Section 4.02    Representations and Warranties of the Purchaser ........................................... 31
Section 4.03    Representations and Warranties of the Servicer ............................................. 31

Article V [Reserved.] .................................................................................................................. 34

Article VI Trigger events and remedies ...................................................................................... 34
Section 6.01    Trigger Events ................................................................................................. 34
Section 6.02    Remedies ......................................................................................................... 36
Section 6.03    Automatic Trigger Event ................................................................................ 37
Section 6.04    Retention Events and Adjustment Events ....................................................... 37
Section 6.05    Limitations under Colombian Laws ................................................................ 37

Article VII Payments and Taxes .................................................................................................. 37
Section 7.01    Payments to the Purchaser .............................................................................. 37
Section 7.02    Taxes. .............................................................................................................. 38

Article VIII [Reserved.] .............................................................................................................. 38

Article IX Miscellaneous ............................................................................................................ 38
Section 9.01    Rights Confined to Parties .............................................................................. 38
Section 9.02    Amendment or Waiver .................................................................................... 39
Section 9.03    Binding Upon Assigns .................................................................................... 39
Section 9.04    Waiver of Immunity ........................................................................................ 39
Section 9.05    Arbitration ....................................................................................................... 39
Section 9.06    Notices. ............................................................................................................ 39
Section 9.07    Construction .................................................................................................... 41
Section 9.08    Severability ...................................................................................................... 41
Section 9.09    GOVERNING LAW ........................................................................................ 41

**Page**

Section 9.10    Use of English Language ............................................................................................... 41
Section 9.11    Currency ...................................................................................................................... 41
Section 9.12    Counterparts ................................................................................................................ 41
Section 9.13    Limited Recourse ........................................................................................................ 41
Section 9.14    Third-Party Beneficiaries. ........................................................................................... 42
Section 9.15    The Agents ................................................................................................................... 42

<u>EXHIBITS</u>

Exhibit A        --        Form of AMEX Notice and Consent
Exhibit B        --        Form of Credomatic Notice and Consent
Exhibit C        --        Form of Seller Closing Certificate
Exhibit D        --        Form of Servicer Closing Certificate
Exhibit E        --        Form of Costa Rican Assignment Agreement

<u>SCHEDULES</u>

Schedule 3.01(b)    --    Projected Price Payment Schedule

## CONTRACT RIGHTS AND RECEIVABLES SALE, PURCHASE AND SERVICING AGREEMENT

**THIS CONTRACT RIGHTS AND RECEIVABLES SALE, PURCHASE AND SERVICING AGREEMENT**, dated December 12, 2017 (this "Agreement"), is made by and among **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Seller (in such capacity, the "Seller"), **USAVflow LIMITED**, an exempted company incorporated in the Cayman Islands with limited liability (the "Purchaser") and **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Servicer (the Servicer together with the Purchaser and the Seller, the "Parties" and each, individually, a "Party").

### R E C I T A L S:

The Seller is engaged in the business of air transportation of passengers and cargo and related services and provides its customers with the means of purchasing its goods and services through the use of Cards by having in place merchant credit card, and Card Processing Agreements with Card Processors. Such agreements provide for the processing of payments on behalf of the Seller of the goods and services that are purchased through the use of Cards;

The Seller entered into (a) the *CONVENIO REGIONAL DE AVIANCA-GRUPO BAC CREDOMATIC PARA EL PROCESAMIENTO DE TRANSACCIONES DE TARJETAS EN COMERCIOS AFILIADOS*, dated as of June 10, 2015 (the "Credomatic Master Agreement"), among the Seller, TACA International Airlines, S.A. and BAC International Bank, Inc. and its Subsidiaries ("Credomatic"), (b) the MERCHANT APPLICATION & AGREEMENT, dated March 17, 2016 (the "Credomatic Supplement") between Avianca, Inc., as agent on behalf of the Seller, and Credomatic, and (c) the Assignment of Rights Agreement, dated on or about the date hereof (the "Credomatic Assignment" and, collectively with the Credomatic Master Agreement and the Credomatic Supplement, including as modified pursuant to the Credomatic Notice and Consent (defined below), and all extensions, amendments, supplements, or replacements of such agreements among Credomatic and its affiliates and Avianca S.A. or any of its affiliates, including but not limited to the amendment to the Credomatic Master Contract dated November 29, 2017, collectively, the "Credomatic Contract"), among the Seller, TACA International Airlines, S.A., Avianca, Inc. and Credomatic, pursuant to which Credomatic agrees, among other things, to pay the Seller for goods and services of the Seller purchased in the United States with Visa® or MasterCard® Cards;

The Seller entered into the Airline Card Service Agreement, dated as of October 8, 2013 (as modified pursuant to the AMEX Notice and Consent (defined below), and all extensions, amendments, supplements, or replacements of such agreements among AMEX (defined below) and its affiliates and Avianca S.A. or any of its affiliates, collectively, the "AMEX Contract"), among American Express Travel Related Services Company, Inc. (together with its successors or assigns, "AMEX Inc.")), American Express Payment Services Limited (together with its successors or assigns, "AMEX Limited"; and, collectively with AMEX Inc., "AMEX"), the Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp., pursuant to which AMEX agrees, among other things, to pay the Seller for goods and services of the Seller purchased in the United States with the American Express® Card;

Article 887 of the Colombian Code of Commerce provides that any party to a mercantile contract of successive performance (*contratos de ejecución periódica o sucesiva*) can be replaced, partially or in whole, by a third party in all or part of the contractual positions under the contract;

Article 1959 of the Colombian Civil Code provides that any party may assign a receivable (*crédito*), provided that certain requirements set forth in Title XXV of such code are met;

In exchange for the Purchaser's payment of the Advance Payment and the Additional Purchase Price, the Seller hereby agrees, under said articles 887 and 1959, effective on the Effective Date to (i) sell and transfer to the Purchaser, and to be replaced by the Purchaser in the contractual positions under the Card Processing Agreements with respect to, all rights of the Seller in, to and under the Contract Rights; and (ii) sell and transfer to the Purchaser the Receivables;

The Seller and the Purchaser have agreed that the Advance Payment and the Additional Purchase Price for the Contract Rights and the Receivables shall be due and payable as provided herein;

For purposes of article 1618 of the Colombian Civil Code, it is the intention of the Seller to make a definitive and final transfer to the Purchaser of the Contract Rights and the Receivables which constitutes a "true sale"; and

The Parties have separately agreed that the Servicer will provide servicing duties in respect of the Contract Rights and the Receivables solely pursuant to the Undertaking Agreement as set forth therein.

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein contained, the Parties hereby agree as follows:

## ARTICLE I

### DEFINITIONS AND INTERPRETATION

**Section 1.01    Definitions**.  Except as otherwise provided herein, capitalized terms used herein (including in the foregoing Recitals) and not otherwise defined herein shall have the following meanings:

"Account Control Agreement" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Purchaser, the U.S. Account Bank and the Collateral Agent.

"Administration Agreement" means the administration agreement dated the date hereof entered into between the Purchaser and MaplesFS Limited.

"Additional Card Processing Agreement" means a Card Processing Agreement that is the subject of any Contract Rights and Receivables Addition.

"Additional Card Processor" means each Person who enters into a Notice and Consent with the Seller in connection with a Contract Rights and Receivables Addition.

"Additional Purchase Price" means, with respect to each Payment Period, the amount, if any, by which the Monthly Net Activity Amount for such Payment Period exceeds the amounts that will be required to be retained in the Collections Account or the Debt Service Reserve Account or disbursed from the Collections Account to Persons other than the Seller pursuant to Sections 2.01, 2.02, 2.03 and 2.04 of the Cash Management Agreement.

"Adjustment Event" means:

(a)    a Retention Event that has continued for three consecutive months;

(b)    any default, early amortization event or similar event shall occur with respect to any Indebtedness of the Seller or Avianca, Inc., Holdings or any Specified Subsidiary that exceeds in aggregate U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof; or

2

(c)      any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) for the payment of money in excess of U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Seller or Avianca, Inc., Holdings or any Specified Subsidiary and remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed.

"Adjustment Event Priority of Payments" means the priority of payments set forth in Section 2.03 of the Cash Management Agreement.

"Administrative Agent" means Citibank, N.A., and its successors and assigns in such capacity under the Purchaser Credit Agreement.

"Administrative Agent's Account" means the account maintained at Citibank, N.A., New York, New York USA, ABA No. 021000089, SWIFT: CITIUS33, Account No. 36852248, Account Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Purchaser in writing.

"Advance Payment" means the amount of $150,000,000, which is due and payable by the Purchaser to the Seller on the Effective Date, as provided in Section 3.01(a)(i), on account of the Transfer and Sale of the Contract Rights and the Receivables.

"Affiliate" means (i) with respect to the Seller and Holdings, means any Subsidiary of Holdings, and (ii) with respect to any other Person, another Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agents" means the Administrative Agent and the Collateral Agent.

"AMEX" has the meaning specified in the foregoing Recitals.

"AMEX Contract" has the meaning specified in the foregoing Recitals.

"AMEX Notice and Consent" means the written agreement dated as of, or on or about, the date hereof among the Seller, AMEX, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit A, pursuant to which (i) the transfer of the Contract Rights and Receivables from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to New York law notice of such transfer will be given to, and such transfer will be consented to by, AMEX.

"Anti-Corruption Laws" means (a) the United States Foreign Corrupt Practices Act of 1977, (b) the United Kingdom Bribery Act of 2010, and (c) any other similar Applicable Law relating to bribery or corruption.

"Anti-Money Laundering Laws" means any Applicable Law related to money laundering or terrorism financing, including (a) 18 U.S.C. §§ 1956 and 1957, and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 et seq., as amended by the Patriot Act, and its implementing regulations.

"Applicable Law" means any applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, approval, concession, grant, franchise, license, agreement, directive,

guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by (or any interpretation or administration of any of the foregoing by), any Governmental Authority, whether in effect as of the date hereof or hereafter.

"ARC" means Airlines Reporting Corporation, or any successor or replacement thereof.

"Authorized Signatory" means a person that has been duly authorized to execute or sign any Transaction Document or any document, certificate, or notice to be executed or signed under or in connection with any Transaction Document.

"Avianca, Inc." means Avianca, Inc., a New York corporation.

"Break Costs" means the amount (if any), of "Break Costs" as notified by the Administrative Agent pursuant to Section 2.08 of the Cash Management Agreement.

"Business Day" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"Capital Lease Obligations" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or other amount due under such lease prior to the first date upon which lease may be terminated by the lessee without payment of penalty.

"Card Processing Agreements" means the Credomatic Contract, the AMEX Contract, and each Additional Card Processing Agreement.

"Card Processors" means Credomatic, AMEX, and each Additional Card Processor.

"Cards" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Seller and its Affiliates.

"Cash Management Agreement" means that certain Cash Management Agreement, dated as of the date hereof, among the parties hereto, Citibank, N.A., as Administrative Agent and Citibank, N.A., as Collateral Agent.

"Change of Control" means

(a)    the direct or indirect sale or transfer (other than by way of merger or consolidation that is permitted hereby) of all or substantially all the assets of the Seller or Avianca, Inc. to another Person (in each case, unless such other Person is a Permitted Holder):

(b)    the consummation of any transaction (including by merger, consolidation, acquisition, or any other means) as a result of which Permitted Holders cease to be the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of Holdings (or its successors by merger, consolidation, or purchase of all or substantially all their assets) (on a fully diluted basis): or

(c)    Holdings shall cease to (i) own, directly or indirectly, beneficially and of record more than 50% of the Voting Stock of the Seller or Avianca, Inc. or any Specified Subsidiary (in each case, on a fully diluted basis) or (ii) have the power to direct or cause the direction of the management and policies of the Seller or Avianca, Inc. or any Specified Subsidiary.

4

"Collateral" means the property, rights and accounts that, in accordance with the RSPA Security Documents, from time to time, are subject to any Lien in favor of the Purchaser.

"Collateral Agent" means Citibank, N.A. in its capacity as collateral agent under the Purchaser Credit Agreement, or its successor in such capacity.

"Collateral Trustee" means Citibank, N.A., London Branch in its capacity as collateral trustee under the Purchaser Credit Agreement, or its successor in such capacity.

"Collections" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Seller, the Purchaser, or any other Person.

"Collections Account" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Collections Coverage Ratio" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the amount of the Surcharge plus the Monthly Amortization payable on the next succeeding Payment Date.

"Collections Origination Date" means, in respect of the Contract Rights, each date on which the obligation of the applicable Card Processor to pay Collections to the Purchaser accrues under the applicable Card Processing Agreement.

"Colombia" means the Republic of Colombia.

"Colombian Civil Code" means the Colombian *Código Civil*.

"Colombian Code of Commerce" means the Colombian *Código de Comercio*.

"Colombian Back-Up Security Agreement" means that certain Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof between the Seller and the Purchaser.

"Contract Rights" means the contract rights of the Seller under the Card Processing Agreements to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processors thereunder.  For the avoidance of doubt, the Contract Rights shall not include (a) any obligation or liability of the Seller under the Card Processing Agreements or arising in any manner therefrom; or (b) the rights of the Seller:

(a) to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

(b) to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreement;

(c) to request, to treat or to have access to confidential information pertaining to cardholder account information;

(d)    to request or receive a restricted card list pursuant to the relevant Card Processing Agreement;

(e)    to grant consent to a Card Processor to display or show the trademarks, logos or company names of the Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

(f)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

(g)    to handle all claims or complaints by a cardholder with respect to Card transactions;

(h)    to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreement; or

(i)    to receive any Collections derived from sales which are not Specified Sales.

"Contract Rights and Receivables Addition" has the meaning specified in Section 2.03(b).

"Contract Rights and Receivables Addition Date" means the date on which any Contract Rights and Receivables Addition is completed pursuant to Section 2.03.

"Costa Rican Assignment Agreement" means that certain Costa Rican law governed RSPA Assignment Agreement, dated as of the date hereof, between the Seller and the Purchaser, substantially in the form of Exhibit E hereto.

"Costa Rican Back-Up Security Agreement" means that certain Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof between the Seller and the Purchaser.

"Credomatic" has the meaning specified in the foregoing Recitals.

"Credomatic Contract" has the meaning specified in the foregoing Recitals.

"Credomatic Notice and Consent" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Seller, Credomatic, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B, pursuant to which (i) the transfer of the Contract Rights and Receivables under the Credomatic Contract from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"Custodian" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of this Agreement to carry out the duties and responsibilities provided in Article VII.

"Debt Service Reserve Account" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Debt Service Required Amount" means the "Debt Service Required Amount" as notified by the Administrative Agent pursuant to Section 2.06(a) of the Cash Management Agreement.

6

"<u>Defaulted Amount</u>" means the unpaid amount of any Contract Rights, Collections or Receivables which is due and payable by a Card Processor but which has not been paid by a Card Processor in accordance with the applicable Card Processing Agreement; provided that, for the avoidance of doubt, if the failure of such Card Processor to make such payment is permitted under the applicable Card Processing Agreement as a result of a breach by the Seller or its Affiliates under such Card Processing Agreement, then the unpaid amount of such Contract Rights, Collections or Receivables shall be deemed not to be a Defaulted Amount.

"<u>Delinquent</u>" means, with respect to any Contract Rights, Collections or Receivables, any scheduled payment required to be made by the Card Processor with respect thereto that is more than 10 days after its originally scheduled due date.

"<u>Dollars</u>" and "<u>$</u>" mean lawful money of the United States.

"<u>Effective Date</u>" means the date first set forth above.

"<u>Excluded Taxes</u>" means any of the following Taxes imposed on or with respect to the Recipient or required to be withheld or deducted from a payment to the Recipient, Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits, in each case, (a) imposed as a result of such Recipient being organized under the laws of, or having its principal office in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (b) that are Other Connection Taxes.

"<u>Expenses Agreement</u>" means the Expenses Agreement dated December 12, 2017, between the Purchaser and the Seller, providing for the Seller to pay certain fees to the Purchaser and to pay various fees and expenses incurred by or payable to the Purchaser, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Purchaser and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Purchaser.

"<u>Government Approvals</u>" means approvals, authorizations, permits, consents, exemptions and licenses of or by, and notices to or filings or registrations with, any Governmental Authority.

"<u>Governmental Authority</u>" means any nation or government, any state or municipality, any multilateral or similar organization or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to the government of Colombia, England, the Cayman Islands or any other jurisdiction.

"<u>Guarantee</u>" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "<u>Guarantee</u>" shall not include endorsements for collection or deposit in the ordinary course of business. The term "<u>Guarantee</u>" used as a verb has a corresponding meaning.

"<u>Hedging Obligations</u>" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"<u>Holdings</u>" means Avianca Holdings S.A., a Panamanian company.

"IFRS" means the International Financial Reporting Standards as adopted in the English language by the International Accounting Standards Board.

"Indebtedness" means with respect to any Person on any date of determination (without duplication):

      (a)     the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

      (b)     all Capital Lease Obligations of such Person;

      (c)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Effective Date);

      (d)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

      (e)     the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

      (f)     all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

      (g)     all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

      (h)     to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"Indemnified Person" has the meaning specified in the Undertaking Agreement.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of Seller under any Transaction Document and (b) to the extent not otherwise described in (a), Other Taxes.

"Insolvency Event" means, with respect to any Person (a) the making of a general assignment for the benefit of creditors, (b) the filing of a voluntary petition in bankruptcy, (c) being adjudged as bankrupt or insolvent, or having had entered against such Person an order for relief in any bankruptcy or insolvency proceeding, (d) the filing by such Person of a petition or answer seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under Law 1116 or any other Applicable Law, (e) the filing by such Person of an answer or other pleading admitting or failing to contest the material allegations of a petition filed against such Person in any proceeding specified in clause (g) below, (f) seeking, consenting to or acquiescing in the appointment of a custodian, trustee, receiver or liquidator of such Person, in or out of court, or of all or any substantial part of the assets of such Person or (g) the failure to obtain dismissal within 60 days of the commencement of any proceeding against such Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any Applicable Law, or the entry of any order appointing a trustee, liquidator or receiver of such Person or of such Person's assets or any substantial portion thereof; provided that an Insolvency Event with respect to the Seller, shall not be deemed to have occurred or to be continuing on account of the fact that the Seller has been placed and remains "under supervision" by the Colombian Superintendency of Ports and Transportation unless that entity imposes restrictions or requirements on the Seller, in addition to those in effect as of the Effective Date, that (i) increase the burdens on the Seller of complying with such "supervision" or (ii) are otherwise reasonably likely to have a Material Adverse Effect.

"Law 1116" means Colombian Law 1116 of 2006, which establishes the Corporate Insolvency Regime for Colombia.

"Lender" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Lien" means any *caución* (as defined in the Colombian Civil Code), *garantía mobiliaria*, lien, security interest, hypothecation, assignment, pledge, mortgage, deed of trust, or other charge, encumbrance, or claim of any kind, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or other conveyance in the nature thereof, having substantially the same economic effect as any of the foregoing and any filing of or agreement to give any public notice under any Applicable Law of any jurisdiction to evidence any of the foregoing.

"Liquidated Damages" has the meaning specified in Section 6.02.

"Loss" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to or arising from the inaccuracy or alleged inaccuracy of any representation and warranty made by the Seller or Servicer hereunder or under the Transaction Documents or any breach or alleged breach by the Seller or Servicer of any of its undertakings in this Agreement or any of the Transaction Documents or the occurrence of any Trigger Event or Adjustment Event, or otherwise as a result of the transactions contemplated hereby, including in pursuant to the Purchaser Finance Documents.

"Material Adverse Effect" means any material adverse effect on, or a material adverse change in: (a) the business, property, assets, liabilities, condition (financial or otherwise), results of operations or prospects of the Seller, (b) the ability of the Seller, the Servicer or Avianca, Inc. to perform its respective obligations under the Transaction Documents to which it is a party, (c) the rights and/or remedies the Purchaser is purported to have under any Transaction Document, (d) the economic or financial condition or stability (financial, political or otherwise) of the Cayman Islands, Colombia, Panama, Peru, Costa Rica or El Salvador, (e) the validity and enforceability of any Transaction Document, (f) the Liens granted to

the Purchaser pursuant to the Transaction Documents or the value thereof, or (g) the Contract Rights or the Receivables or the Collections in respect of either, including on the timeliness, payment frequency, collectability, amount, or ability to calculate the amount of such Collections.

"Monthly Amortization" means, with respect to each Payment Period, the sum of the amounts that will be required to be disbursed pursuant to Sections 2.02(a)(i), (b) and (c) of the Cash Management Agreement for such Payment Period.

"Monthly Net Activity Amount" means, with respect to any Payment Period, the sum of all Collections paid to the Collections Account on account of Net Activity with respect to the Contract Rights in such Payment Period.

"Monthly Settlement Amount" means "Principal Payment Amount" as defined in the Cash Management Agreement.

"Net Activity" means with respect to any Card Processor and the applicable Contract Rights in respect of any Card Processing Agreement, on any day or during any period, the total net amount that is, for purposes of the definition of "Monthly Net Activity Amount" and Section 4.01(n), payable to the Purchaser or, for purposes of Section 2.02(f), Section 3.01(c) and Section 3.02 hereunder, and Section 3.02(k) and Section 3.02(l) of the Undertaking Agreement, paid to the Collections Account by the Card Processor under its respective Card Processing Agreement on such day or during such period, which amount shall be equal to the sum of the total face value of all charges made by holders of Cards processed under such Card Processing Agreement relating to the Contract Rights in such period, minus all discounts, credits, and other amounts deducted by such Card Processor from the amounts due to the Purchaser on such day or during such period under such Card Processing Agreement pursuant to such Card Processing Agreement.

"New York Pass-Through Account" means the Dollar deposit account with account number 11925000 established and maintained by the Purchaser at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"Notice and Consents" means, collectively, the Credomatic Notice and Consent, the AMEX Notice and Consent and each Supplemental Notice and Consent.

"OFAC" means the U.S. Treasury Department Office of Foreign Assets Control.

"Officer's Certificate" means a certificate signed by an Authorized Signatory.

"Organizational Documents" means with regard to any Person:  (a) its articles of incorporation, deed of incorporation or other similar document, (b) its estatutos sociales, by-laws, articles of association or other similar document, (c) any certificate of designation or other document relating to the rights of preferred shareholders or other holders of capital stock of such Person, (d) any shareholder rights agreement, registration rights agreement, joint venture agreement or other similar agreement relating to such Person and (e) all resolutions and consents of the shareholders (or similar owners), the board of directors (or any committee thereof) or similar governing body of such Person.

"Other Connection Taxes" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Transaction Document).

"Other Taxes" means all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Transaction Document.

"Party" has the meaning specified in the introduction to this Agreement.

"Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, of the United States.

"Payment Date" means, for each Payment Period, the last day of the Payment Period.

"Payment Period" means the period commencing on the Effective Date and ending on the date that is one calendar month thereafter; and thereafter each period commencing on the last day of the preceding Payment Period and ending on the date one month thereafter, provided that (a) any Payment Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Payment Period shall end on the first preceding Business Day; and (b) any Payment Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Payment Period) shall end on the last Business Day of the calendar month at the end of such Payment Period; provided that until the Purchaser Credit Agreement obligations shall be paid in full, "Payment Period" shall mean "Interest Period" as defined in the Purchaser Credit Agreement.

"Permitted Holders" means any or all of the following:

(a)     Mr. Germán Efromovich, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and the respective children, grandchildren and spouses of any of the foregoing;

(b)     Roberto Jose Kriete Avila, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and their respective children, grandchildren and spouses of any of the foregoing;

(c)     the respective ancestors, descendants, spouses, heirs, legatees and successors of any Person described in paragraphs (a) and (b) above or in this paragraph (c);

(d)     the executor, administrator, or other representative of any Person described in paragraphs (a), (b) or (c) above who is deceased, incompetent, or incapacitated;

(e)     any trust or other entity in which any of the Persons described in paragraphs (a), (b), (c), or (d) above has an interest, whether or not fixed or exclusive; and

(f)     any Affiliate of any one or more of the persons described in paragraphs (a), (b), (c), (d) or (e) above.

"Permitted Termination" means, with respect to a Card Processing Agreement, any termination of the Card Processing Agreement which is (a) initiated by the Card Processor thereunder without the Seller's consent in accordance with the terms of the Card Processing Agreement, (b) is initiated by the Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of an Insolvency Event of the Card Processor thereunder, (c) is initiated (with the consent of the Administrative Agent, at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement) by the Seller without the consent of the Card Processor

thereunder in accordance with the terms of the Card Processing Agreement on account of a material breach by the Card Processor thereunder of the provisions of the Card Processing Agreement or (d) is requested by the Seller on account of its good faith dissatisfaction with the performance of the Card Processor thereunder and is agreed to by the Card Processor thereunder, provided that a Contract Rights and Receivables Addition for a replacement Card Processing Agreement has already been consummated prior to such termination.

"Person" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"Potential Event" means any event that is, or after notice or passage of time or both would be, a Trigger Event or an Adjustment Event, pursuant to clauses (b) and (c) of the definition thereof.

"Priority of Payments" means the Standard Daily Priority of Payments, the Standard Payment Date Priority of Payments, the Adjustment Event Priority of Payments or the Trigger Event Priority of Payments, as the context may require.

"Projected Price Payment" has the meaning specified in Section 3.01(b).

"Projected Price Payment Schedule" has the meaning specified in Section 3.01(b).

"Purchase Price" has the meaning specified in Section 3.01(a).

"Purchaser" has the meaning specified in the introductory paragraph hereof.

"Purchaser Credit Agreement" means that certain Loan Agreement, dated as of the date hereof, among the Purchaser, as borrower, the guarantors party thereto, the Administrative Agent, the Collateral Agent, the lenders party thereto from time to time.

"Purchaser Finance Documents" means the Purchaser Credit Agreement, all Credit Documents (as defined in the Purchaser Credit Agreement) and all other documents and instruments executed and/or delivered in connection therewith.

"Purchaser Finance Parties" means the Person(s) from time to time (i) providing financing or refinancing to, (ii) arranging financing or refinancing for, or (iii) acting as an agent with respect to financing or refinancing for, the Purchaser under the Purchaser Financing in respect of its funding or refinancing of the Advance Payment paid to the Seller under this Agreement, including the Administrative Agent and Collateral Agent and the Collateral Trustee.

"Purchaser Financing" means the financing arrangements provided to the Purchaser pursuant to the Purchaser Credit Agreement and the other Purchaser Finance Documents, which may be in the form of a loan, note or bond, pursuant to which the Purchaser funds the Advance Payment paid to the Seller under this Agreement and the financing arrangements, if any, pursuant to which the Purchaser refinances from time to time the indebtedness the Purchaser shall have incurred pursuant to the Purchaser Credit Agreement and the other Purchaser Finance Documents.

"Receivables" means any and all Collections accrued under the Card Processing Agreements that are due on account of Specified Sales from (a) AMEX or Credomatic to the Seller immediately prior to giving effect to this Agreement on the Effective Date (and due to the Purchaser immediately upon giving effect to this Agreement on the Effective Date) and (b) each Additional Card Processor to the Seller immediately prior to giving effect to this Agreement and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date (and due to the Purchaser immediately upon

giving effect to this Agreement and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date).

"Receivables Files" means, with respect to each of the Contract Rights and Receivables, the following:

(a)    the electronic ledgers used by the Seller or the Servicer as a master record of the Contract Rights and the Collections and all documents representing the Receivables, including all billing data and other related records;

(b)    executed copies of all agreements and other documentation governing the Contract Rights and the Receivables and all amendments, supplements or modifications to any such agreements and/or other documentation; and

(c)    any and all other documents and/or records that the Seller or the Servicer shall keep on file in accordance with its normal policies and procedures with respect to the Contract Rights and the Receivables and similar contract rights and receivables.

"Recipient" means (a) the Administrative Agent, (b) the Purchaser, (c) the Servicer or (d) any other Person receiving a payment from the Seller hereunder or a disbursement pursuant hereto or pursuant to the Cash Management Agreement, as applicable.

"Reference Period" means, at any date of determination, the most recently completed four consecutive fiscal quarters of Holdings on or immediately prior to such date.

"Related Party" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"Required Lenders" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Retention Event" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"RSPA Security Documents" means the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, all additional security documents as might be required for any necessary Contract Rights and Receivables Addition and all other documents, instruments and filings to be executed and delivered by the Seller and/or the Purchaser, in connection with such agreements and the transactions contemplated thereby.

"Sale" means the transaction occurring on account of the Seller's selling, assigning, and transferring to the Purchaser the Contract Rights and the Receivables hereunder.

"Sales Slip" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"Sanctioned Jurisdiction" means any country or territory that is the subject of Sanctions broadly restricting or prohibiting dealings with, in or involving such country or territory.

"Sanctioned Person" means any individual or entity that is, or is owned or controlled by Persons that are, (a) identified on a Sanctions List, (b) organized, domiciled or resident in a Sanctioned Jurisdiction, (c) with whom dealings are restricted or prohibited under Sanctions or (d) otherwise the subject or target of any Sanctions.

"Sanctions" means any economic or financial sanctions or trade embargoes imposed, administered or enforced by (a) the United States (including OFAC and the United States Department of State), (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) the United Kingdom (including Her Majesty's Treasury) or (e) any Governmental Authority in the jurisdiction of the Seller or its Affiliates.

"Sanctions List" means the list of designated individuals or entities that are the subject of Sanctions, including, without limitation, in (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (b) the Consolidated United Nation Security Council Sanctions List, (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union and (d) the Consolidated List of Financial Sanctions Targets in the U.K. maintained by Her Majesty's Treasury of the United Kingdom.

"Seller" has the meaning specified in the introductory paragraph hereof.

"Seller's Account" means account of the Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías de Continente Americano S.A. Avianca.

"Servicer" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the Undertaking Agreement to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

 "Solvent" means, when used with respect to any Person, that at the time of determination: (a) the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) it is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) it has capital sufficient to carry on its business as conducted and as proposed to be conducted; (e) it is "solvent" as such term is defined in the Uniform Commercial Code as in effect in the State of New York and is in compliance with each applicable solvency standard under the Applicable Laws of each jurisdiction other than the United States or any state, commonwealth or territory thereof where it is organized or maintains assets or conducts its business; and (f) with respect to the Seller that, at the time of determination its financial status (i) is sufficiently sound to enable it to comply with its existing obligations under the Transaction Documents, (ii) has not resulted in, and is not likely to lead to, a dissolution status of the Seller under article 457(2) of the Colombian Code of Commerce or otherwise, and or (iii)  has not triggered, and is not expected to trigger, an Insolvency Event of the Seller including under article 9 of Law 1116.

"Specified Sales" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Purchaser and the Collateral Agent from time to time as provided in the Notice and Consent by and among, inter alia, the Purchaser, the Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "Specified Sales" shall include only "Specified Sales" as defined in the Notice and Consent relating to such Card Processing Agreement.

"Specified Subsidiary" means each of TACA International Airlines, S.A., a company organized under the laws of El Salvador, Avianca Costa Rica S.A., a company organized under the laws of Costa

Rica, and Trans American Airlines, S.A., a company organized under the laws of Peru, and any successors or assigns of each of the foregoing.

"Standard Daily Priority of Payments" means the priority of payments set forth in Section 2.01 of the Cash Management Agreement.

"Standard Payment Date Priority of Payments" means the priority of payments set forth in Section 2.02 of the Cash Management Agreement.

"Subsidiary" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person.

"Supplemental Notice and Consent" means a Notice and Consent among the Card Processor and its applicable Affiliates, the Seller and its applicable Affiliates, the Purchaser and the Collateral Agent, in such form as the Collateral Agent shall approve in its sole discretion, with respect to any Card Processor in connection with any Contract Rights and Receivables Addition.

"Surcharge" means  (a) "Interest Amount" as defined in the Cash Management Agreement or (b) "Interest Accrued" as defined the Cash Management Agreement.

"Taxes" means all present and future sales, use, gross receipts, general corporation, franchise, income, mortgage, profits, withholding, intangibles, property (tangible and intangible), privilege, license, value added, ad valorem, capital, severance production, excise, stamp and other taxes, duties and other similar government charges and assessments imposed by or on behalf of any government or taxing authority (including interest, fines or penalties thereon and additions thereto).

"Transaction Documents" means, collectively, this Agreement, the Costa Rican Assignment Agreement, the Expenses Agreement, the Administration Agreement, the Undertaking Agreement, the RSPA Security Documents, the Cash Management Agreement, the Card Processing Agreements, each Notice and Consent, and each other transfer, assignment or other document executed and delivered by the Seller and/or the Servicer in connection with the foregoing.

"Transfer" means (i) in respect of the Contract Rights, the "cesión de contrato" set forth in article 887 of the Colombian Code of Commerce; and (ii) in respect of the Receivables, the "cesión"  set forth in article 1959 of the Colombian Civil Code, all of which, pursuant to the term of this Agreement.

"Trigger Event Priority of Payments" means the priority of payments set forth in Section 2.04 of the Cash Management Agreement.

"Trigger Events" means each of the events specified in Section 6.01.

"U.K. Account Bank" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders.

"U.K. Account Charge" means the English law security agreement dated as of the date hereof and entered into between the Purchaser as chargor, the Collateral Trustee and the U.K. Account Bank.

"U.S. Account Bank" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"Undertaking Agreement" means the Receivables Maintenance Agreement, dated the date hereof, by and among the Seller, the Servicer and the Purchaser.

"United States" and "U.S." means the United States of America and the territories and possessions thereof.

"Unsettled Balance" means, at any date of determination, the difference of (a) the Advance Payment less (b) the aggregate Monthly Settlement Amounts distributed to the Administrative Agent for the benefit of the Lenders and by the Administrative Agent to the Lenders in accordance with the Purchaser Credit Agreement up to such time in accordance with the applicable Priority of Payments.

"Unwind Amount" means an amount equal to, at any date of determination, the sum, without duplication, of (a) the Unsettled Balance, plus (b) the accrued and unpaid Surcharge on the Unsettled Balance through the date of payment of the Unsettled Balance in full, plus (c) all other amounts (including enforcement costs and expenses) due and payable to the Agents or the Collateral Trustee (for their own accounts or for the account or benefit of any other Person), including the Indemnified Persons (other than the Purchaser), plus (d) any Break Costs.

"Voting Stock" of a Person means all classes of capital stock or other interests (including partnership interests) of such Person then-outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

**Section 1.02    Other Interpretive Provisions**.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices, and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)    Unless otherwise expressly provided herein:   (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any Transaction Document, and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

(h)    The Transaction Documents are the result of negotiations among and have been reviewed by counsel to the Purchaser, the Seller and the Servicer and are the products of all of such Parties.  Accordingly, they shall not be construed against any Party merely because of any such Party's involvement in their preparation.

(i)    The specification of dollar amounts hereunder in U.S. Dollars shall be deemed to include U.S. Dollars and the equivalent thereof in other currencies.

## ARTICLE II

### PURCHASE, SALE AND TRANSFER

**Section 2.01    Purchase, Sale and Transfer of the Contract Rights and Receivables**.  Subject to the terms and conditions of this Agreement, in reliance on the recitals, agreements, representations, and warranties herein contained and made pursuant hereto:

(a)    In accordance with article 905 of the Colombian Code of Commerce and other Applicable Law:

(i)    effective on the Effective Date the Seller sells to the Purchaser, and the Purchaser buys from the Seller, finally, definitively, and irrevocably, the existing (as of the date hereof) Contract Rights arising under and the Receivables accrued under the AMEX Contract and the Credomatic Contract; and

(ii)    effective on each applicable Contract Rights and Receivables Addition Date, and subject to the conditions precedent set forth in Section 2.03 herein, the Seller shall sell to the Purchaser, and the Purchaser shall buy from the Seller, finally, definitively, and irrevocably, the Contract Rights arising under and the Receivables accrued under the applicable Additional Card Processing Agreement.

(b)    In accordance with articles 887 *et. seq.* of the Colombian Code of Commerce and other Applicable Law:

(i)    effective on the Effective Date, the Seller shall, for the purpose of perfecting the Transfer to the Purchaser of the existing Contract Rights arising under the AMEX Contract and the Credomatic Contract, execute the applicable Notice and Consents relating thereto with the intention that, from the date of execution of the applicable Notice and Consents, for all legal and contractual purposes the Contract Rights under the AMEX Contract and the Credomatic Contract will belong to the Purchaser, as its final, definitive and indefeasible property with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code; and

(ii)    effective on each applicable Contract Rights and Receivables Addition Date, the Seller shall, for the purpose of perfecting the Transfer to the Purchaser of the Contract Rights arising under each Additional Card Processing Agreement, execute the applicable Notice and Consent relating thereto with the intention that, as from the date of execution of the applicable Notice and Consent, for all legal and contractual purposes, the Contract Rights under such Additional Card Processing Agreement will belong to the Purchaser, as its final, definitive and indefeasible property with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code.

(c)    In accordance with article 1959 of the Colombian Civil Code and other Applicable Law:

(i)    effective on the Effective Date, the Seller hereby acknowledges that it has, for the purposes of perfecting among the Parties the Transfer of the Receivables accrued under the

AMEX Contract and the Credomatic Contract, delivered to the Purchaser a copy of the AMEX Contract and a copy of the Credomatic Contract, respectively, and the Purchaser hereby acknowledges receipt of a copy of the AMEX Contract and a copy of the Credomatic Contract, with the intention of perfecting the transfer of the Receivables under the AMEX Contract and the Credomatic Contract among the Parties and producing the result that, as from the Effective Date, for all legal and contractual purposes, the Receivables under the AMEX Contract and the Credomatic Contract will belong to the Purchaser, as its final, definitive and indefeasible property; and

(ii)      effective on each applicable Contract Rights and Receivables Addition Date, the Seller shall, for the purpose of perfecting among the Parties the Transfer of the Receivables accrued under each Additional Card Processing Agreement, deliver to the Purchaser a copy of the applicable Additional Card Processing Agreement and execute the applicable Notice and Consent, and the Purchaser will acknowledge receipt of a copy of the applicable Additional Card Processing Agreement, with the intention of perfecting the transfer of the Receivables accrued under the applicable Additional Card Processing Agreement among the Parties and producing the result that, as from the applicable Contract Rights and Receivables Addition Date, for all legal and contractual purposes, the Receivables accrued under the Additional Card Processing Agreement will belong to the Purchaser, as its final, definitive and indefeasible property.

(d)      In accordance with article 1960 et. seq. of the Colombian Civil Code and other Applicable Law, for all legal and contractual purposes:

(i)      the Transfer of the Receivables accrued under the AMEX Contract and the Credomatic Contract will be binding on each applicable Card Processor upon the execution of the applicable Notice and Consent; and

(ii)      the Transfer of the Receivables accrued under each Additional Card Processing Agreement will be binding on the Card Processor party thereto upon the execution of the applicable Notice and Consent.

(e)      The Parties intend that the Transfer and the Sale shall be, and shall be treated by the Parties and all third parties as, a final, definitive, and irrevocable sale to the Purchaser from the Seller and not as a lending transaction.

(f)      The Parties do not intend that the Transfer and the Sale includes the sale of entire contractual position of the Seller under the Card Processing Agreements.  To the contrary, without any prejudice whatsoever of the right and title of the Purchaser to the Contract Rights and the Receivables and of the Purchaser to enforce the Contract Rights of the Seller against the Card Processors, the Seller will remain with and retain the contract rights under the Card Processing Agreements other than the Contract Rights and will retain the contractual relationship with the Card Processors.

(g)      The Seller hereby authorizes the Purchaser on the Effective Date and from time to time thereafter to file one or more UCC-1 financing statements pursuant to the Uniform Commercial Code as in effect in any state of the United States, for the purpose of perfecting the sale of the Contract Rights and Receivables sold hereunder under the Applicable Laws of the United States and the states thereof.

(h)      With respect to the Contract Rights and Receivables relating to the Credomatic Contract, simultaneously herewith, the applicable parties thereto shall execute and deliver the Costa Rican Assignment Agreement, to perfect the sale of such Contract Rights and Receivables under Costa Rican law.

(i)      The Seller and the Servicer agree that they shall from time to time at the Seller's cost, execute and deliver all such additional assignments and other transfers as may be requested by the Purchaser or the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement) necessary or desirable under Applicable Law to perfect the title to the Contract Rights and the Receivables in the Purchaser.

**Section 2.02**      **Effective Date**.  The Transfer and the Sale of the existing Contract Rights and Receivables under the AMEX Contract and the Credomatic Contract shall be effective as from the Effective Date upon satisfaction of each of the conditions precedent set forth in this Section 2.02:

(a)      *Purchase Price:* payment by the Purchaser to the Seller of the Advance Payment.

(b)      *Closing documents*:  the Purchaser and the Administrative Agent shall have received the following documents in form and substance satisfactory to the Purchaser and the Lenders:

(i)      Each Transaction Document, duly executed and delivered by the parties thereto, each of which shall be in full force and effect;

(ii)      Legal opinions dated the Effective Date and addressed to the Purchaser, the Administrative Agent, the Lenders and the other Purchaser Finance Parties from (i) Costa Rican counsel, (ii) Colombian counsel to the Seller, (iii) Cayman counsel to Seller and (iv) New York counsel to the Seller, in each case in form and substance satisfactory to the Purchaser Finance Parties;

(iii)      a certificate dated the Effective Date, addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties and signed by a duly Authorized Signatory on behalf of each of the Seller and Avianca, Inc. in the form set forth in Exhibit C and Exhibit D, respectively;

(iv)      Audited consolidated financial statements of Holdings (including a balance sheet, statement of operations and statement of cash flows) as of and for the fiscal year ended on December 31, 2016.

(c)      *MAE*:  There shall not have occurred a Material Adverse Effect.

(d)      *No Trigger Event or Adjustment Event*:  No Potential Event, Trigger Event or Adjustment Event shall have occurred and be continuing.

(e)      *No Retention Event:* No Retention Event shall have occurred and be continuing.

(f)      *Collections Activity Statement.*  The Seller shall have delivered to the Purchaser and the Administrative Agent a statement, in the form of the Monthly Servicer's Statement required pursuant to Section 3.02(k) of the Undertaking Agreement (for the month ending December 6th, 2017) and otherwise in form and substance acceptable to the Lenders, regarding Collections in respect of the Contract Rights, including Collections derived on account of Net Activity with respect to each Card Processor, and certain other matters, certified as accurate and truthfully prepared;

(g)      *Authorizations*:  The Purchaser and the Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Applicable Law in connection with execution of the Transaction Documents and the performance of their obligations thereunder.

(h)      *Collections*:  The Purchaser and the Administrative Agent shall have received all data, reports, and/or other documentation fairly stating tthat the gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in

2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and that the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385, and the Purchaser Finance Parties shall be reasonably satisfied that the net amounts due and payable on the Collections shall on an annual basis be sufficient to support the Loans (as defined in the Purchaser Credit Agreement).

(i)      *Collections Agreements*:  The Card Processing Agreements and the Notice and Consents shall be in full force and effect, no default or event of default shall have occurred and be continuing thereunder, and the Purchaser shall have legal title to the Contract Rights and the Receivables and the Colombian Back-Up Security Agreement and Costa Rican Back-Up Security Agreement shall each have been registered as a moveable guarantee in their respective jurisdictions.

(j)      *Bondholder Consents*:  The holders of the ordinary bonds of the Seller, dated September 4, 2009, shall have provided all consents to the transactions contemplated hereby as are required to permit such transactions under the documents evidencing and securing such bonds, in the form of the Acta Asamblea Extraordinaria de Tenedores de los Bonos Emitidos por Aerovías del Continente Americano Avianca S.A. Emision Agosto de 2009, dated October 19, 2017.

(k)      *Accuracy of Representations*:  The representations and warranties by the Seller and the Servicer in this Agreement and the other Transaction Documents shall be true and correct as of the Effective Date.

(l)      *RSPA Security Documents*:  The Purchaser and the Seller shall each have taken all actions, and provided evidence thereof to the Administrative Agent, required to be taken by them on or prior to the Effective Date pursuant to the RSPA Security Documents, and there shall be no outstanding governmental filings (including financing statements under the Uniform Commercial Code) against any of the Contract Rights or the Receivables or the Collections, including the following: UCC-1 and other statements under the Uniform Commercial Code shall have been filed in the appropriate filing office, the Colombian Back-Up Security Agreement shall have been registered in the moveable guarantee registry of Colombia as a movable guarantee, and the Costa Rican Back-Up Security Agreement shall have been registered in the moveable guarantee registry of Costa Rica as a movable guarantee.

(m)      *Know Your Customer*:   The Purchaser, the Administrative Agent and each Purchaser Finance Party shall have received all necessary credit and other internal approvals, completed its due diligence with scope and results satisfactory to it in its sole discretion and received "know your customer" approval for the Servicer, the Seller and each Card Processor required under applicable client onboarding procedures or "know your customer" or anti-money laundering rules and regulations, including the Patriot Act.

(n)      *Certificate of Good Standing*: such documents and other certifications that the Administrative Agent, acting at the direction of the Lenders in accordance with the Purchaser Credit Agreement, may reasonably require to evidence that Seller and Servicer are duly organized or formed and that Seller and Servicer are validly existing, in good standing and qualified to engage in business in each jurisdiction where their conduct of business requires such qualification.

(o)      *Process Agent Acceptance*: evidence that the Process Agent mentioned in Section 3.10 of the Cash Management Agreement has agreed to receive process in the manner specified therein, in form reasonably satisfactory to the Lenders;

**Section 2.03**    **Third Party Liability**.

(a)        In consideration for the payment of the Purchase Price, including but not limited to all payments made pursuant to <u>Section 3.01(f)</u>, (i) pursuant to article 1965 of the Colombian Civil Code the Seller shall warrant to the Purchaser the existence of the Receivables; and (ii) pursuant to article 890 of the Colombian Code of Commerce, the Seller shall warrant to the Purchaser the existence and validity of the Card Processing Agreements.  Purchaser shall bear the risk of the insolvency of a Card Processor solely to the extent set forth in <u>Section 3.01(f)</u>.

(b)        As a consequence of the foregoing, upon the termination of any Card Processing Agreement pursuant to a Permitted Termination, or upon any of them being declared illegal or invalid or, for any reason whatsoever, if the Card Processing Agreements cease to exist, the Seller shall within 10 days of such termination, illegality, invalidity, or extinguishment, as the case may be, take all actions as shall be necessary or appropriate to effect a replacement (a "**Contract Rights and Receivables Addition**") of the Contract Rights impaired as a result of such termination, illegality, invalidity, or extinguishment, as the case may be, by:

(i)        entering into a new Card Processing Agreement and a Notice and Consent with respect thereto to complete a Transfer and Sale of the Contract Rights and Receivables relating thereto;

(ii)        delivering to the Administrative Agent and the Purchaser legal opinions dated the date of the Contract Rights and Receivables Addition Date and addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties from Colombian counsel to the Seller, and such other counsel as the Purchaser Finance Parties shall reasonably request, in each case in form and substance satisfactory to the Purchaser Finance Parties;

(iii)        delivering to the Administrative Agent and the Purchaser a certificate dated the date of the Contract Rights and Receivables Addition Date, addressed to the Purchaser, the Administrative Agent and the other Purchaser Finance Parties and signed by a duly Authorized Signatory on behalf of each of the Seller in the form set forth in <u>Exhibit C</u>, respectively;

(iv)        confirming to the Administrative Agent that the Purchaser and the Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Applicable Law in connection with execution of the documents necessary for the Contract Rights and Receivables Addition and the performance of their obligations thereunder and hereunder;

(v)        confirming to the Administrative Agent and the Purchaser that the related Notice and Consents shall be in full force and effect, and no default or event of default shall have occurred and be continuing thereunder;

(vi)        granting a back-up security interest in favor of the Purchaser over the new Card Processing Agreement and the Contract Rights thereunder; and

(vii)        delivering to the Purchaser and the Administrative Agent or assuring that the Purchaser and the Administrative Agent have otherwise received any documentation that the Purchaser or the Administrative Agent (acting at the direction of the Lenders in accordance with the Purchaser Credit Agreement) shall have reasonably determined is necessary to effect such Contract Rights and Receivables Addition, in the form and substance satisfactory to the Purchaser and the Administrative Agent.

**Section 2.04        Restrictions on Sales, etc**.  The Seller shall not sell, transfer, or assign, or purport to sell, transfer, or assign, the Contract Rights or the Receivables (or any portion thereof) to any Person other than the Purchaser, or to create or suffer to exist a Lien on any Contract Rights, any Receivables or the Collections, except in favor of the Purchaser.

Section 2.05   **Waiver of Rights**.  The Seller unconditionally and irrevocably waives any rights it may claim to have under article 870 of the Colombian Code of Commerce and under articles 1546 and 1609 of the Colombian Civil Code or otherwise to rescind this Agreement or any other Transaction Document for any reason or to refrain from complying with its obligations hereunder (including as a result of the failure by the Purchaser to satisfy any of its obligations hereunder, including the making of any payment pursuant to Section 3.01(a)(ii)).   As a result of such waiver, the Seller understands, acknowledges, and agrees that:  (a) its remedies in the case of a failure by the Purchaser to make one or more payments of Additional Purchase Price hereunder shall be limited to the right to make a claim against the Purchaser for payment of any Additional Purchase Price payments that are past due and unpaid, and (b) the Seller shall not be entitled to and shall not attempt to, under any circumstances, reclaim any right, title, or interest in, to or under any of the Contract Rights or the Receivables.

Section 2.06   **Property Rights**.

(a)      As a consequence of the Transfer and the Sale of the Contract Rights as provided for in Section 2.01 above, the Purchaser will have the sole, exclusive and unencumbered right to receive all Collections derived from (i) the Receivables, and (ii) the Contract Rights accrued now or hereafter under the Card Processing Agreements.

(b)      The Seller acknowledges and agrees that the Contract Rights, Receivables and Collections referred to in (a) shall under no circumstances be considered the property of the Seller, and that the Purchaser's use of said Collections shall not be restricted in any way by the terms of this Agreement, any other Transaction Document or Applicable Law.

Section 2.07   **Nonpetition Covenant**.  The Seller shall not acquiesce in, petition for, or otherwise invoke or cause the Purchaser to invoke the process of any Governmental Authority for, the commencement or continuation of a case or proceeding concerning the Purchaser under any Cayman Islands, Colombian, or other bankruptcy, insolvency, or similar Applicable Law, or the appointment of a receiver, liquidator, purchaser, custodian, sequestrator, or other similar official of the Purchaser or for any substantial part of its property, or the ordering of the winding-up or liquidation of the affairs of the Purchaser.

Section 2.08   **Languages**.  This Agreement is being signed in the English and Spanish languages.  In the event of any conflict between the English and the Spanish versions of this Agreement, the Spanish version shall prevail.

**ARTICLE III**

**CONSIDERATION**

Section 3.01   **Purchase Price**.

(a)      In consideration of the Sale and Transfer of the Contract Rights, the Receivables and the Collections derived therefrom, the Purchaser shall pay to the Seller a purchase price (the "Purchase Price") in an amount equal to the sum of the Advance Payment and the Additional Purchase Price with respect to each Payment Period, which shall be due and payable, as follows:

(i)      The Advance Payment, which shall be due and payable on the Effective Date.

(ii)      The Additional Purchase Price with respect to each Payment Period, which shall be due and payable in installments, (A) as provided in Section 2.01(c), Section 2.02(f) and Section 2.03(e) of the Cash Management Agreement and (B) payable pursuant to Section 3.01(f); *provided* that no Additional Purchase Price shall be paid during the continuance of a Retention Event, an

Adjustment Event or a Trigger Event.  The Seller hereby acknowledges and irrevocably agrees to the payment of the Additional Purchase Price on such terms and conditions.

(b)      Without affecting the Purchaser's obligations set forth above in clause (a)(ii), based on the information of the Collections provided by the Seller to the Purchaser concerning the historical collections the Seller has received from the Card Processors on account of Specified Sales, the Purchaser expects, but will not have the obligation to make, Additional Purchase Price payments according to the  payment schedule set forth in Schedule 3.01(b) (the "Projected Price Payment Schedule" and each of the projected payments included in the Projected Price Payment Schedule, a "Projected Price Payment").

(c)      Given that the installments of the Additional Purchase Price shall be paid based on the actual amounts paid to the Collections Account on account of Net Activity with respect to the Contract Rights in each Payment Period as from the date hereof, the Parties hereby acknowledge and irrevocably agree that the Projected Price Payment Schedule and Projected Price Payments shall be adjusted automatically on each Payment Date to reflect the actual amount of each installment of Additional Purchase Price due as provided in clause (a)(ii) above.

(d)      For the avoidance of doubt, the payment by the Purchaser to the Seller of the Purchase Price shall be consideration for the Sale and Transfer of the existing Contract Rights and the Receivables hereunder, which shall be effective on the Effective Date with respect to the AMEX Contract and the Credomatic Contract and shall be effective on the applicable Contract Rights and Receivables Addition Date with respect to each Additional Card Processing Agreement.

(e)      The Seller hereby irrevocably waives its right to request the resolución of the Agreement, pursuant to article 1546 of the Colombian Civil Code and article 870 of the Colombian Code of Commerce, upon any failure of the Purchaser to pay when due the Additional Purchase Price. As a consequence, upon any such breach, the Seller irrevocably consent and agrees that its sole remedy shall be a claim for monetary damages hereunder.

(f)      Notwithstanding anything to the contrary in this Agreement, to the extent that the amounts that have been paid by Purchaser to Seller, or disbursed to the Seller hereunder, as Additional Purchase Price have been adversely affected by any default in payment by any Card Processor, the Purchaser shall pay the Seller such defaulted amount after disbursement to the Purchaser and the Administrative Agent and the payment in full to the Purchaser Finance Parties of all of the obligations under the Purchaser Financing.

**Section 3.02      Surcharge**.  The Surcharge, which is deducted from the Net Activity in the calculation the Additional Purchase Price, is intended to compensate the Purchaser for making the Advance Payment in advance of the Collections Origination Dates with respect to the Contract Rights purchased hereunder.

**Section 3.03      Break Costs**.  The Seller shall pay to the Purchaser, by depositing such amounts in the Collections Account, the Break Costs if all or any part of any amount of any Monthly Settlement Amount is disbursed to the Administrative Agent pursuant to the Cash Management Agreement or if all or any part of the Liquidated Damages (and applied by the Administrative Agent to the component of the Liquidated Damages calculated by reference to the Unsettled Balance) is disbursed to the Administrative Agent pursuant to the Cash Management Agreement on a day other than a Payment Date.

**Section 3.04      Maintenance of Records**.  The Purchaser shall keep books and records as required to comply with the Cayman Islands Companies Law (2013 Revision), Section 59(1).

Section 3.05   **Payments to the Seller**.  Whenever any amount is due, owing or payable to the Seller under or in connection with this Agreement or the other Transaction Documents, payment of such sum into the Seller's Account shall constitute complete discharge of the obligation to pay such amounts. The Seller hereby irrevocably acknowledges and agrees that any amount due and payable from time to time by the Purchaser shall be payable in accordance with the applicable Priority of Payments.

Section 3.06   **Payments by the Seller**.  Whenever any amount is due, owing or payable by the Seller under or in connection with this Agreement or the other Transaction Documents, all payments by the Seller to any Party hereunder shall be calculated and made without (and free and clear of any deduction for) set-off, counterclaim, defense or recoupment.  The obligations of the Seller under this Agreement are independent from, and are not affected by, any obligations, rights or remedies arising out of or in connection with any other agreements among the Parties.

# ARTICLE IV

# REPRESENTATIONS AND WARRANTIES

Section 4.01   **Representations and Warranties of the Seller**.  The Seller hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Seller pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement and the other Transaction Documents) on the date hereof, the date of each Contract Rights and Receivables Addition Date and the date of each Collections Origination Date, that:

(a)      It has been duly organized, is validly existing as a sociedad anónima in good standing under the Applicable Laws of Colombia, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged, and has its principal office at Avenida Calle 26, No. 59-15 Piso 10, Bogotá, D.C., Colombia;

(b)      It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)      It has the corporate power and authority to execute this Agreement and each other Transaction Document to which it is a party and to carry out the terms and perform its obligations set forth herein and therein; it has full power and authority to sell and Transfer the Contract Rights and the Receivables pursuant to this Agreement and each other Transaction Document to which it is a party and has duly authorized such Sale and Transfer to the Purchaser by all necessary corporate action; and the execution, delivery, and performance of this Agreement and each other Transaction Document to which it is a party have been duly authorized by the Seller by all necessary corporate action;

(d)      Except for the registration of the Colombian Back-Up Security Agreement with the Colombian *Registro de Guarantias Mobiliarias* and the registration of the Costa Rican Back-Up Security Agreement with the Costa Rican *Registro de Guarantias Mobiliarias,* no authorization, consent or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, Costa Rica or the United States, or any statute thereof, any other Person that has not been obtained or made, is (i) necessary for the due execution, delivery, and performance by the Seller of this Agreement or any other Transaction Document to which it is a party or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement or any other Transaction Document to which it is a party for the validity or enforceability thereof against the Seller or any Card Processor or

(iii) necessary to effect or perfect the Purchaser's ownership of the Contract Rights and Receivables under all Applicable Law or the Liens purported to be created under the Transaction Documents;

(e)      The execution and delivery of this Agreement and each other Transaction Document to which it is a party and the undertaking and performance by it of the obligations expressed to be assumed by it herein and therein and the use of proceeds (i) will not conflict with, or result in a breach of or default under, (A) any Applicable Laws, (B) its articles of incorporation, bylaws or other Organizational Documents or (C) any agreement or instrument to which it is a party or by which it is bound or (ii) result in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of the Seller or its Subsidiaries;

(f)      This Agreement and each other Transaction Document to which it is a party has been duly authorized, executed, and delivered by the Seller and is a legal, valid, and binding obligation of the Seller, enforceable in accordance with its terms and each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such law, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in Colombia, Costa Rica, the U.S. or any state thereof and the jurisdiction of incorporation of each party thereto for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no Taxes are required to be paid for the validity and enforceability thereof;

(g)      The Seller has previously furnished to the Purchaser the consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows) of Holdings: (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on March 31, 2017. Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present the financial condition of Holdings and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material Indebtedness and other liabilities, direct or contingent, and Holdings and its consolidated Subsidiaries as of the date thereof;

(h)      There are no litigations, investigations, arbitrations or other proceedings or investigations pending or, to the Seller's knowledge, threatened, before any Governmental Authority having jurisdiction over the Seller or its Subsidiaries or any of their property that individually or in the aggregate (i) assert the invalidity of this Agreement or any other Transaction Document, (ii) seek to prevent the consummation of any of the transactions contemplated by this Agreement or any other Transaction Document, (iii) seek any determination or ruling that could be reasonably likely to have a Material Adverse Effect, or (iv) if adversely determined, could be reasonably likely to result in a Material Adverse Effect;

(i)      It is not in violation of any Applicable Law applicable to it or any of its properties, the violation of which could be reasonably likely to result in a Material Adverse Effect;

(j)      There are no Taxes imposed or levied on, or with respect to, payments to be made pursuant to this Agreement or otherwise in respect of the transactions contemplated hereby;

(k)      There are no Taxes imposed or levied on, or with respect to, the execution, delivery, enforcement, or admissibility in evidence of this Agreement, any other Transaction Document or any other document to be furnished hereunder or thereunder;

(l)     There are no Taxes imposed or levied on the Purchaser or on the income, assets, or operations of the Purchaser with respect to the transactions contemplated by this Agreement;

(m)     Under the Applicable Laws of Colombia, the Cayman Islands, or any other jurisdiction, or any Governmental Authority of any thereof or therein, each of the Seller and its Subsidiaries is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by it of such Transaction Documents constitute private and commercial acts rather than public or governmental acts and neither the Seller nor its Subsidiaries nor any of their property has any immunity from jurisdiction of any court or from any action, suit, set-off or proceeding, or other legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise);

(n)     It has (a) (i) entered into no contracts, letters of intent, memoranda of understanding, or other agreements or arrangements, (ii) made no change to its internal policies, procedures, or business practices, and (iii) made no plans to enter into any such agreements or arrangements or to make any such change, and (b) to its knowledge, no event or circumstance has occurred (other than changes in general economic conditions) that, in the case of either of the foregoing clause (a) or clause (b) of this Section 6.01(n) could reasonably be expected to have a material adverse effect on the Net Activity due or to become due under any Card Processing Agreement on an annual basis going forward;

(o)     The Purchase Price is fair and has been agreed on an arm's length basis and on market conditions, taking into consideration the economics of this Agreement;

(p)     The purpose and the effect of this Agreement is to sell the Receivables and the existing Contract Rights on market terms conditions.

(q)     It is not and shall not be in violation of any terms or provisions of any Card Processing Agreement and there are no material disputes between the Seller or any of its Affiliates and any Card Processor with respect to any of the terms of the settlement arrangements of the Seller with such Card Processor or any other issues under the Card Processing Agreement between the Seller and such Card Processor;

(r)     It is not aware of any basis, considering its financial condition, upon which the transactions contained in this Agreement are capable of being affected by any *acción revocatoria* under Colombian law, including under article 74 of Law 1116, and the Seller shall, from the date hereof, take all additional steps necessary or advisable to avoid affecting or impairing the rights of its creditors;

(s)     Both before and after giving effect to this Agreement and the other Transaction Documents and the entering into of the transactions contemplated hereby and thereby, the Seller was and is Solvent;

(t)     All of the Collections were originated and shall be originated by the Seller or its agents or on its behalf in the ordinary course of business, and the Card Processing Agreements relating thereto were fully and properly executed by the parties thereto and constitute the enforceable obligations thereof;

(u)     (i) Immediately prior to giving effect to the Sale and Transfer hereunder, all of the Contract Rights and the Receivables (and the Collections derived therefrom) are legally and beneficially owned by the Seller, free and clear of any Lien, and have not been sold, transferred, assigned, pledged, or otherwise conveyed by the Seller to any Person other than to the Purchaser pursuant to this Agreement; and (ii) the Sale and Transfer made pursuant to this Agreement convey to the Purchaser good and valid title to all of the Contract Rights and Receivables (and the Collections derived therefrom) and

vests the Purchaser with the definitive and indefeasible ownership (with all privileges set forth in the first paragraph of article 669 of the Colombian Civil Code), to (w) all of the Contract Rights and Receivables, (x) all funds collected or to be collected in respect of all of the Collections as well as all income and proceeds of the foregoing and (y) all performance rights of any nature whatsoever under the Card Processing Agreements (except those explicitly excluded from the Receivables pursuant to the definition thereof);

(v)    The Sales and Transfers made pursuant to this Agreement constitute final and definitive Sales and Transfers, as the case may be, of the Contract Rights and the Receivables from the Seller to the Purchaser, under the Applicable Laws of Colombia, and any other Applicable Laws, and it is the intention of the Seller that the title to such Contract Rights and Receivables not be part of the Seller's estate in the event of an Insolvency Event in respect of the Seller or any Affiliate thereof;

(w)    The irrevocable instructions given by the Seller to each Card Processor in each applicable Notice and Consent are binding on the Seller and do not contravene (i) any provision of Applicable Law or the Organizational Documents of the Seller or its Affiliates, (ii) any agreement or other instrument binding upon the Seller or its Affiliates, (iii) any judgment, order or decree of any Governmental Authority having jurisdiction over the Seller or its Affiliates or (iv) any other Applicable Laws to which the Seller or its Affiliates is subject and each Notice and Consent is enforceable against the parties thereto and sufficient to legally obligate each such Card Processor to make payments of the Collections for the benefit of the Purchaser directly to the New York Pass-Through Account;

(x)    The Collections represent the genuine, legal, valid, and binding payment obligation of each Card Processor, enforceable by the holder thereof in accordance with its terms, except as (i) the enforceability thereof may be limited by bankruptcy, insolvency or similar Applicable Laws affecting creditors' rights generally and (ii) the availability of equitable remedies may be limited by equitable principles of general applicability;

(y)    The Contract Rights, the Receivables and the Collections are not the subject and shall not be the subject of any other sale or Lien by the Seller, other than in connection with the transactions contemplated by this Agreement and the other Transaction Documents;

(z)    All of the Receivables have arisen in all material respects in accordance with the terms and conditions of a Card Processing Agreement and in compliance with all Applicable Laws of all applicable jurisdictions, and no Receivables have been originated in, or are subject to the Applicable Laws of, any jurisdiction under which the sale, transfer and/or assignment of such Receivables under this Agreement is unlawful, void or voidable;

(aa)    With respect to the Contract Rights and Receivables: (i) no Contract Rights or Receivables have been subordinated or rescinded, with the exception of the subordination of security interests under the Colombian Back-Up Security Agreement and the Costa Rican Back-Up Security Agreement, (ii) no actions, suits, proceedings, or investigations are pending or threatened in respect of such Contract Rights or Receivables, (iii) no amounts due in respect of Receivables are Delinquent, (iv) no Card Processor has made any chargebacks or imposed any other charges upon the Seller under its Card Processing Agreement except in the ordinary course of business and consistent with past practice under such Card Processing Agreement, (v) each of the Seller and its Affiliates and each Card Processor is in compliance in all material respects with the terms and conditions of each Card Processing Agreement;

(bb)    The Purchaser has no obligation or liability to any Card Processor or other Person in respect of the Contract Rights or the Receivables (other than the obligation of the Purchaser to pay the Purchase Price to the Seller), any contracts relating thereto, or any airline transportation services related thereto;

(cc)    The payment obligations of the Seller under this Agreement and each other Transaction Document to which it is a party will be direct, general, unconditional and unsubordinated obligations of the Seller and will, except to the extent secured pursuant to the Transaction Documents, rank at least pari passu in priority of payment with all other existing and future unsecured and unsubordinated indebtedness of the Seller, other than any indebtedness mandatorily preferred by Applicable Laws;

(dd)    The Seller's only Subsidiaries, as of the date hereof, are as follows:  Tampa Cargo S.A.S. – Avianca, Inc. - Latin Logistics LLC - Avianca Leasing LLC - Aviation Leasing Services Inc. - International Trade Marks Agency Inc. - Aviation Leasing Services Investment S.A. - AVSA Properties I Inc. - AVSA Properties II Inc. - AVSA Properties III Inc. - AVSA Properties IV Inc. - AVSA Properties V Inc. - AVA Leasing I LLC - Tri-aircraft Leasing LLC - Tri-aircraft Leasing II LLC - Octo-Aircraft Leasing LLC - Uni-Aircraft Leasing LLC - Ronair N.V. - Tampa Interholding B.V. - Tampa Cargo Logistics Inc. - Avifreight México S.A.P.I de C.V. - Aero Transporte de Carga Unión S.A. de C.V. Aerounión;

(ee)    No Trigger Event, Potential Event, Retention Event or Adjustment Event has occurred and is continuing;

(ff)    Since December 31, 2016, no event or circumstance exists that has had or could reasonably be expected to have a Material Adverse Effect;

(gg)    The RSPA Security Documents provide the Purchaser with effective, valid, legally binding and enforceable first priority Liens on all of the Collateral described therein;

(hh)    Neither Holdings and its Subsidiaries nor the Seller has any Indebtedness other than Indebtedness set forth in the financial statements previously delivered to the Purchaser or pursuant to this Agreement the Transaction Documents and the Purchaser Finance Documents;

(ii)    Each of the Seller and its Subsidiaries is in compliance with all Applicable Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; provided, however, that where such compliance relates to any Anti-Corruption Laws or Sanctions, such Person is in compliance in all respects and subject to no exceptions;

(i)    Each of the Seller and its Subsidiaries has conducted its businesses in compliance with all applicable Anti-Money Laundering Laws. None of the Seller or any of its Subsidiaries or any of their respective directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Seller's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.  The Seller and its Subsidiaries have implemented, maintained and enforced policies and procedures designed to promote and achieve compliance by the Seller and its Subsidiaries with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(ii)    None of the Seller or any of its Subsidiaries or any of their respective directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Seller's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

(jj)       Each of Holdings and its Subsidiaries has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns; provided, however, that Holdings and its Subsidiaries will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which Holdings or its Subsidiaries, as applicable, has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(kk)       None of the Seller nor its Subsidiaries is required to register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended;

(ll)        The Seller has disclosed to the Purchaser all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or Affiliates is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Seller or any of their Subsidiaries to the Purchaser in connection with the negotiation of any Transaction Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Seller represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

(mm)      There are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving Holdings or any of its Subsidiaries. There are no unfair labor practices, grievances, complaints or arbitrations pending or, to the Seller's knowledge, threatened, against or involving Holdings or any of its Subsidiaries, nor are there any arbitrations or grievances threatened or involving Holdings or any of its Subsidiaries;

(nn)       It is not necessary in order for the Purchaser or any Agent to enforce any rights or remedies under the Transaction Documents, or solely by reason of the execution, delivery and performance by the Seller or its Subsidiaries of the Transaction Documents, that the Purchaser or any Agent be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction.  Neither the Purchaser nor any Agent is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Transaction Document;

(oo)       Each Receivables File sets forth an accurate and complete list of all Contract Rights, Receivables and Collections that have been sold and assigned by the Seller to the Purchaser and the information contained therein accurately identifies it as being sold and transferred to the Purchaser hereunder and indicates that the Purchaser is the owner of such rights and that the Collateral Agent has a security interest therein; and

(pp)       It is a sophisticated entity with respect to the terms of the transactions contemplated by the Transaction Documents.  It has adequate information to make an informed decision regarding the sale of the Contract Rights and Receivables pursuant to the Transaction Documents.  It is acting for its own account and it has made its own independent decision to enter into the Transaction Documents and as to whether the sale of the Contract Rights and Receivables pursuant thereto is proper for it based on its own judgment and upon advice of such advisers as it deems necessary.  It is not relying

on any communication (written or oral) of the other parties to this Agreement or the other Transaction Documents as investment advice or as a recommendation to sell the Contract Rights and Receivables hereunder.  It is capable of assessing the merits of and understanding, and understands and accepts, the terms, conditions and risks of the transactions contemplated by the Transaction Documents.

(qq)     The gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385.  Since the beginning of 2013 and through October 31 2017, such net amount of collections paid to the Seller on account of such sales has historically approximated 96% or more of the gross amount of such collections.

(rr)     Holdings, the Specified Subsidiaries and the Seller have each previously furnished to the Administrative Agent their consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows): (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on September 30, 2017.  Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present its financial condition and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material indebtedness and other liabilities, direct or contingent, and its consolidated Subsidiaries as of the date thereof.

(ss)     There is no litigation, investigation, arbitration or other proceeding pending or, to the knowledge of Holdings, the Specified Subsidiaries and the Seller after due and diligent investigation, threatened in writing against any of Holdings, the Specified Subsidiaries and the Seller or any of their Subsidiaries before any arbitrator or Governmental Authority that, solely in the case of Holdings, the Seller or each Specified Subsidiary: (a) in the aggregate, has had or, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (b) could reasonably be expected to materially and adversely affect the legality, validity, binding effect or enforceability of any of the Transaction Documents or Purchaser Finance Documents.

(tt)     Each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such laws, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in the U.S. and Colombia for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no taxes are required to be paid for the validity and enforceability thereof.

(uu)     The instructions to the Card Processors found in the Notices and Consents are sufficient to legally obligate each such Card Processor to make payments of the Collections directly to the New York Pass-Through Account in order to discharge the Collections owed to the Purchaser with respect to the relevant Card Processing Agreement;

(vv)     Seller and its Subsidiaries are subject to civil and commercial law with respect to their obligations under the Transaction Documents to which they are a party, and the execution, delivery

and performance by them of such Transaction Documents constitute private and commercial acts rather than public or governmental acts.  Neither Seller nor any of its Subsidiaries nor any of their respective properties is entitled to immunity on the grounds of sovereignty or otherwise from the jurisdiction of any court or from any action, suit, set-off or proceeding, or service of process in connection therewith, arising under the Transaction Documents; and

(ww)    Seller has not owned or leased the aircraft identified as MSN 4175 and MSN 6992 in UCC-1 financing statements 2015080610 and 2015080609, respectively, naming Seller as debtor and Wells Fargo Bank Northwest, N.A. Owner Trustee as secured party, filed in the office of the District of Columbia Recorder of Deeds and the Liens described therein do not affect the Seller of the Contract Rights, Receivables or Collections sold or transferred hereunder.

**Section 4.02    Representations and Warranties of the Purchaser**.  The Purchaser hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Purchaser pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement) on the date hereof that:

(a)    It has been duly organized, is validly existing as a company incorporated and in good standing under the Applicable Laws of the Cayman Islands, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged, and has its principal office at Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands;

(b)    It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)    It has the corporate power and authority to execute and deliver this Agreement and to carry out the terms set forth herein; it has full power and authority to enter into and perform its obligations under this Agreement; and the execution, delivery, and performance of this Agreement have been duly authorized by the Purchaser by all necessary corporate action;

(d)    No authorization or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, or the United States that has not been obtained, is (i) necessary for the due execution, delivery, and performance by the Purchaser of this Agreement or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement for the validity or enforceability thereof against the Purchaser; and

(e)    This Agreement has been duly authorized, executed, and delivered by the Purchaser and is a legal, valid, and binding obligation of the Purchaser, enforceable in accordance with its terms.

**Section 4.03    Representations and Warranties of the Servicer**.  The Servicer hereby represents and warrants to the other Parties hereto (which representations and warranties constitute, and shall be deemed to be, obligations of the Servicer pursuant to the Applicable Laws of Colombia, the breach or inaccuracy with respect to which shall give rise to the remedies provided for in this Agreement) on the date hereof, the date of each Contract Rights and Receivables Addition Date and the date of each Collections Origination Date that:

(a)    It has been duly organized, is validly existing as a corporation in good standing under the Applicable Laws of the of its jurisdiction of organization, has the corporate power and authority to own, lease, and operate its property and to conduct the business in which it is currently engaged and

has its principal office as of the date hereof at Avenida Calle 26, No. 59-15, 10th Floor, Bogotá, D.C., Colombia;

(b)      It is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business or its ownership, leasing, or operating of property requires such qualification, licenses and approvals;

(c)      It has the corporate power and authority to execute this Agreement and each other Transaction Document to which it is a party and to carry out the terms and perform its obligations set forth herein and therein; and the execution, delivery, and performance of this Agreement and each other Transaction Document to which it is a party have been duly authorized by the Servicer by all necessary corporate action;

(d)      No authorization or approval or filing, notice, registration, or other action of any Governmental Authority of Colombia, the Cayman Islands, Costa Rica or the United States, or any statue thereof, or any other Person that has not been obtained or made, is (i) necessary for the due execution, delivery, and performance by the Servicer of this Agreement or any other Transaction Document to which it is a party or (ii) required to be obtained prior to the execution, delivery, and performance of this Agreement or any other Transaction Document to which it is a party for the validity or enforceability thereof against the Servicer;

(e)      The execution and delivery of this Agreement and each other Transaction Document to which it is a party and the undertaking and performance by it of the obligations expressed to be assumed by it herein and therein (i) will not conflict with, or result in a breach of or default under, (A) any Applicable Laws, (B) its articles of incorporation, bylaws or other Organizational Documents or (C) any agreement or instrument to which it is a party or by which it is bound or (ii) result in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of the Servicer;

(f)      This Agreement and each other Transaction Document to which it is a party has been duly authorized, executed, and delivered by the Servicer and is a legal, valid, and binding obligation of the Servicer, enforceable in accordance with its terms and each of the Transaction Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such law, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in Colombia, Costa Rica, the U.S. or any state thereof and the jurisdiction of incorporation of each party thereto for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Transaction Document have been accomplished, and no Taxes are required to be paid for the validity and enforceability thereof;

(g)      It is not in violation of any Applicable Law applicable to it or any of its properties, the violation of which could be reasonably likely to result in a Material Adverse Effect;

(h)      Under the Applicable Laws of Colombia, the Cayman Islands, or any other jurisdiction, or any Governmental Authority of any thereof or therein, the Servicer is subject to civil and commercial law with respect to its obligations under the Transaction Documents to which it is a party, and the execution, delivery and performance by it of such Transaction Documents constitute private and commercial acts rather than public or governmental acts and neither the Servicer nor any of its property has any immunity from jurisdiction of any court or from any action, suit, set-off or proceeding, or other legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise);

(i)    Both before and after giving effect to this Agreement and the other Transaction Documents and the entering into of the transactions contemplated hereby and thereby, the Servicer was and is Solvent;

(j)    (i) Immediately prior to giving effect to the Sale and Transfer hereunder, all of the Contract Rights and the Receivables are legally and beneficially owned by the Seller, free and clear of any Lien, and have not been sold, transferred, assigned, pledged, or otherwise conveyed by the Seller to any Person other than to the Purchaser pursuant to this Agreement; and (ii) the Sale made pursuant to this Agreement conveys to the Purchaser good and valid title to all of the Contract Rights and Receivables and vests in the Purchaser exclusive ownership of, and all right, title, and interest of the Seller in and to (w) all of the Contract Rights and Receivables, (x) all funds collected or to be collected in respect of all of the Collections as well as all income and proceeds of the foregoing and (y) all performance rights of any nature whatsoever under the Card Processing Agreements (except those explicitly excluded from the Receivables pursuant to the definition thereof);

(k)    The Servicer is in compliance with all Applicable Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; provided, however, that where such compliance relates to any Anti-Corruption Laws or Sanctions, such Person is in compliance in all respects and subject to no exceptions;

(i)    The Servicer has conducted its businesses in compliance with all applicable Anti-Money Laundering Laws. Neither of the Servicer nor any of its directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Servicer's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws. The Servicer has implemented, maintained and enforced policies and procedures designed to promote and achieve compliance by the Servicer with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(ii)    Neither of the Servicer nor any of its directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Servicer's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

(l)    The Servicer has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns; provided, however, that the Servicer will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Servicer has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(m)    The Servicer is not required to register as an "investment company," as such term is defined in the Investment Company Act of 1940, as amended;

(n)    The Servicer has disclosed to the Purchaser all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or Affiliates is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. No information, report, financial statement, exhibit or schedule furnished by or on behalf of the Servicer or any of their Subsidiaries to the Purchaser in connection with the negotiation

of any Transaction Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, the Servicer represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

(o)        It is not necessary in order for the Purchaser or any Agent to enforce any rights or remedies under the Transaction Documents, or solely by reason of the execution, delivery and performance by the Seller or its Subsidiaries of the Transaction Documents, that the Purchaser or any Agent be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction. Neither the Purchaser nor any Agent is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Transaction Document;

(p)        Each Receivables File sets forth an accurate and complete list of all Contract Rights, Receivables and Collections that have been sold and assigned by the Seller to the Purchaser and the information contained therein accurately identifies it as being sold and transferred to the Purchaser hereunder and indicates that the Purchaser is the owner of such rights and that the Collateral Agent has a security interest therein; and

(q)        It is a sophisticated entity with respect to the terms of the transactions contemplated by the Transaction Documents.  It has adequate information to make an informed decision regarding the sale of the Contract Rights and Receivables pursuant to the Transaction Documents.  It is acting for its own account and it has made its own independent decision to enter into the Transaction Documents and as to whether the sale of the Contract Rights and Receivables pursuant thereto is proper for it based on its own judgment and upon advice of such advisers as it deems necessary.  It is not relying on any communication (written or oral) of the other parties to this Agreement or the other Transaction Documents as investment advice or as a recommendation to sell the Contract Rights and Receivables hereunder.  It is capable of assessing the merits of and understanding, and understands and accepts, the terms, conditions and risks of the transactions contemplated by the Transaction Documents.

## ARTICLE V

## [RESERVED.]

## ARTICLE VI

## TRIGGER EVENTS AND REMEDIES

Section 6.01    **Trigger Events**.  Each of the following events shall constitute a "Trigger Event":

(a)        (i) the Seller or the Servicer fails to pay any amount due under this Agreement or any other Transaction Document when due or any Monthly Settlement Amount or Surcharge is not paid or disbursed to the Administrative Agent's Account when due unless (x) the amount in the Collections Account is sufficient on such due date to pay or disburse all amounts due on such date and (y) such amount is paid or disbursed from the Collections Account to pay such amount in full within 3 Business Days of its due date or (ii) upon any application or attempted application of funds pursuant to the Cash Management Agreement, the cash standing to the credit of the Collections Account and the Debt Service

Reserve Account is insufficient to pay or disburse the Monthly Settlement Amount or Surcharge due on such date;

(b)      the Collections Coverage Ratio is below 1.75:1.00 at any date of determination, a Retention Event occurs and continues for six consecutive months, or an Adjustment Event as described in clause (b) or (c) of the definition thereof occurs and continues for 10 consecutive days;

(c)      the Seller or the Servicer fails duly to perform or observe:

(i)      any term or obligation under the Undertaking Agreement (except Sections 2.01(c), (d), (e), and (s)(i) and Section 2.02(c) thereof), any RSPA Security Document or any Notice and Consent; or

(ii)      any other term or obligation contained hereunder or in any other Transaction Document to which it is a party and such failure shall continue unremedied for 30 days after the earlier of (i) the Seller obtaining knowledge of such failure or (ii) written notice thereof having been given by the Purchaser to the Seller;

(d)      any representation, warranty, certification or statement made or deemed to be made by the Seller, the Servicer or Holdings in any Transaction Document, or any certificate, financial statement or other document delivered pursuant to or in connection with any Transaction Document shall prove to have been incorrect when made, repeated or delivered (or deemed made, repeated or delivered) or the Seller, the Servicer or Holdings shall provide the Purchaser with material false information;

(e)      a Card Processing Agreement is terminated by any party for any reason, unless such termination is a Permitted Termination and the Seller and the Servicer complete a Contract Rights and Receivables Addition acceptable to the Purchaser (with the consent of the Administrative Agent acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) promptly (and in any event within 10 days) following such termination;

(f)      the Seller or the Servicer or any of their Affiliates breaches its obligations under a Card Processing Agreement and such breach gives the relevant Card Processor the right to terminate the Card Processing Agreement, unless the relevant Card Processor in writing waives its right to terminate the Card Processing Agreement on account of such breach;

(g)      a Card Processor fails to make payments under the relevant Card Processing Agreement into the New York Pass-Through Account for 10 consecutive days, unless the Card Processing Agreement is terminated within such 10 days in connection with a Permitted Termination;

(h)      any Insolvency Event occurs with respect to the Seller (other than a filing for, or a commencement of, a restructuring process of the Seller pursuant to Law 1116, while the effects set forth under article 16 of said law (or other similar under other bankruptcy law in Colombia), are legal and binding) or the Servicer or any Affiliate thereof, or any of them shall admit in writing its inability to pay its debts generally;

(i)      (i) the capacity or ability of the Seller to operate domestic and/or international flights is materially impaired for any reason or (ii) the capacity or ability of the Specified Subsidiaries, individually or collectively, to operate domestic and/or international flights is materially impaired for any reason, unless the gross revenue generated by their domestic and international flights immediately before such material impairment constituted less than 30% of the gross revenue generated by the Seller and all Specified Subsidiaries in the aggregate in the previous 12 months;

(j)      any Change of Control occurs;

(k)      (i) any Transaction Document (other than a Card Processing Agreement) or any term thereof (A) shall be revoked, terminated, become void or cease to be in full force and effect, (B) shall become, or the performance of or compliance with any obligation thereunder shall become, unlawful, or (C) shall be repudiated (or purportedly repudiated) by any party thereto or its legality, validity or enforceability shall be challenged by any Person; or (ii) the Seller or the Servicer shall deny that it has any or further liability or obligation under any Transaction Document;

(l)      (i) the Purchaser shall cease to have the benefit of, as contemplated under the Transaction Documents effective, valid, legally binding and enforceable first priority perfected ownership interests in, or Liens securing or purported to be securing the Seller's obligations to the Purchaser on the Contract Rights and Receivables sold hereunder to the Purchaser as provided herein, or (ii) the Seller or any of its Affiliates shall, directly or indirectly, contest the effectiveness, validity, legality, binding nature, enforceability or priority of such Liens;

(m)      any Government Approval at any time necessary to enable the Seller or the Servicer to comply with any of its obligations under any of the Transaction Documents shall be revoked, withdrawn, withheld or otherwise not in full force and effect or shall be modified or amended in a manner that has had or could reasonably be expected to have a Material Adverse Effect;

(n)      any change in Applicable Law shall occur affecting the Seller, the Servicer, Holdings or any of their respective Subsidiaries if the effect thereof has or could reasonably be expected to have a Material Adverse Effect;

(o)      a moratorium shall be declared by any Governmental Authority having jurisdiction in respect of any Indebtedness owed by, or other obligations of, the Seller or the Servicer to the Purchaser, or any Governmental Authority of any applicable jurisdiction declares any general payment delay, refusal to pay or acknowledge a payment obligation, repudiation or other action (whether or not formally announced), which in any such case relates to Indebtedness or any category of Indebtedness or obligation not to be paid in accordance with its terms or prevents the availability of foreign exchange to or by the Seller or the Servicer for the purpose of performing any obligation under this Agreement or any other Transaction Document;

(p)      it is or becomes unlawful for the Seller or the Servicer to perform any of its obligations under the Transaction Documents to which it is a party;

(q)      any event or series of events occurs which, in the reasonable opinion of the Purchaser or the Administrative Agent (at the instruction of the Lenders acting reasonably), has or is reasonably likely to have a Material Adverse Effect (other than pursuant to clause (d) of the definition of Material Adverse Effect), and such event or series of events continues unremedied for 30 days after the Purchaser or the Administrative Agent provides to the Seller in writing a notice specifying with reasonable particularity such event or series of events that in its reasonable opinion has or is reasonably likely to have a Material Adverse Effect; or

(r)      following a disbursement from the Debt Service Reserve Account pursuant to the Cash Management Agreement,  the Debt Service Reserve Account does not have a balance at least equal to the Debt Service Required Amount within 3 Business Days of such disbursement.

**Section 6.02      Remedies**.  Upon the occurrence of a Trigger Event, the Purchaser may or the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) shall prematurely terminate (*resolver*) this Agreement, upon written notice to the Parties to this Agreement (with a copy to the Administrative Agent in the case of a notice by the Purchaser).  As a consequence of the early termination (*resolución*) of this Agreement, the Parties agree that the Seller shall pay to the Purchaser liquidated damages (*cláusula penal como estimación mínima y anticipada de*

*perjuicios*) (the "Liquidated Damages") in an amount equal to the Unwind Amount, which Liquidated Damages shall be due and payable by the Seller upon such demand without the need of a court procedure or any other procedure whatsoever to adjudicate the Seller in default (*mora*) or for any other purpose. At any time while the Liquidated Damages are not paid in full, the Seller hereby irrevocably authorizes the Purchaser, the Servicer and the Agents to apply the amount of all Collections (including, without limitation, all cash standing to the credit of the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account) to the payment of the Liquidated Damages and disburse such Collections in accordance with the Trigger Event Priority of Payments. In any event, the Purchaser may exercise from time to time all other rights and remedies provided hereunder or under any other Transaction Document and all rights and remedies under Applicable Law, including to a purchaser of similar assets. The exercise of any one or more of the rights under this Section 6.02 shall not preclude the subsequent exercise of any other rights or remedies exercisable hereunder, under any other Transaction Documents or under Applicable Law. The Seller and the Purchaser agree and acknowledge that the Purchaser may pursue additional damages, if not covered by the Liquidated Damages, under the other provisions of the Transaction Documents. Once the Liquidated Damages is paid in full as provided for hereunder, the Purchaser may proceed to unwind the purchase and sale by transferring back to the Seller the Contract Rights, the Receivables, and all Collections derived therefrom.

**Section 6.03    Automatic Trigger Event**. In the case of a Trigger Event specified in Section 6.01(h), and notwithstanding the availability of other remedies under Section 6.02, the Liquidated Damages shall automatically become and be forthwith due and payable and all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be disbursed to repay such amounts.

**Section 6.04    Retention Events and Adjustment Events**. Upon the occurrence and during the continuance of a Retention Event or an Adjustment Event, the Purchaser or the Administrative Agent (in accordance with Section 2.09(b) of the Cash Management Agreement or at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) may, upon written notice to the other Parties, in each case with a copy to the Administrative Agent, instruct the Collateral Agent that a Retention Event or an Adjustment Event (as applicable) has occurred and the Collateral Agent may adjust the payments made to conform to the applicable Priority of Payments.

**Section 6.05    Limitations under Colombian Laws**. The Parties agree that no provision of this Agreement shall: (a) prevent the commencement of a proceeding under Law 1116 or the filing of a petition in Colombia to commence a proceeding under Law 1116 with respect to the Seller, whether in a voluntary or involuntary manner; (b) be construed to mean that the purpose of such provision is to prevent or create obstacles to prevent, directly or indirectly, proceedings from being commenced in Colombia under Law 1116 with respect of the Seller; (c) prohibit the Seller from negotiating a restructuring agreement under Law 1116; or (d) impose any restrictions or unfavorable effects (efectos desfavorables) upon the Seller for the negotiation or execution of a restructuring agreement under Law 1116.

## ARTICLE VII

## PAYMENTS AND TAXES

**Section 7.01    Payments to the Purchaser**. Notwithstanding anything to the contrary herein, the parties hereto hereby agree that any payments made to or to be disbursed to the Purchaser in accordance with any Priority of Payments in respect of the Surcharge or any Monthly Settlement Amount or Break Costs, or any portion of the Liquidated Damages relating to the foregoing amounts, shall be made to the Administrative Agent's Account; *provided* that any amounts to be paid in connection with any fees, expenses or indemnities or other amounts shall be paid as directed by the intended ultimate recipient of such amount.

**Section 7.02**     **Taxes.**

(a)     Any and all payments made by the Seller to, or disbursed under the Cash Management Agreement to, any Recipient (including, but not limited to, any Surcharge, Monthly Settlement Amount and Unwind Amount, or related concepts under the Cash Management Agreement or any other Transaction Document) made under any Transaction Document shall be made without deduction or withholding for any Taxes, except as required by Applicable Law.  If any Applicable Law (as determined in the good faith discretion of the Seller) requires the deduction or withholding of any Tax from any such payment by the Seller, then the Seller shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Applicable Law and, if such Tax is an Indemnified Tax, then the sum payable by the Seller shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this Section 7.02) the Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     The Seller shall timely pay to the relevant Governmental Authority in accordance with Applicable Law, or at the option of the recipient timely reimburse it for the payment of, any Other Taxes.

(c)     The Seller shall indemnify any recipient, within 10 days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this Section 7.02) payable or paid by such Recipient or required to be withheld or deducted from a payment to such recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority.  A certificate as to the amount of such payment or liability delivered to the Seller by Purchaser shall be conclusive absent manifest error.

(d)     As soon as practicable after any payment of Taxes by the Seller to a Governmental Authority pursuant to this Section 7.02, the Seller shall deliver to the applicable Recipient the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to such Recipient.

## ARTICLE VIII

## [RESERVED.]

## ARTICLE IX

## MISCELLANEOUS

**Section 9.01**     **Rights Confined to Parties**.   Except as set forth in Section 9.14, nothing expressed or implied herein is intended or shall be construed to confer upon or to give to any Person, other than the Parties and their successors and assigns, any right, remedy or claim under or by reason of this Agreement, and the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns. Notwithstanding anything in the foregoing to the contrary, the Parties hereto acknowledge and agree that (a)  the Seller may not assign its rights or obligations hereunder, (b) pursuant hereto the Purchaser may assign the Receivables and the Collections and all its rights hereunder in accordance with the terms of the Purchaser Finance Documents and the transactions in connection therewith, and (c) as a result of such assignment by the Purchaser, the rights of the Purchaser under this Agreement may be enforced by the Collateral Agent on behalf of the Purchaser Finance Parties.

Section 9.02    **Amendment or Waiver**.  Any provision of this Agreement may be amended or waived only with the written consent of each of the Seller, the Purchaser and the Administrative Agent (acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement); provided that any amendment that affects the rights or obligations of the Servicer hereunder shall require also the written consent of the Servicer.

Section 9.03    **Binding Upon Assigns**.  Except as otherwise provided herein, the provisions of this Agreement (including any amendments, modifications and waivers hereof properly adopted) shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns. Neither the Purchaser nor the Seller nor the Servicer may assign or otherwise transfer any of its respective rights or obligations hereunder without the prior written consent of the Administrative Agent (acting at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement).

Section 9.04    **Waiver of Immunity**.  This Agreement and any other documents delivered pursuant hereto, and any actions taken hereunder, constitute commercial acts by the Seller and the Purchaser.  To the extent that the Seller or the Purchaser, or any of their respective assets, may have, or may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Seller and the Purchaser hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues wherever located with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement, any of the other Transaction Documents, or any document delivered pursuant hereto or thereto; it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

Section 9.05    **Arbitration**.  All disputes arising out of or in connection with this Agreement shall be finally settled by arbitration under the Rules of Arbitration of the International Chamber of Commerce. There shall be three arbitrators. The language of arbitration shall be English. The seat of arbitration shall be Miami, Florida.

Section 9.06    **Notices**.  All notices and other communications hereunder shall be made in writing and in English (by letter, electronic mail (provided that in such case of any Agent, such electronic notice shall be delivered in a ".pdf" attachment)) and shall be sent as follows:

(a)    if to the Purchaser, to it at c/o P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands; Attention:  The Directors; Facsimile No.:  (345) 945-7100; Telephone No.:  (345) 945-7099; Email:  info@maplesfS.com;

with copies to:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Miriam Y. Molina
Tel.:  (212) 816-5576
Email: miriam.molina@citi.com;

and

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

and with a copy to the Collateral Agent to it as set forth below.

and

(b)      if to the Seller, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.:  571-413-9809; Telephone No.:  571-295-6765; Email: Lucia.avila@Avianca.com;

and

(c)      if to the Servicer, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.:  571-413-9809; Telephone No.:  571-295-6765; Email: Lucia.avila@Avianca.com;

and

(d)      if to the Administrative Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Miriam Y. Molina, Tel.: (212) 816-5576, Email: miriam.molina@citi.com;

with copies to:

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

and with a copy to the Collateral Agent to it as set forth below.

and

(e)      if to the Collateral Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Karen Abarca, Tel.: (212) 816-7759, Email: karen.abarca@citi.com;

Except as otherwise provided in this Agreement, all such communications shall be deemed to have been duly given when personally delivered or, in the case of a facsimile, or mailed notice, upon receipt, and in the case of email, upon confirmation of receipt, in each case given or addressed as aforesaid.  Any Party may change its address or facsimile number for notices and other communications hereunder by notice to the other Parties (including notice to the Administrative Agent).  Any notice given by e-mail shall be accompanied by an electronic request for a return receipt, and a copy of the notice

(including on diskette or compact disc) shall, within two (2) Business Days thereafter, be mailed to the addressee.

**Section 9.07    Construction**.   The Table of Contents hereto and the Article and Section headings herein are for convenience only and shall not affect the construction hereof.

**Section 9.08    Severability**.   To the extent permitted by law, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 9.09    GOVERNING LAW**.   THE PROVISIONS OF THIS AGREEMENT, AND ALL THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER, SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF COLOMBIA, WITHOUT REGARD TO CONFLICTS OF LAWS PRINCIPLES.

**Section 9.10    Use of English Language**.   All certificates, reports, notices, and other documents and communications given or delivered pursuant to this Agreement shall be in the English language or accompanied by a certified English translation thereof.

**Section 9.11    Currency**.   Payment of the Purchase Price and all other amounts payable by the Purchaser or the Seller under this Agreement shall be made in United States Dollars.

**Section 9.12    Counterparts**.   This Agreement may be executed in two or more counterparts (including via facsimile), each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**Section 9.13    Limited Recourse**.   Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Purchaser's obligations under this Agreement shall be limited recourse obligations of the Purchaser, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) of the Purchaser at such time available for application by or on behalf of the Purchaser in making payments in accordance with this Agreement.   The parties hereby acknowledge and agree that the Purchaser's obligations under this Agreement are solely the corporate obligations of the Purchaser, and that none of the officers, directors, shareholders or agents of the Purchaser, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Purchaser hereunder.   After the Purchaser's assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of the Purchaser's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Purchaser and its liability hereunder, and the Seller shall not have the right to proceed against the Purchaser or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Purchaser or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 9.13 shall survive termination of this Agreement.

Section 9.14    **Third-Party Beneficiaries**.

(a)    Except as set forth in Section 9.14(b) below, the Parties do not confer any rights or remedies upon any Person other than the Parties and their respective successors and permitted assigns.

(b)    The parties hereby designate the Administrative Agent as a third-party beneficiary of this Agreement, having the right to enforce this Agreement.

**Section 9.15**    **The Agents**.  It is acknowledged and agreed to by all Parties that the Agents are not a party to this Agreement and shall have no duties or obligations under or in connection with this Agreement.  In relation to the giving of any consent, approval or notice by any Agent, or the taking of any other action by any Agent, it is acknowledged and accepted by the Parties that in all cases such Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed by the Lenders in accordance with the terms of the Purchaser Finance Documents.  The Parties acknowledge and agree that they will not have any rights against the Agents hereunder, and hereby release, waive, discharge, exculpate and covenant not to sue any Agent for any action taken or omitted by such Agent under this Agreement, and from any costs, claim, loss, expense or liability resulting therefrom.

[signature page follows]

**IN WITNESS WHEREOF,** the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**USAVflow Limited, as the Purchaser**

By: _____

Name: Peter Lundin

Title: Director

Aerovías del Continente Americano S.A. Avianca, as the Seller

By: _____

Name:   ROBERTO HEO

Title:

*Signature page to Contract Rights and Receivables Sale, Purchase and Servicing Agreement*

Aerovías del Continente Americano S.A. Avianca, as the Servicer

By:
Name:     ROBERTO   HELD
Title:

*Signature page to Contract Rights and Receivables Sale, Purchase and Servicing Agreement*

<u>EXHIBIT A</u>

<u>Form of AMEX Notice and Consent</u>

# FORM OF AMEX NOTICE AND CONSENT

American Express Travel Related Services Company, Inc.
3 World Financial Center
200 Vesey Street, 40th Floor
New York, NY 10285
Attention:  President, Global Merchant Services / General Counsel's Office / Merchant Services
Practice Group

and

American Express Payment Services Limited
Merchant Services
P.O. Box 72
Brighton BN88 IAH

With copy to:

American Express Company (Mexico), S.A. de C.V.
Complejo Tecnoparque
Eje 5 Norte No. 990 Edificio C
Colonia Santa Bárbara
Azcapotzalco
Mexico, D.F.
Attention: Vice President and General Manager, Merchant Services Americas, LAC

December 12, 2017

<u>NOTICE AND CONSENT</u>

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), between Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and as the Servicer and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser, (b) the Receivables Maintenance Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Cash Management Agreement**"), among Avianca S.A., the Company, Avianca USA and Citibank, N.A. as Administrative Agent (in such capacity,

the "**Administrative Agent**") and as Collateral Agent (in such capacity, the "**Collateral Agent**"), (d) the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Security Agreement**"), between Avianca S.A. and the Company, (e) the Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**New York Security Agreement**" and collectively with the RSPA, the Undertaking Agreement, the Cash Management Agreement and the Colombian Security Agreement, the "**Agreements**"), by and between the Company, as grantor, and the Collateral Agent, and (f) that certain Airline Card Service Agreement, dated as of October 8, 2013 (as modified pursuant to this Notice and Consent, and all extensions, amendments, supplements, or replacements of such agreements among AMEX (as defined below) and its affiliates and Avianca S.A. or any of its affiliates, collectively, the "**AMEX Contract**"), among American Express Travel Related Services Company, Inc. (together with its successors or assigns, "**AMEX Inc.**"), American Express Payment Services Limited (together with its successors or assigns, "**AMEX Limited**"; and, collectively with AMEX Inc., "**AMEX**"), Avianca S.A., Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp. (collectively, the "**Carriers**"), pursuant to which AMEX agrees to pay the Seller for goods and services of the Seller purchased with the American Express Card in the United States;

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

1. Notice

The Carriers, Avianca, Inc. ("**Avianca USA**") and the Company hereby give AMEX written notice that,

    (i)        pursuant to, and subject to the terms and condtions of, the RSPA, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

    (ii)      pursuant to the Colombian Security Agreement, Avianca S.A. will grant to the Company a security interest (garantía mobiliaria) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables; and

    (iii)     pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of

the Company's right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables.

2. <u>Carriers and Avianca USA Acknowledgment and Agreement and Avianca S.A. Agreement</u>

Pursuant to and in connection with the AMEX Contract, the Carriers and Avianca USA acknowledge and agree (i) that Avianca S.A. is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect of the Assigned Contract Rights and the Assigned Receivables and (ii) that after giving effect to the transactions described in 1 above, the Company is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect to the Assigned Contract Rights and the Assigned Receivables.

The Carriers and Avianca USA hereby confirm that any and all payments that have been received by Avianca USA under the AMEX Contract have been received solely in Avianca USA's capacity as agent, and Avianca USA disclaims any entitlement to or ownership of those payments.

Avianca S.A. hereby agrees that it shall promptly notify AMEX and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

3. <u>AMEX Representations and Agreements</u>

Pursuant to and in connection with section 10.(g) of the AMEX Contract, which requires AMEX's prior written consent for the assignment of rights under the AMEX Contract, by AMEX's signature below, AMEX unconditionally and irrevocably:

(i)     acknowledges, and consents to, the transactions described in section 1 set forth above;

(ii)    (a) represents that, to its knowledge, immediately before giving effect to the transactions described in 1, Avianca S.A. is entitled under the AMEX Contract to the Assigned Contract Rights and Assigned Receivables and (b) agrees that after giving effect to the transactions described in 1 above, (x) the Company is entitled under the AMEX Contract to the Assigned Contract Rights and Assigned Receivables and (y) AMEX will make all applicable payments with respect to the Assigned Contract Rights and the Assigned Receivables, including, without limitation, in respect of any airline ticket sales and related services identified by those certain merchant numbers, geographic jurisdictions

and/or other distinguishing characteristics specified on Exhibit A hereto, in accordance with the instructions set forth below;

(iii)    represents that Exhibit A hereto sets forth as of the date hereof the merchant numbers that fairly identify the Specified Sales and agrees that it will (x) use commercially reasonable efforts to notify the Collateral Agent of any changes to such merchant numbers and (y) promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(iv)    represents that, to its knowledge, the Carriers are not in breach of any obligation under the AMEX Contract;

(v)    represents that, to its knowledge, it has not received notice of any currently effective assignment of, or pledge of any security interest in, any of the Assigned Contract Rights or the Assigned Receivables; and

(vi)    agrees that if it enters into any other contract or replacement contract with the Carriers or any of their affiliates with respect to the Specified Sales, such contract will be automatically subject to this Notice and Consent and the defined term "AMEX Contract" shall be deemed to include any such contract for all purposes hereunder.

4.    Directions Regarding Payments

In connection with the Agreements, notwithstanding anything to the contrary set forth in the AMEX Contract, the Carriers, Avianca USA and the Company hereby irrevocably authorize and instruct AMEX to pay all amounts payable by AMEX in respect of the Assigned Contract Rights and the Assigned Receivables in U.S. dollars to the Company's account specified below:

| | |
|---|---|
| ACH to: | Citibank, N.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cr: | A & T Account Administration |
| A/C #: | 36114317 |
| Reference: | 11925000 |
| Beneficiary Name: | USAVflow Ltd |

or to such other account as may from time to time be designated in writing by the Collateral Agent to AMEX by sending a written request (together with a copy of this Notice and Consent) via first class mail or overight delivery to:

American Express Travel Related Services Company, Inc.

20022 N. 31st Avenue
Mail Code: 08-03-17
Phoenix, AZ 85027
Attn: Banking Team

and otherwise to act in accordance with the payment instructions of the Collateral Agent in connection therewith, in each case, without further instruction from the Carriers, Avianca USA or the Company and (ii) cease making any such payments to any other account(s).

Notwithstanding anything to the contrary herein, each of the Carriers, Avianca USA and the Company acknowledge and agree that AMEX is not required to alter its regular course of business with respect to acceptance of payment instructions from merchants and that American Express will have no liability if it acts in accordance with payment instructions received from an employee or agent of Carriers acting with apparent authority.

5.   <u>Limited Recourse</u>

Notwithstanding any other provision of this Notice and Consent, each party hereto hereby agrees that the Company's obligations under this Notice and Consent shall be limited recourse obligations of the Company, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) of the Company at such time available for application by or on behalf of the Company in making payments in accordance with this Notice and Consent.  The parties hereby acknowledge and agree that the Company's obligations under this Notice and Consent are solely the corporate obligations of the Company, and that none of the officers, directors, shareholders or agents of the Company, any of its affiliates or any other person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Company hereunder.  After the Company's assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) are realized and exhausted, all sums due but still unpaid in respect of the Company's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Company and its liability hereunder, and the parties hereto shall not have the right to proceed against the Company or any of its affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable law in respect of the Company or its affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 5 shall survive termination of this Notice and Consent.

6.  <u>Other Provisions</u>

This Notice and Consent supersedes all prior payment instructions from the Carriers or Avianca USA to AMEX with respect to amounts payable to Avianca S.A., the other Carriers, Avianca USA or the Company in respect of the Assigned Contract Rights and the Assigned Receivables.

All notices related to this Notice and Consent (i) to AMEX should be made to the address set forth above, (ii) to Collateral Agent should be made to the address set forth on its signature page below and (iii) to Avianca S.A., the Company or any Carrier should be made to the address set forth below:

> Aerovías del Continente Americano S.A. Avianca
> Centro Administrativo
> Avenida Calle 26 No. 59-15 Piso 10
> Bogotá, D.C.
> Colombia
> Attention:  Vicepresidente Financiero;
> E-mail:  lucia.avila@avianca.com;

Company, Avianca USA and the Carriers agree that such payment instructions may not be revoked or changed and this Notice and Consent may not be amended without the prior written consent of the Collateral Agent, except that Company, Avianca USA and the Carriers hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to AMEX and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by AMEX and the Collateral Agent

Nothing in this Notice and Consent shall be construed as creating or implying any additional obligation of AMEX under the AMEX Contract, except as expressly provided herein, and nothing contained herein shall otherwise amend or modify the terms and conditions of the AMEX Contract. For the avoidance of doubt, Company, Avianca USA, and the Carriers each acknowledge that AMEX retains all of its rights under the AMEX Contract, including, but not limited to, AMEX's right to Chargeback and exercise Protective Actions under Section 3 of the AMEX Contract.

THIS NOTICE AND CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company, Avianca USA, and Carriers will indemnify and hold harmless AMEX from any and all liabilities, claims, demands, actions or judgments, including but not limited to attorneys' fees, arising out of or resulting from their respective acts or omissions, or those of their respective employees, officers or agents in connection arisinig or resulting from AMEX's compliance with the terms of this Notice and Consent.

Notwithstanding the fact that this Notice and Consent is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and the Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to articles 887 *et seq* of the Colombian Commercial Code and article 1959 of the Colombian Civil Code, respectively, and the transfer of a security interest in and lien on the Assigned Contract Rights and the Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Security Agreement pursuant to Secured Transaction Law 1676 of 2013.

This Notice and Consent may be executed in any number of counterparts and by different parties on separate counterparts. Each of such counterparts shall be deemed to be an original, and all of such counterparts, taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Notice and Consent by electronic mail shall be equally as effective as delivery of a manually executed counterpart.

Any reference to the Collateral Agent in this Notice and Consent shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Purchaser Credit Agreement (as defined in the RSPA). In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Purchaser Credit Agreement. Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice and Consent. The Collateral Agent shall have no liability to AMEX, the Carriers or to any other party hereto in connection with this Notice and Consent or for or in connection with any action or inaction on its part under or in connection with this Notice and Consent, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law. Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice and Consent and pursuant to the Purchaser Credit Agreement have instructed the Collateral Agent to enter into this Notice and Consent, as agent for and on behalf of the Lenders. The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Purchaser Credit Agreement as if specifically set forth herein.

*[Remainder of page intentionally left blank]*

Please acknowledge your receipt of this Notice and Consent and your agreement to the payment terms specified above by executing this Notice and Consent where indicated below and returning it in pdf format by electronic mail to the Company and the Collateral Agent.  Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:_____

Title:_____


TACA INTERNATIONAL AIRLINES S.A.

By:_____

Name:_____

Title:_____


LÍNEAS AÉREAS COSTARRICENSES S.A.

By:_____

Name:_____

Title:_____


TRANS AMERICAN AIRLINES S.A. DBA TACA PERÚ

By:_____

Name:_____

Title:_____


AVIATECA S.A.

By:_____

Name:_____

Title:_____

*Signature page to AMEX Notice and Consent*

AMERICA CENTRAL CORPORATION

By:_____
Name:_____
Title:_____

LIFEMILES CORP

By:_____
Name:_____
Title:_____

USAVFLOW LIMITED

By:_____
Name:_____
Title:_____

AVIANCA, INC.

By:_____
Name:_____
Title:_____

*Signature page to AMEX Notice and Consent*

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.


By:_____

Name:_____

Title:_____

*Signature page to AMEX Notice and Consent*

AMERICAN EXPRESS PAYMENT SERVICES LIMITED

By:_____

Name:_____

Title:_____

*Signature page to AMEX Notice and Consent*

Citibank, N.A., as Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____


<u>Address for Notices</u>:

Citibank, N.A.

388 Greenwich Street

New York, NY 10013

Attn:  Karen Abarca

Tel.:  (212) 816-7759

E-mail: karen.abarca@citi.com / cts.spag@citi.com

*Signature page to AMEX Notice and Consent*

<u>SCHEDULE 1</u>

<u>DEFINED TERMS</u>

"**ARC**" means Airlines Reporting Corporation, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. under the AMEX Contract to (a) receive any kind of payments, indemnities or economic compensations derived from Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against AMEX. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the AMEX Contract or arising in any manner therefrom; or (y) the rights of Avianca S.A.:

(i)     to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

(ii)    to submit Sales Slips for billing or issue credit slips in any manner provided by AMEX Contract;

(iii)   to request, to treat or to have access to confidential information pertaining to cardholder account information;

(iv)    to request or receive a restricted card list pursuant to the AMEX Contract;

(v)     to grant consent to AMEX to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the AMEX Contract;

(vi)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the AMEX Contract;

(vii)   to handle all claims or complaints by a cardholder with respect to Card transactions;

(viii)  to receive documentation from AMEX that is required in connection with the defense of any claim of a cardholder asserted in connection with the AMEX Contract; or

(ix)    to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the AMEX Contract in respect of Specified Sales that are due by AMEX to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A and its affiliates.

*Schedule 1*

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by Avianca S.A., the Company, or any other Person.

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by an American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

*Schedule 1*

EXHIBIT A

MERCHANT NUMBERS

7992700286

Exhibit A

AMERICAS 93198734 (2K)

EXHIBIT B
MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice and Consent, dated as of  December 12, 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice and Consent**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation, Lifemiles Corp., USAVflow Limited, American Express Travel Related Services Company, Inc. (together with its successors or assigns, "**AMEX Inc.**"), American Express Payment Services Limited (together with its successors or assigns, "**AMEX Limited**"; and, collectively with AMEX Inc., "**AMEX**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice and Consent.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice and Consent from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO
S.A. AVIANCA

By:_____
Name:_____
Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

AMERICAN EXPRESS TRAVEL RELATED SERVICES COMPANY, INC.

By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93198734 (2K)

AMERICAN EXPRESS PAYMENT SERVICES LIMITED

By:_____

Name:_____

Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93198734 (2K)

REPLACEMENT EXHIBIT A

Exhibit B

AMERICAS 93198734 (2K)

<u>EXHIBIT B</u>

<u>Form of Credomatic Notice and Consent</u>

## FORM OF CREDOMATIC NOTICE OF TRANSFER

**BAC International Bank, Inc.**
Dirección Regional de Tarjetas
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso
Attention: Juan Carlos Páez Mena
COO Card Business
Tel: (+506) 2502-8672
Email:jcpaez@baccredomatic.com

December 12, 2017

NOTICE OF TRANSFER

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), between Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and the Servicer and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser, (b) the Receivables Maintenance Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified, the "**Cash Management Agreement**"), among Avianca S.A., the Company and Citibank, N.A., as Administrative Agent (the "**Administrative Agent**") and Citibank N.A. as the Collateral Agent (the "**Collateral Agent**"), (d) the Assignment Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Costa Rican Assignment Agreement**"), between Avianca S.A. and the Company, (e) the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Back-Up Security Agreement**"), between Avianca S.A. and the Company, (f) the Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Costa Rican Back-Up Security Agreement**"), between Avianca S.A. and the Company, (g) the Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**New York Security Agreement**") by and between the Company, as grantor, and the Collateral Agent, (h) the Loan Agreement, to be dated on or about the date hereof  (as

amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Loan Agreement**"; and collectively with the RSPA, the Undertaking Agreement, the Costa Rican Assignment Agreement, the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement and the New York Security Agreement, the "**Agreements**"), among the Company, the Guarantors party thereto, the Lenders party thereto from time to time, the Administrative Agent and the Collateral Agent, (i) the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of June 10, 2015 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Credomatic Master Agreement**"), among Avianca S.A., TACA International Airlines, S.A. (together with Avianca S.A., the "**Client**"), on behalf of themselves and their respective affiliates (collectively, the "**Client Affiliates**"), and BAC International Bank, Inc., on behalf of itself and its subsidiaries (collectively, "**Credomatic**"), and (j) the supplemental local agreements (the "**Credomatic Local Supplements**") signed, from time to time, by the Client Affiliates and Credomatic in accordance with the terms of the Credomatic Master Agreement, and (f) the Merchant Application & Agreement, dated March 17, 2016 (the "**Credomatic USA Supplement**"), among Avianca Inc. and Credomatic of Florida and, collectively with the Credomatic Local Supplements, the Credomatic Master Agreement, and all extensions, amendments, supplements, or replacements of such agreements among Credomatic (or any Credomatic company) and Avianca S.A. or any of its affiliates, collectively, the "**Credomatic Contracts**"), directly or through Avianca, Inc., a corporation organized under the laws of the State of New York ("**Avianca USA**"), as the Servicer as agent on behalf of Avianca S.A., pursuant to which Credomatic serves as Avianca S.A.'s merchant card processor of vouchers of Master Card International Incorporated, Visa U.S.A., Inc., Visa International, and Diners Club for sales made in the United States.

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

### 1. Notice of Transfer of Receivables

Pursuant to this Notice of Transfer (the "**Notice of Transfer**"), the Client, Avianca USA and the Company hereby give Credomatic written notice that,

(i) pursuant to, and subject to the terms and conditions of, the RSPA and the Costa Rican Assignment Agreement, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

(ii) pursuant to the Colombian Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (*garantía mobiliaria*) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables;

(iii)    pursuant to the Costa Rican Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (*garantía mobiliaria*) in all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables;

(iv)    pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of the Company's right, title, and interest in and to the Assigned Contract Rights and Assigned Receivables; and

(v)    Avianca USA is authorized to act, and is acting, on behalf of Avianca S.A. as its agent and attorney-in-fact for all purposes of the Credomatic Contracts.

## 2. Consent and Agreement

(i) The Client, Avianca USA and the Company hereby unconditionally and irrevocably authorize and request Credomatic to execute and deliver to the Collateral Agent the enclosed Credomatic Consent and Agreement (the "**Credomatic Consent and Agreement**"), and each of the Client, Avianca USA and the Company (each, together with their respective successors and permitted assigns, individually, a "**Notice Party**" and all, collectively, the "**Notice Parties**") and the Collateral Agent (as agent for and on behalf of and as instructed by each of the Lenders) hereby agree to the terms and conditions thereof.

(ii) The Credomatic Consent and Agreement, when executed and delivered by Credomatic (or any Credomatic company, as applicable), will be effective only (A) in connection with the sale and transfer of the Assigned Receivables and Assigned Contract Rights under the Agreements and (B) to the extent necessary to satisfy the payment obligations referred to in Section 3(a) hereof. The provisions of the Credomatic Consent and Agreement do not extend to any (x) future sale, assignment, transfer or other disposition of receivables or contract rights (other than as specified in section 1), or (y) any creation and issuance of securities or obligations or any additional or subsequent indebtedness secured by the Assigned Receivables or Assigned Contract Rights other than as created under the Agreements as in effect as of the date hereof (any such transaction described in this clause (c), a "**Future Transaction**").

(iii) Neither of the Credomatic companies shall have any obligation to consent or otherwise agree to any Future Transaction.

(iv) Avianca S.A. and Avianca USA agree to notify Credomatic at least 20 Business Days in advance of any Future Transaction (other than as notified in Section 1).

## 3. Payment Instructions.

(a) Each Notice Party hereby unconditionally and irrevocably authorizes and directs Credomatic (and, specifically, its subsidiary Credomatic of Florida Inc.), from and after the

date specified as its effective date in the Consent and Agreement until the termination of this Notice of Transfer under Section 5 hereof, (i) to remit all amounts payable by Credomatic to Avianca S.A., Avianca USA and the Company in respect of the Assigned Contract Rights and Assigned Receivables (net of Incidental Charges but without any set-off, counterclaim, deduction or withholding, other than those derived from the Credomatic Agreement or otherwise related to Incidental Charges) in U.S. dollars through the Federal Reserve Bank's Automated Clearing House Network ("FedACH") to the Company's account specified below (the "**Directed Amounts**"):

| | |
|---|---|
| ACH to: | Citibank, N.A. |
| ABA: | 021000089 |
| SWIFT: | CITIUS33 |
| Cr: | A & T Account Administration |
| A/C #: | 36114317 |
| Reference# | 11925000 |
| Beneficiary Name: | USAVflow Ltd |

or to such other account as may from time to time be designated in writing by the Collateral Agent to Credomatic and the Company (any such account the "**Collection Account**"), without further instruction from the Avianca S.A., Avianca USA or the Company and (ii) to cease making any such payments to any other account(s).

(b) (i) Credomatic will be required to make payments of Directed Amounts pursuant to subsection 3.(a) to the extent that amounts are available and due and owing to Avianca S.A. or Avianca USA, respectively, under the Credomatic Contracts, (ii) subsection 3.(a) shall in no way be construed to increase the amounts owed by, create any additional payment obligation and/or waive any rights of any of the Credomatic companies under the Credomatic Contracts or the Credomatic Card Program except as expressly set out in section 3.(a), and (iii) subsection 3(a) shall in no way be construed to limit, impair, or otherwise affect any rights of the Credomatic companies from time to time to create a reserve account or otherwise reserve from amounts otherwise owing to Avianca S.A., Avianca USA or the Company, respectively, in accordance with the provisions of Section 9 of the Credomatic Master Agreement or the terms of the Credomatic Card Program to provide for chargebacks or other set-offs, counterclaims, deductions or withholdings derived from the Credomatic Agreement or otherwise related to Incidental Charges.

(c) Nothing contained in this Notice of Transfer, the Agreements or any other agreement or document delivered in connection herewith or therewith shall interfere with Credomatic's (or any of the Credomatic companies') right to enforce its rights and remedies *vis-a-vis* the Client or the Client Affiliates or any other party under any Credomatic Contracts or the Credomatic Card Program, including, without limitation, (i) termination of Avianca S.A., TACA International Airlines, S.A. or any Client Affiliate's participation in any Credomatic Contracts for breaches thereof or pursuant to any other terms of such Credomatic Contracts or the Credomatic Card Program, or (ii) Credomatic's right to amend or

alter the terms of any such Credomatic Contracts in order to comply with changes or requirements of the Card Programs. Furthermore, in case of amendments or alterations to the Credomatic Card Program, Credomatic's obligations pursuant to the Consent and Agreement are to be performed in accordance with the Card Programs as so altered or amended.

(d)  Nothing contained in this Notice of Transfer, the Agreements or any other agreement or document delivered in connection herewith or therewith shall interfere with any of the BdB Lenders' rights pursuant to the BdB Loan Agreement.

(e)  This Notice of Transfer and the authorization and directions given herein supersede any other payment instructions from the Client, any Client Affiliate or the Company.

## 4. Representations, Warranties and Covenants.

(a)  Avianca S.A. and Avianca USA each represents and warrants that, in spite of the fact that the Credomatic USA Supplement was executed solely by Avianca USA, Avianca USA has been acting at all times as an agent on behalf of Avianca S.A. and that, therefore, immediately before giving effect to the transactions described herein, Avianca S.A. should be construed as the sole owner of the Assigned Contract Rights and Assigned Receivables. Avianca S.A. and Avianca USA each further represent and warrant that such agency relationship with regard to the contract rights and receivables arising from or related to such Credomatic USA Supplement has been duly documented and that no third parties (including creditors of Avianca USA) have any right or claim over any contract rights or receivables arising from or related to the Credomatic USA Supplement.

(b)  Each Notice Party represents and warrants that this Notice of Transfer constitutes its legal, valid and binding obligations enforceable against it in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles.

(c)  The Client and Avianca USA each represents and warrants that each Credomatic Security Document to which it is a party constitutes its legal, valid and binding obligations enforceable against it in accordance with its respective terms, except as such enforcement may be limited by bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles, and that the execution, delivery and performance of the Notice of Transfer and each such Credomatic Security Document by each such party that is a party thereto, does not and will not contravene the Agreements or the laws or regulations of any applicable jurisdiction.

(d)  The Client, the Company and Avianca USA each further represents and warrants that (i) each of this Notice of Transfer and each such Credomatic Security Document does not violate or conflict with any agreement, document or other restriction of any kind or character to which it or any of its respective properties is bound or subject, (ii) its instructions contained in this Notice of Transfer are binding on it, (iii) this Notice of Transfer constitutes the only

authorization required from it, and (iv) no authorization is required from any authority in any of the applicable jurisdictions or from any other Person in order for Credomatic to make payments in accordance herewith and with the Consent and Agreement.

(e)  The Client, Avianca USA, and the Company each represents and agrees that neither Credomatic nor any Credomatic company has prepared or participated in the preparation of the Agreements, any private placement memorandum, offering circular or supplement thereto or amendment thereof concerning the Agreements or any related offering materials relating to any security, and each such party represents and warrants that neither Credomatic nor any Credomatic company will be liable to any party to the Agreements, any Secured Party or any holder of any such securities for any loss, damage or expense such party or holder may suffer or incur in connection with its participation in the Agreements, its loan or its investment in any such securities; provided that Credomatic (and each Credomatic company, as applicable) shall remain liable to pay to the Company the amounts due pursuant to paragraph (a), clauses (ii) and (iii) of the Credomatic Consent and Agreement. Each such party further represents that neither Credomatic nor any Credomatic company has had access to the wording of the Agreements. The Client, Avianca USA, and the Company understand and agree that neither Credomatic nor any Credomatic company makes any representation or warranty as to the amount, type or nature of any Assigned Receivables and/or Assigned Contract Rights that will be created or that are currently in existence.

(f)  Neither Credomatic nor any Credomatic company shall be liable for any obligation or duty of any Person under, or the accuracy, completeness, veracity or sufficiency of, the Notice of Transfer, the Credomatic Consent and Agreement, or any of the Agreements or other agreement, document or instrument delivered in connection therewith; and neither Credomatic nor any Credomatic company shall have any duty to ascertain or to inquire as to the performance or observance on the part of any Person (other than Credomatic) of any of the terms, covenants or conditions of any of the aforementioned Notice of Transfer, Credomatic Consent and Agreement, Agreements or other agreements, documents or instruments. Furthermore, neither Credomatic nor any Credomatic company shall have any duty to monitor or verify the accuracy of the information that Client, Avianca USA and/or the Company make with regard to the Assigned Receivables and/or Assigned Contract Rights.

(g)  The Client represents and warrants that it is in compliance in all material respects with its obligations *vis-à-vis* Credomatic and/or its affiliates.

(h)  The Client, Avianca USA, and the Company each agree to notify Credomatic promptly after an officer of any such parties obtains actual knowledge of the occurrence of any event that, with the giving of notice or passage of time, or both would become an event of default, an acceleration event or any event that could have the effect of triggering a special allocation of the Collections or payments under any of the Agreements or a repurchase of any certificates, notes or other securities issued in accordance with the Agreements (an "Incipient Event").

(i)  The Client, Avianca USA, and the Company each agrees to comply at all times with any applicable law, rule or regulation of any jurisdiction, in each case applicable

6

to or binding upon such party or any of its property or to which such party or any of its property is subject, prohibiting or otherwise relating to money laundering, such as, by way of example, the U.S.A. Patriot Act (2001), the U.S. Bank Secrecy Act, Federal Corrupt Practices Act, any interim or final regulation thereunder, or any statute, interim or final regulation or executive order enforced by the United States Department of Treasury Office of Foreign Assets Control ("**OFAC**") (such laws, rules or regulations hereinafter jointly referred to as "**Money Laundering Laws**"). Furthermore, each Notice Party agrees to maintain appropriate compliance and internal anti-money laundering policies and procedures designed to ensure its compliance with such Money Laundering Laws.

(j)    The Client, Avianca USA, and the Company each agrees, subject to laws specifically applicable to such party, to comply with any reasonable requests for information made by Credomatic, concerning any such party and arising in connection with any Money Laundering Laws; *provided* that no such party shall be required to disclose to Credomatic any confidential information which such party is specifically prohibited from disclosing pursuant to a contractual obligation binding on it or any such laws to which it is subject. Without limiting the generality of the foregoing, each Notice Party agrees to notify Credomatic as soon as it knows (or, exercising reasonable diligence in its administration of the Agreements which it is a party, should know) that payments by Credomatic or any Credomatic company are being made, directly or indirectly, to a Person who is or an entity that is (or a Person or entity controlled by a Person who is or an entity that is) (i) listed on the list of specially designated nationals and blocked persons promulgated by OFAC (the "**OFAC List**") or any list of known or suspected terrorists, terrorist funding organizations or money-launderers administered by OFAC or promulgated by the President of the United States of America or any agency of the federal government of the United States of America, (ii) a government body, including any political subdivision, agency, or instrumentality thereof, of any country subject to, or is a political faction or party or an official or employee of any government subject to, sanctions enforceable by OFAC or another agency, (iii) a national of, or located in, or affiliated with the government of Cuba, Iran or Syria (until such time as the general counsel or any counsel to Credomatic determines otherwise), (iv) any other entity or Person with whom U.S. persons are prohibited from doing or facilitating business under any statute, interim or final regulation or executive order enforced by OFAC or another agency or (v) is acting for the benefit of, or on behalf of, any Person or entity described in clause (i)- (iv) in connection with any transaction under or contemplated by this Notice of Transfer, the Credomatic Consent and Agreement or the Agreements (a "Prohibited Person"). For the purpose of the foregoing definition of Prohibited Person, the term "controlled by", includes the ownership of five percent or more of any class of voting securities of an entity, the equity securities of which are not publicly traded.

(k)    Avianca S.A. hereby agrees that it shall promptly notify Credomatic and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

## 5. Termination.

(a) This Notice of Transfer, as it relates to the Credomatic Consent and Agreement, and the Credomatic Consent and Agreement shall automatically terminate upon the earlier to occur of (A) the Scheduled Termination Date or (B) delivery by the Collateral Agent to Credomatic of an executed notice of termination in the form attached as Annex A to the Credomatic Consent and Agreement (a "**Termination Notice**").  Each of the Notice Parties agrees to notify Credomatic in accordance herewith promptly upon the payment in full of obligations under the Loan Agreement, and following such notification, upon written request by Credomatic to the Collateral Agent, the Collateral Agent shall (at the direction of the Required Lenders (as defined in the Loan Agreement)) deliver a Termination Notice, without limitation of the right of the Collateral Agent (at the direction of the Required Lenders (as defined in the Loan Agreement)) to deliver a Termination Notice at any time.

(b) The Notice Parties hereby unconditionally and irrevocably authorize and direct Credomatic, upon termination of this Notice of Transfer and the Credomatic Consent and Agreement as provided in Section 5(a) above to redirect the Directed Amounts to (i) if Avianca S.A. and the Company have not at least 15 days before such termination given a joint written notice to Credomatic of details sufficient to identify the account to which the Directed Amounts should be redirected, the account specified in Schedule 2 hereto, and (ii) if Avianca S.A. and the Company have at least 15 days before such termination given joint written notice to Credomatic of details sufficient to specify a different account in a bank within the United States of America to which the Directed Amounts should be redirected, to the account so identified in such notice, and to pay the beneficiary of the bank account specified as provided in the foregoing clause (i) or clause (ii), as applicable, all amounts due from Credomatic to or for the account of such Client Affiliate with respect to settlements for Assigned Receivables and Assigned Contract Rights pursuant to the Credomatic Contracts.

(c) Each Client Affiliate will submit to Credomatic (or each applicable Credomatic company) any additional forms or agreement required by Credomatic (or such Credomatic company), confirming the foregoing instructions, no later than 21 days following the delivery of such notice of termination.

## 6. Other Limitations on Scope of Obligations.

(a) Notwithstanding the provisions of any Agreements, except as set forth in Section 3(a), Credomatic's duties and obligations in connection with the Agreements and this Notice of Transfer shall be determined solely by the express provisions of the Credomatic Consent and Agreement and this Notice of Transfer, and neither of the Credomatic companies shall be liable except for the performance of such duties and obligations as are specifically set forth in the Credomatic Consent and Agreement and in Section 3(a).  No implied covenants or obligations shall be read into any Agreements against either of the Credomatic companies nor shall any Agreements be construed to modify, create or impose any obligation or duty upon either of the Credomatic companies in connection with the Credomatic Contracts, the Credomatic Card Program or such Agreements.

(b) In furtherance but without limitation of the generality of the provisions of this subsection:

(i) Except as expressly set forth Section 3(a) herein or in paragraph (a) of the Credomatic Consent and Agreement, nothing contained in any Agreements or any other agreement or document delivered in connection therewith shall limit or otherwise impair the rights or remedies of Credomatic (or any Credomatic company) under the Credomatic Contracts or the Credomatic Card Program, all of which are hereby reserved, or interfere with the right of either Credomatic company to enforce its rights and remedies vis-a-vis the Client, Avianca USA, the Company or any of the Client Affiliates or any other party under any of the Credomatic Security Documents, the Credomatic Contracts or Credomatic Card Program, including, without limitation termination of such Credomatic Contracts for breaches thereof, or upon the occurrence of a Fundamental Change with respect to Client, Avianca USA, the Company or any of the Client Affiliates or otherwise in accordance with the Credomatic Contracts or the Credomatic Card Program.

(ii) Neither of the Credomatic companies shall be liable or deemed to be in breach of the Credomatic Consent and Agreement for any actions by it taken in good faith which impair or could impair the Assigned Receivables or Assigned Contract Rights in circumstances where such actions by it were taken (x) in the exercise of its rights or the fulfillment of its obligations with respect to the Assigned Receivables or Assigned Contract Rights in accordance with this Notice of Transfer and the Credomatic Consent and Agreement, (y) in accordance with the Credomatic Contracts or the Credomatic Card Program, or (z) because of actions or inactions in breach of the Credomatic Contracts on the part of the Client, Avianca USA, the Company or any of the Client Affiliates, such as its obligation to pay the Credomatic companies. Without limiting the generality of the foregoing, such actions by a Credomatic company could include but would not be limited to termination of the Client, Avianca USA, the Company or any of the Client Affiliates' contractual relationship with Credomatic, upon the occurrence of a Fundamental Change or any event described in Section 6(b)(iii).

(iii) A good faith determination by any counsel to either of the Credomatic companies that: (x) its performance under this Notice of Transfer or the Credomatic Consent and Agreement will cause it to violate any Money Laundering Law, or (y) the Client, Avianca USA, the Company or any of the Client Affiliates has violated any Money Laundering Law, then, and in any such event, each Credomatic company shall have the right to take measures available to it under applicable law or under the Credomatic Contracts, the Credomatic Card Program and the Credomatic Consent and Agreement.

(iv) Neither of the Credomatic companies shall be liable (x) to any Person for the due execution, legality, validity, enforceability, genuineness or sufficiency of any Agreements (other than for its obligations under the Credomatic Consent and Agreement) or (y) for any obligation or duty of any Notice Party or any other Person under the Agreements, including without limitation the obligation of Avianca S.A. to authorize travel agencies in the United States to accept payment for airline tickets or related services provided by Avianca S.A. by a Master Card® Card or Visa® Card, however branded, or any one or more of said Cards, only

through the Credomatic companies using the merchant codes set forth on Exhibit A hereto (as amended pursuant to a Merchant ID Supplement from time to time), for complying with Client's ordinary course of business requests to open new merchant codes or to amend or close the merchant codes set forth on Exhibit A hereto, or for any loss or damages suffered by any Person on account of any Notice Party's or other Person's breach of any such obligation or duty, or any other agreements, documents or instruments executed and delivered in connection herewith or therewith. Neither of the Credomatic companies shall have any duty to ascertain or to inquire as to the performance or observance on the part of any other Person of any of the terms, covenants or conditions of any Agreements or other agreements, documents or instruments executed and delivered in connection herewith or therewith.

(v) Nothing contained in any of the Agreements or any other agreements, documents or instruments executed and delivered in connection herewith or therewith shall be construed to impose a duty on either of the Credomatic companies to monitor or verify the accuracy of the information that Client, Avianca USA, the Company or any of the Client Affiliates (or any successor) provides to either of the Credomatic companies with respect to which amounts are payable to or for the account of the foregoing from the Credomatic companies in connection with the Receivables.

Without limiting the rights and obligations of the Client, Avianca USA, the Company or any of the Client Affiliates under the Credomatic Contracts or the Credomatic Card Program, each of the Notice Parties covenants and agrees, to the extent permitted by law, not to initiate or voluntarily participate in any suit or other legal action against a Credomatic company arising out of or based upon any action (or failure to act) of either of the Credomatic companies, taken (or, in the case of a failure to act, not taken) in good faith that could impair the Assigned Receivables, in each case, in the circumstances described in this Section 6. For the avoidance of doubt, each of the Notice Parties acknowledges and agrees that any actions (and any failure to act) on the part of a Credomatic company, as applicable, taken or not taken in accordance with Section 6(b), which shall not constitute a breach of the terms of, or a failure to perform under, this Notice of Transfer or the Credomatic Consent and Agreement.

Neither of the Credomatic companies shall have or incur any liability for any non-performance (or delay in performance) of its obligations under the Credomatic Consent and Agreement to the extent such non-performance (or delay in performance) is caused by (i) any operational failure or problem on the part of any Notice Party, or (ii) any unforeseen circumstance not within the reasonable control of a Credomatic company including, without limitation, any act of God, strike, civil commotion, act of terrorism, riot, war, threat of war, political upheaval and any fire, explosion, storm, flood, earthquake or other natural physical disaster; provided that the Credomatic companies shall continue payments under paragraph (a) of the Credomatic Consent and Agreement as promptly as practicable following any change in such circumstance permitting continuation of payments. In no event shall a Credomatic company be liable for any indirect, special, incidental or punitive losses or damages of any kind whatsoever, including lost profits, relating to its obligations under the Credomatic Consent and Agreement.

(vi) This Notice of Transfer supersedes all prior payment instructions from the Client or Avianca USA to Credomatic with respect to amounts payable to Avianca USA, Avianca S.A. or the Company in respect of the Contract Rights and Receivables. All notices related to this Notice of Transfer and the Credomatic Acknowledgment and Consent to the Client and Credomatic the Company and the Collateral Agent to the addresses set forth herein or on the signature pages below.

### 7. Governing Law; Consent to Jurisdiction.

(a) This Notice of Transfer and the Credomatic Consent and Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflict of laws other than Sections 5-1401 and 5-1402 of the New York General Obligations Law.

(b) This Notice of Transfer, the Credomatic Consent and Agreement, the Credomatic Security Documents and any other documents delivered pursuant hereto or thereto, and any actions taken hereunder, constitute commercial acts by the Notice Parties that are party to such documents or agreements. To the extent that the Client, Avianca USA, the Company or any of the Client Affiliates, or any of their respective assets, may have, or may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from setoff or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Client, Avianca USA, the Company or any of the Client Affiliates hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues, wherever located, with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Notice of Transfer, the Credomatic Consent and Agreement, any Credomatic Security Document or any document delivered pursuant hereto or thereto (collectively, the "**Credomatic Documents**"), in each case for the benefit of each Credomatic company and its successors and assigns, it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

(c) Each Notice Party hereby irrevocably agrees that any legal action, suit or proceeding brought by or against any of them with respect to any matter under or arising out of or in any way connected with any of the Credomatic Documents or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding may be brought in the courts of the State of New York in the Borough of Manhattan, New York, or of the United States of America in the Borough of Manhattan, New York, and by execution and delivery of this agreement, each Notice Party and the Collateral Agent (acting for and on behalf of the Lenders) hereby irrevocably accepts and submits to the non-exclusive jurisdiction of the aforesaid courts in person, generally and unconditionally, with respect to any such action, suit or proceeding for itself and in respect of its property, assets and revenues.

11

(d) Each of the Client and the Company hereby irrevocably designates, appoints and empowers National Registered Agents, Inc., with offices on the date hereof at 111 Eighth Avenue, New York, New York 10011, and its successors, as its Process Agent to receive, accept and acknowledge for and on its behalf and on behalf of its property, service of any and all legal process, summons, notices and documents which may be served in any such action, suit or proceeding in the courts of the State of New York or of the United States of America in the State of New York, which service may be made on such designee, appointee and agent in accordance with legal procedures prescribed for such courts. The Client, Avianca USA and the Company will take any and all action necessary to continue such designation by it in full force and effect and to advise Credomatic and the Collateral Agent of any change of address of such Process Agent; and should such Process Agent become unavailable for this purpose for any reason, the Client, Avianca USA and the Company will forthwith irrevocably designate a new Process Agent within New York, New York, which shall agree to act as such, with the powers and for the purposes specified in this subsection. Each of the Client, Avianca USA and the Company further irrevocably consents and agrees to the service upon it of any and all legal process, summons, notices and documents out of any of the aforesaid courts in any such action, suit or proceeding by hand delivery, to it at its address set forth in Section 9 hereof or to any other address of which it shall have given notice pursuant to Section 9 hereof or to its then Process Agent. Each of the Client, Avianca USA and the Company agrees that service upon it or any such Process Agent for it as provided for herein shall, to the fullest extent permitted by law, constitute valid and effective personal service upon it and that the failure of any such Process Agent to give any notice of such service to the Client, Avianca USA and the Company, as the case may be, shall not impair or affect in any way the validity of such service or any judgment rendered in any action or proceeding based thereon.

(e) In addition, each Notice Party hereby irrevocably and unconditionally waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of any of the aforesaid actions, suits or proceedings brought in any such court arising out of or in connection with any of the Credomatic Documents brought in any of the aforesaid courts, and hereby further irrevocably and unconditionally waives and agrees, to the fullest extent permitted by law, not to plead or claim that any such action, suit or proceeding brought in any such court has been brought in an inconvenient or inappropriate forum.

(f) **EACH PARTY HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE EXTENT PERMITTED BY LAW, TRIAL BY JURY IN ANY LEGAL ACTION OR PROCEEDING RELATING TO THIS NOTICE OF TRANSFER OR THE CONSENT AND AGREEMENT OR ANY COUNTERCLAIM RELATING THERETO.**

(g) Notwithstanding the fact that this Notice of Transfer is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to (i) articles 887 et seq of the Colombian Commercial Code and (ii) the transfer of contract rights for Cesión under Costa Rican Law and articles 1104 of the Costa Rican Civil

Code and 491 of the Costa Rican Commercial Code and the transfer of a security interest in and lien on the Assigned Contract Rights and Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Back-Up Security Agreement, pursuant to the Colombian Secured Transactions Law 1676 of 2013.

## 8. Conditions to Effectiveness.

The Credomatic Consent and Agreement shall not be delivered, and neither Credomatic nor any Credomatic company shall have any obligations hereunder, unless, on or prior to the Closing Date, the following conditions are fulfilled:

(a) Credomatic (and each applicable Credomatic company) shall have received and approved copies of all forms and any other documentation, in the form attached hereto as Exhibit C, which Credomatic agrees is all that currently is required (i) from each Notice Party under the Credomatic Contracts to direct the payment of amounts payable in respect of Assigned Receivables and Assigned Contract Rights to the corresponding bank specified in the Credomatic Consent and Agreement, and (ii) to implement the operational changes required by all such documentation and the Credomatic Consent and Agreement;

(b) Credomatic shall have received a manually-signed, fully-executed copy of this Notice of Transfer;

(c) Credomatic shall have received manually-signed copies of all Credomatic Security Documents requested by it and such documents shall be in full force and effect;

(d) Credomatic shall have received copies of the Agreements, as executed;

(e) Credomatic shall have received favorable legal opinions, dated the Closing Date in respect of which the Credomatic companies have received written permission from the authors of such opinions allowing the Credomatic companies to rely thereon, from counsel to the Client, Avianca USA and the Company, each in form and substance reasonably acceptable to Credomatic;

(f) No Fundamental Change shall have occurred and be continuing.

Credomatic's delivery to the Notice Parties and the Collateral Agent of an executed copy of the executed Credomatic Consent and Agreement shall be deemed to be evidence of satisfaction of the foregoing conditions precedent.

## 9. Notices.

All notices, requests, demands or other communications to or upon the Credomatic companies or any Notice Party or the Collateral Agent shall be in writing and shall become effective when received. Any written notice shall either be mailed, certified or registered mail, return receipt requested with proper postage for airmail prepaid, or confirmed facsimile, or by overnight delivery service (providing for delivery receipts) or delivered by

hand or by electronic mail. All notices, requests, demands or other communications under this Notice of Transfer shall be addressed to Credomatic and/or the Client (or the applicable Client Affiliates) and made to (a) in the case of the Client and Avianca USA, the address set forth on Avianca S.A.'s signature pages, (b) in the case of the other parties hereto, the addresses set forth on their respective signature pages below (or such other address as shall be specified by one party hereto to each of the other parties) and (c) in the case of Credomatic, the address set forth on Credomatic's signature page of the Consent.

**10. Assignments; Amendments.**

None of Client, the Company and the Client Affiliates shall assign or amend this Notice of Transfer without the prior written consent of the Collateral Agent and Credomatic; nor shall Credomatic assign or amend the Credomatic Consent and Agreement without the prior written consent of the Collateral Agent and Avianca S.A., except that the Parties hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to Credomatic and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by Credomatic and the Collateral Agent.

**11. Confidentiality.**

(a) Without the prior written consent of Credomatic, none of the Notice Parties shall distribute copies of (or otherwise disclose the contents of) any of the agreements and documents comprising the Credomatic Contracts or the Credomatic Card Program to any Person, except to the extent provided in subsection (c).

(b) Except as required to consummate the transactions contemplated by the Agreements and except to the extent provided in subsection (c), each of the Notice Parties, on their own behalf and on behalf of their respective officers, employees, agents, advisers, and consultants, agrees that the terms of this Notice of Transfer, the Credomatic Consent and Agreement, the Credomatic Contracts, the Credomatic Card Program and the Credomatic Security Documents, and the substance of the negotiations (but not the fact that negotiations occurred) among the parties hereto shall be confidential, and except as required to consummate the transactions contemplated by the Agreements, may not be disclosed to any third party (save to any of its officers, employees, agents, advisers, and consultants) or used in any way without the prior written consent of Credomatic.

(c) The Notice Parties' obligations of confidentiality in this Section shall not apply to information that (i) was in the public domain prior to the date of this Notice of Transfer or subsequently came into the public domain through no fault of the receiving party (or its officers, employees, agents, advisers, and consultants), (ii) was received by any party (or any of its officers, employees, agents, advisers, and consultants) from a third party that, to the receiving party's knowledge, is not bound by any obligation of confidentiality to any other party in respect of such information (iii) is disclosed by the receiving party in order to enforce this Notice of Transfer, the Credomatic Consent and Agreement or any Credomatic Security Document or the rights of such party hereunder or thereunder, (iv) is disclosed in response to a valid order of a court with competent jurisdiction or governmental authority,

and (v) is disclosed at the request, and subject to the confidentiality statements, of any rating agency then rating any of the Notice Parties or their affiliates. Unless prohibited by law, rule or regulation, written notice of the fact of such disclosure shall promptly be delivered to Credomatic.

### 12. Counterparts.

(a) This Notice of Transfer may be executed in any number of counterparts and by different parties on separate counterparts. Each of such counterparts shall be deemed an original, and it shall not be necessary in making proof of this Notice of Transfer to produce or account for more than one such counterpart.

(b) Credomatic will kindly indicate their understanding and agreement with the above by signing 7 copies of the Credomatic Consent and Agreement, retaining one copy for their records, delivering one copy to each of the Collateral Agent, the Client, Avianca USA and the Company for its files.

### 13.    The Collateral Agent

Any reference to the Collateral Agent in this Notice of Transfer shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Loan Agreement.  In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Loan Agreement.  Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice of Transfer.  The Collateral Agent shall have no liability to Credomatic or to any other party hereto in connection with this Notice of Transfer or for or in connection with any action or inaction on its part under or in connection with this Notice of Transfer, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law.  Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice of Transfer and pursuant to the Loan Agreement have instructed the Collateral Agent to enter into this Notice of Transfer, as agent for and on behalf of the Lenders.  The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

### 14.    Limited Recourse

Notwithstanding any other provision of this Notice of Transfer, each party hereto hereby agrees that the Company's obligations under this Notice of Transfer shall be limited recourse obligations of the Company, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration

agreement dated the date hereof entered into between the Company and MaplesFS Limited) of the Company at such time available for application by or on behalf of the Company in making payments in accordance with this Notice of Transfer.  The parties hereby acknowledge and agree that the Company's obligations under this Notice of Transfer are solely the corporate obligations of the Company, and that none of the officers, directors, shareholders or agents of the Company, any of its affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Company hereunder.  After the Company's assets (other than the ordinary share capital and any transaction fee charged by the Company pursuant to the administration agreement dated the date hereof entered into between the Company and MaplesFS Limited) are realized and exhausted, all sums due but still unpaid in respect of the Company's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Company and its liability hereunder, and the parties hereto shall not have the right to proceed against the Company or any of its affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable law in respect of the Company or its affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 14 shall survive termination of this Notice of Transfer.

[*Remainder of page intentionally left blank*]

Please acknowledge your receipt of this Notice of Transfer and execute the attached Credomatic Consent and Agreement and return it in pdf format by electronic mail to the Company and the Collateral Agent. Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE
AMERICANO S.A. AVIANCA

By:_____

Name:_____

Title:_____

Address for Notices:
Aerovías del Continente Americano S.A.
Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C., Colombia
Attention:  Vicepresidente Financiero
Facsimile No.:  571-413-9809
Telephone No.:  571-295-6765
E-mail:  Lucia.avila@Avianca.com

[Credomatic Notice of Transfer - Signature Page]

TACA INTERNATIONAL AIRLINES S.A.

By:_____

Name:_____

Title:_____

AVIANCA, INC.

By:_____

Name:_____

Title:_____

[Credomatic Notice of Transfer - Signature Page]

USAVFLOW LIMITED


By:_____

Name:_____

Title:_____


<u>Address for Notices</u>:

USAVflow Limited
c/o P.O. Box 1093GT,
Queensgate House,
South Church Street, Georgetown,
Grand Cayman, Cayman Islands;
Attention:  The Directors;
Facsimile No.:  (345) 945-7100;
Telephone No.:  (345) 945-7099;
E-mail:  info@maplesfinance.com;


[Credomatic Notice of Transfer - Signature Page]

CITIBANK,   N.A.,   as
Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____


<u>Address for Notices</u>:

Citibank, N.A.

Agency & Trust

388 Greenwich Street

New York, New York 10013

Attention:  Karen Abarca

Tel: (212) 816-7759

Email: <u>karen.abarca@citi.com</u> /cts.spag@citi.com

[Credomatic Notice of Transfer - Signature Page]

<u>SCHEDULE 1</u>

<u>DEFINED TERMS</u>

"**ARC**" means Airlines Reporting Corporation, a company which provides ticket transaction settlement services between airlines and travel agencies (both traditional and online) and the travel management companies that sell their products in the United States, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. under the Credomatic Contracts (including, specifically, the Credomatic USA Supplement) to (a) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against Credomatic. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the Credomatic Contracts or arising in any manner therefrom; (y) any rights of TACA International Airlines, S.A. or its subsidiaries under the Credomatic Contracts or (z) the rights of Avianca S.A.:

> (i)    to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;
>
> (ii)    to submit Sales Slips for billing or issue credit slips in any manner provided by Credomatic Contracts;
>
> (iii)    to request, to treat or to have access to confidential information pertaining to cardholder account information;
>
> (iv)    to request or receive a restricted card list pursuant to the Credomatic Contracts;
>
> (v)    to grant consent to Credomatic to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the Credomatic Contracts;
>
> (vi)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the Credomatic Contracts;
>
> (vii)    to handle all claims or complaints by a cardholder with respect to Card transactions;
>
> (viii)    to receive documentation from Credomatic that is required in connection with the defense of any claim of a cardholder asserted in connection with the Credomatic Contracts; or

Schedule 1 – 1

(ix)    to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the Credomatic Contracts that are due on account of Specified Sales from Credomatic to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA. For the avoidance of doubt, the Receivables shall not include any and all Collections accrued under the Credomatic Contracts that are due by Credomatic to TACA International Airlines, S.A. or its subsidiaries.

"**BdB Lenders**" means Banco de Bogotá S.A., New York Agency and any other Person that shall have become a party to the BdB Loan Agreement pursuant to an assignment, other than any such Person that ceases to be a party thereto pursuant to an assignment.

"**BdB Loan Agreement**" means the Credit and Guaranty Agreement, (dated as of June 16, 2015) among Taca International Airlines S.A. (as Borrower), Avianca Holdings S.A. (as Guarantor), Fiduciaria Bogotá S.A. (as Administrative Agent), and the BdB Lenders.

"**Card Programs**" means the Credomatic Card Program and all current or future credit and debit card programs administered (pursuant to each of their respective regulations, by-laws, operating regulations, agreements or arrangements) by Visa, MasterCard, American Express, Discover, Diners Club, JCP and/or any other card networks included in the Credomatic Contracts, as applicable.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A.

"**Closing Date**" means the date on which the Agreements are executed and become effective.

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by the Seller, the Purchaser, or any other Person.

"**Credomatic Card Program**" means (i) the Visa and MasterCard credit and debit card programs administered by Credomatic or its affiliates pursuant to (a) the Visa agreements, Visa by-laws, Visa operating regulations, Visa Base II clearing and settlement system regulations, and any other agreements or arrangements governing the rights, duties and obligations of the Visa companies and their respective clients with respect to the procedures administered by the Visa companies for the clearing and settlement of paper (collectively the "**Visa Regulations**"), in each case as such Visa Regulations, and other agreements and arrangements may be amended, restated, superseded or replaced from time to time; (b) the MasterCard by-laws, MasterCard rules, MasterCard operating regulations and MasterCard agreement and any other agreements or arrangements regulating the rights, duties and obligations of MasterCard and its members with respect to the procedures administered by MasterCard for the clearing and settlement of paper (collectively the "**MasterCard Regulations**"), in each case as such MasterCard Regulations and other agreements or arrangements may be amended, restated, superseded or replaced from time to time; (ii) any agreements, by-laws, rules, operating regulations or arrangements similar to the ones described

Schedule 1 – 2

in the previous subsection (i) but regulating the rights, duties and obligations with regard to other Card Programs; and (iii) Credomatic's internal by-laws, rules, regulations, guidelines, requirements relating to Credomatic's participation in any such Card Programs and Credomatic's relationship with its cardholders and acquirers and other clients, partners or customers.

"**Credomatic Security Documents**" means (i) the Indemnification Agreement, dated on or about the date hereof between Avianca S.A. and Credomatic delivered to Credomatic in connection with the Consent and Agreement, (ii) any other agreement, instrument, letter of credit or arrangement securing, guaranteeing or in any way supporting Avianca S.A.'s, the Client's or any Client Affiliate's obligation to pay any claims arising from any Credomatic Agreement or any other agreement or instrument delivered to Credomatic as collateral or security in connection with the transaction contemplated by the Agreements or with the Credomatic Consent and Agreement, and (iii) any other agreement, instrument or document which is supplemental to, or in substitution for, or in furtherance of any of (i) and (ii) above.

"**Incidental Charges**" means and includes each amount from time to time falling due to or for the account of Credomatic (or any of its affiliates) in relation to services provided by Credomatic for Avianca S.A. or any of its affiliates, Avianca USA, and/or the Company to Credomatic, including, without limitation, charges in respect of: (i) service, license or royalty fees, transaction fees, collateral and other assessments; clearing and settlement fees, late settlement fees; chargebacks and second chargebacks, the creation, funding, or maintenance of a reserve account, arbitration, dispute resolution or compliance settlements; arbitration, dispute resolution or compliance fees; reversals of any amounts improperly credited, credit refunds or other adjustments; international outgoing interchange fees; and any other charges arising out of the normal course of any of Credomatic's acquisition and related clearing and settlement pursuant to the Credomatic Contracts, to the Credomatic Card Program and to any applicable rules and regulations, (ii) each amount in respect of legal expenses reasonably incurred by Credomatic (or any of its affiliates) in connection with or arising directly out of any competing claims of third parties which may arise relating to amounts payable by the Client, Avianca USA, and/or the Company to or for the account of Credomatic (or any of its affiliates) pursuant to the Credomatic Agreement and the Credomatic Consent and Agreement; (iii) any other obligations at any time owing by Avianca S.A. or any of its affiliates or the Company to Credomatic (or any of its affiliates) under any of the Credomatic Contracts or the Credomatic Card Program.

"**Fundamental Change**" means and and shall be construed, in accordance with the Credomatic Contracts or the Credomatic Card Program, to include any of the following events: (A) the Client, Avianca USA, the Company or any of the Client Affiliates becomes insolvent, (B) (i) a voluntary or involuntary petition shall be filed by or against the Client, Avianca USA, the Company or any of the Client Affiliates, or (ii) any similar proceeding or action shall be commenced or taken by or against the Client, Avianca USA, the Company, or any of the Client Affiliates, (iii) any of the Client Affiliates or the Client, Avianca USA, the Company or any of the Client Affiliates shall consent to or acquiesce in any such proceeding or action, (1) which seeks liquidation, reorganization, possession or similar

Schedule 1 – 3

relief with respect to it or its debts under applicable bankruptcy, insolvency or similar law, (2) which seeks controlled administration or preliminary concordat, or (3) which seeks the appointment of a trustee, receiver, liquidator, custodian, examiner, intervenor or other similar official of the Client, Avianca USA, the Company or any of the Client Affiliates for all or any substantial part of its property, (C) a general moratorium shall be imposed on the payment or performance of debts or contractual obligations of the Client, Avianca USA, the Company or any of the Client Affiliates, (D) all or a substantial part of the properties of the Client, Avianca USA, the Company or any of the Client Affiliates shall be condemned, seized or otherwise appropriated or custody of such properties shall be assumed by any governmental authority or court or other Person or entity purporting to act under the authority of the government of any jurisdiction, or the Client, Avianca USA, the Company or any of the Client Affiliates shall be prevented from exercising normal control over all or a substantial part of its property, (E) any authorization of any governmental authority (including, without limitation, any foreign exchange authorization), which is necessary for the fulfillment by the Client, Avianca USA, the Company or any of the Client Affiliates of any obligation to Credomatic, shall be suspended, revoked, withdrawn, modified or withheld or shall otherwise fail to remain valid or cease to exist, and (F) Client, Avianca USA, the Company or any of the Client Affiliates shall have failed to fulfill any material obligation to Credomatic under the Credomatic Contracts or the Credomatic Card Program as a result of either (i) a determination by any court of competent jurisdiction or governmental authority that the performance of its obligations under the Credomatic Contracts or the Credomatic Card Program violates law or regulation of any governmental authority, including without limitation the U.S. USA Patriot Act (2001), or (ii) any publicly known action or inaction by a third party or third parties, including, without limitation, terrorist acts, armed hostilities or labor strikes, and it shall have failed to cure such nonperformance within a reasonable period of time following notice from Credomatic of such failure.

"**Lenders**" means each Person who is or from time to time becomes a party as a lender to the Purchaser Credit Agreement (as defined in the RSPA).

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Person**" shall mean any legal person, including any individual, partnership, corporation (including a business trust), joint stock company, trust, joint venture, unincorporated association, limited liability company or other entity, or a government or any political subdivision or agency thereof.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Scheduled Termination Date**" means June 12, 2023 as such date may be extended to a new date (the "**New Termination Date**"), which is not more than six months following the later of the Scheduled Termination Date and the latest occurring New Termination Date, by written notice from the Collateral Agent to Credomatic prior to such date.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by

Schedule 1 – 4

Avianca S.A. where payment in the case of any such sale is made by a Master Card® Card or Visa® Card, however branded, or any one or more of said Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

<u>SCHEDULE 2</u>

ACCOUNT INFORMATION


ACH to:              Citibank, N.A.
ABA:                 021000089
SWIFT:               CITIUS33
Cr:                  A & T Account Administration
A/C #:               36114317
Reference:           11925000
Beneficiary Name:    USAVflow Ltd

EXHIBIT A

MERCHANT CODES

Credomatic FL (VI/MC): 5610-014001084970

Exhibit A

EXHIBIT B
MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice of Transfer, dated as of  December 12, 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), Taca International Airlines S.A., BAC International Bank, Inc., on behalf of itself and its subsidiaries (collectively, "**Credomatic**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO
S.A. AVIANCA

By:_____

Name:_____

Title:_____

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

BAC INTERNATIONAL BANK, INC.

By:_____

Name:_____

Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

CITIBANK, N.A., as Collateral Agent

By:_____

Name:_____

Title:_____


By:_____

Name:_____

Title:_____

Exhibit B

REPLACEMENT EXHIBIT A

Exhibit B

<u>EXHIBIT C</u>
REQUIRED FORMS AND DOCUMENTATION

Exhibit C

**Exhibit C**
**to Credomatic Notice of Transfer**

See the following attached documents:

1. ABA/DDA Change Request Form

2. Bank Letter together with the completed form above confirming the designated Account legal name, Account number, and the ABA routing number referred to in the form above





Credomatic of Florida, Inc
9150 S. Dadeland Blvd.          Tel: 305-372-3012
Suite 800                              Fax: 305-670-5251
Miami, Florida 33156        www.credomaticusa.com

# ABA/DDA Change Request

| Merchant Account #: | | |
|---|---|---|
| Merchant Name (DBA): | | |
| Requested By: | | |
| Phone #: | | |
| | Current | New |
| Bank Name | | |
| ABA/Routing Number | | |
| DDA/Account Number | | |

**Merchant Signature:** _____     _____

**Date**

**Merchant Owner/Principal Name:** _____
       **(Printed)**

**NOTE: CHANGES TO BANKING INFORMATION WILL NOT BE PROCESSED
WITHOUT A VOIDED CHECK OR BANK LETTER.**

*Please note: A Support Representative will contact you to verify the above information*



Global Transaction Services
388 Greenwich Street
New York, NY  10013

Karen Abarca, Vice President
Direct:      212-816-2977
Facsimile:  212-816-5530
Karen.Abarca@citi.com

Avianca S.A.
Att: Lucia Avila
Avenida Calle 26 # 59 – 15
Bogota, Colombia

December 11, 2017

### AEROVIAS DEL CONTINENTE AMERICANO S.A. – "AVIANCA"

To Whom It May Concern,

Based on the request received, for the purpose of the above mentioned transaction currently being negotiated, we have reserved the account number listed below along with the wire instructions in connection to such account. Once the agreements have been finalized, the account will be available for use:

| Account No | Account Name |
|---|---|
| 11925000 | USAVflow Ltd Pass thru Account |

Payments shall be sent by wire transfer pursuant to the following instructions:

CITIBANK, N.A.
ABA: 0210-0008-9
SWIFT: CITIUS33
CR: A & T Account Administration
A/C#.: 36114317
Ref:11925000

Thank you,

Miriam Molina
Vice President

Citibank, N.A.


**CREDOMATIC**
*Merchant Services*

**Merchant Services Department**
T: 1-877-372-3012
F: 305-670-5251
cof-merchant_dept@credomaticusa.com

## ABA/DDA Change Request *

Merchant Account #:  5610014001084970

Merchant Name (DBA):  AVIANCA TRAVEL AGENCIES

Requested By:  Henry Ernesto Zavaleta

Phone #:  (503) 2247-2399

|  | Current | New |
|---|---|---|
| Bank Name | JP Morgan Chase NA | Citibank, N.A |
| ABA/Routing Number | 021000021 | 021000089 |
| DDA/Account Number | 581936155 | 11925000 |

Date:  December, 2017

Merchant Signature: _____

Merchant Owner/Principal Name (Printed):

Henry Ernesto Zavaleta   / Sales to cash Manager

## *Attach a voided check or bank letter to process changes to banking information

*Merchant Services Department will contact you to verify the above information*

9150 S. Dadeland Blvd. Suite 800 Miami, FL 33156
www.credomaticmerchantservices.com

EXECUTION VERSION

# FORM OF CREDOMATIC CONSENT AND AGREEMENT

December 12, 2017

BAC International Bank, Inc., on behalf itself and its subsidiaries (collectively, "**Credomatic**" and each a "**Credomatic Company**"), hereby acknowledges receipt of and consents to all the terms of the Notice of Transfer, dated December 12, 2017 (the "**Notice**"), delivered by Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), Avianca, Inc., a corporation organized under the laws of the State of New York ("**Avianca USA**"), and Citibank, N.A., as Collateral Agent for the Lenders as defined therein (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"). Capitalized terms used but not defined herein shall have the meanings given in the Notice.

(a)      For good and valuable consideration given by Avianca S.A., its subsidiaries and the Company, and subject to the terms of the Notice, Credomatic unconditionally and irrevocably:

(i)      acknowledges, and consents to, the transactions described in Section 1 ("Notice and Transfer of Receivables") of the Notice;

(ii)      represents that, to the best of its understanding pursuant to the representations made by the Notice Parties, immediately before giving effect to the transactions described in Section 1 of the Notice, Avianca S.A. is the owner of the Assigned Contract Rights and Assigned Receivables and agrees that after giving effect to the transactions described in Section 1 of the Notice, the Company is the owner of the Assigned Contract Rights and Assigned Receivables and agrees to make all applicable payments under the Credomatic Contracts, in respect of Specified Sales in accordance with the instructions set forth in Section 3 (a) of the Notice unless and until such Notice is terminated in accordance with Section 5(a) of the Notice; *provided that* all such payments shall be made in United States dollars in immediately available and freely transferable funds and *provided further that*, except for payment of the Directed Amounts to the account specified in the Notice, neither Credomatic nor any Credomatic Company shall have any further obligation with respect to receipt by any party of any amounts to be paid pursuant to this clause (ii), including but not limited to amounts that may be withheld from such payments on account of taxes.

(iii)      waives any right to set off, deduct or apply any deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held by Credomatic on behalf of Avianca S.A. or the Company (in each case, other than those deposits held in relation to the Credomatic Contracts) or other obligations at any time owing by Credomatic to

Avianca S.A. or the Company under any agreement other than the Credomatic Contracts against the obligations of the Client under the Credomatic Contracts and amounts payable under clause (ii) above; *provided, however*, that Credomatic and the Credomatic companies shall at all times have the right to set off any and all Incidental Charges owed to or for the account of Credomatic (or the Credomatic companies) (y) against any and all amounts due from Credomatic (or the Credomatic companies) to or for the account of Client or each of the Client Affiliates; and/or, (z) against any and all amounts due from Credomatic (or the Credomatic companies) to or for the account of (or deposited in accounts held by Credomatic, or the Credomatic companies on behalf of) the Company or the Collateral Agent under clause (ii) above, whether such amounts are due by reason of Receivables, Contract Rights or otherwise;

(iv)    represents that Exhibit A hereto is a true and correct and complete copy of the Credomatic Contracts that are relevant to Specified Sales as of the date hereof and agrees that it will promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(v)    represents that, based on its understanding of the representations made by the Notice Parties in the Notice , Exhibit B to the Notice sets forth the merchant codes that fairly identify the sales and services associated with the Assigned Contract Rights and Assigned Receivables as of the date hereof.

(vi)    agrees that the Collateral Agent (for and on behalf of the Lenders) shall be an express and intended third party beneficiary of the agreements contained herein;

(vii)    agrees that it shall simultaneously copy all notices made by Credomatic to the Client under the Credomatic Contracts, to Avianca S.A., Avianca USA, the Company and the Collateral Agent in accordance with Section 9 of the Notice.

(viii)    represents that Client is not in breach of any material obligation under the Credomatic Contracts;

(ix)    represents it has not received notice of any currently effective assignment of, or pledge of any security interest with regard to any of the Assigned Contract Rights or Assigned Receivables;

(x)    agrees that, as long as this Credomatic Consent and Agreement remains in effect, it will not consent to any assignment of, or pledge of any security interest in any of the Assigned Contract Rights or Assigned Receivables to any Person other than pursuant to the Notice;

(xi)    agrees not to enter into any other contract or replacement contract with the Client or any of its affiliates with respect to the Specified Sales without the previous written consent of the Collateral Agent, and to transact all business in respect of the Specified Sales under the current Credomatic Contracts as extended; *provided, however, that,* such limitation shall not limit or otherwise impair Credomatic's rights or remedies under the Credomatic Contracts, including, without limitation, its rights under clause 3 of the Credomatic Master Agreement or its rights to modifiy, amend, replace or update the Credomatic Contracts in a way that does not materially affect the Specified Sales, the Assigned Receivables or the Assigned Contract Rights; and *provided further, that* such limitation shall not limit or otherwise impair Credomatic's rights to enter into new contractual relationships with other Client Affiliates that are not being processed, acquired or otherwise serviced by Credomatic as of the date hereof.

(xii)   this Consent and Agreement shall remain in full force and effect until terminated in accordance with Section 5(a) of the Notice; and

(xiii)  all notices, requests, demands or other communications to or upon Credomatic or any Notice Party shall be made in accordance with Section 9 of the Notice;

(b)    Credomatic is executing this Credomatic Consent and Agreement in reliance upon the agreements, representations and warranties on the part of each of the Notice Parties contained in the Notice, particularly those contained in Sections 4 and 6 thereof.  Except as expressly set forth in Section 3(a) to the Notice and in paragraph (a) above, nothing contained herein, in the Notice or in any Agreements shall limit or otherwise impair either Credomatic's or the Credomatic companies' rights or remedies under the Credomatic Contracts or the Credomatic Card Program, all of which are hereby reserved, and neither Credomatic nor any of the Credomatic companies shall be liable or deemed to be in breach of this Credomatic Consent and Agreement for any actions by either Credomatic or the Credomatic companies taken in good faith which impair or could impair the Receivables in circumstances where such actions by such Credomatic company were taken (i) in the exercise of its rights or the fulfillment of its obligations with respect to the Receivables in accordance with the Notice and this Credomatic Consent and Agreement, (ii) in accordance with the Credomatic Contracts and/or the Credomatic Card Program, or (iii) because of actions or inactions in breach of the Credomatic Contracts or the Credomatic Card Program on the part of the Client and/or any of the Client's affiliates, such as their respective obligations to pay Credomatic or fulfill their obligations to their respective clients.  Without limitation of the generality of the foregoing, such actions by a Credomatic company could include but would not be limited to termination of any of the Client's or the Client Affiliate's corresponding Credomatic Contract upon the occurrence of a Fundamental Change or otherwise in accordance with the Credomatic Contracts or any event described in Section 6 of the Notice.  Except as expressly set forth in Section 3(a) to the Notice and in paragraph (a) above, nothing contained herein, in the Notice or in any Agreement shall modify, create or impose any obligations or duties upon either of the Credomatic companies in connection with the Credomatic Card Program.

(c)    Credomatic is executing this Credomatic Consent and Agreement only in connection with the Agreements to the extent described in the Notice.  This Credomatic Consent and Agreement shall be effective as of the date hereof, subject to the conditions, in the Notice. Credomatic's consent, representations and agreements hereunder expressly do not extend to any Future Transaction.

[*next page is signature page*]

This Consent and Agreement shall be binding upon Credomatic and its respective successors and assigns and shall inure to the benefit of Client, the Company and the Collateral Agent, with respect to their interests in the Receivables, and their respective successors and assigns.

BAC International Bank, Inc.,
as Credomatic

By: _____
Name: RODOLFO TABASH ESPINACH
Title: President and Attorney-in-Fact

<u>Address for Notices</u>:
DIRECCIÓN REGIONAL DE TARJETAS
Attn: Juan Carlos Páez Mena
COO Card Business
BAC | Credomatic
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso

**ANNEX A**

NOTICE OF TERMINATION

BAC INTERNATIONAL BANK, INC.
DIRECCIÓN REGIONAL DE TARJETAS
Attn: Juan Carlos Páez Mena
COO Card Business
BAC | Credomatic
COSTA RICA, San José, Escazú, Guachipelín
Oficentro Plaza Roble, Edificio Terrazas B
Cuarto Piso

[Date]

Ladies and Gentlemen:

Reference is made to the Consent and Agreement, dated December 12, 2017 (the "**Credomatic Consent**"), given by Credomatic to Citibank, N.A., as Collateral Agent for the Lenders as defined therein (in such capacity, together with its successors and assigns in such capacity, the "**Collateral Agent**"). Capitalized terms used but not defined herein shall have the meanings given in the Credomatic Consent.

In accordance with paragraph (a), clause (xii) of the Credomatic Consent, the undersigned hereby notifies Credomatic that the Credomatic Consent is hereby terminated.

Accordingly, you are authorized to redirect all amounts payable by Credomatic to Avianca S.A., Avianca USA, and the Company in respect of the Assigned Contract Rights and Assigned Receivables to the bank account specified in Schedule 2 to the Notice, so that Credomatic shall no longer have obligations to follow the instructions of the Collateral Agent pursuant to the Notice and the Credomatic Consent.

CITIBANK, N.A., as
Collateral Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

EXHIBIT C

Form of Seller Closing Certificate

[●], 2017

I, the undersigned, a director of AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA, a Colombian *sociedad anónima* incorporated, registered and existing under the laws of Colombia (the "Seller"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 2.02(b)(iii) of the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of December 12, 2017, between the Seller, USAVflow as the Purchaser thereto, and Aerovías del Continente Americano S.A. Avianca as the Servicer thereto (the "RSPA").  Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the RSPA.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Seller approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of the Servicer.

4.      Attached hereto as Annex C is a true and correct copy of each of the Card Processing Agreements, as in effect as of the date hereof

5.      The persons listed on Annex D hereto are duly authorized and qualified to sign the RSPA, the other documents to which the Seller is a party and all documents delivered in connection therewith (the "Transaction Documents") and instructions and certificates in connection therewith on behalf of the Seller and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

6.      On the date hereof, the representations and warranties of the Seller in the Transaction Documents are true and correct.

7.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

8.      The Seller has taken all actions required to be taken by the Seller pursuant to the Transaction Documents on or prior to the date thereof.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Seller as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:

Title:

The undersigned, being the duly elected and qualified [_____] of the Seller, hereby certifies that [_____] is the duly elected and qualified [_____] of the Seller and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Seller as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:

Title:

AMERICAS 93840356

Exhibit C

ANNEX A - Resolutions

Exhibit C

ANNEX B – Constitutional Documents

Exhibit C

ANNEX C – Card Processing Agreements

Exhibit C

ANNEX D – Incumbency

| Name | Title | Signature |
|------|-------|-----------|
| [●] | | |
| [●] | | |
| [●] | | |

Form of Avianca, Inc. Closing Certificate

I, the undersigned, _____ of AVIANCA, INC., a company duly incorporated in New York ("Avianca, Inc."), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 2.02(b)(iii) of the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of _____, 2017, between Aerovias del Continente Americano S.A. Avianca, as the Seller thereto, and USAVflow Limited, as the Purchaser thereto). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the RSPA.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of Avianca, Inc. approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of Avianca, Inc..

4.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Transaction Documents to which Avianca, Inc. is a party and all documents delivered in connection therewith (the "Transaction Documents") and instructions and certificates in connection therewith on behalf of Avianca, Inc. and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

5.      On the date hereof, the representations and warranties of Avianca, Inc. in the Transaction Documents are true and correct.

6.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

7.      Avianca, Inc. has taken all actions required to be taken by Avianca, Inc. pursuant to the Transaction Documents on or prior to the date thereof.

      IN WITNESS WHEREOF, I have hereunto set my hand on behalf of Avianca, Inc. as of the date first written above.

AVIANCA, INC.

By:_____

Name:

Title:

      The undersigned, being the duly elected and qualified [_____] of Avianca, Inc., hereby certifies that [_____] is the duly elected and qualified [_____] of Avianca, Inc. and that the foregoing signature appearing above her name is her genuine signature.

      IN WITNESS WHEREOF, I have hereunto set my hand on behalf of Avianca, Inc. as of the date first written above.

AVIANCA, INC.

By:_____

Name:

Title:

ANNEX A - Resolutions

Exhibit D

ANNEX B – Constitutional Documents

Exhibit D

ANNEX C – Incumbency

| **Name** | **Title** | **Signature** |
|----------|-----------|---------------|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit D

<u>EXHIBIT E</u>

<u>Form of Costa Rican Assignment Agreement</u>

EXECUTION VERSION

# **FORM OF RSPA ASSIGNMENT OF RIGHTS AGREEMENT**

This RSPA ASSIGNMENT OF RIGHTS AGREEMENT, dated as of December 12, 2017 (this "Agreement") is made by and between (i) Aerovias del Continente Americano, S.A. AVIANCA, a corporation constituted under the laws of Colombia ("Avianca"), and (ii) USAVflow Limited, an exempted company incorporated with limited liability in the Cayman Islands ("USAVflow") (together the "Parties" and each individually, a "Party").

RECITALS

WHEREAS, reference is made to the AVIANCA-BAC CREDOMATIC Regional Agreement for the Processing of Credit Card Transactions in Affiliated Commercial Establishments, dated as of June 10, 2015, between the Parties (the "Credomatic Master Agreement") pursuant to which BAC International Bank, Inc. ("BAC Credomatic") serves Avianca's card processing agent for sales generated through the cards and in the locations and/or channels specified in the Credomatic Master Agreement.

WHEREAS, reference is made to the Merchant Application & Agreement dated March 17, 2016 among Avianca, Inc., a corporation organized under the laws of the State of New York ("Avianca, Inc.") and Credomatic of Florida, Inc. (the "Credomatic Supplement"), a "Local Contract" as defined under the Credomatic Master Agreement (together with the Credomatic Master Agreement, the "Assigned Agreements").

WHEREAS, reference is made to the Mutual Assignment of Rights Agreement, dated as of the date hereof, among Avianca, Taca International Airlines S.A. (TACA), and BAC Credomatic (the "Taca Assignment") pursuant to which Avianca's and Taca's respective rights under the Assigned Agreements were divided into "Avianca Contract Rights" and "Taca Contract Rights," and TACA assigned all such "Avianca Contract Rights" to Avianca and Avianca assigned all such "TACA Contract Rights" to TACA.

WHEREAS, under the Assigned Agreements, Avianca is entitled to rights to payments due on account of the sale of the goods and services it provides in the business of air transportation of passengers and cargo.

WHERAS, reference is made to the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of the date hereof among Avianca, USAVflow and, Avianca, Inc. (the "RSPA") pursuant to which Avianca sold and USAVflow purchased those certain Avianca Contract Rights falling within the definitions of "Collections," "Contract Rights," or "Receivables" set forth in the RSPA..

NOW, THEREFORE, in consideration of the previous and of the covenants hereinafter contained, it is agreed as follows:

1. **Definitions**

Capitalized terms not defined herein shall have the meaning ascribed to them in the Credomatic Master Agreement.

"<u>Avianca Contract Rights</u>" means the contract rights of Avianca under the Assigned Agreements, now existing or hereafter arising to (a) receive any kind of payments, indemnities or economic compensations derived from any ticket sales or other sales by Avianca, and including all such amounts relating to merchant identification codes pertaining to Avianca, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against BAC Credomatic.

### 2.   Confirmation of Avianca, Inc.'s Role

The Parties hereby confirm that (i) Avianca, Inc. has acted, and will continue to act, as an agent on behalf of Avianca under the Credomatic Supplement, (ii) Avianca, Inc. executed and delivered the Credomatic Supplement on behalf of Avianca, which is the Merchant pursuant to such agreement, (iii) at all times, including immediately prior to the effective date of such agreements, Avianca (and not Avianca, Inc.) is and has been a party to the Credomatic Master Agreement and the Credomatic Supplement and therefore entitled to all amounts payable in respect of the Avianca Contract Rights from Credomatic under said agreements and (iii) any and all payments that have been received by Avianca, Inc. under the Credomatic Master Agreement and/or the Credomatic Supplement have been received solely in Avianca, Inc.'s capacity as agent and Avianca, Inc. disclaims any entitlement to or ownership of those payments.

### 3.   Assignment

In exchange for the payment of the Advance Payment and the Additional Purchase Price (as defined in the RSPA), Avianca hereby irrevocably assigns to USAVflow, and USAVflow hereby irrevocably assumes from Avianca, as of the date of this Agreement, all the Avianca Contract Rights under the Assigned Agreements.

The Parties hereby confirm that the Avianca Contract Rights are fully transferable and that this assignment complies with all assignment requirements under the Assigned Agreements.

The Parties further confirm that the Assigned Agreements are currently valid and in force and there are no outstanding or reasonably foreseeable claims amongst the Parties related to the functioning of the Assigned Agreements and/or related to the rights and obligations that each Party derives from such Assigned Agreements.

### 4.   Notice and Consent

The Parties acknowledge notice and consent to the described assignment pursuant to the terms of the Credomatic Master Agreement and article 491 of the Costa Rican Commerce Code.

The Parties further acknowledge that BAC Credomatic, it has been given notice of and acknowledged its consent to this Assignment in the Credomatic Notice and Consent Agreement, dated as of the date hereof a copy of which is attached to this Agreement as Exhibit A.

### 5.   Governing Law

This Agreement shall be governed by the Laws of Costa Rica and may be translated into Spanish by an official translator in accordance to Article 395 of the Costa Rican Civil Code.

The Parties are also authorized to go before a Costa Rican Notary Public so that he or she may grant a certain date to this Agreement in accordance with Article 491 of the Costa Rican Commerce Code.

### 6.  Limited Recourse

Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that USAVflow's obligations under this Agreement shall be limited recourse obligations of USAVflow, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by USAVflow pursuant to the Administration Agreement) of USAVflow at such time available for application by or on behalf of USAVflow in making payments in accordance with this Agreement.  The parties hereby acknowledge and agree that USAVflow's obligations under this Agreement are solely the corporate obligations of USAVflow, and that none of the officers, directors, shareholders or agents of USAVflow, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by USAVflow hereunder.  After USAVflow's assets (other than the ordinary share capital and any transaction fee charged by USAVflow pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of USAVflow's obligations hereunder shall be extinguished and shall not thereafter revive with respect to USAVflow and its liability hereunder, and the parties hereto shall not have the right to proceed against USAVflow or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of USAVflow or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 6 shall survive termination of this Agreement.

### 7.  Miscellaneous

This Agreement shall be binding upon and shall take effect to the benefit of the parties hereto and their respective successors and permitted assigns.

This Agreement shall constitute an integral part of the Assigned Agreements and of any existing or successive agreements derived from such Assigned Agreements.

[Signature pages follow]

IN WITNESS WHEREOF, the Parties hereto execute this Agreement in the date written above.


_____
Avianca
Aerovías del Continente Americano, S.A. Avianca


Name:_____

Title:_____

_____

USAVflow
USAVflow, Limited


Name:_____

Title:_____

<u>Exhibit A</u>
<u>Credomatic Notice and Consent</u>

Schedule 3.01b

Projected Price Payment Schedule

| Month | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |
|-------|------|------|------|------|------|------|
| January | | 46,674,759 | 45,889,017 | 48,583,942 | 51,452,481 | 54,383,469 |
| February | | 42,745,021 | 41,694,640 | 44,282,524 | 46,904,458 | 49,629,001 |
| March | | 49,930,014 | 49,320,745 | 52,104,580 | 55,160,232 | 58,278,472 |
| April | | 41,159,901 | 40,054,651 | 42,573,984 | 45,112,613 | 47,781,268 |
| May | | 51,852,870 | 51,382,792 | 54,368,990 | 57,468,446 | 60,725,371 |
| June | | 44,535,429 | 43,757,078 | 46,378,219 | 49,082,988 | 51,966,564 |
| July | | 49,051,102 | 48,487,309 | 51,310,694 | 54,276,640 | 57,386,392 |
| August | | 47,249,194 | 46,607,624 | 49,440,950 | 52,271,055 | 55,313,839 |
| September | | 46,202,719 | 45,546,799 | 48,232,765 | 51,061,333 | 54,003,005 |
| October | | 49,284,390 | 48,832,483 | 51,700,017 | 54,692,453 | 57,806,065 |
| November | | 46,295,536 | 45,663,976 | 48,349,467 | 51,205,632 | 54,164,938 |
| December | 22,420,323 | 38,390,283 | 37,437,407 | 39,719,197 | 42,117,715 | 17,118,813 |
| Total | $22,420,323 | $553,371,219 | $544,674,521 | $577,045,329 | $610,806,046 | $618,557,197 |

**EXHIBIT B**

EXECUTION VERSION

LOAN AGREEMENT,

dated as of December 12, 2017

among

USAVFLOW LIMITED,
as the Borrower,

THE LENDERS PARTY FROM TIME TO TIME TO THIS AGREEMENT,
as Lenders,

AVIANCA HOLDINGS S.A.,
TACA INTERNATIONAL AIRLINES, S.A.,
AVIANCA COSTA RICA S.A. and
TRANS AMERICAN AIRLINES, S.A.
as Guarantors

Citibank, N.A.,
as Administrative Agent

and

Citibank, N.A.,
as Collateral Agent

# TABLE OF CONTENTS

**Page**

1.   Definitions .................................................................................................................... 1
     1.1     Defined Terms ................................................................................................. 1
     1.2     Other Interpretive Provisions ...................................................................... 19

2.   Amount and Terms of the Commitments and Loans .............................................. 19
     2.1     The Loan ......................................................................................................... 19
     2.2     Borrowing Procedures .................................................................................. 20
     2.3     New York Pass-Through Account, Collections Account, Debt Service Reserve
     Account, Cash Management Agreement, RSPA ..................................................... 20
     2.4     Payments ........................................................................................................ 21
     2.5     Interest ............................................................................................................ 23
     2.6     Optional Prepayment .................................................................................... 24
     2.7     Taxes ............................................................................................................... 25
     2.8     Increased Costs .............................................................................................. 26
     2.9     Mitigation Obligation .................................................................................... 26
     2.10    Break Funding Payments .............................................................................. 27

3.   Conditions to Loan ..................................................................................................... 27
     3.1     Conditions Precedent .................................................................................... 27

4.   Representations and Warranties ............................................................................... 30
     4.1     Obligors' Representations ............................................................................. 30
     4.2     Further Assurances ........................................................................................ 34

5.   Covenants .................................................................................................................... 34
     5.1     Enforceability, Rank ...................................................................................... 34
     5.2     Corporate Existence ...................................................................................... 35
     5.3     Payment of Taxes and Other Claims ........................................................... 35
     5.4     Maintenance of Properties ............................................................................ 35
     5.5     Insurance ........................................................................................................ 35
     5.6     Books and Records; Reporting ..................................................................... 35
     5.7     Further Assurances; Security Filings ........................................................... 37
     5.8     Limitation on Indebtedness .......................................................................... 37
     5.9     Limitation on Restricted Payments .............................................................. 37
     5.10    Limitation on Affiliate Transactions ........................................................... 38
     5.11    Limitation on Sales of Assets ....................................................................... 38
     5.12    Limitation on Liens ....................................................................................... 39
     5.13    Limitation on Lines of Business ................................................................... 39
     5.14    Consolidation, Merger .................................................................................. 39
     5.15    Maintenance of Separateness ....................................................................... 40
     5.16    Limitation on Investments ............................................................................ 41
     5.17    Use of Proceeds ............................................................................................. 41
     5.18    Investment Company Act .............................................................................. 41
     5.19    Compliance with Laws .................................................................................. 41
     5.20    Card Processing Agreements ........................................................................ 42

6.   Events of Default ........................................................................................................ 43
     6.1     Events of Default ........................................................................................... 43

7.      Agents ....................................................................................................................... 46
        7.1     The Agents ................................................................................................... 46

8.      Miscellaneous .......................................................................................................... 52
        8.1     Amendments and Waivers ............................................................................ 52
        8.2     Time ............................................................................................................. 52
        8.3     Addresses for Notices................................................................................... 52
        8.4     Effectiveness ................................................................................................ 54
        8.5     Survival ........................................................................................................ 54
        8.6     Fees and Expenses........................................................................................ 54
        8.7     Indemnities ................................................................................................... 55
        8.8     Assignment and Transfer .............................................................................. 56
        8.9     Law and Jurisdiction .................................................................................... 59
        8.10    Service of Process ........................................................................................ 60
        8.11    Partial Invalidity........................................................................................... 60
        8.12    Counterparts ................................................................................................. 60
        8.13    Rights in Collections Account and New York Pass-Through Account ........... 61
        8.14    Patriot Act .................................................................................................... 61
        8.15    Acknowledgement and Consent to Bail-In of EEA Financial Institutions....... 61
        8.16    Force Majeure .............................................................................................. 62
        8.17    Right of Setoff .............................................................................................. 62
        8.18    Confidentiality............................................................................................... 62
        8.19    Guarantee ..................................................................................................... 63
        8.20    Secured Parties' Undertakings and Clawback................................................ 66
        8.21    Third Party Beneficiaries .............................................................................. 67


Exhibit A          Form of Assignment and Assumption
Exhibit B          Form of Promissory Note
Exhibit C          Form of Borrower's Officer's Certificate
Exhibit D          Form of Guarantor's Officer's Certificate
Exhibit E          Form of Notice and Consent
Exhibit F          Form of New York Security Agreement
Exhibit G          Form of Compliance Certificate
Exhibit H          Form of Notice of Borrowing

Schedule 1.1       Commitments
Schedule 4.1.8     Corporate Structure of Guarantors
Schedule 5.12      Permitted Liens
Schedule 8.3.3     Applicable Lending Offices and Addresses for Notices

This LOAN AGREEMENT (this "**Agreement**"), dated as of December 12, 2017, is among USAVFLOW, an exempted company incorporated and registered under the laws of the Cayman Islands with registered number 324668 and having its registered office at the offices of MaplesFS Limited, PO Box 1093, Queensgate House, Grand Cayman, KY1-1102, as borrower (the "**Borrower**"), each Person party hereto as a lender from time to time (each, a "**Lender**," and collectively, the "**Lenders**"), AVIANCA HOLDINGS S.A., a company organized under the laws of Panama, TACA INTERNATIONAL AIRLINES, S.A., a company organized under the laws of El Salvador, AVIANCA COSTA RICA S.A., f/k/a LINEAS AÉREAS COSTARRICENSES S.A., a company organized under the laws of Costa Rica, and TRANS AMERICAN AIRLINES, S.A., a company organized under the laws of Peru, as guarantors (the "**Guarantors**"), Citibank, N.A., as administrative agent for the Lenders (in such capacity, or any successor appointed pursuant to <u>Section 7.1.6</u>, the "**Administrative Agent**") and Citibank, N.A., as collateral agent for the Lenders (in such capacity, or any successor appointed pursuant to <u>Section 7.1.6</u>, the "**Collateral Agent**").

**WHEREAS**, the Borrower has requested that the Lenders make the Loans to the Borrower in an aggregate principal amount not exceeding U.S.$150,000,000; and

**WHEREAS**, each Lender is willing, on the terms and subject to the conditions hereinafter set forth, to make its Loan to the Borrower;

**NOW**, **THEREFORE**, the parties hereto agree as follows:

**1.      DEFINITIONS**

**1.1      Defined Terms**

In this Agreement the following expressions have the following meanings:

"**Account Control Agreement**" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Borrower, the U.S. Account Bank and the Collateral Agent.

"**Additional Amounts**" has the meaning specified in <u>Section 2.7.2</u>.

"**Adjusted EBITDA**" means, with respect to any period for any Person, such Person's Consolidated EBITDA adjusted to exclude income or expenses resulting from foreign currency adjustments, derivative financial instruments, other financial income and transactions with Affiliates, in each case determined for such Person and its Subsidiaries on a consolidated basis and as set forth in the consolidated income statement of such Person in accordance with IFRS for such period.

"**Adjusted EBITDAR**" means, with respect to any period for any Person, such Person's Adjusted EBITDA adjusted to exclude aircraft and other related rent expenses payable during such period, in each case determined for such Person and its Subsidiaries on a consolidated basis and as set forth in the consolidated income statement of such Person in accordance with IFRS for such period.

"**Adjusted EBITDAR Coverage Ratio**" means, at any date of determination, with respect to Holdings and its Subsidiaries on a consolidated basis, the ratio of (a) Adjusted EBITDAR for the Reference Period most recently ended on or before such date to (b) the sum of (i) aircraft and other related rent expenses plus (ii) interest expense, in each case for such Reference Period.

"**Administrative Agent's Account**" means the account maintained at Citibank, N.A., New York, New York, USA, ABA No. 021000089, SWIFT: CITIUS33, Account No. 36852248, Account

Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Borrower in writing.

"**Administration Agreement**" means the administration agreement dated the date hereof entered into between the Borrower and MaplesFS Limited.

"**Administrative Agent**" has the meaning specified in the first paragraph of this Agreement.

"**Administrative Questionnaire**" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"**Affiliate**" with respect to Holdings, the Guarantors and the Receivables Seller, means Holdings and any Subsidiary of Holdings and with respect to any other Person, means, another Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person. For purposes of this definition, the term "control" (including the terms "controlling", "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"**Affiliate Transaction**" has the meaning specified in <u>Section 5.10</u>.

"**Agent Fees Due**" means fees due and payable to the Agents, the Collateral Trustee, any Delegate or any Receiver under the Credit Documents, including only such fees as have been notified to the Administrative Agent in writing at least 2 Business Days' prior to any date of calculation.

"**Agent Fee Letter**" means the fee letter, dated September 11, 2017, among the Administrative Agent, the Collateral Agent, U.K. Account Bank and the Receivables Seller, as may be amended from time to time by the parties thereto.

"**Agent Indemnified Person**" has the meaning specified in <u>Section 8.7.3</u>.

"**Agents**" means the Administrative Agent and the Collateral Agent.

"**Air Travel Receivables**" of a Person means such Person's rights to receive payment on account of its sale of any airline tickets or rendition of related services, including the right to receive all collections derived therefrom, whether paid for by Cards or otherwise.

"**AMEX**" means American Express Travel Related Services Company, Inc.

"**AMEX Contract**" means the Airline Card Service Agreement, dated as of October 8, 2013 (as modified by the AMEX Notice and Consent), among AMEX, American Express Payment Services Limited, the Receivables Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation and Lifemiles Corp.

"**AMEX Notice and Consent**" means the Notice and Consent, dated on or about the date hereof, by and among AMEX, American Express Payment Services Limited, the Receivables Seller, Taca International Airlines S.A., Líneas Aéreas Costarricences S.A., Trans American Airlines S.A. dba Taca Peru, Aviateca S.A., America Central Corporation, Lifemiles Corp, the Borrower, Avianca USA and the Collateral Agent.

"**Anti-Corruption Laws**" means (a) the United States Foreign Corrupt Practices Act of 1977, (b) the United Kingdom Bribery Act of 2010, and (c) any other similar applicable Law relating to bribery or corruption.

"**Anti-Money Laundering Laws**" means any applicable Law related to money laundering or terrorism financing, including (a) 18 U.S.C. §§ 1956 and 1957, and (b) the Bank Secrecy Act, 31 U.S.C. §§ 5311 *et seq.*, as amended by the Patriot Act, and its implementing regulations.

"**Approved Fund**" means any Fund that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

"**ARC**" means Airlines Reporting Corporation or any successor or replacement thereof.

"**Arranger Fee Letter**" means the fee letter, dated as of the date hereof, between the Bookrunner, and the Borrower, as may be amended from time to time by the parties thereto.

"**Assignment and Assumption**" means an assignment and assumption entered into by a Lender and a Qualified Lender (with the consent of any party whose consent is required by <u>Section 8.8.2</u>), and acknowledged by the Administrative Agent, in substantially the form of <u>Exhibit A</u>.

"**Authorized Signatory**" means a person that has been duly authorized to execute or sign any Credit Document or any document, certificate or notice to be executed or signed under or in connection with any Credit Document.

"**Avianca USA**" means Avianca, Inc., a New York corporation.

"**Bail-In Action**" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"**Bail-In Legislation**" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"**Bankruptcy Law**" means Title 11, United States Code or any similar governmental, federal or state law of the United States or other applicable jurisdictions relating to bankruptcy, insolvency, receivership, winding-up, suspension of payments, liquidation, reorganization or relief of debtors or the law of any other jurisdiction relating to bankruptcy, insolvency, receivership, winding-up, suspension of payments, liquidation, reorganization or relief of debtors or any amendment to, succession to or change in any such law.

"**Bankruptcy Order**" means any court order, made in a proceeding pursuant to or within the meaning of any Bankruptcy Law, containing an adjudication of bankruptcy or insolvency, or a declaration of or providing for liquidation, receivership, winding-up, dissolution, "**concordate**" or reorganization, or appointing a Custodian of a debtor or of all or any substantial part of a debtor's property, or providing for the staying, arrangement, adjustment or composition of indebtedness or other relief of a debtor.

"**Bookrunner**" means Deutsche Bank AG, London Branch, in its capacity as bookrunner and joint lead arranger.

"**Borrower**" has the meaning specified in the first paragraph of this Agreement.

"**Business Day**" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"**Capital Lease Obligations**" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or any other amount due under such lease prior to the first date upon which such lease may be terminated by the lessee without payment of a penalty.

"**Capitalization Ratio**" means, at any date of determination, with respect to Holdings and its Subsidiaries on a consolidated basis, the ratio of:

    (a)    the sum of (i) the aggregate amount of Holdings' Indebtedness *plus* (ii) scheduled annual rental payments under aircraft operating leases payable by Holdings or its Subsidiaries as of such date of determination, multiplied by seven, *less* (iii) the aggregate amount of cash of Holdings and its Subsidiaries;

            to

    (b)    the sum of (i) the amount resulting from the calculation in clause (a) above *plus* (ii) the amount of shareholders' equity of Holdings as of such date;

            in each case without duplication.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Receivables Seller and its Affiliates.

"**Card Processing Agreement**" means each of the AMEX Contract and the Credomatic Contract, and any other card processing agreement approved by the Required Lenders and subject to a Notice and Consent.

"**Card Processor**" means each of AMEX and Credomatic, and any other card processor approved by the Required Lenders and that has executed and delivered a Notice and Consent.

"**Cash Equivalents**" as to any Person, means (a) securities issued or directly and fully guaranteed or insured by the U.S. or any agency or instrumentality thereof (provided that the full faith and credit of the U.S. is pledged in support thereof) having maturities of not more than one year from the date of acquisition by such Person, (b) time deposits, demand deposits and certificates of deposit of any commercial bank having, or which is the principal banking subsidiary of a bank holding company organized under the laws of the U.S., any State thereof or the District of Columbia having capital, surplus and undivided profits aggregating in excess of U.S.$500,000,000, having maturities of not more than one year from the date of acquisition by such Person, (c) repurchase obligations with a term of not more than 90 days for underlying securities of the types described in subsection (a) above entered into with any bank meeting the qualifications specified in subsection (b) above, (d) commercial paper issued by any issuer rated at least A-1 by S&P or at least P-1 by Moody's or carrying an equivalent rating by a nationally recognized rating agency, if both of the two named rating agencies cease publishing ratings of commercial paper issuers generally, and in each case maturing not more than one year after the date of acquisition by such Person or (e) investments in money market funds substantially all of whose assets comprise securities of the types described in subsections (a) through (d) above.

"**Cash Management Agreement**" means the Cash Management Agreement, to be dated on or about the date hereof, among the Receivables Seller, the Borrower, Avianca USA, the Collateral Agent and the Administrative Agent.

"**Change in Law**" means (a) the adoption of any Law, rule or regulation after the date of this Agreement, (b) any change in any Law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.8.2, by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement.

"**Change of Control**" means:

(c)    MaplesFS Limited, solely as trustee of the Trust created pursuant to the Declaration of Trust, made by MaplesFS Limited and dated on or about the date hereof, to hold the shares in the capital of the Borrower, ceases to directly own 100% of the issued shares in the capital of the Borrower;

(d)    the direct or indirect sale or transfer (other than by way of merger or consolidation) of all or substantially all the assets of the Receivables Seller or the Borrower to another Person (in each case, unless such other Person is a Permitted Holder);

(e)    the consummation of any transaction (including by merger, consolidation, acquisition, or any other means) as a result of which Permitted Holders cease to be the "beneficial owner" (as such term is used in Rule 13d-3 under the Exchange Act), directly or indirectly, of more than 50% of the total voting power of the Voting Stock of Holdings (or its successors by merger, consolidation, or purchase of all or substantially all their assets) (on a fully diluted basis); or

(f)    Holdings shall cease to (i) own directly or indirectly, beneficially and of record more than 50% of the Voting Stock of the Receivables Seller or any Guarantor (on a fully diluted basis) or (ii) have the power to direct or cause the direction of the management and policies of the Receivables Seller or the Servicer or any Guarantor.

"**Claims**" has the meaning specified in Section 8.7.3(a).

"**Clawback Amount**" has the meaning specified in Section 8.20.3.

"**Closing Date**" means the date on which funds are disbursed to the Borrower pursuant to Section 2.2.

"**Collateral**" means the property, rights and accounts that, in accordance with the Security Documents, from time to time, are subject to any Lien in favor of the Collateral Agent or the Collateral Trustee for the benefit of the Secured Parties.

"**Collateral Agent**" means Citibank, N.A., or any successor, as collateral agent for the Lenders under this Agreement, the Cash Management Agreement and the New York Security Agreement.

"**Collateral Trustee**" means Citibank, N.A. London Branch, or any successor, as collateral trustee for the Lenders under the English Security Documents.

"**Collateral Trustee Fee Letter**" means the fee letter, dated November 10, 2017, among the Collateral Trustee and the Receivables Seller, as may be amended from time to time by the parties thereto.

"**Collections**" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Receivables Seller, the Borrower, or any other Person.

"**Collections Account**" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Borrower at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"**Collections Coverage Ratio**" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the Interest Amount plus the Principal Payment Amount payable on the next succeeding Payment Date. The Administrative Agent shall notify the Parties hereto of the Collections Coverage Ratio upon the determination thereof pursuant to the Cash Management Agreement.

"**Colombian Back-Up Security Agreement**" means the Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Commitment**" means the obligation of any Lender to make a Loan to the Borrower hereunder on the Closing Date, in a principal amount equal to the amount set forth opposite such Lender's name on Schedule 1.1.

"**Compliance Certificate**" means, with respect to any Obligor, a certificate substantially in the form of Exhibit G signed by the Chairman, Vice Chairman or other director of its board of directors, its President, Vice President, Secretary, Assistant Secretary, Chief Financial Officer, Comptroller, Treasurer, Assistant Treasurer, or other Authorized Signatory and delivered to the Administrative Agent.

"**Consolidated EBITDA**" for any Reference Period, with respect to Holdings and its Subsidiaries on a consolidated basis, means Consolidated Net Income for such period plus, without duplication and to the extent deducted in calculating Consolidated Net Income for such period, the sum of (a) Consolidated Interest Expense for such period, (b) the sum of federal, state, local and foreign income taxes accrued or paid in cash during such period, (c) the amount of depreciation and amortization expense deducted in determining Consolidated Net Income, (d) any extraordinary, unusual or non-recurring items reducing Consolidated Net Income for such period, and (e) any non-cash items reducing Consolidated Net Income for such period, minus (i) any extraordinary, unusual or non-recurring items increasing Consolidated Net Income for such period and (ii) any non-cash items increasing Consolidated Net Income for such period.

"**Consolidated Interest Expense**" for any Reference Period, with respect to Holdings and its Subsidiaries on a consolidated basis, means the total interest expense (including that portion attributable to capital leases in accordance with IFRS and capitalized interest) premium payments, debt discount, fees, charges and related expenses with respect to all outstanding Indebtedness of Holdings and its Subsidiaries, in each case whether or not paid in cash during such period.

"**Consolidated Net Income**" for any Reference Period, means the consolidated net income (or loss) of Holdings and its Subsidiaries, determined on a consolidated basis in accordance with IFRS.

"**Contract Rights**" means the contract rights of Receivables Seller under each Card Processing Agreement to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processor thereunder. For the avoidance of doubt, the Contract Rights shall not include (x) any obligation or liability of Receivables Seller under any Card Processing Agreement or arising in any manner therefrom; or (y) the rights of Receivables Seller:

(a)      to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

(b)      to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreements;

(c)      to request, to treat or to have access to confidential information pertaining to cardholder account information;

(d)      to request or receive a restricted card list pursuant to the relevant Card Processing Agreements;

(e)      to grant consent to a Card Processor to display or show the trademarks, logos or company names of Receivables Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreements;

(f)      to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreements;

(g)      to handle all claims or complaints by a cardholder with respect to Card transactions;

(h)      to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreements; or

(i)      to receive any Collections derived from sales which are not Specified Sales.

"**Contract Rights and Receivables Addition**" means, in connection with a Permitted Termination of a Card Processing Agreement and so long as no Default or Event of Default has occurred and is continuing, a sale and transfer of additional Contract Rights and Receivables under a new Card Processing Agreement by the Receivables Seller to the Borrower in accordance with the RSPA, which additional Contract Rights and Receivables shall be subject to the Security Documents and payable to the New York Pass-Through Account.

"**Core Assets**" means assets used or useful in the business of providing air transportation for passengers and cargo, owning, servicing, and maintaining aircraft, aircraft engines, propellers, and spare parts for such property, owning, leasing, and maintaining facilities in order to conduct such business, or providing other services and selling merchandise related thereto, or any one or more of the foregoing activities.

"**Costa Rican Assignment Agreement**" means the Assignment Agreement, to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Costa Rican Back-Up Security Agreement**" means the Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof, between the Receivables Seller and the Borrower.

"**Contractual Currency**" has the meaning specified in Section 8.7.2.

"**Credit Documents**" means this Agreement, the Receivables Transfer Documents, the Notes, the Security Documents, the Fee Letters and all other documents and instruments executed and/or delivered in connection with any of the foregoing.

"**Credomatic**" means BAC International Bank, Inc. and its subsidiaries.

"**Credomatic Contract**" means, collectively, (a) the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of June 10, 2015, among the Receivables Seller, TACA International Airlines, S.A. and Credomatic, (b) the Merchant Application & Agreement, dated March 17, 2016 between Avianca USA, as agent on behalf of the Receivables Seller, and Credomatic, (c) the Amendment to the *Convenio Regional de Avianca-Grupo BAC Credomatic para el Procesamiento de Transacciones de Tarjetas en Comercios Afiliados*, dated as of November 9, 2017, among the Receivables Seller, TACA International Airlines, S.A. and Credomatic and (d) the Assignment of Rights Agreement, dated on or about the date hereof, among the Receivables Seller, TACA International Airlines, S.A., Avianca USA and Credomatic, in each case as modified by the Credomatic Notice and Consent.

"**Credomatic Notice and Consent**" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Receivables Seller, Credomatic, the Borrower, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B to the RSPA, pursuant to which (i) the transfer of the Contract Rights and Receivables under the Credomatic Contract from the Receivables Seller to the Borrower will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce and Article 1959 et. seq. of the Colombian Civil Code, accordingly; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"**Custodian**" means any receiver, interim receiver, receiver and manager, receiver-manager, trustee, assignee, liquidator, sequestrator or similar official under any Bankruptcy Law or any other Law respecting secured creditors and the enforcement of their security or any other person with like powers whether appointed judicially or out of court and whether pursuant to an interim or final appointment.

"**Debt Service Required Amount**" has the meaning specified in Section 2.3.3(a).

"**Debt Service Reserve Account**" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Borrower at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"**Default**" means any event that is, or after notice or passage of time or both would be, an Event of Default.

"**Delegate**" has the meaning given to that term in the Security Trust Deed.

"**Dispose**" means to, directly or indirectly, consummate any sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions), including any disposition

8

by means of a merger, consolidation or similar transaction, of any property or assets. "**Disposition**" means any such sale, lease, transfer or other disposition (or series of related sales, leases, transfers or dispositions).

"**EEA Financial Institution**" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"**EEA Member Country**" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"**EEA Resolution Authority**" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"**English Security**" means the security created or expressed to be created in favor of the Collateral Trustee as trustee for the Secured Parties pursuant to the U.K. Account Charge.

"**English Security Documents**" means the Security Trust Deed and the U.K. Account Charge.

"**Environmental Law**" means all Laws relating to contamination, pollution, the protection of human health or the environment or the transportation, treatment, storage, disposal, release, threatened release or handling of or exposure to Hazardous Materials and any specific agreements entered into with any Governmental Authority that include commitments related to any of the above.

"**EU Bail-In Legislation Schedule**" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"**Event of Default**" means one of those circumstances described in <u>Section 6.1</u>.

"**Excluded Taxes**" has the meaning specified in <u>Section 2.7.1.</u>

"**Expenses Agreement**" means the Expenses Agreement dated December 12, 2017, between the Borrower and the Receivables Seller, providing for the Receivables Seller to pay certain fees to the Borrower and to pay various fees and expenses incurred by or payable to the Borrower, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Borrower and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Borrower.

"**Fee Letters**" means the Agent Fee Letter, the Arranger Fee Letter and the Collateral Trustee Fee Letter.

"**Fund**" means any Person (other than a natural Person) that is (or will be) engaged in making, purchasing, holding or otherwise investing in commercial loans, bonds and similar extensions of credit in the ordinary course of its activities.

"**Government Approvals**" means approvals, authorizations, permits, consents, exemptions and licenses of or by, and notices to or filings or registrations with, any Governmental Authority.

"**Governmental Authority**" means any nation or government, any state or municipality, any multilateral or similar organization or any other agency, instrumentality or political subdivision thereof and any entity exercising executive, legislative, judicial, monetary, regulatory or administrative functions of or pertaining to the government of Colombia, England, the Cayman Islands or any other jurisdiction.

"**Guarantee**" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise) or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "Guarantee" shall not include endorsements for collection or deposit in the ordinary course of business.  The term "Guarantee" used as a verb has a corresponding meaning.

"**Guaranteed Obligations**" has the meaning specified in <u>Section 8.19.1</u>.

"**Guarantor**" has the meaning specified in the first paragraph of this Agreement.

"**Hazardous Materials**" means explosive or radioactive materials, asbestos or asbestos-containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes, wastes and all hazardous or toxic substances, wastes or other pollutants (including petroleum or petroleum distillates) and any other chemicals, materials or substances designated, classified or regulated under any applicable Environmental Law.

"**Hedging Obligations**" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"**Holdings**" means Avianca Holdings S.A., a Panamanian company.

"**IFRS**" means the International Financial Reporting Standards as adopted in the English language by the International Accounting Standards Board.

"**Incur**" means to issue, assume, Guarantee, incur or otherwise become liable for, provided, however, that any Indebtedness or capital stock of a Person existing at the time such Person becomes a Subsidiary (whether by merger, consolidation, acquisition or otherwise) shall be deemed to be Incurred by such Subsidiary at the time it becomes a Subsidiary.  The term "**Incurrence**" when used as a noun shall have a correlative meaning.  The accretion of principal of a non-interest bearing or other discount security, the payment of interest on any Indebtedness in the form of additional Indebtedness with the same terms and the payment of dividends on capital stock in the form of additional shares of the same class of capital stock shall not be deemed the Incurrence of Indebtedness.

"**Indebtedness**" means, with respect to any Person on any date of determination (without duplication):

(a)    the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

(b)    all Capital Lease Obligations of such Person;

(c)    all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Closing Date);

(d)    all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

(e)    the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

(f)    all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(g)    all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(h)    to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"**Indemnified Person**" has the meaning specified in Section 8.7.1.

"**Indemnified Taxes**" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Obligors under any Credit Document.

"**Interest Amount**" has the meaning specified in Section 2.5.1.

"**Interest Determination Date**" has the meaning specified in Section 2.5.3.

"**Interest Period**" has the meaning specified in Section 2.5.2.

"**Investment**" means any direct or indirect acquisition or investment by any Person in another Person, whether by means of: (a) the purchase or other acquisition of any equity interest, notes,

bonds, debentures or other securities of another Person, (b) a loan, advance or capital contribution to, guaranty or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit or all or a substantial part of the business of such Person.

"**Law**" means (a) any statute, law, treaty, regulation, ordinance, rule, judgment, order, decree, permit, concession, grant, franchise, license, agreement or other governmental restriction or any interpretation or administration of any of the foregoing by any Governmental Authority (including Government Approvals) and (b) any directive, guideline, policy, requirement or any similar form of decision of or determination by any Governmental Authority, in each case, whether now or hereafter in effect (including, in each case, any Environmental Law).

"**Lender**" has the meaning specified in the first paragraph of this Agreement.

"**Lending Office**" as to any Lender, means the office or offices of such Lender described as such on Schedule 8.3.3, or such other office or offices as a Lender may from time to time notify the Borrower and the Administrative Agent.

"**LIBOR**" has the meaning specified in Section 2.5.3.

"**Lien**" means any mortgage, pledge, security interest, encumbrance, lien or charge to secure or provide for the payment of any obligation of any person (including any conditional sale or other title retention agreement or lease in the nature thereof).

"**Loan**" has the meaning specified in Section 2.1.1.

"**London Business Day**" has the meaning specified in Section 2.5.4.

"**Loss**" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to or arising from the inaccuracy or alleged inaccuracy of any representation and warranty made by any Obligor hereunder or under the Security Documents or any breach or alleged breach by any Obligor of any of its undertakings in this Agreement, the Notes or the Security Documents.

"**Material Adverse Effect**" means any material adverse effect on, or a material adverse change in: (a) the business, property, assets, liabilities, condition (financial or otherwise), results of operations or prospects of any Obligor or the Receivables Seller, (b) the ability of the Receivables Seller or any Obligor to perform its respective obligations under the Credit Documents to which it is a party, (c) the rights and/or remedies any of the Secured Parties are purported to have under any Credit Document, (d) the economic or financial condition or stability (financial, political or otherwise) of Cayman Islands, Colombia, Panama, Peru, Costa Rica or El Salvador, (e) the validity and enforceability of any Credit Document, (f) the Liens granted pursuant to the Security Documents or the value thereof or (g) the Contract Rights or the Receivables or the Collections in respect of either, including on the timeliness, payment frequency, collectability, amount, or ability to calculate the amount of such Collections.

"**Maturity Date**" means the fifth anniversary of the Closing Date; provided that if such day is not a Business Day, the Maturity Date shall be the next preceding Business Day.

"**New York Pass-Through Account**" means the Dollar deposit account with account number 11925000 established and maintained by the Borrower at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"**New York Security Agreement**" means that certain first priority pledge and security agreement, dated on or about the date hereof, by and between the Borrower and the Collateral Agent and substantially in the form attached hereto as Exhibit F.

"**Note**" means each promissory note of the Borrower, duly executed and delivered by the Borrower to each Lender and in form and substance set out in Exhibit B hereto, evidencing the aggregate Indebtedness of the Borrower to the Lenders resulting from the Loan and also means all other promissory notes accepted from time to time in substitution therefor or renewal thereof.

"**Notice and Consent**" means each of the AMEX Notice and Consent and the Credomatic Notice and Consent, and any other notice and consent by and among, *inter alia*, the Borrower, the Receivables Seller, the Collateral Agent and the relevant Card Processor, notifying such Card Processor of (a) the assignment in favor of the Collateral Agent of the Contract Rights and Receivables and (b) the irrevocable instruction to deposit all Collections into the New York Pass-Through Account, substantially in the form attached hereto as Exhibit E (or otherwise as approved by the Required Lenders in their sole discretion).

"**Notice of Assignment and Assumption**" means the Notice of Assignment and Assumption in substantially the form set forth as Exhibit A to the Assignment and Assumption.

"**Notice of Borrowing**" has the meaning specified in Section 2.2.1.

"**Obligors**" means, collectively, the Borrower and each Guarantor.

"**OFAC**" means the U.S. Treasury Department Office of Foreign Assets Control.

"**Officer's Certificate**" means, with respect to any Obligor, a certificate signed by the Chairman, Vice Chairman or other director of its board of directors, its President, Vice President, Secretary, Assistant Secretary, Chief Financial Officer, Comptroller, Treasurer, Assistant Treasurer, or other Authorized Signatory and delivered to the Administrative Agent or to the Borrower with authority to deliver the same to the Administrative Agent.

"**Other Connection Taxes**" means, with respect to any Recipient, Taxes imposed as a result of a present or former connection between such Recipient and the jurisdiction imposing such Tax (other than connections arising from such Recipient having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced any Credit Document, or sold or assigned an interest in any Credit Documents ).

"**Participant**" has the meaning specified in Section 8.8.4.

"**Participant Register**" has the meaning specified in Section 8.8.4.

"**Patriot Act**" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001, Pub. L. No. 107-56, 115 Stat. 272, of the United States.

"**Payment Date**" has the meaning specified in Section 2.5.1.

"**Permitted Holders**" means any or all of the following:

(a)     Mr. Germán Efromovich, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and the respective children, grandchildren and spouses of any of the foregoing;

(b)    Roberto Jose Kriete Avila, his spouse and their respective parents, aunts, uncles, brothers, sisters, nephews, nieces, in-laws and other family members (by marriage, adoption or otherwise) and their respective children, grandchildren and spouses of any of the foregoing;

(c)    the respective ancestors, descendants, spouses, heirs, legatees and successors of any Person described in paragraphs (a) and (b) above or in this paragraph (c);

(d)    the executor, administrator, or other representative of any Person described in paragraphs (a), (b) or (c) above who is deceased, incompetent, or incapacitated;

(e)    any trust or other entity in which any of the Persons described in paragraphs (a), (b), (c), or (d) above has an interest, whether or not fixed or exclusive; and

(f)    any Affiliate of any one or more of the persons described in paragraphs (a), (b), (c), (d) or (e) above.

"**Permitted Lien**" means any of the following:

(a)    Liens in favor of the Borrower pursuant to the Receivables Transfer Documents;

(b)    Liens on any of a Guarantor's property or assets existing on the Closing Date and listed on Schedule 5.12, and any renewals, replacements, or extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, or obligations secured by such Liens does not increase from the amount outstanding on the Closing Date, and (y) any such renewal, replacement, or extension does not encumber any additional assets or properties of the Guarantor or its Subsidiaries;

(c)    Liens for Taxes not yet due or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Guarantor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(d)    Carriers', warehousemen's, mechanics', materialmen's, repairmen's or other like Liens arising in the ordinary course of business which are not overdue for a period of more than ninety (90) days or which are being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which the Guarantor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

(e)    any Lien securing a judgment for the payment of money the entry of which shall not have constituted an Event of Default so long as such Lien is adequately bonded and any appropriate legal proceedings which may have been duly initiated for the review of the judgment have not been finally terminated or the period within which such proceeding may be initiated has not expired;

(f)    Liens arising solely by virtue of any statutory or common law provisions relating to bankers' Liens, rights of setoff, or similar rights and remedies with regard to deposit accounts or other funds maintained with depositary institutions;

(g)    licenses, sublicenses, leases, and subleases as they relate to any aircraft, airframe, engine, or  related equipment and to the extent such licenses, sublicenses, leases, or subleases do not interfere in any material respect with the business of the Guarantors, the Receivables Seller, and their respective Subsidiaries, taken as a whole;

(h)     salvage or similar rights of insurers, in each case as it relates to any aircraft, airframe, engine, or other equipment installed on aircraft, if any;

(i)     Liens on aircraft, airframe, engines, and appliances, parts, components, instruments, appurtenances, furnishings, and other equipment installed on aircraft;

(j)     Liens on any of a Guarantor's property securing Indebtedness or obligations Incurred as all or part of the purchase price of such property or for value given to enable the Guarantor to acquire rights in or the use of the property, and any renewals, replacements, or extensions of such Liens, provided that (x) the aggregate principal amount of the Indebtedness, if any, or obligations secured by such Liens does not increase from the amount of the Indebtedness or obligations so Incurred, and (y) any such renewal, replacement, or extension does not encumber any additional assets or properties of the Guarantor or its Subsidiaries;

(k)     Liens on a Guarantor's Air Travel Receivables; and

(l)     other Liens (on assets or property that do not constitute Collateral) securing obligations in an aggregate amount not exceeding 50% of Consolidated EBITDA for the most recently ended Reference Period.

*provided* that under no circumstances shall a Lien on any of the Contract Rights or the Receivables or the Collections derived therefrom be considered to constitute a Permitted Lien, except a Lien created pursuant to the Credit Documents.

 "**Permitted Termination**" means, with respect to a Card Processing Agreement, any termination of the Card Processing Agreement which is (a) initiated by the Card Processor thereunder without the Receivables Seller's consent in accordance with the terms of the Card Processing Agreement, (b) is initiated by the Receivables Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of an insolvency event of the Card Processor thereunder, (c) is initiated (with the consent of the Required Lenders)  by the Receivables Seller without the consent of the Card Processor thereunder in accordance with the terms of the Card Processing Agreement on account of a material breach by the Card Processor thereunder of the provisions of the Card Processing Agreement or (d) is requested by the Receivables Seller on account of its good faith dissatisfaction with the performance of the Card Processor thereunder and is agreed to by the Card Processor thereunder, provided that a Contract Rights and Receivables Addition for a replacement Card Processing Agreement has already been consummated prior to such termination.

"**Person**" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"**Platform**" has the meaning specified in Section 7.1.13.

"**Prepayment Date**" has the meaning specified in Section 2.6.1.

"**Principal Payment Amount**" means, (a) with respect to the first twelve (12) Payment Dates following the Closing Date, U.S.$0 and (b) with respect to each of the forty-eight (48) Payment Dates thereafter, U.S.$3,125,000.

"**Process Agent**" means National Registered Agents, Inc., 111 Eighth Avenue, New York, NY 10011.

"**Qualified Agent**" shall mean an institution (i) that is a Qualified Lender and (ii) that does not charge for the services to be provided in its capacity as an Agent in excess of the charges customarily assessed for such services by other reputable institutions that provide such services in the ordinary course of their business.

"**Qualified Lender**" means an institution that is (a) a Lender or any Affiliate (other than a natural person) of a Lender, or (b)(i) a commercial bank, commercial finance company or other financial institution or trust company having a combined capital and surplus of more than U.S.$50,000,000 or (ii) a fund that is administered or managed by an entity described in clause (i) or its Affiliate, or has total assets under management of more than U.S.$50,000,000 and, in each case, that is not based in a Sanctioned Jurisdiction.

"**Receivables**" means any and all Collections accrued under the Card Processing Agreements in respect of Specified Sales that are due by a Card Processor to Receivables Seller immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Receivables Seller**" means Aerovías del Continente Americano S.A. Avianca.

"**Receivables Transfer Documents**" means the RSPA, the Undertaking Agreement, the Cash Management Agreement, the Costa Rican Assignment Agreement, the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, the Expenses Agreement, the Administration Agreement and the Notices and Consents.

"**Receiver**" has the meaning given to that term in the U.K. Account Charge.

"**Recipient**" means (a) the Administrative Agent, (b) any Secured Party or (c) any other Person entitled to any payment under the Credit Documents, as applicable.

"**Reference Period**" means, at any date of determination, the most recently completed four consecutive fiscal quarters of Holdings on or immediately prior to such date.

"**Regulation U**" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Regulation X**" means Regulation X of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof.

"**Related Party**" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"**Required Lenders**" means, at any time, Lenders holding an outstanding principal amount of the Loan representing more than 50% of the outstanding principal amount of the Loans at such time.

"**Restricted Payment**" means, with respect to any Person, any dividend or other distribution (whether in cash, securities or other property) of such Person, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, defeasance, acquisition, cancellation or termination of any capital stock of such Person, or on account of any return of capital to such Person's stockholders, partners or members (or the equivalent Persons thereof).

"**Retention Event**" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"**RSPA**" means the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, to be dated on or about the date hereof, among the Receivables Seller, as the seller, the Borrower as the purchaser and the Servicer, as the servicer.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Sanctioned Jurisdiction**" means any country or territory that is the subject of Sanctions broadly restricting or prohibiting dealings with, in or involving such country or territory.

"**Sanctioned Person**" means any individual or entity that is, or is owned or controlled by Persons that are, (a) identified on a Sanctions List, (b) organized, domiciled or resident in a Sanctioned Jurisdiction, (c) with whom dealings are restricted or prohibited under Sanctions or (d) otherwise the subject or target of any Sanctions.

"**Sanctions**" means any economic or financial sanctions or trade embargoes imposed, administered or enforced by (a) the United States (including OFAC and the United States Department of State), (b) the United Nations Security Council, (c) the European Union or any European Union member state, (d) the United Kingdom (including Her Majesty's Treasury) or (e) any Governmental Authority in the jurisdiction of any Obligor.

"**Sanctions List**" means the list of designated individuals or entities that are the subject of Sanctions, including, without limitation, in (a) the Specially Designated Nationals and Blocked Persons List maintained by OFAC, (b) the Consolidated United Nation Security Council Sanctions List, (c) the consolidated list of persons, groups and entities subject to EU financial sanctions maintained by the European Union and (d) the Consolidated List of Financial Sanctions Targets in the U.K. maintained by Her Majesty's Treasury of the United Kingdom.

"**Secured Parties**" means the Lenders, the Agents, the Collateral Trustee, any Delegate and any Receiver.

"**Security Documents**" means the New York Security Agreement, the Account Control Agreement, the English Security Documents and all other documents, instruments and filings to be executed and delivered by the Borrower or the Guarantors in favor of any Secured Parties in connection with such agreements and the transactions contemplated thereby.

"**Security Trust Deed**" means the Security Trust Deed to be entered into on or about the date hereof among the Lenders, the Collateral Trustee and the Borrower.

"**Seller's Account**" means account of the Receivables Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías de Continente Americano S.A. Avianca.

"**Servicer**" means, initially, Aerovías del Continente Americano S.A. Avianca and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the RSPA to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

"**Solvent**" means, when used with respect to any Person, that at the time of determination: (a) the assets of such Person, at a fair valuation, are in excess of the total amount of its debts (including contingent liabilities); (b) the present fair saleable value of its assets is greater than its probable liability on its existing debts as such debts become absolute and matured; (c) it is then able and expects to be able to pay its debts (including contingent liabilities and other commitments) as they mature; (d) it has capital sufficient to carry on its business as conducted and as proposed to

be conducted; and (e) it is "solvent" as such term is defined in the Uniform Commercial Code as in effect in the State of New York and is in compliance with each applicable solvency standard under the Applicable Laws of each jurisdiction other than the United States or any state, commonwealth or territory thereof where it is organized or maintains assets or conducts its business.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Borrower and the Collateral Agent from time to time as provided in the Notice and Consent by and among, *inter alia*, the Borrower, the Receivables Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "**Specified Sales**" shall include only "**Specified Sales**" as defined in the Notice and Consent relating to such Card Processing Agreement.

"**Subsidiary**" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person or (c) one or more Subsidiaries of such Person.

"**Taxes**" has the meaning specified in <u>Section 2.7.1.</u>

"**Trigger Event**" has the meaning assigned to such term in the RSPA.

"**Trust Property**" has the meaning assigned to such term in the Security Trust Deed.

"**Undertaking Agreement**" means the Receivables Maintenance Agreement, to be dated on or about the date hereof, among the Receivables Seller, the Borrower and Avianca USA.

"**Unrelated Person**" has the meaning specified in <u>Section 5.15.</u>

"**U.S.$**" and "**Dollars**" denote the lawful currency for the time being of the United States of America.

"**U.K. Account Bank**" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders.

"**U.K. Account Charge**" means the English law security agreement dated as of the date hereof and entered into between the Borrower as chargor, the Collateral Trustee and the U.K. Account Bank.

"**U.S. Account Bank**" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"**Voting Stock**" of a Person means all classes of capital stock or other interests (including partnership interests) of such Person then outstanding and normally entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof.

"**Write-Down and Conversion Powers**" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

## 1.2    Other Interpretive Provisions

With reference to this Agreement and each other Credit Document, unless otherwise specified herein or in such other agreement:

1.2.1    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

1.2.2    The words "**herein**," "**hereto**," "**hereof**" and "**hereunder**" and words of similar import when used in any Credit Document shall refer to such agreement as a whole and not to any particular provision thereof.

1.2.3    Article, Section, Exhibit and Schedule references are to the Credit Document in which such reference appears.

1.2.4    The term "**including**" is by way of example and not limitation.

1.2.5    The term "**documents**" includes any and all instruments, documents, agreements, certificates, notices, reports, financial statements and other writings, however evidenced, whether in physical or electronic form.

1.2.6    In the computation of periods of time from a specified date to a later specified date, the word "**from**" means "**from and including**;" the words "**to**" and "**until**" each mean "**to but excluding**;" and the word "**through**" means "**to and including**."

1.2.7    Section headings herein and in each Credit Document are included for convenience of reference only and shall not affect the interpretation of this Agreement or any other agreement.

1.2.8    All accounting terms not specifically or completely defined herein shall be construed in conformity with, and all financial data (including financial ratios and other financial calculations) required to be submitted pursuant to this Agreement shall be prepared in conformity with, IFRS, except as otherwise specifically prescribed herein.

1.2.9    A reference to an agreement shall be deemed to refer to such agreement as amended, modified and/or supplemented from time to time.

1.2.10    A reference to a party to any document includes that party's successors and permitted assigns.

1.2.11    A reference to any law means such law as amended from time to time and includes any successor legislation thereto and any rules and regulations promulgated thereunder.

## 2.    AMOUNT AND TERMS OF THE COMMITMENTS AND LOANS

## 2.1    The Loan

2.1.1    Subject to and in accordance with this Agreement, each Lender severally, but not jointly, agrees to make to the Borrower on the Closing Date a term loan in an aggregate amount of U.S.$150,000,000 denominated in Dollars (each, a "**Loan**" and collectively, the

"**Loans**") to the Borrower, which Loans shall be (a) incurred pursuant to a single drawing on the Closing Date and (b) made by each such Lender in an aggregate principal amount equal to its respective Commitment.

2.1.2    The Loan made by each Lender shall be evidenced by a Note, which the Borrower shall deliver to such Lender, duly executed by the Borrower, and which Notes shall be governed by New York law and shall comply with all requirements for the validity and enforceability of promissory notes under applicable Law in the Cayman Islands.  The mutilation, loss, theft or destruction of a Note shall not imply or be deemed to constitute a cancellation of debt or of any other obligation under or in respect of this Agreement or any Loan.  If a Note is mutilated, the Borrower shall issue and deliver a new Note of the same principal amount and maturity as the mutilated Note, provided that such mutilated Note shall be returned to the Borrower.  If a Note is lost, stolen or destroyed, the Borrower shall, promptly upon the written request of the Lender, issue and deliver to the applicable Lender a new Note of the same principal amount and maturity as the lost, stolen or destroyed Note, provided that the applicable Lender delivers to the Borrower a lost, stolen or destroyed note affidavit and indemnity in form and substance reasonably satisfactory to the Borrower but without requiring any further action from the Lender other than as may be required by applicable Law.

## 2.2    Borrowing Procedures

2.2.1    The Borrower shall give written notice, substantially in the form of <u>Exhibit H</u> (a "**Notice of Borrowing**"), to the Administrative Agent of the proposed borrowing of the Loans not later than 11:00 a.m. (New York City time), two Business Days prior to the proposed Closing Date.  The Notice of Borrowing shall be irrevocable and binding on the Borrower and shall specify (a) the requested Closing Date and (b) the principal amount of Loans to be borrowed, which shall not be in excess of the Commitments.

2.2.2    Following receipt of the Notice of Borrowing, the Administrative Agent shall promptly provide a copy of such Notice of Borrowing to each Lender.  Subject to the satisfaction of the conditions set forth in <u>Section 3</u>, each Lender shall remit the amount of its applicable Loan to the Administrative Agent's Account on the Closing Date in immediately available funds not later than 11:00 a.m. (New York City time) on the Closing Date specified in the Notice of Borrowing.  The Administrative Agent shall remit all funds so received in like funds as received by the Administrative Agent by wire transfer to the Seller's Account.

## 2.3    New York Pass-Through Account, Collections Account, Debt Service Reserve Account, Cash Management Agreement, RSPA

2.3.1    All Collections will be deposited by the Card Processors, as instructed in the relevant Notice and Consent, into the New York Pass-Through Account.

2.3.2    All Collections deposited in the New York Pass-Through Account shall be transferred by the Collateral Agent to the Collections Account on each Business Day if such Collections are received on or before 11:00 a.m. (New York City time) on such Business Day.  Any Collections received after 11:00 a.m. (New York City time) on a Business Day shall be transferred to the Collections Account on the immediately succeeding Business Day.  Upon receipt of notice that an Event of Default and a Trigger Event have occurred, the Collateral Agent is hereby authorized and directed by the Lenders to transfer all cash standing to the credit of the New York Pass-Through Account to the Collections Account.

2.3.3    (a)    The Debt Service Reserve Account shall be funded pursuant to Section 2.01 of the Cash Management Agreement not later than the date that is sixty (60) days after the Closing Date and the amount in the Debt Service Reserve Account shall from such date and at all times thereafter be at least equal at all times to the sum of:

(i)    the Agent Fees Due during the immediately succeeding four months, *plus*;

(ii)    the amount of the Interest Amount due under Section 2.5 on the next four consecutive Payment Dates, assuming for such purposes that LIBOR for such payments will be the same rate in effect as of such date of determination, *plus*;

(iii)    the sum of the Principal Payment Amounts due under this Agreement for the immediately succeeding four months (together with clauses (i) and (ii), the "**Debt Service Required Amount**").

(b)    The Collateral Agent shall make disbursements from the Collections Account to the Debt Service Reserve Account if the amount in the Debt Service Reserve Account is less than the Debt Service Required Amount, as provided in the Cash Management Agreement.

2.3.4    The Collateral Agent shall make disbursements from the Collections Account and the Debt Service Reserve Account on behalf of the Borrower in respect of all principal, interest and other amounts due to the Secured Parties and the other Persons entitled thereto, in each case as provided in the Cash Management Agreement.

2.3.5    Upon the receipt by the Administrative Agent of written notice from any Lender that a Retention Event has occurred or from the Required Lenders that an Adjustment Event (as defined in the Cash Management Agreement) or a Trigger Event, as applicable, has occurred, the Administrative Agent shall send a notice, substantially in the form attached to the Cash Management Agreement as Exhibit A thereto, to each Lender, the Borrower, the Receivables Seller, Avianca USA, the Collateral Agent and (in the case of a Trigger Event), the Collateral Trustee.

2.3.6    Upon the receipt by the Administrative Agent of any notices or other communications pursuant to or in connection with the Credit Documents or the Receivables Transfer Documents, the Administrative Agent shall promptly make available copies of such notices and communications to the Lenders hereunder in accordance with Section 7.1.13 hereof.

**2.4    Payments**

2.4.1    The Borrower shall repay or cause to be repaid the principal amount of the Loans on each Payment Date in the relevant Principal Payment Amount in accordance with this Agreement; provided that, on the Maturity Date, the Borrower shall pay the aggregate principal amount of all Loans outstanding on such date.

2.4.2    If any Retention Event or Event of Default (unless the Loans have been accelerated) has occurred and is continuing for three consecutive months, funds in the Collections Account shall be applied as set forth in the Cash Management Agreement, including to prepay the Principal Payment Amounts in inverse order of maturity and accrued interest thereon to the extent provided therein.

2.4.3  (a)  All payments of principal and interest under this Agreement shall be made in Dollars and in immediately available funds, without set off or counterclaim, by transfer to the Administrative Agent's Account, as provided in the Cash Management Agreement.  The following amounts shall be deemed payments by the Borrower under this Agreement: (i) payments made by disbursements from the Collections Accounts or the Debt Service Reserve Account and (ii) amounts paid to or received by the Administrative Agent from the Collateral Agent pursuant to the Security Documents.

(b)  If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal and interest then due hereunder, such funds shall be applied (i) first, toward payment of interest then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest then due to such parties, and (ii) second, toward payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.  The Parties hereto acknowledge that the Administrative Agent will not accept payments in respect of amounts hereunder other than principal, interest and break costs into the Administrative Agent's Account.

(c)  If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on the Loan or participations in the Loan resulting in such Lender receiving payment of a greater proportion of the aggregate amount of the Loan and accrued interest thereon relative to its *pro rata* share of the Loan than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loan to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest in their respective portions of the Loan, provided that (i) if any such participations are purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Obligors pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of the Loan to any assignee or participant, other than to the Obligors or any Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Obligors consent to the foregoing and agree, to the extent they may effectively do so under Law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Obligors rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Obligors in the amount of such participation.

2.4.4  (a)  The Administrative Agent shall on each Payment Date and each other Business Day, as applicable, and to the extent funds are received from the Collateral Agent pursuant to the terms of the Cash Management Agreement, cause to be distributed funds in the Administrative Agent's Account in respect of the payment of principal, interest or break costs ratably to the Lenders by wire transfer to such Lender's Lending Office, in each case to be applied in accordance with the terms of this Agreement, and the Administrative Agent's

Account shall not be used for any other purpose.  Each Lender shall from time to time specify to the Administrative Agent any change to such Lender's Lending Office.

(b)     Upon execution of an Assignment and Assumption, delivery of an executed Notice of Assignment and Assumption to the Administrative Agent, recording of the information contained therein in the register pursuant to <u>Section 8.8.3</u> and payment to the Administrative Agent of the Registration Fee (as defined in such Assignment and Assumption), from and after the effective date specified in such Notice of Assignment and Assumption, the Administrative Agent shall make all payments hereunder and under the Notes in respect of the interest assigned thereby to the assignee thereunder, and the parties to such Assignment and Assumption shall make all appropriate adjustments in such payments for periods prior to such effective date directly between themselves.

## 2.5     Interest

2.5.1     Interest shall accrue on the outstanding principal amount of the Loan at a rate of LIBOR plus 4.75% per annum during each applicable Interest Period.  Interest accrued for each Interest Period (the "**Interest Amount**") shall be paid in cash on the last day of the Interest Period during which it accrued (each such day, a "**Payment Date**").  Interest shall be calculated by the Administrative Agent on the basis of a 360-day year and actual days elapsed.

2.5.2     As used herein, "**Interest Period**" means the period commencing on the Closing Date and ending on the date that is one calendar month thereafter; and thereafter each period commencing on the last day of the preceding Interest Period and ending on the date one month thereafter, <u>provided</u> that:

(a)     any Interest Period that would otherwise end on a day that is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the first preceding Business Day;

(b)     any Interest Period that begins on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month at the end of such Interest Period) shall end on the last Business Day of the calendar month at the end of such Interest Period; and

(c)     no Interest Period shall extend beyond the Maturity Date.

2.5.3     Two Business Days prior to the commencement of each Interest Period (the "**Interest Determination Date**"), the Administrative Agent shall determine "**LIBOR**" to be applicable to such Interest Period as the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate) appearing on Reuters Screen LIBOR01 Page (or on any successor or substitute page of such service, or any successor to or substitute for such service, providing rate quotations comparable to those currently provided on such page of such service, as determined by the Administrative Agent from time to time for purposes of providing quotations of interest rates applicable to Dollar deposits in the London interbank market) at approximately 11:00 a.m., London, United Kingdom time, on the applicable Interest Determination Date, as the rate for Dollar deposits with a maturity comparable to such Interest Period, <u>provided</u> that, with respect to any Interest Period that does not coincide to

a length or period published by Reuters (or any applicable successor page or source providing quotations of BBA LIBOR as may be designated by the Administrative Agent from time to time), LIBOR shall be determined through the use of straight-line interpolation by reference to two such rates, one of which shall be determined as if the length of the period of such deposits were the period of time for which the rate for such deposits are available is the period next shorter than the length of such Interest Period and the other of which shall be determined as if the period of time for which the rate for such deposits are available is the period next longer than the length of such Interest Period. If for any reason rates are not available through Reuters or any applicable successor page, then "LIBOR" shall be determined using other such benchmark rate available to the Administrative Agent and notified by the Administrative Agent to the Borrower and the Lenders; and provided, further, that, if, in any case, such rate is less than zero, LIBOR shall be deemed to be zero.

2.5.4    As used herein, "**London Business Day**" shall mean a day (other than a Saturday or Sunday) on which banks in London, England generally are open for the conduct of substantially all of their commercial lending activities and on which dealings in Dollars are carried on in the London interbank market.

2.5.5    The Administrative Agent shall no later than the Business Day following the related Interest Determination Date, send a notice to the Borrower, the Collateral Agent and the Lenders by email containing LIBOR for such Interest Period, the Debt Service Required Amount (including the Agent Fees Due, the Interest Amount and the Principal Payment Amount) for such Interest Period.

2.5.6    During the continuation of any Event of Default, the Borrower shall pay interest on all outstanding obligations hereunder at the rate of 2% per annum above the rate specified in Section 2.5.1 to the fullest extent permitted by Law.  Such interest shall continue to accrue, to the fullest extent permitted by Law, before, during and after any bankruptcy, insolvency, reorganization, liquidation, dissolution, arrangement or winding up or composition or readjustment of debts of the Obligors.

**2.6    Optional Prepayment**

2.6.1    In addition to principal payments due pursuant to Section 2.4, the Borrower may, at its option, prepay all, but not part, of the outstanding Loan on any Payment Date occurring at least 18 months after the Closing Date (such Payment Date, the "**Prepayment Date**") at a prepayment price equal to the sum of (a) the then-outstanding principal amount of the Loan multiplied by the percentage set forth in the following table plus (b) accrued interest thereon to the Prepayment Date plus (c) any Additional Amounts as may be payable thereon.

| Time Period | Percentage |
|---|---|
| From and including the 18th month after Closing Date to and including the 24th month after Closing Date | 102.0% |
| From and including the 25th month after Closing Date to and including the 48th month after Closing Date | 101.0% |
| From and including the 49th month after Closing Date to and including the Maturity Date | 100.0% |

24

2.6.2     With respect to any optional prepayment of this Loan pursuant to <u>Section 2.6.1</u>, the Borrower will give the Administrative Agent written notice thereof no later than 30 days prior to the Prepayment Date, specifying the Prepayment Date and the premium payable in respect of such prepayment.

**2.7**     **Taxes**

2.7.1     Any and all payments by the Obligors under this Agreement or any Note or in respect thereof shall be made free and clear of and without deduction for any present or future taxes, levies, imposts, deductions, charges or withholdings, and all interest, penalties, additions to tax or other liabilities with respect thereto, imposed or levied at any time including interest, additions to tax or penalties applicable thereto ("**Taxes**"), excluding any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable Lending Office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes and (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or Commitment pursuant to a law in effect on the date on which (i) such Lender acquires such interest in the Loan or commitment (other than pursuant to an assignment request by the Borrower under <u>Section 2.9</u>) or (ii) such Lender changes its Lending Office, except in each case to the extent that, pursuant to <u>Section 2.7.1</u>, amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its Lending Office. Any such Taxes described in the immediately preceding clauses (a) and (b) are hereinafter referred to as "**Excluded Taxes**").

2.7.2     If the Obligors shall be required by law to deduct any Taxes or any present or future taxes, levies, imposts, deductions, charges or withholdings excluded above, including all interest, penalties or other liabilities with respect thereto, imposed or levied at any time, from or in respect of any sum payable under this Loan or in respect thereof to any Lender, (a) if such Taxes are Indemnified Taxes, the Obligors shall pay such additional amounts ("**Additional Amounts**") as may be necessary so that after making all required deductions for Taxes (including deductions applicable to Additional Amounts payable under this clause (a)) such Recipient receives an amount equal to the sum it would have received had no such deductions been made, (b) the Obligors will make such deductions and (c) the Obligors will pay the full amount deducted to the relevant taxing authority or other authority in accordance with Law before penalties are payable or interest accrues thereon and, after each such payment of Taxes, the Obligors shall promptly and in any event within 30 days of such payment deliver to such Recipient (with a copy to the Administrative Agent) an official receipt or a certified copy thereof evidencing such payment.

2.7.3     The Borrower shall indemnify each Lender and each Agent, upon demand therefor, for the full amount of any Taxes or Additional Amounts (including Taxes or Additional Amounts imposed or asserted on or attributable to amounts payable under this <u>Section 2.7</u>) payable or paid by any Obligor or required to be withheld or deducted from a

payment to such Obligor, and any expenses arising therefrom or with respect thereto (other than, in relation to a payment to any Obligor, penalties resulting from the gross negligence or willful misconduct of such Lender or Agent, as determined by a court of competent jurisdiction in a final, non-appealable judgment), whether or not such Taxes or Additional Amounts were correctly or legally imposed or asserted by the relevant governmental authority.

**2.8    Increased Costs**

2.8.1    If any Change in Law shall:

(a)    impose, modify or deem applicable any reserve, special deposit or similar requirement against assets of, deposits with or for the account of, or credit extended by, any Lender; or

(b)    impose on any Lender or the London interbank market any other condition affecting this Agreement or the Loan made by such Lender or participation therein;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining the Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then upon the request of such Lender, the Borrower shall pay to such Lender such additional amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

2.8.2    If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or on the capital of such Lender's holding company, if any, as a consequence of this Agreement or the Loan made by such Lender to a level below that which such Lender or such Lender's holding company could have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower shall pay to such Lender such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

2.8.3    A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as applicable, as specified in Section 2.8.1 or Section 2.8.2, shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown as due on any such certificate within 10 days after receipt thereof.

2.8.4    Failure or delay on the part of the Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation, provided that the Borrower shall not be required to compensate a Lender pursuant to this Section 2.8.4 for any increased costs or reductions incurred more than 360 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor, provided, further, that if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 360-day period referred to above shall be extended to include the period of retroactive effect thereof.

**2.9    Mitigation Obligation**

If any Lender requests compensation under <u>Section 2.8</u>, then such Lender shall use reasonable efforts to designate a different Lending Office for funding or booking its Loan or, in cooperation with the Obligors, to assign its rights and obligations hereunder to another of its offices, branches or Affiliates, if, in the judgment of such Lender, such designation or assignment (a) would eliminate or reduce amounts payable pursuant to <u>Section 2.8</u> in the future and (b) in each case, would not subject such Lender to any unreimbursed cost or expense and would not otherwise be materially disadvantageous to such Lender. The Obligors hereby agree to pay all reasonable costs and expenses incurred by the Lender in connection with any such designation or assignment.

**2.10    Break Funding Payments**

In the event of (a) the payment of any principal of the Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default) or (b) the failure to borrow, continue or prepay the Loan on the date specified in any notice delivered pursuant hereto (other than as a result of a default by the Lender), then, in any such event, the Borrower shall compensate each Lender for the actual losses, costs and expenses attributable to such event (excluding loss of anticipated margin or profit). Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of the Loan had such event not occurred, at the interest rate that would have been applicable to the Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for the Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this <u>Section 2.10</u> shall be delivered to the Borrower, with a copy to the Administrative Agent and the Collateral Agent, and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown due on any such certificate within 10 days after receipt thereof.

**3.    CONDITIONS TO LOAN**

**3.1    Conditions Precedent**

The obligations of the Lenders to make the Loans on the Closing Date shall be subject to the satisfaction (or waiver by the Lenders in accordance herewith) of each of the conditions precedent set forth in this <u>Section 3.1</u>.

3.1.1    *Closing documents*:  the Lenders shall have received the following documents in the form and substance satisfactory to the Lenders:

    (a)    *Credit Documents*:  this Agreement, the Notes, the Receivables Transfer Documents, the Security Documents and the Fee Letters, duly executed and delivered by the parties thereto, each of which shall be in full force and effect;

    (b)    *Security Documents*:  evidence of the taking of all action as may be required on or prior to the Closing Date (such as recordings, filings (including filings under the Uniform Commercial Code and updating the Borrower's register of mortgages and charges) and registrations), in the opinion of counsel to the Lenders, to perfect the Liens created thereby in the Collateral in favor of the Collateral Agent or the Collateral Trustee, as applicable, as first priority Liens,

and there shall be no outstanding governmental filings (including financing statements under the Uniform Commercial Code) against any of the Collateral;

(c) *Legal opinions*:  legal opinions dated the Closing Date and addressed to the Lenders and the Administrative Agent from (i) New York counsel to the Obligors, (ii) Panamanian counsel to the Lenders, (iii) Costa Rican counsel to the Lenders, (iv) Salvadorian counsel to the Lenders, (v) Peruvian counsel to the Lenders, (vi) Cayman Islands counsel to the Borrower and (vii) English counsel to the Lenders, in each case, in form and substance satisfactory to the Lenders;

(d) *Closing certificate*:  a closing certificate dated the Closing Date, addressed to the Lenders and the Administrative Agent and signed by a duly Authorized Signatory on behalf of each of the Obligors substantially in the form set forth in Exhibit C and Exhibit D;

(e) *Incumbency certificate*:  a certificate dated the Closing Date of an Authorized Signatory of the Obligors setting out the full name, title and true signature of each representative of each Obligor authorized to sign, on behalf of the Obligors, the Credit Documents to which it is a party and any documents to be delivered by the Obligors pursuant hereto;

(f) *Process agent's acceptance*: evidence that the Process Agent mentioned in Section 3.17 of the Cash Management Agreement has agreed to receive process in the manner specified therein, in form reasonably satisfactory to the Lenders;

(g) *Organizational documents and resolutions*:  certified copies of (i) the certificate of incorporation, each certificate of incorporation on change of name (if any), by-laws, memorandum and articles of association or other organizational or constitutional documents of each of the Obligors, (ii) the register of members, register of directors and register of mortgages and charges of the Borrower and (iii) the resolutions of the board of directors or other governing body of each of the Obligors approving and authorizing the execution, delivery and performance of this Agreement, and the other Credit Documents to which it is a party, in each case certified as of the Closing Date by such Obligor as being in full force and effect without modification or amendment;

(h) *Financial Statements*: Audited consolidated financial statements of each Obligor (other than the Borrower) and the Receivables Seller (including a balance sheet, statement of operations and statement of cash flows) as of and for the fiscal year ended on December 31, 2016;

(i) *Fees*:  evidence that the Borrower has paid all amounts due and payable hereunder and all fees, expenses and other charges it is required to pay in advance of the Closing Date under this Agreement or any other Credit Document, including the fees, charges and disbursements of all legal counsel to the Lenders and Agents and the Collateral Trustee that have been invoiced and delivered to the Borrower prior to the Closing Date; and

(j) *Certificate of Good Standing*: (i) a certificate of good standing issued by the Registrar of Companies in the Cayman Islands with respect to the Borrower, dated no earlier than 14 days prior to the Closing Date, and (ii) such documents

and other certifications that the Lenders may reasonably require to evidence that each other Obligor is duly organized or formed and that such Obligor is validly existing, in good standing and qualified to engage in business in each jurisdiction where its conduct of business requires such qualification;

3.1.2    *Notice of Borrowing*:   The Administrative Agent shall have received the Notice of Borrowing in accordance with <u>Section 2.2</u>.

3.1.3    *MAE*:  There shall not have occurred a Material Adverse Effect.

3.1.4    *No Event of Default or Retention Event*:  No Retention Event, Default or Event of Default shall have occurred and be continuing.

3.1.5    *Authorizations*:   The Obligors and the Receivables Seller shall have obtained all authorizations, approvals, licenses, registrations and consents required in or by Law in connection with execution of the Credit Documents and the performance of their obligations thereunder.

3.1.6    *Collections*:    The Lenders shall have received all data, reports, and/or other documentation fairly stating that the gross amount of sales that, if made after the date hereof, would fall under the definition of Specified Sales (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $403,216,884, (d) in 2015 were $460,083,247, and that the net amount (including, but not limited to, net of any discount rate, any charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections paid to the Receivables Seller on account of such sales (e) in 2016 were $456,909,053 and (f) in 2017, through October 31, were $454,396,385, and the Lenders shall be reasonably satisfied that the net amounts due and payable on the Collections shall on an annual basis be sufficient to support the Loans.

3.1.7    *Collections Agreements*:  The Receivables Transfer Documents and the Card Processing Agreements shall be in full force and effect, no default or event of default shall have occurred and be continuing thereunder, the Borrower shall have legal title to the Contract Rights and the Receivables and the Colombian Back-Up Security Agreement and the Costa Rican Back-Up Security Agreement shall have been registered as a moveable guarantee in their respective jurisdictions.

3.1.8    *Bondholder Consents*:  The holders of the ordinary bonds of the Receivables Seller, dated September 4, 2009, shall have provided all consents to the transactions contemplated hereby as are required to permit such transactions under the documents evidencing and securing such bonds, in the form of the *Acta Asamblea Extraordinaria de Tenedores de los Bonos Emitidos por Aerovías del Continente Americano Avianca S.A. Emision Agosto de 2009*, dated October 19, 2017.

3.1.9    *Accuracy of representations*:  The representations and warranties by the Obligors in this Agreement and the Credit Documents shall be true and correct as of the Closing Date.

3.1.10   *Security Documents*:  Each Obligor shall have taken all actions required to be taken by it on or prior to the Closing Date pursuant to the Security Documents.

3.1.11   *Know your customer*:  The Administrative Agent, the Collateral Agent, the Collateral Trustee and each Lender shall have received all necessary credit and other internal approvals, completed its due diligence with scope and results satisfactory to it in its sole discretion and received "know your customer" approval for the Obligors and the

Receivables Seller required under applicable client onboarding procedures or "know your customer" or anti-money laundering rules and regulations, including the Patriot Act.

3.1.12 *Lien Searches*: Customary lien searches shall have been run against the Borrower and the Receivables Seller, and the results of such searches shall be satisfactory to the Lenders.

## 4. REPRESENTATIONS AND WARRANTIES

### 4.1 Obligors' Representations

Each Obligor represents and warrants, in respect of itself, to the Lenders and the Administrative Agent that:

4.1.1 *Organization and power*:  each Obligor is duly organized or incorporated and validly existing under the laws of its jurisdiction of incorporation, and each of the Obligors is qualified to do business in each jurisdiction in which the conduct of its business requires it to so qualify and has the requisite corporate power and authority to carry on its business, to borrow money, to guarantee, to grant security and to execute, deliver and perform each Credit Document to which it is or will be party;

4.1.2 *Authorization*:  each Obligor has taken all necessary action to approve and authorize the execution of each Credit Document to which it is a party and the undertaking and performance of the obligations expressed to be assumed by it herein and therein;

4.1.3 *No breach*:  the execution of each Credit Document to which it is a party and the undertaking and performance by each Obligor of the obligations expressed to be assumed by it therein and the use of proceeds will not conflict with, or result in a breach of or default under, (a) any Laws applicable to such Obligor, (b) the articles of incorporation, memorandum and articles of association, bylaws or other organizational documents of such Obligor or (c) any agreement or instrument to which it is a party or by which it is bound;

4.1.4 *Legal, valid, binding and enforceable*:  the Credit Documents to which it is a party constitute and, upon due execution by or on behalf of such Obligor, will constitute legal, valid, binding and enforceable obligations of such Obligor, as such enforceability may be limited by any applicable bankruptcy, insolvency, reorganization, moratorium or similar law affecting creditors' rights generally and by general principles of equity (whether considered in a proceeding in equity or at law);

4.1.5 *Status*:  the payment obligations of such Obligor under the Credit Documents to which it is a party will be direct, general, unconditional and unsubordinated obligations of such Obligor and will, except to the extent secured pursuant to the Security Documents, rank at least *pari passu* in priority of payment with all other existing and future unsecured and unsubordinated indebtedness of such Obligor, other than any indebtedness mandatorily preferred by law;

4.1.6 *Approvals*:  no Government Approval is required to be taken, fulfilled or done for the carrying out of the transactions contemplated by the Credit Documents to which it is a party or the compliance by such Obligor with the terms thereof, as the case may be, except for those that have been (or will, prior to the Closing Date, be) obtained and are (or will, on the Closing Date, be) in full force and effect.  All filings, registrations and Government Approval required for the validity and enforceability of each Credit Document to which such Obligor is a party have been duly made or obtained;

4.1.7    *Taxation*:   no stamp or other duty is assessable or payable in, and no withholding or deduction for any taxes, duties, assessments or governmental charges of whatever nature is imposed or made for or on account of any income, registration, transfer or turnover taxes, customs or other duties or taxes of any kind, levied, collected, withheld or assessed by any Governmental Authority having power to tax in connection with the authorization, execution or delivery of the Credit Documents or with the authorization, execution and the performance of such Obligor's obligations under the Credit Documents to which it is a party save that Cayman Islands stamp duty will be payable if any of the Credit Documents are executed in or brought into the Cayman Islands in fully executed form;

4.1.8    *Subsidiaries*:   the Borrower has no Subsidiaries. Schedule 4.1.8 hereto sets forth the corporate structure of each Guarantor, including the Subsidiaries of each Guarantor and the percentage ownership interest of such Guarantor therein;

4.1.9    *No Event of Default*:   no Default or Event of Default has occurred;

4.1.10   *No Material Adverse Effect*:   since December 31, 2016, no event or circumstance exists that has had or could reasonably be expected to have a Material Adverse Effect;

4.1.11   *No Insolvency*:   immediately after the consummation of the transactions contemplated by the Credit Documents on the date hereof and on the Closing Date, each Obligor is and will be Solvent;

4.1.12   *Security Documents*:   all representations and warranties of the Obligors set forth in the Credit Documents are true and correct and the Security Documents provide the Collateral Agent or the Collateral Trustee (as applicable, and in each case for the benefit of the Secured Parties) with effective, valid, legally binding and enforceable perfected first priority Liens on all of the Collateral;

4.1.13   *Liens*:

(a)    neither the execution, delivery or performance by such Obligor of the Credit Documents to which it is a party, nor compliance by such Obligor with the terms and provisions thereof, results in the creation or imposition of any Lien (other than the Liens created thereunder) upon any of the property or assets of such Obligor;

(b)    the Borrower has not created, Incurred, assumed or otherwise caused or suffered to exist or become effective any Lien on or with respect to any of the Collateral, except as arising under the Security Documents; and

(c)    the Obligors have not created, Incurred, assumed or otherwise caused or suffered to exist or become effective any Lien on or with respect to any of their assets, other than Permitted Liens.

4.1.14   *Use of Proceeds*:   the Borrower's use of proceeds under the Loans will not violate Regulations U or X;

4.1.15   *Existing Indebtedness*:   the Borrower does not have any Indebtedness other than Indebtedness pursuant to this Agreement or the Receivables Transfer Documents;

4.1.16   *Compliance with Laws*:

31

(a)     Each of the Obligors and their Subsidiaries is in compliance with all Laws and Government Approvals in respect of the conduct of its businesses and the ownership of its properties, except, solely in the case of the Guarantors and their Subsidiaries, such non-compliance as could not reasonably be expected to result in a Material Adverse Effect; provided, however, that where such compliance relates to any Anti-Corruption Laws or Sanctions, each of the Obligors and their Subsidiaries is in compliance in all respects and subject to no exceptions;

(b)     The Obligors have conducted their businesses in compliance with all applicable Anti-Money Laundering Laws. None of the Obligors or any of their Subsidiaries or any of their respective directors, officers or employees (i) has taken any action that would constitute or give rise to a violation of Anti-Corruption Laws or (ii) is or has been subject to any action, proceeding, litigation, claim or, to the Obligor's knowledge, investigation with regard to any actual or alleged violation of any Anti-Corruption Laws or Anti-Money Laundering Laws.  The Obligors and their Subsidiaries have implemented, maintain and enforce policies and procedures designed to promote and achieve compliance by the Obligors and their Subsidiaries with all applicable Anti-Money Laundering Laws and Anti-Corruption Laws;

(c)     None of the Obligors or any of their Subsidiaries or any of their respective directors, officers, Affiliates, agents or employees (i) is a Sanctioned Person, (ii) is currently engaging or has during the five years prior to the date hereof engaged in any dealings or transactions with, involving or for the benefit of a Sanctioned Person, or in or involving any Sanctioned Jurisdiction in violation of Sanctions, or (iii) is subject to any action, proceeding, litigation, claim or, to the Obligor's knowledge, investigation with regard to any actual or alleged violation of Sanctions;

4.1.17  *Financial Statements*: each Obligor (other than the Borrower) has previously furnished to the Administrative Agent its consolidated financial statements (including a balance sheet, statement of operations and statement of cash flows): (a) as of and for the fiscal year ended on December 31, 2016, audited by and accompanied by the opinion of an internationally recognized independent public accountant and (b) as of and for the fiscal quarter ended on September 30, 2017. Such financial statements: (x) were prepared in good faith in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; (y) fairly present its financial condition and its consolidated Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with IFRS consistently applied throughout the period covered thereby, other than with respect to mandatory changes required by IFRS; and (z) show all its material indebtedness and other liabilities, direct or contingent, and its consolidated Subsidiaries as of the date thereof;

4.1.18  *No Litigation*:   there is no litigation, investigation, arbitration or other proceeding pending or, to the knowledge of any Obligor after due and diligent investigation, threatened in writing against any Obligor or any of their Subsidiaries before any arbitrator or Governmental Authority that, solely in the case of each Guarantor: (a) in the aggregate, has had or, if adversely determined, could reasonably be expected to have a Material Adverse Effect or (b) could reasonably be expected to materially and adversely

affect the legality, validity, binding effect or enforceability of any of the Credit Documents;

4.1.19   *Payment of Taxes*:  each Obligor has filed, has caused to be filed or has been included in all material Tax returns (national, departmental, local, municipal and foreign) required to be filed and has paid all material Taxes due with respect to the years covered by such returns, except for any such Taxes whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which such Obligor has set aside on its books adequate reserves with respect thereto in accordance with IFRS;

4.1.20   *Legal Form*:  each of the Credit Documents is (or upon its coming into effect will be) in proper legal form under its governing law for the enforcement thereof against the parties thereto under such laws, and constitutes a legal, valid and binding obligation thereof, enforceable in accordance with its terms. Subject to the preceding sentence, all formalities required in the U.S. and the jurisdiction of incorporation of each Obligor for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of each Credit Document have been accomplished, and no taxes are required to be paid for the validity and enforceability thereof;

4.1.21   *Investment Company*:  no Obligor is required to register as an "investment company", as such term is defined in the Investment Company Act of 1940, as amended;

4.1.22   *True and Complete Disclosure*:  each Obligor has disclosed to the Administrative Agent and the Lenders all agreements, instruments and corporate or other restrictions to which it or any of its Subsidiaries or any other Obligor is subject, and all other matters known to it, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.  No information, report, financial statement, exhibit or schedule furnished by or on behalf of any Obligor or any of their Subsidiaries to any Agent or Lender in connection with the negotiation of any Credit Document or included therein or delivered pursuant thereto contained, contains any material misstatement of fact or omitted, omits or will omit to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were, are or will be made, not misleading; provided that to the extent any such information, report, financial statement, exhibit or schedule was based upon or constitutes a forecast or projection, such Obligor represents only that it acted in good faith and utilized reasonable assumptions (based upon accounting principles consistent with its historical audited financial statements) and due care in the preparation of such information, report, financial statement, exhibit or schedule;

4.1.23   *Notices*:  the instructions to the Card Processors found in the Notices and Consents are sufficient to legally obligate each such Card Processor to make payments of the Collections directly to the New York Pass-Through Account in order to discharge the Collections owed to the Borrower with respect to the relevant Card Processing Agreement;

4.1.24   *Immunity*:  each Obligor and their Subsidiaries is subject to civil and commercial law with respect to its obligations under the Credit Documents to which it is a party, and the execution, delivery and performance by it of such Credit Documents constitute private and commercial acts rather than public or governmental acts.  None of the Obligors or any of their Subsidiaries nor any of their respective properties is entitled to immunity on

the grounds of sovereignty or otherwise from the jurisdiction of any court or from any action, suit, set-off or proceeding, or service of process in connection therewith, arising under the Credit Documents;

4.1.25 *Labor Matters*:  there are no strikes, work stoppages, slowdowns or lockouts pending or threatened against or involving any Obligor or any of their Subsidiaries. There are no unfair labor practices, grievances, complaints or arbitrations pending or, to any Obligor's knowledge, threatened, against or involving any Obligor or any of their Subsidiaries, nor are there any arbitrations or grievances threatened involving any Obligor or any of their Subsidiaries;

4.1.26 *No License*:  it is not necessary in order for any Secured Party to enforce any rights or remedies under the Credit Documents, or solely by reason of the execution, delivery and performance by the Obligors of the Credit Documents, that any Secured Party be licensed or qualified with any Governmental Authority, or be entitled to carry on business in any relevant jurisdiction. No Secured Party is or will be deemed to be resident, domiciled or carrying on business in any relevant jurisdiction by reason only of the execution, performance and/or enforcement of any Credit Document.

4.1.27 *Collections*:  the net amount (including, but not limited to, net of any discount rate of charges, any chargebacks, any refunds, any fees and any other amounts owed to the Card Processor under the relevant Card Processing Agreement) of collections (from sales that, if such sales were made after the date hereof, would fall under the definition of Specified Sales) paid (a) in 2012 were $369,151,330, (b) in 2013 were $407,038,709, (c) in 2014 were $438,240,114, (d) in 2015 were $475,663,696, (e) in 2016 were 488,124,169 and (f) in 2017, through July 31, were $315,922,638.

4.1.28 *Affiliates*:  the Borrower is not an Affiliate of the Receivables Seller or any Guarantor

**4.2**    **Further Assurances**

The Obligors shall execute any and all further documents, agreements and instruments, and take all further action at their own expense that may be required under Law, or that the Administrative Agent may reasonably request (acting at the direction of the Required Lenders), in order to effectuate the transactions contemplated by the Credit Documents.

**5.**    **COVENANTS**

**5.1**    **Enforceability, Rank**

Each of the Obligors covenants and agrees with the Lenders that:

(a)    each Obligor shall obtain, comply with the terms of and do all that is necessary to maintain in full force and effect all authorizations, approvals, licenses, registrations and consents required in or by the laws and regulations of the United States, New York and its jurisdiction of incorporation to enable it lawfully to enter into and perform its obligations under the Credit Documents to which it is a party, perform its business or ensure the legality, validity, enforceability or admissibility in evidence of the Credit Documents in the United States, New York and its jurisdiction of incorporation;

(b)    each Obligor shall ensure that at all times its obligations under the Credit Documents to which it is a party will at all times rank at least *pari passu* with all other present and future unsubordinated Indebtedness of such Obligor, other than obligations mandatorily preferred by law;

(c)    the Borrower shall not amend or modify its certificate of incorporation, memorandum and articles of association, by-laws or other organizational documents without the consent of the Required Lenders; and

(d)    Holdings shall, upon demand by the Administrative Agent (acting at the direction of the Required Lenders) in connection with any action to enforce, or potential action to enforce, this Agreement, or any exercise of rights or remedies hereunder or thereunder, cause a certified translation of this Agreement in the Spanish language to be prepared as soon as practicable, but in any event no later than 10 Business Days following such demand.

## 5.2    Corporate Existence

Each Obligor shall do or cause to be done all things necessary to preserve and keep in full force and effect the corporate existence, rights (charter and statutory), licenses and franchises of such Obligor and its Subsidiaries.

## 5.3    Payment of Taxes and Other Claims

Each Obligor shall pay or discharge or cause to be paid or discharged, before the same shall become delinquent, (a) all material taxes, assessments and governmental charges levied or imposed (i) upon such Obligor or any of its Subsidiaries or (ii) upon the income, profits or property of such Obligor or any of its Subsidiaries and (b) all material lawful claims for labor, materials and supplies, which, if unpaid, could reasonably be expected to become a Lien upon the property of such Obligor or any of its Subsidiaries; provided, however, that the Obligors will not be required to pay or discharge or cause to be paid or discharged any such tax, assessment, charge or claim whose amount, applicability or validity is being contested in good faith by appropriate proceedings properly instituted and diligently conducted, and for which such Obligor has set aside on its books adequate reserves with respect thereto in accordance with IFRS.

## 5.4    Maintenance of Properties

Each Obligor shall cause all material properties owned by such Obligor and its Subsidiaries or used or held for use in the conduct of their respective businesses to be maintained and kept in good condition, repair and working order and supplied with all necessary equipment and will cause to be made all necessary repairs, renewals, replacements, betterments and improvements thereof, all as in the reasonable judgment of such Obligor may be necessary so that the business carried on in connection therewith may be properly and advantageously conducted at all times.

## 5.5    Insurance

Each Obligor shall at all times keep all of its and its respective Subsidiaries' properties that are of an insurable nature insured with insurers that are financially sound and responsible, against loss or damage to the extent that property of similar character is usually and customarily so insured by corporations in the relevant jurisdiction of such Obligor similarly situated and owning like properties.

## 5.6    Books and Records; Reporting

5.6.1    Each Obligor shall keep proper books of record and account, in which full and correct entries will be made of all financial transactions and the assets and business of such Obligor in compliance with IFRS.

5.6.2    The Borrower shall provide to the Administrative Agent, in each case, prepared in accordance with IFRS:

(a)    within 180 days after the end of each fiscal year, audited year-end financial statements of the Borrower (including a balance sheet, statement of operations and statement of cash flows) reported by an internationally recognized independent public accountant;

(b)    within 180 days after the end of each fiscal year, audited year-end consolidated financial statements of Holdings and its Subsidiaries, and stand-alone financial statements of each other Guarantor (including, in each case, a balance sheet, statement of operations and statement of cash flows) reported by an internationally recognized independent public accountant;

(c)    within 90 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly financial statements of the Borrower (including a balance sheet, statement of operations and statement of cash flows); and

(d)    within 90 days after the end of each of the first three fiscal quarters of each fiscal year, unaudited quarterly consolidated financial statements of Holdings and its Subsidiaries and stand alone financial statements of each other Guarantor (including, in each case, a balance sheet, statement of operations and statement of cash flows).

5.6.3    Concurrently with any delivery of financial statements:

(a)    the Borrower shall provide to the Administrative Agent an Officer's Certificate of the Borrower, stating that no Event of Default has occurred and is continuing (or, if an Event of Default has occurred, specifying the details of such Event of Default and the action that such Obligor has taken or proposes to take with respect thereto); and

(b)    Holdings shall provide to the Administrative Agent a Compliance Certificate of Holdings, stating that (i) no Event of Default has occurred and is continuing (or, if an Event of Default has occurred, specifying the details of such Event of Default and the action that such Obligor has taken or proposes to take with respect thereto) and (ii) containing all information and calculations necessary for determining compliance by Holdings and its Subsidiaries with the provisions of this Agreement as of the last day of the fiscal quarter or fiscal year of Holdings, as the case may be.

5.6.4    Each Obligor shall provide to the Administrative Agent for the benefit of, and for prompt (and in any event within no less than two Business Days) distribution to, the Lenders:

(a)    promptly and in any event within two Business Days after the occurrence of any Default or Event of Default, notice of such Default or Event of Default including the details thereof and the actions that are being taken or are proposed to be taken with respect thereto;

(b)    promptly and in any event within two Business Days after any Obligor obtains knowledge thereof, written notice of any litigation, claim, investigation, arbitration, other proceeding or controversy pending or, to its knowledge, threatened, involving or affecting any Obligor or any of their Subsidiaries: (i) that could give rise to a Lien on any of its properties, (ii) that could

reasonably be expected to have a Material Adverse Effect or (iii) relating to any of the Credit Documents;

(c)    promptly and in any event within two Business Days after any Obligor obtains knowledge thereof, written notice of any event, change, condition or circumstance that could reasonably be expected to have a Material Adverse Effect; and

(d)    from time to time such other information with respect to any Obligor or any of their Subsidiaries or the Credit Documents and/or the transactions contemplated hereby or thereby as any Lender (acting through the Administrative Agent) or the Administrative Agent (acting at the direction of the Required Lenders) may reasonably request, including any documentation or other evidence to enable such Lender or the Administrative Agent to carry out and be satisfied with the requirements of all applicable "know your customer" laws, regulations and codes of conduct.

**5.7    Further Assurances; Security Filings**

The Borrower shall perform or cause to be performed, from time to time, any and all acts (and execute any and all documents) as may be necessary or required by applicable Law or reasonably requested by any Agent (acting at the direction of the Required Lenders) to maintain each Lien created by the Credit Documents in full force and effect and enforceable in accordance with its terms, including: (a) making filings and recordations, (b) making payments of fees and other charges, (c) issuing and, if necessary, filing or recording supplemental documentation, including continuation statements, (d) publishing or otherwise delivering a notice to third parties, and (e) taking all other actions either necessary or required by applicable Law or otherwise reasonably requested by any Agent (acting at the direction of the Required Lenders) to ensure that all after-acquired property intended to be covered by such Liens is subject to a valid and enforceable first priority Lien in favor of the applicable Agent (for the benefit of the Secured Parties).

**5.8    Limitation on Indebtedness**

5.8.1    Other than Indebtedness incurred pursuant to this Agreement or the Receivables Transfer Documents, the Borrower shall not incur, assume or suffer to exist any Indebtedness.

5.8.2    Holdings hereby agrees that, so long as the Commitments remain in effect, or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, Holdings will maintain a Capitalization Ratio at all times during each Reference Period of not more than 0.86:1.00.

5.8.3    Holdings hereby agrees that, so long as the Commitments remain in effect, or any Loan or other amount is owing to any Lender or the Administrative Agent hereunder, Holdings will maintain an Adjusted EBITDAR Coverage Ratio at all times during each Reference Period of not less than 1.75:1.00.

**5.9    Limitation on Restricted Payments**

5.9.1    The Borrower shall not declare or make, directly or indirectly, a Restricted Payment, or incur any obligation (contingent or otherwise) to do so.

5.9.2    No Obligor (other than the Borrower) shall declare or make, directly or indirectly, a Restricted Payment, or incur any obligation (contingent or otherwise) to do so except to the extent that such a payment is required by applicable Law; <u>provided</u> that the

restrictions set forth in this clause shall not apply if immediately prior to and immediately after giving effect to such Restricted Payment, no Retention Event, Default or Event of Default shall have occurred and be continuing.

**5.10    Limitation on Affiliate Transactions**

5.10.1    No Guarantor shall enter into or permit to exist any transaction (including the purchase, sale, lease or exchange of any property, employee compensation arrangements or the rendering of any service) with any Affiliate (an "**Affiliate Transaction**") of such Guarantor unless (a) the transaction is with a Subsidiary of such Guarantor, or with another Guarantor, or with a Subsidiary of another Guarantor, or (b) such transaction would be immaterial to the financial condition and results of operations of such Guarantor and its Subsidiaries (taken as a whole), or (c) the terms thereof, taken as a whole, are no less favorable to such Guarantor than those that could be obtained at the time of such transaction in arm's-length dealings with a Person that is not an Affiliate of such Guarantor.

5.10.2    The Borrower shall not enter into or permit to exist any Affiliate Transaction except pursuant to the Credit Documents or the Receivables Transfer Documents.

**5.11    Limitation on Sales of Assets**

5.11.1    The Borrower shall not directly or indirectly, consummate any sale, lease, transfer or other Disposition (or series of related sales, leases, transfers or dispositions), including any Disposition by means of a merger, consolidation or similar transaction, of any property or assets.

5.11.2    The Guarantors shall not, and shall ensure their Subsidiaries do not, Dispose of any of their property, whether now owned or hereafter acquired, or, other than with respect to Holdings, issue or sell any of Receivables Seller's, such Guarantor's or such Subsidiary's equity interests to any Person, except:

    (a)    Dispositions in the ordinary course of business, including (i) Dispositions of obsolete or worn-out property, aircraft and equipment, (ii) Dispositions of aircraft and other equipment that has been leased to a Guarantor or any of their Subsidiaries pursuant to sale and leaseback transactions, (iii) Dispositions of aircraft and other equipment replaced within 180 days of such Disposition by aircraft and other equipment of approximately the same or greater value or with approximately the same or greater passenger capacity in connection with the upgrading of the Guarantors' or their Subsidiaries' fleet of aircraft, or (iv) leases and sub-leases of aircraft and related equipment to Affiliates;

    (b)    Dispositions from Holdings or its Subsidiaries to the other Guarantors;

    (c)    Dispositions of assets not constituting Core Assets and not otherwise described in clauses (i) and (ii); provided that at least 75% of the consideration received thereof by the Guarantors, as the case may be, is in the form of cash or Cash Equivalents; provided, further, that neither Receivables Seller nor Holdings nor any of their Subsidiaries shall make Dispositions the proceeds of which are reinvested in Subsidiaries of Holdings that are not Guarantors;

    (d)    Dispositions of assets that would not exceed on a cumulative basis (i) for the period beginning on the Effective Date and ending on the Payment Date of the last Monthly Settlement Amount, 15% of the aggregate value (in accordance

with IFRS) of Holdings' consolidated assets (as such value is adjusted as of the end of each fiscal year of Receivables Seller, Holdings and each other Guarantor based on the inflation provision in IFRS), or (ii) in any single fiscal year of Holdings commencing after the Effective Date 5% of the aggregate value (in accordance with IFRS) of Receivables Seller's consolidated assets; and

(e)    Dispositions of Air Travel Receivables on which Liens are not prohibited by Section 5.12.2.

Notwithstanding the foregoing provisions of this Section 5.11.2, no Disposition, other than Dispositions pursuant to Section 5.11.2(a) shall be permitted if, at the time thereof, there shall exist and be continuing any Retention Event, Default, or Event of Default.

**5.12    Limitation on Liens**

5.12.1    The Borrower shall not, directly or indirectly, create, Incur, assume or otherwise cause or suffer to exist or become effective any Lien of any nature whatsoever (for the avoidance of doubt, including but not limited to Permitted Liens) on any of its assets, except Liens created pursuant to a Credit Document.

5.12.2    No Guarantor shall, directly or indirectly, create, Incur, assume or otherwise cause or suffer to exist or become effective any Lien of any nature whatsoever on any of its assets, except for Permitted Liens.

**5.13    Limitation on Lines of Business**

5.13.1    The Borrower shall not engage in any business or activity other than the transactions expressly contemplated by the Credit Documents.

5.13.2    No Guarantor shall make any substantial change to the general nature of the business of such Guarantor from that carried on at the date of this Agreement.

5.13.3    No Obligor shall (a) change its name or take any other action (other than those permitted hereunder) that could reasonably be expected to adversely affect the priority, perfection or validity of the Liens created by the Credit Documents, (b) change its country of domicile, (c) make or permit any material change in its accounting policies or reporting practices except as required by a change in IFRS or (d) change its fiscal year.

**5.14    Consolidation, Merger**

No Obligor will consolidate or merge with or into, dissolve, liquidate, or convey, lease or transfer all or substantially all of its assets to, any Person in a single transaction or through a series of transactions, unless:

(a)    the Person formed by such consolidation or merger shall expressly assume, by an agreement supplemental hereto, executed and delivered to the Agents and the Lenders in form and substance satisfactory to the Administrative Agent, the performance of every covenant and obligation of the Obligor under this Agreement and the other Credit Documents to which it is a party; and

(b)    (i) such consolidation or merger and such supplemental agreement comply with this Section 5.14 and all conditions precedent herein relating to such transaction have been complied with, (ii) such supplemental agreement is legal, valid and binding and enforceable

against such Person in accordance with the terms of such supplemental agreement (except for laws affecting the enforcement of creditors' rights generally and general principles of equity in whatever proceeding asserted), (iii) following such consolidation or merger, the Collateral Agent shall continue to have an enforceable, valid, and effective security interest in and Lien on the Collateral, and (iv) the Administrative Agent shall have received favorable legal opinions from the Obligor's counsel covering such matters as shall have been covered by legal opinions given by such counsel as of the Closing Date; and

(c)      if the Obligor undergoing such consolidation or merger is Holdings, only if the Lenders have in good faith determined, after receiving notice of the principal terms of such consolidation or merger and *pro forma* financial statements indicating the *pro forma* financial condition on the effective date of the transaction and projected results of operations of the surviving entity, that the merger or consolidation will not have a Material Adverse Effect or otherwise adversely affect the ability of Holdings and the other Guarantors to meet their obligations under this Agreement or the other Transaction Documents or of the Receivables Seller to meet its obligations under the RSPA, the Undertaking Agreement, the Cash Management Agreement or the other Transaction Documents;

provided that notwithstanding the foregoing provisions of this <u>Section 5.14</u>, no such consolidation, merger, conveyance, or transfer shall be permitted (a) if the Obligor is the Borrower or (b) if, at the time thereof, there shall exist and be continuing any Default, Event of Default, or Retention Event.

## 5.15    Maintenance of Separateness

The Borrower shall not take any action, or conduct its affairs in a manner that could reasonably be expected to result in its corporate existence being ignored by any court of competent jurisdiction or in its assets and/or liabilities being substantively consolidated with those of any other Person in a bankruptcy, reorganization or other insolvency proceeding.  In furtherance of the foregoing, the Borrower shall conduct its business (and shall cause each Subsidiary to conduct its business) such that it is a separate and readily identifiable business from, and independent of, any other Person (each such person, an "**Unrelated Person**") and, in particular:

5.15.1    shall observe all corporate formalities necessary to remain a legal entity separate and distinct from, and independent of, all Unrelated Persons;

5.15.2    shall maintain its assets and liabilities separate and distinct from those of each Unrelated Person and shall not comingle its assets with those of any Unrelated Person;

5.15.3    shall maintain its accounts and funds separate and distinct from the accounts and funds of each Unrelated Person and will receive, deposit, withdraw and disburse its funds separately from any funds of any Unrelated Person;

5.15.4    shall maintain records, books, accounts and minutes separate from those of any Unrelated Person;

5.15.5    shall conducts its own business in its own name and not in the name of any Unrelated Person and correct any known misunderstanding regarding its status as a separate entity;

5.15.6    shall maintain an arm's-length relationship with its Affiliates;

5.15.7    shall maintain separate financial statements from each Unrelated Person;

5.15.8 shall pay its own liabilities and obligations out of its own funds, whether in the ordinary course of its business or otherwise, as a legal entity separate from each Unrelated Person;

5.15.9 shall not use stationery, invoices and checks of any Unrelated Person;

5.15.10 shall hold itself out as a separate legal entity and correct any known misunderstanding regarding its status as a separate entity;

5.15.11 shall not induce any third party to rely on the creditworthiness of any Unrelated Person in order that such third party may be induced to contract with it; and

5.15.12 shall observe all corporate or other procedures required by applicable law.

## 5.16    Limitation on Investments

The Borrower shall not make or acquire any Investment.

## 5.17    Use of Proceeds

The Borrower shall use the proceeds of the Loan only to purchase the Contract Rights and Receivables pursuant to the RSPA by payment to the Seller's Account.  The Borrower shall not use the proceeds of the Loans directly or indirectly for "purchasing" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter be in effect or for any purpose which violates or is inconsistent with the provisions of Regulation U or X.

## 5.18    Investment Company Act

The Borrower shall not take (or permit any other Person on behalf of the Borrower to take) any action that could reasonably be expected to result in it being required to be registered as an "investment company" under the United States Investment Company Act of 1940.

## 5.19    Compliance with Laws

5.19.1 The Obligors shall, and shall cause their Subsidiaries to, comply with all requirements of Law, including all relevant Government Approvals and Environmental Laws, except, solely in the case of the Guarantors and their Subsidiaries, where any failure to so comply could not, individually or in the aggregate, have a Material Adverse Effect, and except that the Guarantors may, at their expense, contest by appropriate proceedings conducted in good faith the validity or application of any such requirement of Law, so long as (i) none of the Lenders, Agent or the Obligors would be subject to any criminal liability for failure to comply therewith and (ii) such contest does not involve any material risk of the sale, forfeiture or loss of any of the Collateral; provided, however, that the Obligors shall, and shall cause their Subsidiaries to, comply with all Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions in all respects and subject to no exceptions.

5.19.2 No Obligor shall directly or indirectly use the proceeds of the Loan, or contribute or otherwise make available such proceeds to any Person (a) to fund or facilitate any activities of or business with any person, or in any country or territory, that, at the time of such funding or facilitating, is a Sanctioned Person in violation of Sanctions; (b) to fund or facilitate any activities of or business in any Sanctioned Jurisdiction in violation of Sanctions; (c) in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Law; (d) to engage in any transaction, activity or conduct that would

violate applicable Anti-Money Laundering Laws; or (e) in any other manner that will result in a violation of Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions by any person (including any person participating in the Loan Agreement).

5.19.3    No Obligor shall permit any part of the funds used in repayment of the Loans to be derived from a transaction with, or proceeds from, a Sanctioned Person or a Sanctioned Jurisdiction or use funds that were the subject of money laundering activities or any other activities unlawful under applicable Law to make any payments to the Secured Parties under this Agreement or otherwise make any payment to any Agent or Lender hereunder that would cause such Agent or Lender to be in violation of any applicable Law.

5.19.4    The Obligors shall, and shall cause their Subsidiaries to, continue to maintain and enforce policies and procedures designed to promote and achieve compliance by the Obligors and their Subsidiaries with all applicable Anti-Corruption Laws, Anti-Money Laundering Laws and Sanctions.  The Obligors shall promptly notify the Lenders, to the extent that any such notification does not violate Law (including any applicable privilege), in the event that (a) they or any of their Subsidiaries, or any of their respective directors, officers, Affiliates, agents or employees becomes a Sanctioned Person; and/or (b) they know or have reason to know that they or any of their Subsidiaries, or any of their respective directors, officers, Affiliates, agents or employees may violate or has violated Anti-Corruption Laws, Anti-Money Laundering Laws or Sanctions in connection with this Agreement or in any other manner that will result in a violation by any person (including any person participating in the Loan Agreement).

**5.20    Card Processing Agreements**

5.20.1    Upon any amendment to a Card Processing Agreement, the Borrower shall provide prompt notice and a copy of such amendment to the Administrative Agent.

5.20.2    The Borrower shall cause the Receivables Seller to maintain and promptly, but in any event within two Business Days of an event requiring an update, update the merchant identification codes identified in each Notice and Consent so that it accurately reflects the merchant identification codes associated with the Contract Rights at all times and concurrently provide a copy of such updates to the relevant Card Processor and the Administrative Agent.

5.20.3    To the extent that the Borrower (which shall promptly notify the Agents in writing thereof) or any Agent (acting at the direction of the Required Lenders) shall at any time reasonably determine that the execution of a Notice and Consent is not sufficient to require a Card Processor in any jurisdiction to make payment of the Collections to such New York Pass-Through Account, take such other actions as requested by an Agent (acting at the direction of the Required Lenders) to ensure that such Card Processor is so required.

5.20.4    If any funds are received by the Borrower from time to time in respect of Collections: (a) promptly (and, in any event, within two Business Days) after its receipt thereof, remit such funds to the New York Pass-Through Account (and until so remitted, such funds shall be held in trust by the Borrower for the benefit of the Collateral Agent) and (b) promptly (and, in any event, by no later than the Business Day after any such remittance): (i) notify the Collateral Agent of its receipt of any such funds and of each such remittance by it (or on its behalf) into the New York Pass-Through Account (specifying the amount and date of the remittance and the Card Processing Agreement, if any, with respect to which it received such funds) and (ii) deliver to the Collateral Agent evidence that it has

sent a notice to the applicable Card Processor that all future payments on Collections are to be deposited into the New York Pass-Through Account.

5.20.5    The Borrower shall cause the Receivables Seller to ensure that each of the Card Processing Agreements remains the legal, valid and binding obligations of each of the parties thereto and perform and observe all of its material covenants and obligations contained in each Card Processing Agreement.

# 6.    EVENTS OF DEFAULT

## 6.1    Events of Default

If any of the following events (each, an "**Event of Default**") shall occur and be continuing:

6.1.1    any Obligor fails to pay any amount due under this Agreement or any Note when due, unless (a) the amount in the Collections Account is sufficient on such due date to pay or disburse all amounts due under this Agreement and each Note on such date and (b) such amount is paid or disbursed from the Collections Account to pay such amounts in full within 3 Business Days of its due date;

6.1.2    the Collections Coverage Ratio is below 1.75:1.00 at any date of determination or a Retention Event occurs and continues for six consecutive months;

6.1.3    any Obligor fails duly to perform or observe:

(a)    any term or obligation under Section 2.3, Section 2.4 or Section 5 (except Sections 5.3, 5.4, 5.5 and 5.19.1) hereof or under any Security Document; or

(b)    any other term or obligation contained hereunder or in any other Credit Document (other than any Receivables Transfer Document) to which it is a party and such failure shall continue unremedied for 30 days after the earlier of (i) an Obligor obtaining knowledge of such failure or (ii) written notice thereof having been given by any Agent or any Lender to the Borrower;

6.1.4    the Receivables Seller or the Borrower fails duly to perform or observe any term or obligation contained in, or otherwise defaults under, the Receivables Transfer Documents, a Trigger Event occurs under the RSPA, or the RSPA is terminated for any reason;

6.1.5    any representation, warranty, certification or statement made or deemed to be made by the Receivables Seller or any Obligor in any Credit Document, or any certificate, financial statement or other document delivered pursuant to or in connection with any Credit Document or the Loans shall prove to have been incorrect when made or repeated (or deemed made or repeated) or the Receivables Seller or any Obligor shall provide any Agent or Lender with material false information;

6.1.6    any default, early amortization event or similar event shall occur with respect to (a) any Indebtedness of the Borrower or (b) any Indebtedness of the Receivables Seller or any Obligor (other than the Borrower) that exceeds in aggregate U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency), in each case if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof;

6.1.7    Any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) (a) for the payment of money is entered against the Borrower or (b) for the payment of money in excess of U.S.$20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Receivables Seller or any Obligor (other than the Borrower), and in each case remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed;

6.1.8    a Card Processing Agreement is terminated by either party for any reason, unless such termination is a Permitted Termination and the Receivables Seller and the Borrower complete a Contract Rights and Receivables Addition acceptable to the Required Lenders promptly (and in any event within 10 days) following such termination;

6.1.9    the Receivables Seller or the Borrower breaches its obligations under a Card Processing Agreement and such breach gives the relevant Card Processor the right to terminate the Card Processing Agreement, unless the relevant Card Processor in writing waives its right to terminate the Card Processing Agreement on account of such breach;

6.1.10    a Card Processor fails to make payments under the relevant Card Processing Agreement into the New York Pass-Through Account for 10 consecutive days, unless the Card Processing Agreement is terminated within such 10 days in connection with a Permitted Termination;

6.1.11    any resolution of the shareholders of the Borrower is passed to wind-up the affairs of the Borrower and/or to approve the voluntary liquidation of the Borrower;

6.1.12    the Receivables Seller or any Obligor pursuant to or under or within the meaning of any Bankruptcy Law:

    (a)    commences a voluntary case or proceeding;

    (b)    consents to the making of a Bankruptcy Order in an involuntary case or proceeding or the commencement of any case against it;

    (c)    consents to the appointment of a Custodian of it or for substantially all of its property;

    (d)    makes a general assignment for the benefit of its creditors;

    (e)    files an answer or consent seeking reorganization or relief;

    (f)    shall admit in writing its inability to pay its debts generally; or

    (g)    consents to the filing of a petition in bankruptcy;

6.1.13    a court of competent jurisdiction in any involuntary case or proceeding enters a Bankruptcy Order against the Receivables Seller or any Obligor and such Bankruptcy Order remains unstayed and in effect for 60 consecutive days;

6.1.14    a Custodian is appointed out of court with respect to the Receivables Seller or any Obligor or with respect to all or any substantial part of the assets or properties of any such Person;

6.1.15    (a) the capacity or ability of the Receivables Seller to operate domestic and/or international flights is materially impaired for any reason or (b) the capacity or ability of

the Guarantors (other than Holdings), individually or collectively, to operate domestic and/or international flights is materially impaired for any reason, unless the gross revenue generated by their domestic and international flights immediately before such material impairment constituted less than 30% of the gross revenue generated by the Receivables Seller and all Guarantors (other than Holdings) in the aggregate in the previous 12 months;

6.1.16    any Change of Control occurs;

6.1.17    (a) any Credit Document or any term thereof (i) shall be revoked, terminated, become void or cease to be in full force and effect, (ii) shall become, or the performance of or compliance with any obligation thereunder shall become, unlawful, or (iii) shall be repudiated (or purportedly repudiated) by any party thereto (other than an Agent or a Lender) or its legality, validity or enforceability shall be challenged by any Person (other than an Agent or a Lender); or (b) the Receivables Seller or any Obligor shall deny that it has any or further liability or obligation under any Credit Document;

6.1.18    (a) any Security Document shall not provide or shall cease to provide the Secured Parties with effective, valid, legally binding and enforceable first priority perfected Liens on the Collateral secured or purported to be secured thereby as contemplated under the Credit Documents or (b) the Receivables Seller or any Obligor shall, directly or indirectly, contest the effectiveness, validity, legality, binding nature, enforceability or priority of such Liens;

6.1.19    any Government Approval at any time necessary to enable the Receivables Seller or any Obligor to comply with any of its obligations under any of the Credit Documents shall be revoked, withdrawn, withheld or otherwise not in full force and effect or shall be modified or amended in a manner that has had or could reasonably be expected to have a Material Adverse Effect;

6.1.20    any change in applicable Law shall occur affecting the Receivables Seller, any Obligor or any of their Subsidiaries if the effect thereof has or could reasonably be expected to have a Material Adverse Effect;

6.1.21    a moratorium applicable to any Loan shall be declared by any Governmental Authority having jurisdiction in respect of any Indebtedness owed by the Receivables Seller or any Obligor to the Lenders, or any Governmental Authority of any applicable jurisdiction declares any general payment delay, refusal to pay or acknowledge a payment obligation, repudiation or other action (whether or not formally announced), which in any such case relates to Indebtedness or any category of Indebtedness not to be paid in accordance with its terms or prevents the availability of foreign exchange to or by the Receivables Seller or an Obligor for the purpose of performing any obligation under this Agreement or any other Credit Document;

6.1.22    it is or becomes unlawful for the Receivables Seller or the Servicer to perform any of its obligations under the Receivables Transfer Documents to which it is a party;

6.1.23    any event or series of events occurs which, in the determination of the Administrative Agent (at the instruction of the Lenders acting reasonably), has or is reasonably likely to have a Material Adverse Effect (other than pursuant to clause (d) of the definition of Material Adverse Effect), and such event or series of events continues unremedied for 30 days after the Administrative Agent provides to the Borrower in writing a notice specifying with reasonable particularity such event or series of events that at the

instructions of the Lenders acting reasonably has or is reasonably likely to have a Material Adverse Effect; or

6.1.24   following a disbursement from the Debt Service Reserve Account pursuant to the Cash Management Agreement,  the Debt Service Reserve Account does not have a balance at least equal to the Debt Service Required Amount within 3 Business Days of such disbursement;

then, and in every such event, (x) in the case of an event specified in <u>Sections 6.1.11</u>, <u>6.1.12</u>, <u>6.1.13</u> or <u>6.1.14</u> the entire unpaid principal amount of the Loan and all other amounts payable in respect of the Loan shall automatically become and be forthwith due and payable (and, without limiting the rights of the Agents, the Collateral Trustee and the Lenders under the Credit Documents and applicable Law, all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be applied to repay such amounts in accordance with the Cash Management Agreement and the Security Documents), and (y) in the case of any other event specified in this <u>Section 6.1</u>, at any time thereafter during the continuance of such event, with the consent of the Required Lenders,  the Administrative Agent may (but shall not be obligated), or if so instructed by the Required Lenders, the Administrative Agent shall, by notice in writing given to the Obligors, declare the Loan immediately due and payable whereupon the entire unpaid principal amount of this Loan and all other amounts payable in respect of this Loan shall become and be forthwith due and payable, in each case without presentation, demand, protest or further notice of any kind, all of which are hereby expressly waived by the Obligors to the extent permitted by Law (and, without limiting the rights of the Agents, the Collateral Trustee and the Lenders under the Credit Documents and applicable Law, all amounts deposited in the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account shall be applied to repay such amounts in accordance with the Cash Management Agreement and the Security Documents).

## 7.    AGENTS

### 7.1    The Agents

7.1.1   The Lenders hereby irrevocably appoint each Agent as their agent hereunder and under the other Credit Documents to which such Agent is a party, and authorize each Agent to take such actions on their behalf and to exercise such powers as are delegated to such Agents by the terms hereof and thereof, together with such powers as are reasonably incidental thereto.  Each of the Lenders (a) accepts the authorizations, appointments, acknowledgments and other actions taken by each Agent, on behalf of the Lenders, in accordance with this Agreement and the other Credit Documents to which it is a party, and (b) authorizes and directs each Agent to enter into from time to time such other Credit Documents (including, but not limited to, any amendments, supplements, accession agreements, acknowledgements or similar documents thereto or thereunder and any Notice and Consents) to which it is or is intended to be a party on its behalf, and each Lender agrees to be bound by all of the agreements of the Agents contained in such Credit Documents.  The provisions of this <u>Section 7</u> are solely for the benefit of the Agents and the Lenders, and the Borrower shall not have rights as a third-party beneficiary of any of such provisions.

7.1.2   Any Person serving as an Agent shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not an Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Obligors or any Affiliate thereof as if it were not

an Agent hereunder.  Such Person and its Affiliates may accept deposits from, lend money to, own securities of, act as the financial advisor or in any other advisory capacity for, and generally engage in any kind of business with, the Borrower or any Affiliate thereof as if such Person were not an Agent hereunder and without any duty to account therefor to the Lenders.

7.1.3    No Agent shall have any duties or obligations except those expressly set forth in the Credit Documents to which it is a party.  Without limiting the generality of the foregoing, (a) the duties of the Agents shall be mechanical and administrative in nature; no Agent shall have by reason of this Agreement a fiduciary relationship or other implied duties in respect of the Lenders, regardless of whether a Default has occurred and is continuing, (b) no Agent shall have any duty to take any discretionary action or exercise any discretionary powers (including providing any request, consent, approval waiver or authorization), except discretionary rights and powers expressly contemplated hereby and by the other Credit Documents to which it is a party, that such Agent is required to exercise as directed in writing by the Required Lenders, provided, that, no Agent shall be required to take any action that, in its opinion or in the opinion of its counsel, may expose such Agent to liability or that is contrary to any Credit Document or applicable Law, (c) the Agents make no warranty or representation to any Lender and shall not be responsible to any Lender for any statements, warranties or representations (whether written or oral) made in or in connection with this Agreement or any other Credit Document and (d) except as expressly set forth in in the Credit Documents to which it is a party, no Agent shall have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Obligors or any of their Affiliates that is communicated to or obtained by the bank serving as Agent or any of its Affiliates in any capacity.  Nothing in the Credit Documents, expressed or implied, is intended to or shall be so construed as to impose upon any Agent any obligations in respect of in the Credit Documents except as expressly set forth therein.  No Agent shall be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders or in the absence of its own gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-appealable decision).  The Agents shall not be deemed to have notice of any Default or Event of Default unless and until a Responsible Officer of the Agent has received written notice describing such Default or Event of Default by the Borrower or a Lender.  No Agent shall be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with any Credit Document, (ii) the existence, contents, accuracy or sufficiency of any certificate, valuation, search, report or other document delivered thereunder or in connection therewith (including recalculating or determining, confirming or verifying any calculation or information set forth therein, or made in, or in connection with, any Credit Document or the assets secured thereunder), (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth in any Credit Document, (iv) the validity, enforceability, effectiveness or genuineness of any Credit Document or any other agreement, instrument or document or (v) the satisfaction of any condition set forth in Article 3 or elsewhere in this Agreement or in any Credit Document other than to confirm receipt of items expressly required to be delivered to such Agent.  "**Responsible Officer**," when used with respect to any Agent, means any officer of such Agent with direct responsibility for the administration of any Credit Document.

7.1.4    The Agents shall be entitled to rely upon, and shall not incur any liability and shall be fully protected in relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been

signed or sent by the proper Person, and shall incur no liability and shall be fully protected in relying upon, the truth and correctness of the provisions contained therein. Each Agent may consult with legal counsel (who may be counsel for the Obligors), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in accordance with the advice of any such counsel, accountants or experts.  Each Agent shall be entitled to request written instructions, or written clarifications of any instruction, from the Required Lenders with respect to any right, power, authority, discretion or any action to be taken or not taken in connection with any Credit Document, and such Agent shall be entitled to refrain from exercising such right, power, authority, discretion  or taking such action unless and until such Agent shall have received written instructions, or such written clarification, from the Required Lenders, and such Agent shall not incur liability to any Person by reason of acting on such written instructions or refraining from acting.  Without limiting the foregoing, no Lender shall have any right of action whatsoever against any Agent as a result of such Agent acting or refraining from acting hereunder or under any Credit Document, in accordance with the instructions of the Required Lenders.

7.1.5    Each Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by such Agent.  Each Agent and any such sub-agent may perform any and all of its duties and exercise its rights and powers through their respective Related Parties.  The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of each Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Agent.

7.1.6    (a)    Any Agent may resign at any time upon 30 days' prior notice to each of the Lenders and, unless a Default or Event of Default exists, the Obligors.  Upon any such resignation, the Required Lenders shall have the right to appoint a successor Agent, which shall be a Qualified Agent and shall be consented to by the Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed to have been granted if the Borrower does not object in writing within five (5) Business Days of receiving written notice of such appointment) at all times other than during the existence of an Event of Default.  If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Agent gives notice of its resignation (or such earlier day as shall be agreed by the Required Lenders) (the "**Resignation Effective Date**"), then the retiring Agent may (but shall not be obligated), on behalf of all of the Lenders, appoint a successor Agent that shall be a Qualified Agent or, at the expense of the Borrower, may (but shall not be obligated to) appeal to a court of competent jurisdiction for the appointment of one.   Upon the acceptance of its appointment as Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Agent and the retiring Agent shall be discharged from its duties and obligations hereunder.  After any Agent's resignation hereunder, the provisions of this Article 7 and Section 8.7.3 shall continue in effect for the benefit of such retiring Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was acting as Agent.   Whether or not a successor has been appointed, such resignation shall become effective in accordance with such notice on the Resignation Effective Date.

(b)      The Required Lenders and the Borrower may at any time when an Agent has become the subject of a proceeding under any Bankruptcy Law, or had a receiver, conservator, trustee or custodian appointed for it, upon no less than 10 Business Days' prior written notice, remove such Agent.  If such Agent is removed pursuant to the preceding sentence, the Required Lenders shall have the right to appoint a successor, which successor Agent shall be a Qualified Agent and shall be consented to by the Borrower (such consent not to be unreasonably withheld or delayed and which shall be deemed to have been granted if the Borrower does not object in writing within five (5) Business Days of receiving written notice of such appointment) at all times other than during the existence of an Event of Default, <u>provided</u> that the successor Agent shall not be the subject of a proceeding under any Bankruptcy Law, or had a receiver, conservator, trustee or custodian appointed for it, and shall succeed to and become vested with all of the rights, powers, privileges and duties of the replaced Agent, and the replaced Agent shall be discharged from all of its duties and obligations hereunder and under every Credit Document.  If no such successor shall have been so appointed by the Required Lenders, and shall have accepted such appointment within 30 days (or such earlier day as shall be agreed by the Required Lenders, as the case may be) (the "**Removal Effective Date**"), then such removal shall nonetheless become effective in accordance with such notice on the Removal Effective Date.   The provisions of this <u>Article 7</u> and <u>Section 8.7.3</u> shall continue in effect for the benefit of such replaced Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while the replaced Agent was acting as Agent.

(c)      With effect from the Resignation Effective Date or the Removal Effective Date (as applicable) (i) the retiring or removed Agent shall be discharged from its duties and obligations hereunder and under the other Credit Document (except in the case of any Collateral held by the Collateral Agent on behalf of the Lenders under the Credit Documents, the retiring or removed Collateral Agent shall continue to hold such Collateral until such time as a successor Collateral Agent is appointed by the Required Lenders, the Collateral Agent) and (ii) except for any indemnity payments owed to the retiring or removed Agent all payments, communications and determinations provided to be made by, to or through an Agent shall instead be made by or to each Lender directly, until such time, if any, as a successor Agent is appointed as provided for above in this Section.

(d)      If an Agent consolidates with, merges or converts into, or transfers all or substantially all of its corporate trust business or assets to, another Person, the resulting surviving or transferee Person without any further act shall be the successor to such Agent.

(e)      The Required Lenders shall notify the Collateral Trustee on or prior to the effectiveness of any resignation, removal, merger, consolidation, conversion, transfer or appointment of any successor Agent in accordance with this Agreement.

7.1.7    Each Lender acknowledges that it has, independently and without reliance upon any Agent, and to the extent it deems appropriate, made and shall continue to make (a) its own independent investigation of the financial condition and affairs of the Obligors in connection with the making and the continuance of the Loan and the taking or not taking

of any action in connection herewith and (b) its own appraisal of the creditworthiness of the Obligors and, except as expressly provided in this Agreement, no Agent shall have any duty or responsibility, either initially or on a continuing basis, to provide any Lender or the holder of any Note in respect of the Obligors' obligations under this Agreement, the Security Documents or any Note with any credit or other information with respect thereto, whether coming into its possession before the making of the Loan or at any time or times thereafter.  No Agent shall be responsible to any Lender or the holder of any Note in respect of the Obligors' obligations under any Credit Document for any recitals, statements, information, representations or warranties herein or in any document, certificate or other writing delivered in connection herewith or for the execution, effectiveness, genuineness, validity, enforceability, perfection, collectability, priority or sufficiency of any Credit Document or the financial condition of (i) the Obligors or any of their Affiliates or (ii) any other party to a Credit Document, or be required to make any inquiry concerning either the performance or observance of any of the terms, provisions or conditions of any Credit Document, or the financial condition of the Obligors or any of their Affiliates or the existence or possible existence of any Default or Event of Default.

7.1.8    No Agent shall have any duty to risk or advance its own funds or otherwise incur any liability, financial or otherwise, in the performance of any of its duties hereunder or under the Credit Documents, or be required to take any action that is contrary to this Agreement, any other Credit Document or applicable Law.

7.1.9    Notwithstanding anything else to the contrary herein, whenever reference is made in any Credit Document to any discretionary action by, consent, designation, specification, requirement or approval of, notice, request or other communications from or other direction given, duty or action to be undertaken or to be (or not to be) suffered or omitted by any Agent or to any election, decision, opinion, acceptance, use of judgment, expression of satisfaction or other exercise of discretion, rights or remedies to be made (or not to be made) by any Agent, it is understood that in all cases such Agent shall be fully justified in failing or refusing to take any such action under such Credit Document if it shall not have received such written instruction, advice or concurrence of the Required Lenders, as such Agent deems appropriate.  Notwithstanding anything else to the contrary herein or in any other Credit Document, no Agent shall be liable with respect to any action taken or omitted to be taken by it in accordance with the direction of the Required Lenders under this Agreement or any other Credit Document to which it is a party.  This provision is intended solely for the benefit of each Agent and its successors and permitted assigns and is not intended to and will not entitle the other parties hereto to any defense, claim or counterclaim, or confer any rights or benefits on any party hereto.

7.1.10    In no event shall any Agent be responsible or liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including, but not limited to, loss of profit) irrespective of whether such Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

7.1.11    Notwithstanding anything in any Credit Document to the contrary, an Agent may refuse to perform any duty or exercise any right or power unless it receives indemnity and/or security satisfactory to it against the costs, expenses and liabilities that might be incurred by it in performing such duty or exercising such right or power.

7.1.12    Without limiting the rights and protections of the Agents provided under Article 7 of this Agreement, no Agent shall be liable absent such Agent's gross negligence or willful misconduct (as determined by a court of competent jurisdiction in a final and non-

appealable decision) for (a) any error or omission, express or implied, made or caused, directly or indirectly, by such Agent in connection with the calculation or determination of any amounts, rates or ratios pursuant to any Credit Document or (b) the validity or reliability of any data used or generated in any such calculation or determination. All calculations or determinations made by any Agent pursuant to the terms of any Credit Document shall be, absent manifest error, conclusive for all purposes and binding on all of the parties to such Credit Document, and no Agent shall have any liability therefor. Each Agent may, and in its sole discretion, appoint any other institution (including any Affiliate of such Agent) to serve as its agent from time to time in connection with the performance of any calculation or determination under any Credit Document, and shall not be responsible for the misconduct or negligence of any such agent appointed with due care. Insofar as any Credit Document provides for an Agent to obtain rates, quotes or other data from a bank, dealer or other institution for use in making any calculation or determination hereunder, such Agent may do so from any institution or institutions of the kind contemplated hereby notwithstanding that any one or more of such institutions are Affiliates of such Agent or Affiliates of any of its agents.

7.1.13    The Borrower and each Lender hereby acknowledge that the Administrative Agent will make information available to the Lenders by posting the information on Debt Domain or another similar electronic system (the "**Platform**"). Each Lender hereunder agrees that any document or notice posted on the Platform by the Administrative Agent shall be deemed to have been delivered to the Lenders. Borrower and the Lenders further agree that, to the extent reasonably practicable, any document delivered to the Administrative Agent for purposes of compliance with any provision of this Agreement or for dissemination to any other party hereto shall be delivered to the Administrative Agent in electronic form capable of being posted to the Platform.

Each of the Borrower and Lenders understands that the distribution of materials and other communications through an electronic medium is not necessarily secure and that there are confidentiality and other risks associated with such distribution and agrees and assumes the risks associated with such electronic distribution, except to the extent caused by the willful misconduct or gross negligence of the applicable agent, as determined by a final non-appealable judgment of a court of competent jurisdiction.

The Platform is provided "as is" and "as available." Neither the Administrative Agent, any other Agent nor any of their respective Affiliates warrants the accuracy or completeness of the information contained on the Platform or the adequacy of the Platform and each expressly disclaims liability for errors or omissions in the information contained on the Platform. No warranty of any kind, express, implied or statutory, including any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects is made by the Administrative Agent, any other Agent or any of their respective Affiliates in connection with the information contained on the Platform.

7.1.14    The rights, privileges, protections and benefits given to the Agents are extended to, and shall be enforceable by, each Agent, hereunder and under any Credit Document to which it is a party. In the event that the Citibank, N.A., as Collateral Agent is also acting as U.K. Account Bank under the U.K. Account Charge, the rights and protections afforded to the Collateral Agent under this Agreement shall also be afforded to the Collateral Agent in its capacity as U.K. Account Bank. Neither the Collateral Agent nor the Administrative Agent shall be responsible or liable for any action taken or omitted by the Collateral Trustee, or for any of its obligations under the English Security Documents.

7.1.15    Each Agent and each Lender acknowledges and agrees that the Collateral Trustee is authorized by it and the other Secured Parties to apply any and all moneys received or recovered by the Collateral Trustee in connection with the enforcement of the English Security in accordance with Clause 3.1 (*Application of Proceeds*) of the Security Trust Deed.

## 8.    MISCELLANEOUS

### 8.1    Amendments and Waivers

8.1.1    The provisions of this Agreement may from time to time be amended, modified or waived if such amendment, modification or waiver is in writing and consented to by the Obligors, the Required Lenders and, to the extent its rights, obligations, protections or privileges are affected by such amendment, modification or waiver, any Agent or the Collateral Trustee, <u>provided</u> that, without the written consent of each Lender, such amendment, modification or waiver shall not (a) extend the final maturity of the Loan or any Note, (b) extend any scheduled date for payment thereunder, (c) reduce the rate or amount or extend the time of payment of interest, premium or fees thereon, (d) reduce the principal amount thereof, (e) release any Guarantor or Collateral, (f) change any rights related to the Collections, (g) change any provision of this <u>Section 8.1.1</u> or (h) change <u>Section 2.4.4</u> in a manner that would alter the pro rata sharing of payments required thereby.

8.1.2    No failure or delay on the part of any Agent or Lender in exercising any power or right under any Credit Document will operate as a waiver thereof, nor shall any single or partial exercise of any such power or right preclude any other or further exercise thereof or the exercise of any other power or right.

8.1.3    No notice to or demand on the Obligors in any case shall entitle it to any notice or demand in similar or other circumstances.  No waiver or approval by any Agent or Lender under any Credit Document shall, except as may be otherwise stated in such waiver or approval, be applicable to subsequent transactions.

8.1.4    No waiver or approval hereunder shall require any similar or dissimilar waiver or approval thereafter to be granted hereunder.

### 8.2    Time

Any date or period specified herein may be postponed or extended by mutual agreement between the parties but, as regards any date or period originally fixed or so postponed or extended, time shall be of the essence.

### 8.3    Addresses for Notices

All notices and other communications hereunder shall be made in writing and in English (by letter, electronic mail (<u>provided</u> that in such case of any Agent, such electronic notice shall be delivered in a ".pdf" attachment)) and shall be sent as follows:

8.3.1    *Borrower*:  if to the Borrower, to it at:

USAVflow Limited
c/o P.O. Box 1093
Boundary Hall
Cricket Square

Grand Cayman
KY1-1102
Cayman Islands
Facsimile No.:  (345) 945-7100;
Telephone No.:  (345) 945-7099;
email: info@maplesfs.com

with a copy to

Aerovías del Continente Americano S.A. Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C.,
Colombia;
Attention:  Vicepresidente Financiero;
Facsimile No.:  (571) 413-9809;
Telephone No.:  (571) 295-6765;
email:  Lucia.avila@Avianca.com;

8.3.2    *Guarantors*:  if to any Guarantor, at:

Avianca Holdings S.A.,
c/o Aerovías del Continente Americano S.A. Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C.,
Colombia;
Attention:  Vicepresidente Financiero;
Facsimile No.:  (571) 413-9809;
Telephone No.:  (571) 295-6765;
email:  Lucia.avila@Avianca.com;

8.3.3    *Lenders*:  if to any Lender as of the Closing Date, to it as set forth in Schedule 8.3.3 hereto.

8.3.4    *Administrative Agent*:  if to the Administrative Agent, to it at:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Miriam Y. Molina
Tel.:  (212) 816-5576
email: miriam.molina@citi.com

With a copy to:

Citibank, N.A
1615 Brett Rd
Building #3
New Castle, DE 19720
Attn: Bank Loans, Syndication Department
Facsimile: +1(646) 274-5080

And with a copy to the Collateral Agent to it as set forth below.

8.3.5   *Collateral Agent*:  if to the Collateral Agent, to it at:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

8.3.6   *Collateral Trustee:* if to the Collateral Trustee, to it at:

Citibank, N.A., London Branch
6th floor, CGC-1
Citigroup Centre
Canada Square
Canary Wharf
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com
Fax:      +44 207 500 5877

8.3.7   *Other Lenders*:  if to any other Lender, to it at its address (or email) set forth in the applicable Assignment and Assumption.

## 8.4    Effectiveness

Every notice or other communication sent in accordance with Section 8.3 shall be effective upon receipt by a responsible party at the address or email specified therein.

## 8.5    Survival

The representations, warranties, agreements, undertakings and indemnities herein shall continue in full force and effect notwithstanding completion of the arrangements for the issue of the Notes or any investigation made by or on behalf of any Agent, Lender or Related Party.

## 8.6    Fees and Expenses

8.6.1   Whether or not the transactions contemplated in this Agreement and the other Credit Documents are consummated, the Obligors shall, jointly and severally, pay: (a) all reasonable out-of-pocket expenses incurred by any Agent, the Collateral Trustee, any Receiver, any Delegate, the Bookrunner and their respective Affiliates (including any fees due under the applicable Fee Letter as set forth therein, and the fees and expenses of counsel to the Agents and the Collateral Trustee) in connection with the syndication of the Loans, the preparation, negotiation, execution, delivery and administration of this Agreement and the other Credit Documents, or any amendments, modifications or waivers of the provisions hereof or thereof and (b) all out-of-pocket expenses incurred by an Agent or any Lender (including the fees, charges and disbursements of any counsel for any Agent the Collateral Trustee, any Receiver, any Delegate or any Lender) in connection with the enforcement or protection of its rights or any enforcement or collection proceedings: (i) in connection with this Agreement and the other Credit

Documents, including its rights under this <u>Section 8.6.1</u> or (ii) in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of such Loans.

8.6.2    The Obligors shall pay all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Credit Document, and the Obligors shall indemnify the Lenders, the Agents, the Collateral Trustee, any Receiver and any Delegate against any claim, demand, action, liability, damages, cost, loss or expense (including legal fees) that it may incur as a result or arising out of or in relation to any failure to pay or delay in paying any of the same.

## 8.7    Indemnities

8.7.1    Each Obligor undertakes with the Lenders that such Obligor will indemnify and hold harmless each Lender and any of a Lender's Related Parties (each an "**Indemnified Person**") from and against any and all Loss that any of them may incur or that may be made against any of them, and will reimburse each Indemnified Person for all costs, charges and expenses that any Indemnified Person may pay or incur in connection with investigating, disputing or defending any action or claim as such Loss is incurred; <u>provided</u> that such Loss does not result from such Indemnified Person's or any of its Related Parties' gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that the Obligors may otherwise have.  The Lenders shall not have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this <u>Section 8.7</u>.

8.7.2    The currency in which the Loan is denominated (the "**Contractual Currency**") is the sole currency of account and payment for all sums payable by each Obligor in respect of this Agreement, including damages.  Any amount received or recovered in a currency other than the Contractual Currency (whether as a result of, or of the enforcement of, a judgment, order of a court of any jurisdiction or otherwise) by the Lenders in respect of any sum expressed to be due to them from any Obligor under the Loan or this Agreement shall only constitute a discharge to such Obligor to the extent of the amount in the Contractual Currency that the Lenders are able to purchase in accordance with normal banking procedures with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that amount is less than the amount in the Contractual Currency expressed to be due to the Lenders in respect of the Loan and this Agreement, each Obligor shall indemnify the Lenders against any loss sustained by the Lenders as a result.  In any event, each Obligor shall indemnify the Lenders against any cost of making such purchase.  These indemnities constitute a separate and independent obligation from each Obligor's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Lenders and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due in respect of this Agreement and the Loan or any other judgment or order.  Any such loss aforesaid shall be deemed to constitute a loss suffered by the Lenders and no proof or evidence of any actual loss will be required by any Obligor.

8.7.3  (a)  Each Obligor shall jointly and severally indemnify each Agent, the Collateral Trustee, any Receiver, any Delegate and each Related Party of the Agents, the Collateral Trustee, any Receiver and any Delegate (each, an "**Agent Indemnified Person**") against, and hold each Agent Indemnified Person harmless from and against any and all claims, expenses, obligations, liabilities, losses or damages (including attorney fees and expenses) (collectively, "**Claims**") that any of them may incur or that may be made against any of them in connection with the execution, delivery and performance of the Credit Documents or the transactions contemplated thereby, and will reimburse each Agent Indemnified Person for all such Claims that any Agent Indemnified Person may pay or incur in connection with investigating, disputing or defending any actual or prospective action or claim related thereto, whether based on contract, tort or any other theory, whether brought by a third party or by any Obligor, and regardless of whether any Agent Indemnified Person is a party thereto; provided that such Claims does not result from such Agent Indemnified Person's or any of its Related Parties' gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that any Obligor may otherwise have.  No Agent shall have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this Section 8.7.3.

(b)  To the extent that the Obligors fail to pay any amount required to be paid by it to each Agent Indemnified Person under Section 8.7.3(a), each Lender severally agrees to indemnify each Agent, the Collateral Trustee, any Receiver and any Delegate and to pay each Agent Indemnified Person a portion of such unpaid amount equal to such Lender's *pro rata* share of the Loan (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought); provided that the unreimbursed claims, expenses, obligations, liabilities, losses or damages (including attorney fees and expenses) were incurred by or asserted against the Agent Indemnified Person in its capacity as such.

(c)  To the extent permitted by Law, no party hereto shall assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Loan or the use of the proceeds thereof; provided that the foregoing sentence shall not apply to any damages in respect of any indemnity under this Section 8.7 or to amounts payable under Section 2.7.

(d)  All amounts due under this Section 8.7.3 shall be payable not later than three Business Days after written demand therefor.

(e)  The provisions of this Section 8.7.3 shall survive the termination of this Agreement or the earlier resignation or removal of the Administrative Agent, the Collateral Agent or the Collateral Trustee.

## 8.8  Assignment and Transfer

8.8.1    The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that neither the Borrower nor any other Obligor may assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Administrative Agent and each Lender, and no Lender may assign or otherwise transfer any of its rights or obligations hereunder except (i) to an assignee in accordance with Section 8.8.2, (ii) by way of participation in accordance with the provisions of Section 8.8.4, or (iii) by way of pledge or assignment of a security interest subject to the restrictions of Section 8.8.5 (and any other attempted assignment or transfer by any party hereto shall be null and void). Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, Participants to the extent provided in Section 8.8.4 and, to the extent expressly contemplated hereby, the Related Parties of each Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

8.8.2    Any Lender may at any time assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of the Loans at the time owing to it); provided that any such assignment shall be subject to the following conditions:

(a)    Each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loan assigned.

(b)    No consent shall be required for any assignment except:

(i)    the consent of Holdings (such consent not to be unreasonably withheld or delayed) shall be required unless (x) a Default or Event of Default has occurred and is continuing at the time of such assignment, or (y) such assignment is to a Lender, an Affiliate of a Lender or an Approved Fund; provided that Holdings shall be deemed to have consented to any such assignment unless it shall object thereto by written notice to the Administrative Agent within 5 Business Days after having received notice thereof (provided that the parties to such assignment provide to the Administrative Agent evidence of such receipt in accordance with Section 8.3) and provided, further, that Holdings' consent shall not be required during the primary syndication of the Loans; and

(ii)    the acceptance of the Administrative Agent (such consent not to be unreasonably withheld or delayed) shall be required for assignments of any Loans to a Person who is not a Lender, an Affiliate of a Lender or an Approved Fund; and

(iii)    the acceptance by the Collateral Trustee of the accession of a permitted assignee or transferee of a Lender to the Security Trust Deed as a Secured Party shall be required in accordance with the Security Trust Deed.

(c)    The parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of U.S.$3,500; provided that the Administrative Agent may, in its sole discretion, elect to waive such processing and recordation fee in the case of any assignment.

(d)    The assignee, if it is not a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

(e)    No such assignment shall be made to Holdings or any of Holdings' Affiliates or Subsidiaries.

(f)    No such assignment shall be made to a natural Person (or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person).

Subject to acceptance and recording thereof by the Administrative Agent pursuant to Section 8.8.3, from and after the effective date specified in each Assignment and Assumption, the assignee thereunder shall be a party to this Agreement and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto) but shall continue to be entitled to the benefits of Sections 8.6 and 8.7 with respect to facts and circumstances occurring prior to the effective date of such assignment.  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this paragraph shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with Section 8.8.4.

8.8.3    The Administrative Agent shall maintain a register recording the names and addresses of the Lenders and the principal amount of the Loan owing to each Lender from time to time.  The entries in such register shall be conclusive and binding for all purposes, absent manifest error, and the Obligors, the Administrative Agent and the Lenders may treat each Person whose name is recorded in such register as a Lender hereunder for all purposes of this Agreement.  Such register shall be available for inspection by the Obligors or any Lender at any reasonable time and from time to time upon reasonable prior notice.

8.8.4    Any Lender may at any time, without the consent of, or notice to, the Borrower or the Administrative Agent, sell participations to any Person (other than a natural Person, or a holding company, investment vehicle or trust for, or owned and operated for the primary benefit of, a natural Person, or the Borrower or any of the Borrower's Affiliates or Subsidiaries) (each, a "**Participant**") in all or a portion of such Lender's rights and/or obligations under this Agreement (including all or a portion of the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, and (iii) the Borrower, the Administrative Agent and Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement.  For the avoidance of doubt, each Lender shall be responsible for the indemnity under Section 8.7.3 with respect to any payments made by such Lender to its Participant(s).

Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement.  The Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.7, 2.8 and 2.10 (subject to the requirements and limitations therein) to the same extent as if it

were a Lender and had acquired its interest by assignment pursuant to <u>Section 8.8.2</u>; provided that such Participant (i) agrees to be subject to the provisions of <u>Section 2.9</u> as if it were an assignee under <u>Section 8.8.2</u>; and (ii) shall not be entitled to receive any greater payment under <u>Sections 2.7</u> or <u>2.8</u>, with respect to any participation, than its participating Lender would have been entitled to receive, except to the extent such entitlement to receive a greater payment results from a Change in Law that occurs after the Participant acquired the applicable participation.  To the extent permitted by law, each Participant also shall be entitled to the benefits of <u>Section 8.17</u> as though it were a Lender; <u>provided</u> that such Participant agrees to be subject to <u>Section 2.4.3</u> as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each participant and the principal amounts (and stated interest) of each participant's interest in the Loans or other obligations under the Credit Documents (the "**Participant Register**"); provided that no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any participant or any information relating to a participant's interest in any commitments, loans, letters of credit or its other obligations under any Credit Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, letter of credit or other obligation is in registered form under <u>Section 5f.103-1(c)</u> of the United States Treasury Regulations.  The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

8.8.5   Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank; provided that no such pledge or assignment shall release such Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

## 8.9    Law and Jurisdiction

8.9.1   THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

8.9.2   Each of the parties hereto hereby irrevocably consents to the exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, and any appellate court from any thereof in respect of any actions or proceedings brought against it hereunder, and hereby waives its rights to any other jurisdiction that may apply by virtue of its present or any other future domicile or for any other reason.  Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with the Credit Documents in such courts whether on the grounds of venue, residence or domicile or on the ground that any such suit, action or proceeding has been brought in an inconvenient forum.  Additionally, each of the parties hereto hereby waives the right to assert counterclaims in any such proceedings and agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon such party and

may be enforced in any court of the jurisdiction to which such party is subject by a suit upon such judgment.

8.9.3    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION OR LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY CREDIT DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY).  EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

## 8.10    Service of Process

Each Obligor agrees that service of all writs, processes and summonses in any suit, action or proceeding brought in connection with the Credit Documents against either Obligor in any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, may be made upon the Process Agent, whom such Obligor irrevocably appoints as its authorized agent for service of process.  Each Obligor represents and warrants that the Process Agent has agreed to act as the agent for service of process for the Obligor.  Each Obligor agrees that such appointment shall be irrevocable until one year after the Maturity Date or until the irrevocable appointment by such Obligor of a successor in the City of New York as its authorized agent for such purpose and the acceptance of such appointment by such successor.  Each Obligor further agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.  If the Process Agent shall cease to act as the agent for service of process for any Obligor, such Obligor shall appoint without delay another such agent and provide prompt written notice to the Administrative Agent and the Lenders of such appointment.  With respect to any such action in any court of the State of New York or any United States federal court in the Borough of Manhattan, New York City, New York, United States, service of process upon the Process Agent, as the authorized agent of the Obligors for service of process, and written notice of such service to the Obligors shall be deemed, in every respect, effective service of process upon the Obligors.  Nothing in this Section 8.10 shall affect the right of any party to serve legal process in any other manner permitted by law.

## 8.11    Partial Invalidity

If at any time any provision of this Agreement or any Note is or becomes invalid, illegal or unenforceable in any respect in any jurisdiction, neither the validity, legality or enforceability of the remaining provisions hereof or thereof, nor the validity, legality or enforceability of such provision under the laws of any other jurisdiction, shall in any way be affected or impaired thereby.

## 8.12    Counterparts

This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

**8.13**     **Rights in Collections Account and New York Pass-Through Account**

Each Obligor (other than the Borrower) confirms that it has no rights in either the Collections Account or the New York Pass-Through Account, and the Borrower confirms that (a) its rights in the Collections Account are subject to the first priority continuing and perfected security interest therein and Lien thereon the Borrower has granted to the Collateral Trustee, for the benefit of the Secured Parties, pursuant to the U.K. Account Charge and (b) its rights in the New York Pass-Through Account are subject to the first priority continuing and perfected security interest therein and Lien thereon the Borrower has granted to the Collateral Agent, for the benefit of the Secured Parties, pursuant to the New York Security Agreement.  In the event that any Obligor (other than the Borrower) is considered for any purpose to have rights in the Collections Account or the New York Pass-Through Account prior to the Collateral Trustee's or Collateral Agent's (as applicable) release of its security interest with respect thereto, such Obligor hereby pledges, assigns, hypothecates, transfers, conveys, delivers and grants to the Collateral Trustee or the Collateral Agent (as applicable), for the benefit of the Agents and the Lenders, a first priority continuing and perfected security interest and lien on all of such Obligor's rights as security for the prompt and complete payment and performance of the Loan and all advances, debts, liabilities and obligations, howsoever arising, owed by the Obligors under this Agreement or any Credit Document of every kind and description (whether or not evidenced by any note or instrument and whether or not for the payment of money), direct or indirect, absolute or contingent, due or to become due, now existing or hereafter arising (including all interest, fees, charges, expenses, indemnifications, attorneys' fees and consultants' fees chargeable to the Obligors) under this Agreement or any Credit Document.  In furtherance of the foregoing, the Obligors consent to the terms of the English Security Documents and the New York Security Agreement.

**8.14**     **Patriot Act**

In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States, the Administrative Agent is required to obtain, verify, record and update certain information relating to the individuals and entities which maintain a business relationship with the Administrative Agent.  Accordingly, each of the parties agree to provide to the Administrative Agent, upon request and from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with such law.

**8.15**     **Acknowledgement and Consent to Bail-In of EEA Financial Institutions**

Notwithstanding anything to the contrary in any Credit Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Credit Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)     the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)     the effects of any Bail-In Action on any such liability, including, if applicable:

(i)     a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Credit Document; or

(iii)   the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

**8.16    Force Majeure**

No Agent shall incur any liability for not performing any act or fulfilling any duty, obligation or responsibility hereunder by reason of any occurrence beyond the control of such Agent (including, but not limited to, any act or provision of any present or future law or regulation or governmental authority, any act of God or war, civil unrest, local or national disturbance or disaster, any act of terrorism or the unavailability of the Federal Reserve Bank wire or facsimile or other wire or communication facility).

**8.17    Right of Setoff**

If an Event of Default shall have occurred and be continuing, each Lender and each of their respective Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by such Lender or Affiliate to or for the credit or the account of the Obligors against any of and all the obligations of the Obligors now or hereafter existing under this Agreement held by such Lender or Affiliate, irrespective of whether or not such Lender or Affiliate shall have made any demand under this Agreement and although such obligations may be contingent or unmatured or are owed to a branch, office or Affiliate of such Lender different from the branch, office or Affiliate holding such deposit or obligated on such indebtedness.  The applicable Lender shall notify the Obligors and the Administrative Agent promptly after such set-off or application, <u>provided</u> that any failure to give or any delay in giving such notice shall not affect the validity of any such set-off or application under this Section.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of set-off) that such Lender may have.

**8.18    Confidentiality**

Each of the Administrative Agent and the Lenders agree to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its Affiliates and to its Related Parties (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential); (b) to the extent required or requested by any regulatory authority purporting to have jurisdiction over such Person or its Related Parties (including any self-regulatory authority, such as the National Association of Insurance Commissioners); (c) to the extent required by applicable laws or regulations or by any subpoena or similar legal process; (d) to any other party hereto; (e) in connection with the exercise of any remedies hereunder or under any other Credit Document or any action or proceeding relating to this Agreement or any other Credit Document or the enforcement of rights hereunder or thereunder; (f) subject to an agreement containing provisions substantially the same as those of this Section, to (i) any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights and

obligations under this Agreement, or (ii) any actual or prospective party (or its Related Parties) to any swap, derivative or other transaction under which payments are to be made by reference to the Borrower and its obligations, this Agreement or payments hereunder; (g) on a confidential basis to (i) any rating agency in connection with rating Holdings or its Subsidiaries or the Loans or (ii) the CUSIP Service Bureau or any similar agency in connection with the issuance and monitoring of CUSIP numbers with respect to the Loans; (h) with the consent of Holdings; or (i) to the extent such Information (x) becomes publicly available other than as a result of a breach of this Section, or (y) becomes available to the Administrative Agent, any Lender or any of their respective Affiliates on a nonconfidential basis from a source other than Holdings. In addition, the Administrative Agent and the Lenders may disclose the existence of this Agreement and information about this Agreement to market data collectors, similar service providers to the lending industry and service providers to the Agents and the Lenders in connection with the administration of this Agreement, the other Credit Documents, and the Loans.

For purposes of this Section, "**Information**" means all information received from the Borrower, Holdings or any of their Subsidiaries relating to the Borrower, Holdings or any of their Subsidiaries or any of their respective businesses, other than any such information that is available to the Administrative Agent or any Lender on a nonconfidential basis prior to disclosure by the Borrower, Holdings or any of their Subsidiaries; provided that, in the case of information received from the Borrower, Holdings or any of their Subsidiaries after the date hereof, such information is clearly identified at the time of delivery as confidential.  Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

**8.19    Guarantee**

8.19.1    Guarantee: in order to induce the Agents and the Lenders to enter into this Agreement and to extend credit hereunder, and in recognition of the direct benefits to be received by the Guarantors from the Loan, the Guarantors, jointly and severally, hereby unconditionally and irrevocably guarantee as primary obligors and not merely as surety the full and prompt payment when due, whether upon maturity, acceleration or otherwise, of any and all of the obligations of the Borrower to the Secured Parties under the Credit Documents (the "**Guaranteed Obligations**").  If any or all of the Guaranteed Obligations of the Borrower to the Secured Parties becomes due and payable hereunder, the Guarantors unconditionally and irrevocably promise to pay, jointly and severally, such indebtedness to the Administrative Agent and/or the other Secured Parties, on demand, together with all expenses (including legal fees and expenses) that may be incurred by the Administrative Agent and the other Secured Parties in collecting any of the Guaranteed Obligations.  If claim is ever made upon any Secured Parties for repayment or recovery of any amount or amounts received in payment or on account of any of the Guaranteed Obligations and any of the aforesaid payees repays all or part of said amount by reason of (a) any judgment, decree or order of any court or administrative body having jurisdiction over such payee or any of its property or (b) any settlement or compromise of any such claim effected by such payee with any such claimant (including the Borrower), then and in such event the Guarantors agree that any such judgment, decree, order, settlement or compromise shall be binding upon the Guarantors, notwithstanding any revocation of this Guarantee or other instrument evidencing any liability of the Borrower, and the Guarantors shall be and remain liable to the aforesaid payees hereunder for the amount so repaid or recovered to the same extent as if such amount had never originally been received by any such payee.

8.19.2 **Nature of Liability:** the liability of the Guarantors hereunder is primary, absolute and unconditional, exclusive and independent of any security for or other guaranty of the Guaranteed Obligations, whether executed by any other guarantor or by any other party, and the liability of the Guarantors hereunder shall not be affected or impaired by (a) any direction as to application of payment by the Borrower or by any other party, (b) any other continuing or other guaranty, undertaking or maximum liability of the Guarantors, any other guarantor or of any other party as to the Guaranteed Obligations, (c) any payment on or in reduction of any such other guaranty or undertaking, (d) any dissolution, termination or increase, decrease or change in personnel by the Borrower, (e) any payment made to any Secured Party on the Guaranteed Obligations that any such Secured Party repays to the Borrower pursuant to court order in any bankruptcy, reorganization, arrangement, moratorium or other debtor relief proceeding, and the Guarantors waive any right to the deferral or modification of its obligations hereunder by reason of any such proceeding, (f) any action or inaction by the Secured Parties as contemplated in <u>Section 8.19.4</u> or (g) any invalidity, irregularity or enforceability of all or any part of the Guaranteed Obligations or of any security therefor.

8.19.3 **Independent Obligation:** the obligations of the Guarantors hereunder are independent of the obligations of any other party or the Borrower, and a separate action or actions may be brought and prosecuted against any Guarantor whether or not action is brought against any other party or the Borrower and whether or not any other guarantor, any other party or the Borrower is joined in any such action or actions.  The Guarantors waive, to the fullest extent permitted by Law, the benefit of any statute of limitations affecting its liability hereunder or the enforcement thereof.  Any payment by the Borrower or other circumstance that operates to toll any statute of limitations as to the Borrower shall operate to toll the statute of limitations as to the Guarantors.

8.19.4 **Authorization:** the Guarantors authorize the Secured Parties without notice or demand (except as shall be required by applicable statute and cannot be waived), and without affecting or impairing its liability hereunder, from time to time to:

    (a)    change the manner, place or terms of payment of, and/or change or extend the time of payment of, renew, increase, accelerate or alter, any of the Guaranteed Obligations (including any increase or decrease in the principal amount thereof or the rate of interest or fees thereon), any security therefor, or any liability incurred directly or indirectly in respect thereof, and this guarantee shall apply to the Guaranteed Obligations as so changed, extended, renewed or altered;

    (b)    take and hold security for the payment of the Guaranteed Obligations and sell, exchange, release, impair, surrender, realize upon or otherwise deal with in any manner and in any order any Collections or other property by whomsoever at any time pledged or mortgaged to secure, or howsoever securing, the Guaranteed Obligations or any liabilities (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and/or any offset there against, in each case in accordance with the Security Documents;

    (c)    exercise or refrain from exercising any rights against the Borrower, any other Guarantor or others or otherwise act or refrain from acting;

    (d)    release or substitute any one or more endorsers, guarantors, the Borrower or other obligors;

   (e)     settle or compromise any of the Guaranteed Obligations, any security therefor or any liability (including any of those hereunder) incurred directly or indirectly in respect thereof or hereof, and subordinate the payment of all or any part thereof to the payment of any liability (whether due or not) of the Borrower or any other Guarantor to its creditors other than the Secured Parties;

   (f)     apply any sums by whomsoever paid or howsoever realized to any liability or liabilities of the Borrower to the Secured Parties regardless of what liability or liabilities of the Borrower remain unpaid;

   (g)     consent to or waive any breach of, or any act, omission or default under, this Agreement, any other Credit Document or any of the instruments or agreements referred to herein or therein, or otherwise amend, modify or supplement this Agreement, any other Credit Document or any of such other instruments or agreements; and/or

   (h)     take any other action that would, under otherwise applicable principles of common law, give rise to a legal or equitable discharge of any Guarantor from its liabilities under this guarantee.

8.19.5   Reliance: it is not necessary for any Secured Party to inquire into the capacity or powers of the Guarantors or any of their subsidiaries or the officers, directors, partners or agents acting or purporting to act on their behalf, and any Guaranteed Obligations made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder.

8.19.6   Waiver

   (a)     The Guarantors waive any right (except as shall be required by applicable statute and cannot be waived) to require any Secured Party to (i) proceed against the Borrower, any other guarantor or any other party, (ii) proceed against or exhaust any Collections or other security held from the Borrower, any other guarantor or any other party or (iii) pursue any other remedy in any Secured Party's power whatsoever.  The Guarantors waive any defense based on or arising out of any defense of the Borrower, any other guarantor or any other party, other than payment of the Guaranteed Obligations to the extent of such payment, based on or arising out of the disability of the Borrower, any other guarantor or any other party, or the validity, legality or unenforceability of the Guaranteed Obligations or any part thereof from any cause, or the cessation from any cause of the liability of the Borrower other than payment of the Guaranteed Obligations to the extent of such payment.  The Secured Parties may, at their election, foreclose on any security held by the Administrative Agent, the Collateral Agent or any other Secured Party by one or more judicial or nonjudicial sales, whether or not every aspect of any such sale is commercially reasonable (to the extent such sale is permitted by Law), or exercise any other right or remedy the Secured Party may have against the Borrower or any other party, or any security, without affecting or impairing in any way the liability of the Guarantor hereunder except to the extent the Guaranteed Obligations have been paid.  The Guarantors waive any defense arising out of any such election by the Secured Parties, even though such election operates to impair or extinguish any right of reimbursement or

subrogation or other right or remedy of the Guarantors against the Borrower or any other party or any security.

(b)    The Guarantors waive all presentments, demands for performance, protests and notices, including notices of nonperformance, notices of protest, notices of dishonor, notices of acceptance of this Guarantee, and notices of the existence, creation or incurring of new or additional Guaranteed Obligations. The Guarantors assume all responsibility for being and keeping itself informed of the Borrower's financial condition and assets, and of all other circumstances bearing upon the risk of nonpayment of the Guaranteed Obligations and the nature, scope and extent of the risks that the Guarantors assume and incur hereunder, and agree that neither the Administrative Agent nor any of the other Secured Parties shall have any duty to advise the Guarantors of information known to them regarding such circumstances or risks.

8.19.7    Payments: all payments made by the Guarantors pursuant to this Section 8.19 shall be made in Dollars and will be made without setoff, counterclaim or other defense, and shall be subject to the provisions of Article 2.

8.19.8    Maximum Liability: it is the desire and intent of the Guarantors and the Secured Parties that this guarantee shall be enforced against any Guarantor permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. If, however, and to the extent that, the obligations of any Guarantor under this guarantee shall be adjudicated to be invalid or unenforceable for any reason (including, because of any applicable state or federal Law relating to fraudulent conveyances or transfers), then the amount of such Guarantor's obligations under this Guarantee shall be deemed to be reduced and such Guarantor shall pay the maximum amount of the Guaranteed Obligations that would be permissible under Law.

8.19.9    Discharge Only Upon Payment in Full; Reinstatement In Certain Circumstances: the obligations of the Guarantors hereunder shall remain in full force and effect until all of the payment and performance obligations of the Borrower under the Credit Documents shall have been paid or otherwise performed in full. If at any time any payment made under this Agreement or any other Credit Document is rescinded or must otherwise be restored or returned upon the insolvency, bankruptcy, reorganization or similar event of the Borrower, any Guarantor or any other Person or otherwise, then the obligations of the Guarantors hereunder with respect to such payment shall be reinstated at such time as though such payment had been due but not made at such time.

## 8.20    Secured Parties' Undertakings and Clawback

8.20.1    The Agents and the Lenders shall supply to the Collateral Trustee (in the case of the Lenders, through the Administrative Agent), such information as the Collateral Trustee may reasonably specify (through the Administrative Agent) as being necessary or desirable to enable the Collateral Trustee to perform its functions as trustee under the Security Trust Deed. Each Lender shall deal with the Collateral Trustee exclusively through the Administrative Agent and shall not deal directly with the Collateral Trustee.

8.20.2    The Agents and the Lenders shall not have any independent power to enforce, or have recourse to, any of the Trust Property or to exercise any right, power, authority or discretion arising under the U.K. Account Charge except through the Collateral Trustee.

8.20.3   If any Agent or Lender has received an amount as a result of the enforcement of the English Security and the Collateral Trustee is subsequently required to pay an amount equal to that amount (a "**Clawback Amount**") to a liquidator (or any other party) whether pursuant to a court order or otherwise such Agent or Lender will promptly on the request of the Collateral Trustee pay an amount equal to such Clawback Amount to the Collateral Trustee for payment to the liquidator (or such other party).

8.20.4   The Administrative Agent shall, subject to the Article VII hereof, provide any notice, instruction or approval, in each case on instructions from the Required Lenders, as contemplated under any Credit Document.

8.20.5   The parties to this Agreement acknowledge and agree that the undertakings and obligations in this Section 8.20 are for the benefit of the Collateral Trustee and are provided in connection with the Security Trust Deed.

## 8.21    Third Party Beneficiaries

8.21.1   Except as set forth in Section 8.21.2 below, the parties do not confer any rights or remedies upon any Person other than the parties to this Agreement and their respective successors and permitted assigns.

8.21.2   The parties hereby designate the Collateral Trustee, any Receiver and any Delegate as third-party beneficiaries of Sections 7.1.6(e), 7.1.15, 8.1.1, 8.6, 8.7, 8.20 and 8.21 of this Agreement having the right to enforce Sections 7.1.6(e), 7.1.15, 8.1.1, 8.6, 8.7, 8.20 and 8.21.

## 8.22    Limited Recourse

8.22.1   Notwithstanding any other provision of this Agreement or the Credit Documents, each party hereto hereby agrees that the Borrower's obligations under this Agreement and the Credit Documents shall be limited recourse obligations of the Borrower, with recourse against the Borrower being limited to the Collateral and the actual amount derived from the Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Borrower pursuant to the Administration Agreement) of the Borrower at such time available for application by or on behalf of the Borrower in making payments in accordance with this Agreement and the Credit Documents.    The parties hereby acknowledge and agree that the Borrower's obligations under this Agreement and the Credit Documents are solely the corporate obligations of the Borrower, and that none of the officers, directors, shareholders or agents of the Borrower, any of its Affiliates or any other Person, other than the Guarantors, shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Borrower hereunder. Without limitation of the obligations of the Guarantors hereunder, after the Borrower's Collateral (including liquidation of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Borrower pursuant to the Administration Agreement) is realized and exhausted, all sums due but still unpaid in respect of the Borrower's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Borrower and its liability hereunder, and the parties hereto shall not have the right to proceed against the Borrower or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets, it being agreed that the Guarantors shall remain liable for all of such obligations.

8.22.2   No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, liquidator, provisional liquidator or bankruptcy trustee or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable Law in respect of the Borrower or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties; *provided* that nothing in this Section 8.22.2 shall prohibit or restrict the appointment of a Receiver and/or Delegate under and/or in accordance with and/or as contemplated by any provisions of the U.K. Account Charge.

8.22.3   The provisions of this SCHEDULE 1Part 1Section 1 8.22.3 shall survive termination of this Agreement.

*[signature pages follow]*

**AS WITNESS** the hands of the duly authorized representatives of the parties to this Agreement the day and year first before written.

CITIBANK, N.A., as Administrative Agent

By: _____

Name: _____Miriam Molina_____

Title: _____Vice President_____

By: _____

Name: _____Karen Abarca_____

Title: _____Vice President_____


CITIBANK, N.A., as Collateral Agent

By: _____

Name: _____Karen Abarca_____

Title: _____Vice President_____

By: _____

Name: _____Miriam Molina_____

Title: _____Vice President_____


*Signature page to Loan Agreement*

USAVFLOW LIMITED, as Borrower

By: _____

    Name: Peter Lundin

    Title: Director


By: _____

    Name: _____

    Title: _____

*Signature page to Loan Agreement*

AVIANCA HOLDINGS S.A., as Guarantor

By: _____
    Name: RENATO COVELO
    Title: LEGAL REPRESENTATIVE

By: _____
    Name: _____
    Title: _____

AVIANCA COSTA RICA S.A., as Guarantor

By: _____
Name: Viviana Martin
Title: President

By: _____
Name: _____
Title: _____

*Signature page to Loan Agreement*

TACA INTERNATIONAL AIRLINES, S.A., as
Guarantor

By: _____
    Name: DANILO CORREA SEPULVEDA
    Title: PRESIDENT

By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

TRANS AMERICAN AIRLINES S.A., as
Guarantor

By: _____

Name: GLORIA IRENE LOZA MUBRUGARRA

Title: AUTHORIZED Representative

By: _____

Name: _____

Title: _____

*Signature page to Loan Agreement*

DEUTSCHE BANK AG, LONDON BRANCH, as Lender

By: _____
Name: ~~Gonzalo Barbon~~
Title: ~~Managing Director~~

By: _____
Name: ~~Nicolas Ferrario~~
Title: Managing Director

*Signature page to Loan Agreement*

BANK UNITED N.A., as Lender

By: _____
Name: Jennifer Garcia-Barton
Title: Vice President

By: _____
Name: Jose K. Valdes
Title: Managing Director

*Signature page to Loan Agreement*

BANCO DE CREDITO DEL PERU, MIAMI
AGENCY as Lender

By: _____
    Name: _____
    Title: _____

By: _____
    Name: _____
    Title: _____

**Luis Awapara**
**VP of Corporate and**
**Relationship Banking**

*Signature page to Loan Agreement*

FIRST CITIZENS BANK LIMITED, as Lender

By:

Name: HINDI SAUCAH-JULL

Title: HEAD-LEGAL COMPLIANCE
& GOVERNANCE/CORPIAN
SECRETARY

By:

Name:  STERLING FROST

Title:  DEPUTY CEO – OPERATIONS AND
ADMINISTRATION

*Signature page to Loan Agreement*

METROBANK S.A., as Lender

By: _____
   Name: Ernesto A. Boyd, Jr.
   Title:  Power of Attorney


By: _____
   Name: _____
   Title: _____

USAVflow Limited

*Signature page to Loan Agreement*

PRIVAL BANK S.A., as Lender

By: _____
    Name:   Juan Carlos Fabrega
    Title:     Presidente

By: _____
    Name:   Jaime Sosa
    Title:     Gerente General

VERIFICADO
6/12/2017
Depto. Legal/Prival Bank

*Signature page to Loan Agreement*

MONEDA S.A. ADMINISTRADORA GENERAL
DE FONDOS ACTING ON BEHALF OF
MONEDA LATINOAMERICA DEUDA LOCAL
FONDO DE INVERSION, as Lender

By: _____
    Name: _____
    Title: _____


By: _____
    Name: _____
    Title: _____



*Signature page to Loan Agreement*

MONEDA S.A. ADMINISTRADORA GENERAL
DE FONDOS ACTING ON BEHALF OF
MONEDA DEUDA LATINOAMERICANA
FONDO DE INVERSION, as Lender

By: _____
    Name: _____
    Title: _____

By: _____
    Name: _____
    Title: _____

*Signature page to Loan Agreement*

**EXHIBIT A**

This Assignment and Assumption (the "**Assignment and Assumption**") is dated as of the Effective Date set forth below and is entered into by and between [the][each][1] Assignor identified in item 1 below ([the][each, an] "**Assignor**") and [the][each][2] Assignee identified in item 2 below ([the][each, an] "**Assignee**").  [It is understood and agreed that the rights and obligations of [the Assignors][the Assignees][3] hereunder are several and not joint.][4]  Capitalized terms used but not defined herein shall have the meanings given to them in the Loan Agreement identified below (as amended, the "**Loan Agreement**"), receipt of a copy of which is hereby acknowledged by [the][each] Assignee.  The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full. [The][Each] Assignor is party to a security trust deed dated December 12, 2017 (the "**Security Trust Deed**", among Citibank, N.A., London Branch as collateral trustee, Citibank, N.A. as administrative agent, Citibank, N.A. as collateral agent, the Secured Parties named therein and USAVflow Limited.

Part 1

For an agreed consideration, [the][each] Assignor hereby irrevocably sells and assigns to [the Assignee][the respective Assignees], and [the][each] Assignee hereby irrevocably purchases and assumes from [the Assignor][the respective Assignors], subject to and in accordance with the Standard Terms and Conditions and the Loan Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of [the Assignor's][the respective Assignors'] rights and obligations in [its capacity as a Lender][their respective capacities as Lenders] under the Loan Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all of such outstanding rights and obligations of [the Assignor][the respective Assignors] (including without limitation any guarantees included in such facilities), and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of [the Assignor (in its capacity as a Lender)][the respective Assignors (in their respective capacities as Lenders)] against any Person, whether known or unknown, arising under or in connection with the Loan Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including, but not limited to, contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned by [the][any] Assignor to [the][any] Assignee pursuant to clauses (i) and (ii) above being referred to herein collectively as [the][an] "**Assigned Interest**").  Each such sale and assignment is without recourse to [the][any] Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by [the][any] Assignor.

1.    Assignor[s]:        _____

_____

---

[1] For bracketed language here and elsewhere in this form relating to the Assignor(s), if the assignment is from a single Assignor, choose the first bracketed language.  If the assignment is from multiple Assignors, choose the second bracketed language.

[2] For bracketed language here and elsewhere in this form relating to the Assignee(s), if the assignment is to a single Assignee, choose the first bracketed language.  If the assignment is to multiple Assignees, choose the second bracketed language.

[3] Select as appropriate.

[4] Include bracketed language if there are either multiple Assignors or multiple Assignees.

2.    Assignee[s]:     _____

_____

[Assignee is an [Affiliate][Approved Fund] of [*identify Lender*]

3.    Borrower(s):     USAVFLOW LIMITED

4.    Administrative Agent:     CITIBANK, N.A., as the administrative agent under the Loan Agreement

5.    Loan Agreement:     The U.S.$150,000,000 Loan Agreement dated as of December 12, 2017 among USAVFLOW LIMITED, the guarantors party thereto, the Lenders parties thereto, CITIBANK, N.A., as Administrative Agent, and the other agents party thereto

6.    Assigned Interest[s]:

| Assignor[s][5] | Assignee[s][6] | Aggregate Amount of Loans for all Lenders[7] | Amount of Loans Assigned[8] | Percentage Assigned of Loans[8] | CUSIP Number |
|---|---|---|---|---|---|
|  |  | $ | $ | % |  |
|  |  | $ | $ | % |  |
|  |  | $ | $ | % |  |

[7.    Trade Date:     _____][9]

Part 2

In consideration of [the][each] Assignee being accepted as a Secured Party for the purposes of the Security Trust Deed, [the][each] Assignee hereby confirms that, as from [*Effective Date*], it intends to be party to the Security Trust Deed as a Secured Party, undertakes to perform all the obligations expressed in the Security Trust Deed to be assumed by a Secured Party and agrees that it shall be bound by all the provisions of the Security Trust Deed, as if it had been an original party to the Security Trust Deed.

Part 2 of this Assignment and Assumption has been entered into as of the Effective Date set forth below.

[Signature Pages follow]

---

[5] List each Assignor, as appropriate.

[6] List each Assignee, as appropriate.

[7] Amount to be adjusted by the counterparties to take into account any payments or prepayments made between the Trade Date and the Effective Date.

[8] Set forth, to at least 9 decimals, as a percentage of the Commitment/Loans of all Lenders thereunder.

[9] To be completed if the Assignor(s) and the Assignee(s) intend that the minimum assignment amount is to be determined as of the Trade Date.

    Exhibit A

Effective Date: _____ ___, 20___ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

ASSIGNOR[S][10]
[NAME OF ASSIGNOR]


By:_____
    Title:

[NAME OF ASSIGNOR]


By:_____
    Title:

ASSIGNEE[S][11]
[NAME OF ASSIGNEE]


By:_____
    Title:


[NAME OF ASSIGNEE]


By:_____
    Title:

---

[10] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

[11] Add additional signature blocks as needed. Include both Fund/Pension Plan and manager making the trade (if applicable).

Exhibit A

Accepted:

CITIBANK, N.A., as
   Administrative Agent

By: _____
   Title:

By: _____
   Title:


[Consented to:]$^{12}$

AVIANCA HOLDINGS S.A.

By: _____
   Title:


Accepted by the Collateral Trustee (for purposes of the Security Trust Deed)

_____
for and on behalf of Citibank, N.A., London Branch
Date: _____

---

$^{12}$ To be added only if the consent of the Borrower is required by the terms of the Loan Agreement.

ANNEX 1
to the Assignment and Assumption

[_____]13

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1.    Representations and Warranties.

1.1    Assignor[s].  [The][Each] Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of [the][the relevant] Assigned Interest, (ii) [the][such] Assigned Interest is free and clear of any lien, encumbrance or other adverse claim, and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Loan Agreement or any other Credit Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Credit Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Credit Document, or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Credit Document.

1.2.    Assignee[s].  [The][Each] Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Loan Agreement, (ii) it meets all the requirements to be an assignee under Section 8.8 of the Loan Agreement (subject to such consents, if any, as may be required thereunder), (iii) from and after the Effective Date, it shall be bound by the provisions of the Loan Agreement as a Lender thereunder and, to the extent of [the][the relevant] Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it is sophisticated with respect to decisions to acquire assets of the type represented by the Assigned Interest and either it, or the Person exercising discretion in making its decision to acquire the Assigned Interest, is experienced in acquiring assets of such type, (v) it has received a copy of the Loan Agreement, and has received or has been accorded the opportunity to receive copies of the most recent financial statements delivered pursuant to Section 5.6 thereof, as applicable, and such other documents and information as it deems appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest, and (vi) it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Assignment and Assumption and to purchase [the][such] Assigned Interest; and (b) agrees that (i) it will, independently and without reliance on the Administrative Agent, [the][any] Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Credit Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Credit Documents are required to be performed by it as a Lender.

2.    Payments.  From and after the Effective Date, the Administrative Agent shall make all payments in respect of [the][each] Assigned Interest (including payments of principal, interest, fees and other amounts) to [the][the relevant] Assignor for amounts which have accrued to but excluding the Effective Date and to [the][the relevant] Assignee for amounts which have accrued from and after the

---

13 Describe Loan Agreement at option of Administrative Agent.

Exhibit A

Effective Date.  Notwithstanding the foregoing, the Administrative Agent shall make all payments of interest, fees or other amounts paid or payable in kind from and after the Effective Date to [the][the relevant] Assignee.

       3.    <u>General Provisions</u>.  This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns.   This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument.  Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption.  Part 1 of this Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York. Part 2 of this Assignment and Assumption shall be governed by and construed in accordance with English law.

Exhibit A

**EXHIBIT B**
**FORM OF PROMISSORY NOTE**

$[_____]                                                      New York, New York
[Date]

        FOR VALUE RECEIVED, the undersigned USAVFLOW LIMITED, an exempted company incorporated with limited liability and registered under the laws of the Cayman Islands with registered number 324668 and having its registered office at the offices of MaplesFS Limited, PO Box 1093, Queensgate House, Grand Cayman, KY1-1102, as borrower (the "Borrower"), hereby promises to pay to [_____] or its registered assigns (the "Lender") in lawful money of the United States and in immediately available funds, the principal amount of [_____] DOLLARS or, if less, the aggregate unpaid principal amount of all Loans made by the Lender outstanding under the Loan Agreement (as defined below), which sum shall be due and payable in such amounts on the Maturity Date (as defined in said Loan Agreement) or, if sooner,  on such other dates as are set forth in said Loan Agreement.  Borrower further agrees to pay interest in like money at such office on the unpaid principal amount hereof from time to time outstanding at the rates, and on the dates, specified in Sections 2.4 and 2.5 of the Loan Agreement.  Terms used herein which are defined in the Loan Agreement shall have such defined meanings unless otherwise defined herein.

        The holder of this Note may endorse and attach a schedule to reflect the date and amount of each Loan evidenced by this Note and the date and amount of each payment or prepayment of principal hereof; provided that the failure of the holder to make any such recordation (or any error in such recordation) shall not affect the obligations of Borrower hereunder or under said Loan Agreement.

        This Note is one of the Notes referred to in the Loan Agreement, dated as of December 12, 2017 (as amended, amended and restated, supplemented, waived or otherwise modified from time to time, the "Loan Agreement"), by and among the Borrower, as borrower, each Person party thereto as a lender from time to time, AVIANCA HOLDINGS S.A., a company organized under the laws of Panama, TACA INTERNATIONAL AIRLINES, S.A., a company organized under the laws of El Salvador, AVIANCA COSTA RICA S.A. (formerly known as LINEAS AÉREAS COSTARRICENSES S.A.), a company organized under the laws of Costa Rica, and TRANS AMERICAN AIRLINES, S.A., a company organized under the laws of Peru, as guarantors, Citibank, N.A., as Administrative Agent, and Citibank, N.A., as Collateral Agent.  This Note is subject to the provisions thereof and is subject to optional and mandatory prepayment in whole or in part as provided therein.

        This Note is secured and guaranteed as provided in the Loan Agreement and the Security Documents.  Reference is hereby made to the Loan Agreement and the Security Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and guarantees, the terms and conditions upon which the security interest and each guarantee was granted and the rights of the holder of this Note in respect thereof.

        Upon the occurrence and during the continuation of any one or more of the Events of Default specified in the Loan Agreement, all amounts then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided therein.

        All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, endorser or otherwise, hereby waive presentment, demand, protest and all other notices of any kind.

        **THIS NOTE MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS OF THE LOAN AGREEMENT.  TRANSFERS OF THIS NOTE MUST BE RECORDED**

IN THE REGISTER MAINTAINED BY THE ADMINISTRATIVE AGENT PURSUANT TO THE TERMS OF THE LOAN AGREEMENT.

THIS NOTE AND ANY CLAIM, CONTROVERSY, DISPUTE OR CAUSE OF ACTION (WHETHER IN CONTRACT, TORT OR OTHERWISE) BASED UPON, ARISING OUT OF OR RELATING TO THIS NOTE SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF NEW YORK.

[Signature Page follows.]

**USAVFLOW LIMITED**
as Borrower

By: _____
      Name:
      Title:

**EXHIBIT C**
**FORM OF BORROWER'S OFFICERS' CERTIFICATE**

[●], 2017

I, the undersigned, a director of USAVFLOW LIMITED, an exempted company incorporated, registered and existing under the laws of the Cayman Islands (the "**Borrower**"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 3.1.1 of the Loan Agreement, dated as of December 12, 2017, between the Borrower, the guarantors party thereto, the lenders party from time to time thereto, Citibank, N.A., as administrative agent and Citibank, N.A., as collateral agent (the "**Loan Agreement**"). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the Loan Agreement.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Borrower approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the memorandum and articles of association, the certificate of incorporation and each certificate of incorporation on change of name (if any) of the Borrower which, in each case, are in full force and effect as of the date hereof.

4.      Attached hereto as Annex C is a true and correct copy of the register of directors, register of members and register of mortgages and charges of the Borrower which, in each case, are in full force and effect as of the date hereof

5.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Loan Agreement, the other Credit Documents to which the Borrower is a party and all documents delivered in connection therewith (the "**Transaction Documents**") and instructions and certificates in connection therewith on behalf of the Borrower and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

6.      On the date hereof, the representations and warranties of the Borrower in the Transaction Documents are true and correct.

7.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

8.      The Borrower has taken all actions required to be taken by the Borrower pursuant to the Transaction Documents on or prior to the date thereof.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Borrower as of the date first written above.

USAVFLOW LIMITED

By:_____

Name:

Title:

The undersigned, being the duly elected and qualified [_____] of the Borrower, hereby certifies that [_____] is the duly elected and qualified [_____] of the Borrower and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Borrower as of the date first written above.

USAVFLOW LIMITED

By:_____

Name:

Title:

Exhibit C

ANNEX A - Resolutions

Exhibit C

ANNEX B – Constitutional Documents

Exhibit C

ANNEX C – Statutory Registers

Exhibit C

ANNEX D – Incumbency

| **Name** | **Title** | **Signature** |
|---|---|---|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit C

**EXHIBIT D**
**FORM OF GUARANTOR'S OFFICERS' CERTIFICATE**

[●], 2017

I, the undersigned, [●] of [AVIANCA HOLDINGS S.A.][TACA INTERNATIONAL AIRLINES, S.A.][AVIANCA COSTA RICA S.A., f/k/a LINEAS AÉREAS COSTARRICENSES S.A.,][TRANS AMERICAN AIRLINES, S.A.], a company organized and existing under the laws of [●] (the "**Guarantor**"), DO HEREBY CERTIFY that:

1.      This Certificate is furnished pursuant to Section 3.1.1 of the Loan Agreement, dated as of December 12, 2017, between the Borrower, the Guarantor, the other guarantors party thereto, the lenders party from time to time thereto, Citibank, N.A., as administrative agent and Citibank, N.A., as collateral agent (the "**Loan Agreement**"). Unless otherwise defined herein, capitalized terms used in this Certificate have the meanings assigned to those terms in the Loan Agreement.

2.      Attached hereto as Annex A is a true, correct and complete copy of the resolutions of the Guarantor approving the execution, delivery and performance of the Transaction Documents, which resolutions are in full force and effect without modification or amendment as of the date hereof.

3.      Attached hereto as Annex B is a true, correct and complete copy of the organizational documents and by-laws of the Guarantor.

4.      The persons listed on Annex C hereto are duly authorized and qualified to sign the Loan Agreement, the other Credit Documents to which the Guarantor is a party and all documents delivered in connection therewith (the "**Transaction Documents**") and instructions and certificates in connection therewith on behalf of the Guarantor and the signatures set forth opposite the names of such individuals are true and correct manual signatures of such individuals or a facsimile thereof.

5.      On the date hereof, the representations and warranties of the Guarantor in the Transaction Documents are true and correct.

6.      On the date hereof, no event or circumstance has occurred or is in existence that has had or could reasonably be expected to have a Material Adverse Effect.

7.      The Guarantor has taken all actions required to be taken by the Guarantor pursuant to the Transaction Documents on or prior to the date thereof.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Guarantor as of the date first written above.

[AVIANCA        HOLDINGS        S.A.][TACA
INTERNATIONAL  AIRLINES,  S.A.][AVIANCA
COSTA      RICA      S.A.][TRANS     AMERICAN
AIRLINES, S.A.]

By:_____
Name:
Title:


The undersigned, being the duly elected and qualified [_____] of the Guarantor, hereby certifies that [_____] is the duly elected and qualified [_____] of the Guarantor and that the foregoing signature appearing above her name is her genuine signature.

IN WITNESS WHEREOF, I have hereunto set my hand on behalf of the Guarantor as of the date first written above.

[AVIANCA        HOLDINGS        S.A.][TACA
INTERNATIONAL  AIRLINES, S.A.][ AVIANCA
COSTA      RICA      S.A.][TRANS     AMERICAN
AIRLINES, S.A.]

By:_____
Name:
Title:

Exhibit D

ANNEX A – Resolutions

Exhibit D

ANNEX B – Organizational Documents

Exhibit D

ANNEX C – Incumbency

| **Name** | **Title** | **Signature** |
|----------|-----------|---------------|
| [●] | | |
| [●] | | |
| [●] | | |

Exhibit D

**EXHIBIT E**
**FORM OF NOTICE AND CONSENT**

# FORM OF NOTICE AND CONSENT

[Card Processer]
[Address]
Attention: [●]
Tel: [●]
Email: [●]

[●], 2017

NOTICE AND CONSENT

Ladies and Gentlemen:

Reference is made to (a) Contract Rights and Recievables Sale, Purchase and Servicing Agreement, dated [●] (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**RSPA**"), among Aerovias del Continente Americano S.A. Avianca, a company organized under the laws of Colombia ("**Avianca S.A.**"), as the Seller and USAVflow Limited, a company organized under the laws of the Cayman Islands (the "**Company**"), as the Purchaser and Avianca S.A. as the Servicer, (b) the Receivables Maintenance Agreement, dated [●] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Undertaking Agreement**"), between Avianca S.A. and the Company, (c) the Cash Management Agreement dated [●] (as amended, amended and restated, supplemented or otherwise modified from time to time, the "**Cash Management Agreement**"), among Avianca S.A., the Company, and Citibank, N.A. as Administrative Agent (in such capacity, the "**Administrative Agent**") and as Collateral Agent (in such capacity, the "**Collateral Agent**"), (d) the Contrato de Garantía Mobiliria sobre Ingresos Futuros, dated [●]  (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "**Colombian Security Agreement**"), between Avianca S.A. and the Company, (e) the Security Agreement, dated [●] (as amended, amended and restated, supplemented, or otherwise modificed from time to time, the "**New York Security Agreement**" and collectively with the RSPA, the Undertaking Agreement, the Cash Management Agreement and the Colombian Security Agreement, the "**Agreements**"), by and between the Company, as grantor, and the Collateral Agent, and (f) that certain Airline Card Service Agreement, dated as of [DATE] (as modified pursuant to this Notice and Consent, and all extensions, amendments, supplements, or replacements of such agreements, the "**[CARD PROCESSOR] Contract**") among [CARD PROCESSOR] ("**[CARD PROCESSOR]**") and its affiliates and Avianca S.A. or any of its affiliates, pursuant to which [CARD PROCESSOR] agrees to pay Avianca S.A. for goods and services of Avianca S.A. purchased with the [CARD] in the United States;

Capitalized terms used but not defined herein shall have the meanings given on Schedule 1 hereto.

1. Notice

Avianca S.A. and the Company hereby give [CARD PROCESSOR] written notice that,

    (i)        pursuant to, and subject to the terms and condtions of, the RSPA, Avianca S.A. will sell to the Company, and the Company will buy from Avianca S.A., finally, definitively, and irrevocably, the Assigned Contract Rights and the Assigned Receivables;

    (ii)      pursuant to the Colombian Back-Up Security Agreement, Avianca S.A. will grant to the Company a security interest (garantía mobiliaria) in certain contingent future receivables associated with, and assign to the Company, as collateral, all of Avianca S.A.'s right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables; and

    (iii)    pursuant to the New York Security Agreement, the Company will grant to the Collateral Agent a first priority security interest in, and lien on, all of the Company's right, title, and interest in and to the Assigned Contract Rights and the Assigned Receivables.

2.   <u>Avianca S.A. Representation and Agreement</u>

Pursuant to and in connection with the [CARD PROCESSOR] Contract, Avianca S.A. represents and agrees (i) that Avianca S.A. is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect of the Assigned Contract Rights and the Assigned Receivables and (ii) that after giving effect to the transactions described in Section 1 above, the Company is the sole owner of the Assigned Contract Rights and the Assigned Receivables and therefore entitled to all amounts payable in respect to the Assigned Contract Rights and the Assigned Receivables.

Avianca S.A. hereby agrees that it shall promptly notify [CARD PROCESSOR] and the Collateral Agent of any changes, modifications or supplements to the merchant numbers that fairly identify the Specified Sales by delivering a Merchant ID Supplement.

3.   <u>[CARD PROCESSOR] Representations and Agreements</u>

Pursuant to and in connection with section [●] of the [CARD PROCESSOR] Contract, which requires [CARD PROCESSOR]'s prior written consent for the assignment of rights under the [CARD PROCESSOR] Contract, by [CARD PROCESSOR]'s signature below, [CARD PROCESSOR] unconditionally and irrevocably:

    (i)        acknowledges, and consents to, the transactions described in section 1 set forth above;

(ii)    (a) represents that, to its knowledge, immediately before giving effect to the transactions described in 1 above, Avianca S.A. is entitled under the [CARD PROCESSOR] Contract to the Assigned Contract Rights and Assigned Receivables and (b) agrees that after giving effect to the transactions described in 1 above, (x) the Company is entitled under the [CARD PROCESSOR] Contract to the Assigned Contract Rights and Assigned Receivables and (y) [CARD PROCESSOR] will make all applicable payments with respect to the Assigned Contract Rights and the Assigned Receivables, including, without limitation, in respect of any airline ticket sales and related services identified by those certain merchant numbers, geographic jurisdictions and/or other distinguishing characteristics specified on Exhibit A hereto, in accordance with the instructions set forth below;

(iii)   represents that Exhibit A hereto sets forth as of the date hereof the merchant numbers that fairly identify the Specified Sales and agrees that it will (x) use commercially reasonable efforts to notify the Collateral Agent of any changes to such merchant numbers and (y) promptly acknowledge and accept any Merchant ID Supplement properly delivered to it by Avianca S.A. and reflecting all merchant numbers associated at such time with all Specified Sales;

(iv)    represents that, to its knowledge, the Carriers are not in breach of any obligation under the [CARD PROCESSOR] Contract;

(v)     represents that, to its knowledge, it has not received notice of any currently effective assignment of, or pledge of any security interest in, any of the Assigned Contract Rights or the Assigned Receivables; and

(vi)    agrees that if it enters into any other contract or replacement contract with the Carriers or any of their affiliates with respect to the Specified Sales, such contract will be automatically subject to this Notice and Consent and the defined term "[CARD PROCESSOR] Contract" shall be deemed to include any such contract for all purposes hereunder.

4.   Directions Regarding Payments

In connection with the Agreements, notwithstanding anything to the contrary set forth in the [CARD PROCESSOR] Contract, Avianca S.A. hereby irrevocably authorizes and instructs [CARD PROCESSOR] to pay all amounts payable by [CARD PROCESSOR] in respect of the Assigned Contract Rights and the Assigned Receivables in U.S. dollars to the Company's account specified below:

Wire to:        Citibank, N.A.
ABA:            021000089
SWIFT:          CITIUS33

Cr:     A&T Account Administration
A/C#    36114317
FFC: A/C#   11925000
Ref:     USAVflow Ltd

or to such other account as may from time to time be designated in writing by the Collateral Agent to [CARD PROCESSOR] by sending a written request (together with a copy of this Notice and Consent) via first class mail or overight delivery to:

[CARD PROCESSOR ADDRESS]

and otherwise to act in accordance with the payment instructions of the Collateral Agent in connection therewith, in each case, without further instruction from Avianca S.A. or the Company and (ii) cease making any such payments to any other account(s).

5. <u>Other Provisions</u>

This Notice and Consent supersedes all prior payment instructions from Avianca S.A. to [CARD PROCESSOR] with respect to amounts payable to Avianca S.A. or the Company in respect of the Assigned Contract Rights and the Assigned Receivables.

All notices related to this Notice and Consent (i) to [CARD PROCESSOR] should be made to the address set forth above, (ii) to Collateral Agent should be made to the address set forth on its signature page below and (iii) to Avianca S.A. or the Company should be made to the address set forth below:

Aerovías del Continente Americano S.A. Avianca
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero;
E-mail:  lucia.avila@avianca.com;

The parties hereto agree that such payment instructions may not be revoked or changed and this Notice and Consent may not be amended without the prior written consent of the Collateral Agent, except that the Parties hereto hereby agree that Exhibit A may be amended by the delivery of a Merchant ID Supplement from Avianca S.A. to [CARD PROCESSOR] and the Collateral Agent, and such amendment shall be effective upon the acceptance and acknowledgment thereof by [CARD PROCESSOR] and the Collateral Agent

Nothing in this Notice and Consent shall be construed as creating or implying any additional obligation of [CARD PROCESSOR] under the [CARD PROCESSOR] Contract, except as expressly provided herein, and nothing contained herein shall otherwise amend or modify the terms and conditions of the [CARD PROCESSOR] Contract. For the avoidance of

doubt, Company and Avianca S.A. each acknowledge that [CARD PROCESSOR] retains all of its rights under the [CARD PROCESSOR] Contract, including, but not limited to, [CARD PROCESSOR]'s right to Chargeback and exercise Protective Actions under Section [●] of the [CARD PROCESSOR] Contract.

THIS NOTICE AND CONSENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

The Company and Avianca S.A. will indemnify and hold harmless [CARD PROCESSOR] from any and all liabilities, claims, demands, actions or judgments, including but not limited to attorneys' fees, arising out of or resulting from their respective acts or omissions, or those of their respective employees, officers or agents in connection arisinig or resulting from [CARD PROCESSOR]'s compliance with the terms of this Notice and Consent.

Notwithstanding the fact that this Notice and Consent is governed by the law of the State of New York, it perfects the transfer (*tradición*) of the Assigned Contract Rights and the Assigned Receivables to be sold by Avianca S.A. to the Company under the RSPA, pursuant to articles 887 *et seq* of the Colombian Commercial Code and article 1959 of the Colombian Civil Code, respectively, and the transfer of a security interest in and lien on the Assigned Contract Rights and the Assigned Receivables to be created by Avianca S.A. in favor of the Company under the Colombian Security Agreement pursuant to Secured Transaction Law 1676 of 2013.

This Notice and Consent may be executed in any number of counterparts and by different parties on separate counterparts.  Each of such counterparts shall be deemed to be an original, and all of such counterparts, taken together, shall constitute but one and the same agreement. Delivery of an executed counterpart of this Notice and Consent by electronic mail shall be equally as effective as delivery of a manually executed counterpart.

Any reference to the Collateral Agent in this Notice and Consent shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Lenders and in accordance with the Loan Agreement.  In relation to the giving of any consent, approval or direction by the Collateral Agent hereunder, it is acknowledged and accepted by the parties hereto that in all cases the Collateral Agent shall be acting, giving, withholding or otherwise undertaking and exercising such action solely on behalf of the Lenders and as directed in accordance with the terms of the Loan Agreement.  Under no circumstances shall the Collateral Agent be under any obligation to any party hereto to give any consent, approval or direction, or take any other action in connection with this Notice and Consent.  The Collateral Agent shall have no liability to [CARD PROCESSOR] or to any other party hereto in connection with this Notice and Consent or for or in connection with any action or inaction on its part under or in connection with this Notice and Consent, and such parties agree that any such liability shall be excluded to the fullest extent permitted by applicable law.  Nothing herein shall be construed to be an agreement by the Collateral Agent to any of the provisions contained herein, it being

understood and agreed by all parties hereto that the Lenders have agreed to the terms of this Notice and Consent and pursuant to the Loan Agreement have instructed the Collateral Agent to enter into this Notice of Transfer, as agent for and on behalf of the Lenders.  The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

*[Remainder of page intentionally left blank]*

Please acknowledge your receipt of this Notice and Consent and your agreement to the payment terms specified above by executing this Notice and Consent where indicated below and returning it in pdf format by electronic mail to the Company and the Collateral Agent.  Thank you for your cooperation in this matter.

Very truly yours,

AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA

By:_____

Name:_____

Title:_____

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

[CARD PROCESSOR]

By:_____

Name:_____

Title:_____

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____
Name:_____
Title:_____

By:_____
Name:_____
Title:_____

Address for Notices:
Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
E-mail: karen.abarca@citi.com / cts.spag@citi.com

<u>SCHEDULE 1</u>

<u>DEFINED TERMS</u>

"**ARC**" means Airlines Reporting Corporation, or any successor or replacement thereof.

"**Assigned Contract Rights**" means the contract rights of Avianca S.A. now existing arising under the [CARD PROCESSOR] Contract to (a) receive any kind of payments, indemnities or economic compensations derived from Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (b) to enforce the rights referred to in (a) against [CARD PROCESSOR]. For the avoidance of doubt, the Assigned Contract Rights shall not include (x) any obligation or liability of Avianca S.A. under the [CARD PROCESSOR] Contract or arising in any manner therefrom; or (y) the rights of Avianca S.A.:

    (i)    to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

    (ii)    to submit Sales Slips for billing or issue credit slips in any manner provided by [CARD PROCESSOR] Contract;

    (iii)    to request, to treat or to have access to confidential information pertaining to cardholder account information;

    (iv)    to request or receive a restricted card list pursuant to the [CARD PROCESSOR] Contract;

    (v)    to grant consent to [CARD PROCESSOR] to display or show the trademarks, logos or company names of Avianca S.A. in promotion, advertising, press releases or otherwise pursuant to the [CARD PROCESSOR] Contract;

    (vi)    to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the [CARD PROCESSOR] Contract;

    (vii)    to handle all claims or complaints by a cardholder with respect to Card transactions;

    (viii)    to receive documentation from [CARD PROCESSOR] that is required in connection with the defense of any claim of a cardholder asserted in connection with the [CARD PROCESSOR] Contract; or

    (ix)    to receive any Collections derived from sales which are not Specified Sales.

"**Assigned Receivables**" means any and all Collections accrued under the [CARD PROCESSOR] Contract in respect of Specified Sales that are due by [CARD PROCESSOR] to Avianca S.A. immediately prior to giving effect to the RSPA on the date of the RSPA.

"**Cards**" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of Avianca S.A and its affiliates.

"**Collections**" means all cash collections and other cash proceeds derived from the Assigned Contract Rights or the Assigned Receivables, whether received by Avianca S.A., the Company, or any other Person.

"**Merchant ID Supplement**" means a notice, substantially in the form of Exhibit B hereto.

"**Sales Slip**" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"**Specified Sales**" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Receivables Seller where payment in the case of any such sale is made by an American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth on Exhibit A hereto, with such changes, if any, as shall have been made from time to time after delivery and acceptance of a Merchant ID Supplement.

## EXHIBIT A

## MERCHANT NUMBERS

[●]

Exhibit A

EXHIBIT B
MERCHANT ID SUPPLEMENT

This Merchant ID Supplement, dated as of [●], is delivered pursuant to the Notice and Consent, dated as of  [●], 2017 (as it may from time to time be amended, modified or supplemented in accordance with its terms, the "**Notice and Consent**"), among Aerovías del Continente Americano S.A. Avianca ("**Avianca S.A.**"), [CARD PROCESSOR] (together with its successors or assigns, "**[CARD PROCESSOR]**") and Citibank, N.A. Capitalized terms used herein but not defined herein are used with the meanings given them in the Notice and Consent.

Avianca S.A. represents and warrants that the attached replacement Exhibit A accurately and completely lists all merchant numbers that fairly identify the Specified Sales and hereby agrees that such replacement Exhibit A will replace Exhibit A to the Notice and Consent from and after the date of this Merchant ID Supplement.

IN WITNESS WHEREOF, Avianca S.A. has caused this Merchant ID Supplement to be duly executed and delivered by its duly authorized officer or representative as of the date first written above.

AEROVÍAS DEL CONTINENTE AMERICANO
S.A. AVIANCA

By:_____
Name:_____
Title:_____

Exhibit B

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

[CARD PROCESSOR]

By:_____

Name:_____

Title:_____

Exhibit B

AMERICAS 93892384 (2K)

ACCEPTED AND AGREED AS OF THE DATE
FIRST WRITTEN ABOVE

Citibank, N.A., as Collateral Agent

By:_____
Name:_____
Title:_____


By:_____
Name:_____
Title:_____

Exhibit B

REPLACEMENT EXHIBIT A

Exhibit B

AMERICAS 93892384 (2K)

**EXHIBIT F**
**FORM OF NEW YORK SECURITY AGREEMENT**

# FORM OF NEW YORK SECURITY AGREEMENT

SECURITY AGREEMENT, dated as of December 12, 2017 (as amended, supplemented or modified from time to time (this "**Agreement**"), is made by and between USAVflow Limited, an exempted company incorporated and registered under the laws of the Cayman Islands (the "**Grantor**"), represented in this act by Peter Lundin, and Citibank, N.A., in its capacity as collateral agent for the Secured Parties (in such capacity, together with its successors and assigns in such capacity, if any, the "**Collateral Agent**", together with each other party hereto, the "**Parties**" and each individually a "**Party**") represented in this act by Karen Abarca and Miriam Molina.

## RECITALS:

WHEREAS, the Grantor, as borrower, each Person listed as a guarantor on the signature pages thereto, each lender that is a signatory thereto, and each other Person that becomes a "Lender" thereunder (collectively, the "**Lenders**"), the Collateral Agent and Citibank, N.A. as administrative agent (the "**Administrative Agent**") are parties to the Loan Agreement, dated as of the date hereof (such agreement, as amended, restated, supplemented, modified or otherwise changed from time to time, including any replacement agreement therefor, being hereinafter referred to as the "**Loan Agreement**");

WHEREAS, pursuant to the Loan Agreement, the Lenders have agreed to make certain term loans (collectively, the "**Loans**") to the Grantor; and

WHEREAS, it is a condition precedent to the Lenders making any Loan to the Grantor pursuant to the Loan Agreement that the Grantor shall have executed and delivered this Agreement to the Administrative Agent for the benefit of the Secured Parties;

NOW, THEREFORE, in consideration of the premises and the agreements herein and in order to induce the Lenders to make and maintain the Loans to the Grantor pursuant to the Loan Agreement, the Grantor hereby agrees with the Collateral Agent, for the benefit of the Secured Parties, as follows:

SECTION 1.   <u>Definitions</u>

(a)     Reference is hereby made to the Loan Agreement for a statement of the terms thereof.  All capitalized terms used in this Agreement that are defined in the Loan Agreement or in Article 8 or 9 of the Code and which are not otherwise defined herein shall have the same meanings herein as set forth therein; <u>provided</u> that terms used herein which are defined in the Code on the date hereof shall continue to have the same meaning notwithstanding any replacement or amendment of such statute except as the Collateral Agent may otherwise determine.

(b)     For the avoidance of doubt, the following terms shall have the respective meanings provided for in the Code: "Accounts", "Account Debtor", "Cash Proceeds", "Chattel Paper", "Deposit Account", "Documents", "Electronic Chattel Paper", "General Intangibles", "Instruments", "Investment Property", "Letter-of-Credit Rights", "Noncash

Proceeds", "Payment Intangibles", "Proceeds", "Promissory Notes", "Record", "Securities Account" and "Supporting Obligations".

(c)    As used in this Agreement, the following terms shall have the respective meanings indicated below, such meanings to be applicable equally to both the singular and plural forms of such terms:

"**Administrative Agent**" has the meaning assigned to such term in the preamble hereto.

"**Assigned Agreements**" has the meaning assigned to such term in <u>Section 2</u> hereof.

"**Code**" means the Uniform Commercial Code as in effect from time to time in the State of New York.

"**Collateral**" has the meaning assigned to such term in <u>Section 2</u> hereof.

"**Costa Rican Collateral**" means all rights to the Collateral derived from the Credomatic Contract as well as any rights of the Grantor as a secured party under the Costa Rican Back-Up Security Agreement.

"**Costa Rican Notary Public**" means a Costa Rican notary public, in good standing and with no legal impediments to act as the enforcer of the Costa Rican Collateral in accordance with the Law on Security over Moveable Assets and this Agreement.

"**Costa Rican Security**" means the security granted over the Costa Rican Collateral ("*bien dado en garantía*") as understood under the Law on Security over Moveable Assets and incorporating all the rights and obligations that the Law on Security over Moveable Assets grants in relation to such secured collateral.

"**Costa Rican Trustee**" means any legally appointed trustee ("*fiduciario*")  in good standing according to the laws of Costa Rica and able to perform the duties required of a trustee under the Law on Security over Moveable Assets.

"**Filing**" means (a) any UCC financing statement (including continuation statements and amendment statements, as applicable) or (b) any analogous filing, registration or record under applicable law, in each case covering any Collateral, that is filed, registered or recorded with any governmental, municipal or other office.

"**Grantor**" has the meaning assigned to such term in the preamble hereto.

"**Law on Security over Moveable Assets**" means under Costa Rican law, the *Ley de Garantías Mobiliarias*, law number 9246 and its bylaws.

"**Lender**" has the meaning assigned to such term in the Recitals hereto.

"**Loan**" has the meaning assigned to such term in the Recitals hereto.

"**Loan Agreement**" has the meaning assigned to such term in the Recitals hereto.

"**Moveable Asset Security System**" means the *Sistema de Garantías Mobiliarias* as understood under the Law on Security over Moveable Assets.

"**Notice of Registration of Costa Rican Collateral**" means the notice of registration of Costa Rican Collateral delivered by the Grantor to the Collateral Agent in form and substance set out in Exhibit A hereto, evidencing the specific language to be included by the Collateral Agent in the Security Registration Forms. The Notice of Registration of Costa Rican Collateral shall be delivered accompanied by a Spanish translation of such notice.

"**Out of Court Enforcement**" means the enforcement procedure agreed to under this Agreement for the enforcement of the Costa Rican Collateral established in accordance to Articles 57 and 58 of the Law on Security over Moveable Assets ("*ejecución en sede extrajudicial*").

"**Secured Obligations**" has the meaning assigned to such term in <u>Section 3</u> hereof.

"**Security Enforcement Form**" means the form or forms required under the Law on Security over Moveable Assets or any other law, regulation, bylaw or otherwise required by the Moveable Asset Security System, the Costa Rican National Registry or any other public or private entity, including any courts or other authority appointed to enforce the Costa Rican Collateral. This term includes the term "*formulario de ejecución*" as utilized in Article 57 of the Law on Security over Moveable Assets.

"**Security Registration Forms**" means the form or forms required under the Law on Security over Moveable Assets or any other law, regulation, bylaw or other regulation, required by the Moveable Asset Security System, the Costa Rican National Registry or any other public or private entity to register and perfect the security interest in the Costa Rican Collateral in favor of the Collateral Agent. This term includes the "*formulario de publicidad inicial*", "*formulario de modificación*", "*formulario de cancelación*", "*formulario de ejecución*" and any other forms" as  established in articles 11, 43 and 44 of the Law on Security over Moveable Assets.

"**Termination Date**" means the date on which the Grantor's obligations under the Credit Documents have been paid or otherwise performed in full and all of the Commitments have been terminated. For the purposes of registration of the Costa Rican Collateral, the termination date shall be the one set out in the Notice of Registration of Costa Rican Collateral and may be adapted from time to time to adjust to the Termination Date of the Credit Documents.

SECTION 2.   <u>Grant of Security Interest; Power of Attorney</u>.

(a)      As collateral security for the payment, performance and observance of all of the Secured Obligations, the Grantor hereby pledges and assigns to the Collateral Agent (and its agents and designees), and grants to the Collateral Agent (and its agents

and designees), for the benefit of the Secured Parties, a continuing security interest in, all of the following property, wherever located and whether now or hereafter existing and whether now owned or hereafter acquired, all of the Grantor's right, title and interest in (all being collectively referred to herein as the "**Collateral**"):

   (i)  the Contract Rights;

   (ii)  the Receivables;

   (iii)  the Collections;

   (iv)  the New York Pass-Through Account;

   (v)  the RSPA, the Undertaking Agreement, the Cash Management Agreement, the Costa Rican Assignment Agreement, the Costa Rican Back-Up Security Agreement, the Colombian Back-Up Security Agreement, the Notices and Consents and all other agreements to which the Grantor is a party (each as amended, restated, supplemented, modified or otherwise changed from time to time, collectively the "**Assigned Agreements**"), including (i) all claims of the Grantor for damages arising out of or for breach of or default under the Assigned Agreements and (ii) all rights of the Grantor to terminate, amend, supplement, modify or waive performance under the Assigned Agreements, to perform thereunder and to compel performance and otherwise to exercise all remedies thereunder;

   (vi)  all Accounts, Chattel Paper (whether tangible or electronic), Documents, General Intangibles (including Payment Intangibles), Instruments (including Promissory Notes), Investment Property, Letter-of-Credit Rights and Supporting Obligations, in each case, to the extent relating to the Contract Rights, the Receivables, the Collections or the Assigned Agreements;

   (vii)  any security interests or liens that the Grantor has in any of the foregoing;

   (viii)  all Proceeds, including all Cash Proceeds and Noncash Proceeds, and products of any and all of the foregoing Collateral; and

   (ix)  all other proceeds, products, offspring, accessions, rents, profits, income, benefits, substitutions and replacements of and to any and all of the foregoing Collateral (including, without limitation, any proceeds of insurance thereon and all causes of action, claims and warranties now or hereafter held by the Grantor in respect of any of the items listed above), and all books, correspondence, files and other Records, including, without limitation, all tapes, disks, cards, software, data and computer programs in the possession or under the control of the Grantor or any other Person from time to time acting for the Grantor that at any time evidence or contain information relating to any of the foregoing Collateral hereof or are otherwise necessary or helpful in the collection or realization thereof;

   in each case, howsoever the Grantor's interest therein may arise or appear (whether by ownership, security interest, claim or otherwise).

(b)    Additionally, the Grantor hereby, (i) based on the Law on Security over Moveable Assets and (ii) constituting a Costa Rican Security, grants to the Collateral Agent (and its agents and designees) for the benefit of the Secured Parties, a continuing security interest in the Costa Rican Collateral to secure full, complete and indefeasible performance of the Secured Obligations. With respect to such Costa Rican Collateral, the Collateral Agent may (but shall not be obligated to) at its option exercise from time to time all rights and remedies under this Agreement, the Law on Security over Moveable Assets or any other available legal instrument.

(c)    The Grantor hereby authorizes the Collateral Agent to file the Security Registration Forms before the relevant entities. The Collateral Agent may appoint anyone it deems appropriate to act on its behalf to file the Security Registration Forms;

(d)    Anything contained herein to the contrary notwithstanding:

(i)    the Grantor will remain liable under the Assigned Agreements, to the extent set forth therein, to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed;

(ii)    the exercise by the Collateral Agent of any of its rights hereunder will not release the Grantor from any of its duties or obligations under the Assigned Agreements; and

(iii)    neither the Collateral Agent nor any other Secured Party will have any obligation or liability under any Assigned Agreement by reason of or arising out of this Agreement or any other document related thereto, nor will the Collateral Agent or any other Secured Party be required or obligated in any manner to perform or fulfill any of the obligations or duties of the Grantor thereunder or to make any payment, or to make any inquiry as to the nature or sufficiency of any payment received by it, or to present or file any claim, or take any action to collect or enforce any claim for payment included in the Collateral.

(e)    None of the Collateral Agent, any other Secured Party or any purchaser at a foreclosure sale under this Agreement will be obligated to assume any obligation or liability under any Assigned Agreement unless the Collateral Agent, such other Secured Party or such purchaser otherwise expressly agrees in writing to assume any or all of said obligations or liabilities.

(f)    Grantor hereby constitutes and appoints the Collateral Agent its true and lawful attorney, irrevocably, with full power (i) to exercise any right of the Grantor under the Assigned Agreements, and (ii) after the occurrence of and during the continuance of an Event of Default (in the name of Grantor or otherwise) to act, require, demand, receive, compound and give acquittance for any and all moneys and claims for moneys due or to become due to Grantor under or arising out of the Collateral, to endorse any checks or other instruments or orders in connection therewith and to file any claims or take any action or institute any proceedings necessary or advisable (as determined by the Required Lenders) to protect the interests of the Secured Parties, which appointment as attorney is coupled with an interest.

SECTION 3.   Security for Secured Obligations.   The security interest created hereby in the Collateral constitutes continuing collateral security for all of the following obligations, whether now existing or hereafter incurred (the "**Secured Obligations**"):

(a)      the prompt payment by the Grantor, as and when due and payable (whether by scheduled maturity, required prepayment, acceleration, demand or otherwise), of all amounts from time to time owing by the Grantor in respect of the Loan Agreement and/or the other Credit Documents, including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and all other amounts due or to become due under any Credit Document (including, without limitation, all interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts that accrue after the commencement of any proceeding under any Bankruptcy Law of any Obligor, whether or not the payment of such interest, fees, commissions, charges, expense reimbursements, indemnifications and other amounts are unenforceable or are not allowable, in whole or in part, due to the existence of such proceeding); and

(b)      the prompt payment and due performance and observance by the Grantor of all of its other obligations from time to time existing in respect of this Agreement and any other Credit Document.

SECTION 4.   Guaranteed Amount

For purposes of the Costa Rican Security only, the guaranteed amount will be considered to be of USD $150,000,000 plus any additional amounts arising out of the Secured Obligations.

SECTION 5.   Representations and Warranties.   The Grantor represents and warrants as follows:

(a)      Schedule I hereto sets forth a complete and accurate list as of the date hereof of (i) the exact legal name of the Grantor, (ii) the jurisdiction of incorporation of the Grantor, (iii) the type of company of the Grantor, (iv) the address of the Grantor's principal place of business, namely its registered office address in the Cayman Islands and (v) the address or addresses where the Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper, in each case, that relate to the Collateral.

(b)      The Grantor is and will be at all times the sole and exclusive owner of, or otherwise have and will have adequate rights in, the Collateral free and clear of any Liens (other than the Lien, if any, created by the Receivables Seller in favor of the Grantor, which the Grantor has pledged and assigned to the Collateral Agent hereunder).   No effective financing statement or other instrument similar in effect covering all or any part of the Collateral is on file in any recording or filing office, other than financing statements or other instruments in favor of the Collateral Agent or in favor of the Grantor and assigned of record to the Collateral Agent.

(c)      This Agreement creates a legal, valid and enforceable first priority security interest in favor of the Collateral Agent, for the benefit of the Secured Parties, in the Collateral, as security for the Secured Obligations.

(d)     The Grantor has delivered to the Initial Lenders, for filing in the applicable governmental, municipal or other office specified in <u>Schedule II</u>, true, complete and correct copies of all appropriate Filings containing an accurate description of the Collateral. Such Filings are all of the Filings that are necessary to perfect the security interest in favor of the Collateral Agent (for the benefit of the Secured Parties) in respect of all Collateral in which the Security Interest may be perfected by filing, recording or registration in the United States. No further or subsequent Filing is necessary in the United States, except as provided under applicable law with respect to (i) the filing of continuation statements and (ii) any changes to the Grantor's organizational structure or to the Grantor's organizational documents permitted by the Loan Agreement, as required pursuant thereto in order for the Collateral Agent to continue to have at all times following each such change a legal, valid and perfected security interest in all the Collateral.

(e)     The Grantor does not maintain, nor at any time after the date of this Agreement shall establish or maintain, any demand, time, savings, passbook or similar account, except for the New York Pass-Through Account, the Collections Account and the Debt Service Reserve Account.

SECTION 6.     <u>Covenants as to the Collateral</u>.

(a)     <u>Further Assurances</u>.  The Grantor will take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as may be necessary or required by applicable law or as the Collateral Agent may require from time to time in order (i) to perfect and protect, or maintain the perfection of, the security interest and Lien purported to be created hereby; (ii) to enable the Collateral Agent to exercise and enforce its rights and remedies hereunder in respect of the Collateral; or (iii) otherwise to effect the purposes of this Agreement, including, without limitation:  (A) at the request of the Collateral Agent, marking conspicuously all of its Records pertaining to the Collateral with a legend, in form and substance satisfactory to the Collateral Agent, indicating that such Records are subject to the security interest created hereby, (B) if any Account relating to the Collateral shall be evidenced by a Promissory Note or other Instrument or Chattel Paper, delivering and pledging to the Collateral Agent such Promissory Note, other Instrument or Chattel Paper, duly endorsed and accompanied by executed instruments of transfer or assignment, all in form and substance satisfactory to the Collateral Agent, (C) executing or authenticating (to the extent, if any, that the Grantor's signature is required thereon or its authentication is required with respect thereto) and filing of such financing or continuation statements or amendments thereto, (D) furnishing to the Collateral Agent from time to time statements and schedules further identifying and describing the Collateral and such other reports in connection with the Collateral as the Collateral Agent may reasonably request, all in reasonable detail, and (E)  taking all actions required by law in any relevant Uniform Commercial Code jurisdiction, or by other law as applicable in any foreign jurisdiction.  The Grantor shall not take or fail to take any action which could in any manner impair the validity or enforceability of the Collateral Agent's security interest in and Lien on any Collateral.

(b)     <u>Accounts Relating to the Collateral</u>. The Grantor (or the Servicer on its behalf) will, except as otherwise provided in this <u>subsection (b)</u>, continue to collect, at its own expense, all amounts due or to become due under the Accounts relating to the Collateral.  In

connection with such collections, the Grantor (or the Servicer on its behalf) may (and, at the Collateral Agent's direction, will) take such action as the Grantor (or, if applicable, the Collateral Agent) may deem necessary or advisable to enforce collection or performance of such Accounts; provided, however, that the Collateral Agent shall have the right at any time, to notify the Card Processors or obligors under any such Accounts of the assignment of such Accounts to the Collateral Agent and to direct such Card Processors or obligors to make payment of all amounts due or to become due to the Grantor thereunder in respect of the Collection Rights directly to the Collateral Agent or its designated agent and, upon the occurrence and during the continuance of an Event of Default, to enforce collection of any such Accounts and to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Grantor might have done. All amounts and proceeds (including Instruments) received by the Grantor in respect of such Accounts relating to the Collateral shall be received in trust for the benefit of the Collateral Agent hereunder, shall be segregated from other funds of the Grantor and shall be forthwith paid over to the Collateral Agent or its designated agent in the same form as so received (with any necessary endorsement) and applied as specified in the Loan Agreement and the Grantor will not adjust, settle or compromise the amount or payment of any such Account relating to the Collateral or release wholly or partly any Card Processor or obligor thereof or allow any credit or discount thereon. Any such securities, cash, investments and other items so received by the Collateral Agent or its designated agent in respect of the Collateral shall (in the sole and absolute discretion of the Collateral Agent) be held as additional Collateral for the Secured Obligations or distributed in accordance with Section 8 hereof.

(c)     Control.  The Grantor hereby agrees to take any or all action that may be necessary or desirable or that the Collateral Agent may request in order for the Collateral Agent to obtain control in accordance with Sections 9-104, 9-105, 9-106, and 9-107 of the Code with respect to the following to the extent they relate to the Collateral:  (i) Electronic Chattel Paper, (ii) Investment Property and (iii) Letter-of-Credit Rights.   The Grantor hereby acknowledges and agrees that any agent or designee of the Collateral Agent shall be deemed to be a "secured party" with respect to the Collateral under the control of such agent or designee for all purposes.

(d)     Records; Inspection and Reporting.

(i)     The Grantor shall keep adequate records concerning the Collateral.

(ii)     The Grantor shall not, without the prior written consent of the Collateral Agent, amend, modify or otherwise change (A) its name, (B) its jurisdiction of incorporation as set forth in Schedule I hereto or (C) its registered office address in the Cayman Islands as set forth in Schedule I hereto.  The Grantor shall immediately notify the Collateral Agent in writing upon obtaining an organizational identification number, if on the date hereof, the Grantor did not have such identification number.

(e)     New York Pass-Through Account. For the New York Pass-Through Account, the Grantor shall cause the U.S. Account Bank to execute and deliver to the Collateral Agent, on or prior to the date hereof, the Account Control Agreement.

SECTION 7.    <u>Additional Provisions Concerning the Collateral</u>.

(a)    To the maximum extent permitted by applicable law, and for the purpose of taking any action that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, the Grantor hereby (i) authorizes the Collateral Agent to execute any such agreements, instruments or other documents in the Grantor's name and to file such agreements, instruments or other documents in the Grantor's name and in any appropriate filing office, (ii) authorizes the Collateral Agent at any time and from time to time to file, one or more financing or continuation statements and amendments thereto, relating to the Collateral and (iii) ratifies such authorization to the extent that the Collateral Agent has filed any such financing statements, continuation statements, or amendments thereto, prior to the date hereof; *provided, however*, that, without limiting the foregoing, the Collateral Agent shall not be responsible for preparing, executing or filing any financing or continuation statements or any amendments thereto, for authenticating any signature of the Grantor, or otherwise for perfecting or maintaining the perfection of any security interest in the Collateral (including the Costa Rican Collateral).  A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.

(b)    The Grantor hereby irrevocably appoints the Collateral Agent as its attorney-in-fact and proxy, with full authority in the place and stead of the Grantor and in the name of the Grantor or otherwise, from time to time in the Collateral Agent's discretion, to take any action and to execute any instrument that the Collateral Agent may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation, (i) to ask, demand, collect, sue for, recover, compound, receive and give acquittance and receipts for moneys due and to become due under or in respect of any Collateral, (ii) to receive, endorse, and collect any drafts or other Instruments, Documents and Chattel Paper in connection with preceding <u>clause (i)</u>, (iii) to receive, endorse and collect all Instruments made payable to the Grantor representing any dividend, interest payment or other distribution in respect of any Collateral and to give full discharge for the same, (iv) to file any claims or take any action or institute any proceedings which the Collateral Agent may deem necessary or desirable for the collection of any Collateral or otherwise to enforce the rights of each Secured Party with respect to any Collateral, (v) to execute assignments, licenses and other documents to enforce the rights of each Secured Party with respect to any Collateral, (vi) to pay or discharge taxes or Liens levied or placed upon or threatened against the Collateral, the legality or validity thereof and the amounts necessary to discharge the same to be determined by the Collateral Agent (in its sole discretion), and such payments made by the Collateral Agent shall constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand, and shall bear interest from the date payment of said amounts is demanded at the rate set forth in Section 2.5.6 of the Loan Agreement, and (vii) to sign and endorse any invoices, freight or express bills, bills of lading, storage or warehouse receipts, assignments, verifications and notices in connection with Accounts, Chattel Paper and other documents relating to the Collateral.  This power is coupled with an interest and is irrevocable until the Termination Date.

(c)    If the Grantor fails to perform any agreement or obligation contained herein, the Collateral Agent may itself perform, or cause performance of, such

agreement or obligation, in the name of the Grantor or the Collateral Agent, and the fees and expenses of the Collateral Agent incurred in connection therewith shall be payable by the Grantor pursuant to <u>Section 13(g)</u> hereof constitute additional Secured Obligations of the Grantor to the Collateral Agent, be due and payable immediately without demand and bear interest from the date payment of said amounts is demanded at the rate set forth in Section 2.5.6 of the Loan Agreement.

(d)      The powers conferred on the Collateral Agent hereunder are solely to protect the interests of the Secured Parties in the Collateral and shall not impose any duty upon it to exercise any such powers.  Other than the exercise of reasonable care to assure the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Collateral Agent shall have no duty as to any Collateral or as to the taking of any necessary steps to preserve rights against other parties or any other rights pertaining to any Collateral and shall be relieved of all responsibility for any Collateral in its possession upon surrendering it or tendering surrender of it to the Grantor (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct).  The Collateral Agent shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which the Collateral Agent accords its own property; it being understood that the Collateral Agent shall not have responsibility for ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relating to any Collateral, whether or not the Collateral Agent has or is deemed to have knowledge of such matters.  The Collateral Agent shall not be liable or responsible for any loss or damage to any of the Collateral, or for any diminution in the value thereof, by reason of the act or omission of any warehouseman, carrier, forwarding agency, consignee or other agent or bailee selected by the Collateral Agent in good faith.

(e)      The Grantor hereby authorizes the Secured Parties to file any such financing statements without the signature of such Assignor where permitted by law (and such authorization includes describing the Collateral as "all assets of Debtor, whether now owned or hereafter acquired or arising." of such Grantor).

SECTION 8.   <u>Remedies Upon Default</u>.   If any Event of Default shall have occurred and be continuing:

(a)      The Collateral Agent may exercise in respect of the Collateral, in addition to any other rights and remedies provided for herein or otherwise available to it, all of the rights and remedies of a secured party upon default under the Code (whether or not the Code applies to the affected Collateral), and also may (i) take absolute control of the Collateral, including, without limitation, transfer into the Collateral Agent's name or into the name of its nominee or nominees (to the extent the Collateral Agent has not theretofore done so) and thereafter receive, for the benefit of each Secured Party, all payments made thereon, give all consents, waivers and ratifications in respect thereof and otherwise act with respect thereto as though it were the outright owner thereof, (ii) require the Grantor to, and the Grantor hereby agrees that it will, at its expense and upon request of the Collateral Agent forthwith, assemble all or part of the Collateral as directed by the Collateral Agent and make it available to the Collateral Agent at a place or places to be designated by the Collateral Agent that is reasonably

convenient to both parties, and (iii) without notice except as specified below and without any obligation to prepare or process the Collateral for sale, sell the Collateral or any part thereof at public or private sale, at any of the Collateral Agent's offices, at any exchange or broker's board or elsewhere, for cash, on credit or for future delivery, and at such price or prices and upon such other terms as the Collateral Agent may deem commercially reasonable.  The Grantor agrees that, to the extent notice of sale or any other disposition of the Collateral shall be required by law, at least 10 days' prior notice to the applicable Grantor of the time and place of any public sale or the time after which any private sale or other disposition of the Collateral is to be made shall constitute reasonable notification.  If the Collateral Agent sells any of the Collateral upon credit, the Grantor will be credited only with payments actually received by the Collateral Agent from the purchaser thereof, and if such purchaser fails to pay for the Collateral, the Collateral may resell the Collateral and the Grantor shall be credited with proceeds of the sale.  The Collateral Agent shall not be obligated to make any sale or other disposition of Collateral regardless of notice of sale having been given.  The Collateral Agent may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned. The Grantor hereby waives any claims against each Secured Party arising by reason of the fact that the price at which the Collateral may have been sold at a private sale was less than the price which might have been obtained at a public sale or was less than the aggregate amount of the Secured Obligations, even if the Collateral Agent accepts the first offer received and does not offer the Collateral to more than one offeree, and waives all rights that the Grantor may have to require that all or any part of the Collateral be marshaled upon any sale (public or private) thereof.  The Grantor hereby acknowledges that (A) any such sale of the Collateral by the Collateral Agent shall be made without warranty, (B) the Collateral Agent may specifically disclaim any warranties of title, possession, quiet enjoyment or the like, (C) the Collateral Agent may bid (which bid may be, in whole or in part, in the form of cancellation of indebtedness), if permitted by law, for the purchase, lease, license or other disposition of the Collateral or any portion thereof for the account of the Collateral Agent (on behalf of itself and each Secured Party) and (D) such actions set forth in clauses (A), (B) and (C) above shall not adversely affect the commercial reasonableness of any such sale of the Collateral.

(b)      Any cash held by the Collateral Agent (or its agent or designee) relating to the Collateral and all Cash Proceeds received by the Collateral Agent (or its agent or designee) in respect of any sale of or collection from, or other realization upon, all or any part of the Collateral, may, in the discretion of the Collateral Agent, be held by the Collateral Agent (or its agent or designee) as Collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Collateral Agent pursuant to Section 13(g) hereof) in whole or in part by the Collateral Agent against, all or any part of the Secured Obligations in such order as the Collateral Agent shall elect, consistent with the provisions of the Loan Agreement.  Any surplus of such cash or Cash Proceeds held by the Collateral Agent (or its agent or designee) and remaining after the Termination Date shall be paid over to whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct.

(c)      [Reserved.]

(d)      The Grantor hereby acknowledges that if the Collateral Agent

complies with any applicable requirements of law in connection with a disposition of the Collateral, such compliance will not adversely affect the commercial reasonableness of any sale or other disposition of the Collateral.

(e)     The Collateral Agent shall not be required to marshal any present or future collateral security (including, but not limited to, this Agreement and the Collateral) for, or other assurances of payment of, the Secured Obligations or any of them or to resort to such collateral security or other assurances of payment in any particular order, and all of the Collateral Agent's rights hereunder and in respect of such collateral security and other assurances of payment shall be cumulative and in addition to all other rights, however existing or arising. To the extent that the Grantor lawfully may, the Grantor hereby agrees that it will not invoke any law relating to the marshalling of collateral which might cause delay in or impede the enforcement of the Collateral Agent's rights under this Agreement or under any other instrument creating or evidencing any of the Secured Obligations or under which any of the Secured Obligations is outstanding or by which any of the Secured Obligations is secured or payment thereof is otherwise assured, and, to the extent that it lawfully may, the Grantor hereby irrevocably waives the benefits of all such laws.

(f)     Notwithstanding the foregoing and any provision to the contrary herein, amounts credited to the New York Pass-Through Account shall be transferred to the Collections Account in accordance with the Loan Agreement, to be applied as described in the Cash Management Agreement.

SECTION 9.   Remedies Upon Default for the Costa Rican Collateral. Notwithstanding any remedies available to the Collateral Agent under this Agreement, the following shall be applicable with respect to the enforcement of Costa Rican Collateral in the Republic of Costa Rica:

(a)     Forced Assignment of Collections and Contract Rights.

(i)     If an Event of Default has occurred and is continuing, the Collateral Agent may provide notice of such event to the Grantor and submit the Security Enforcement Form before the relevant Costa Rican authorities under the Law on Security over Moveable Assets.

(ii)     To the extent that a Security Enforcement Form is filed, the Collateral Agent may request in writing to the Grantor to (i) wire any Collections received and not previously wired or transferred at that moment to the Collections Account and (ii) to assign the Contract Rights not previously assigned to the Collateral Agent.

(iii)     The Collateral Agent may also notify Grantor's applicable counterparties of the assignment of the Costa Rican Collateral and instruct them to (i) wire any Collections  to be sent to Grantor to the Collections Account, or any other such account that the Collateral Agent instructs and (ii) to take note of and implement the assignment of Contract Rights in favor of the Collateral Agent.

(b)     Out of Court Enforcement

(i)      The Parties fully and irrevocably agree that after an Event of Default has occurred and is continuing, the Collateral Agent may, in addition to the Forced Assignment of Collections and Contract Rights outlined above and to any other rights and remedies provided for herein or otherwise available to it, exercise all of the rights and remedies of a secured party upon default under the Law on Security over Moveable Assets, including the forced sale of the Costa Rican Collateral though Out of Court Enforcement.

(ii)      Appointment of Enforcement Agent. Upon registration of the Security Enforcement Form, the Collateral Agent may appoint a Costa Rican Notary Public or Costa Rican Trustee to serve as the person designated to enforce its security interest in the Costa Rican Collateral through the Out of Court Enforcement (the "**Enforcement Agent**"); it being understood and agreed that the Collateral Agent shall have no responsibility for or incur any liability in respect of any actions taken or not taken by any such Enforcement Agent.

(iii)      Within two (2) business days of being appointed as such, the Enforcement Agent shall be required to provide notice to the Grantor so that it can, within a term of five (5) business days after receiving such notice, provide documentation evidencing payment of all Secured Obligations ("**Full Performance**").

(iv)      If Full Performance is not properly evidenced at the end of such term, the Enforcement Agent may proceed with the forced sale or auction of the Collateral.

(v)      If the Enforcement Agent is instructed to proceed with the forced sale or auction of the Collateral, it shall publish a notice of sale in a Costa Rican newspaper of national circulation with at least 8 days' notice prior to the date of the sale or auction. Such notice must indicate the time, place and date of the sale as well as a brief description of the assets to be sold, a base price and parameters for additional base prices were they to be adjusted for auction. Written notice of the sale must also be provided to all interested parties which have a legal right over the Costa Rican Collateral in accordance to article 57 of the Law on Security over Moveable Assets.

(vi)      If the first auction is unsuccessful, the Enforcement Agent, at the direction of the Collateral Agent, may hold a second and up to a third auction. Such auctions may be held immediately after the first auction or at later dates that shall not be set at more than ten (10) business days after the immediately preceding auction. In each succeeding auction the Enforcement Agent will set lower base prices in accordance with the parameters established in the notice published before the first auction. If the third auction is unsuccessful, the Costa Rican Collateral will be awarded to the Collateral Agent as payment for the base price of the third auction.

(vii)      From the sale or auction, the Enforcement Agent will prepare an affidavit to be signed by the Enforcement Agent and the purchaser of the Costa Rican Collateral. Upon payment of the price in the sale or auction, the Enforcement Agent shall grant evidence of title to the purchaser. The transfer of title over the Collateral in the event of a forced sale or auction will be free of any liens established pursuant to this Agreement.

SECTION 10. <u>Notices, Etc.</u>  All notices and other communications provided for

hereunder shall be given in accordance with Section 8.3 of the Loan Agreement. For purposes of the registration of the Costa Rican Collateral, the notice addresses shall be as set out in the Notice of Registration of Costa Rican Collateral and may be adapted from time to time in accordance with Section 8.3 of the Loan Agreement.

SECTION 11. <u>Security Interest Absolute</u>.

(a)    All rights of the Secured Parties, all Liens and all obligations of each of the Grantor hereunder shall be absolute and unconditional irrespective of (i) any lack of validity or enforceability of the Loan Agreement or any other Credit Document, (ii) any change in the time, manner or place of payment of, or in any other term in respect of, all or any of the Secured Obligations, or any other amendment or waiver of or consent to any departure from the Loan Agreement or any other Credit Document, (iii) any exchange or release of, or non-perfection of any Lien on any Collateral, or any release or amendment or waiver of or consent to departure from any guaranty, for all or any of the Secured Obligations, (iv) any release of or consent to the departure of any Guarantor from the Loan Agreement or any other Credit Document or (v) any other circumstance that might otherwise constitute a defense available to, or a discharge of, the Grantor in respect of the Secured Obligations.  All authorizations and agencies contained herein with respect to any of the Collateral are irrevocable and powers coupled with an interest.

(b)    The Grantor hereby waives (i) promptness and diligence, (ii) notice of acceptance and notice of the incurrence of any Secured Obligation, (iii) notice of any actions taken by the Collateral Agent, any Lender, or any other Person under any Credit Document or any other agreement, document or instrument relating thereto, (iv) all other notices, demands and protests, and all other formalities of every kind in connection with the enforcement of the Secured Obligations, the omission of or delay in which, but for the provisions of this subsection (b), might constitute grounds for relieving the Grantor of any of the Grantor's obligations hereunder and (v) any requirement that any Agent or any Lender protect, secure, perfect or insure any security interest or other lien on any property subject thereto or exhaust any right or take any action against the Grantor or any other Person or any collateral.

SECTION 12. <u>Limited Recourse</u>.

(a)    Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Grantor's obligations under this Agreement shall be limited recourse obligations of the Grantor, with recourse against the Grantor being limited to the Collateral and the actual amount derived from the Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Grantor pursuant to the Administration Agreement) of the Grantor at such time available for application by or on behalf of the Grantor in making payments in accordance with this Agreement.  The parties hereby acknowledge and agree that the Grantor 's obligations under this Agreement are solely the corporate obligations of the Grantor, and that none of the officers, directors, shareholders or agents of the Grantor, any of its Affiliates or any other Person, other than the Guarantors, shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Grantor hereunder.  Without limitation of the obligations of the Guarantors under the Credit Documents, after the Grantor's

Collateral (including the proceeds of any contingent claims that are included in the Collateral, other than the ordinary share capital and any transaction fee charged by the Grantor pursuant to the Administration Agreement) is realized and exhausted, all sums due but still unpaid in respect of the Grantor's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Grantor and its liability hereunder, and the parties hereto shall not have the right to proceed against the Grantor or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets, it being agreed that the Guarantors shall remain liable for all of such obligations.

(b)     No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, liquidator, provisional liquidator or bankruptcy trustee or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under applicable Law in respect of the Grantor or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties; provided that nothing in this Section 12(b) shall prohibit or restrict the appointment of a Receiver and/or Delegate under and/or in accordance with and/or as contemplated by any provisions of the U.K. Account Charge.

(c)     The provisions of this Section 12 shall survive termination of this Agreement.

SECTION 13. Miscellaneous.

(a)     No amendment of any provision of this Agreement (including any Schedule attached hereto) shall be effective unless it is in writing and signed by the parties hereto, and no waiver of any provision of this Agreement, and no consent to any departure by the Grantor therefrom, shall be effective unless it is in writing and signed by the Collateral Agent, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

(b)     No failure on the part of the Collateral Agent (on behalf of the Secured Parties) or the Secured Parties to exercise, and no delay in exercising, any right hereunder or under any other Credit Document shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.  The rights and remedies of the Secured Parties provided herein and in the other Credit Documents are cumulative and are in addition to, and not exclusive of, any rights or remedies provided by law.  The rights of the Secured Parties under any Credit Document against any party thereto are not conditional or contingent on any attempt by such Person to exercise any of its rights under any other Credit Document against such party or against any other Person, including but not limited to, the Grantor.

(c)     This Agreement shall create a continuing security interest in the Collateral and shall (i) remain in full force and effect, subject to paragraph (e) below, until the Termination Date and (ii) be binding on the Grantor all other Persons who become bound as debtor to this Agreement in accordance with Section 9-203(d) of the Code, and shall inure,

together with all rights and remedies of the Secured Parties hereunder, to the benefit of the Secured Parties and their respective successors, transferees and assigns. Without limiting the generality of underline(clause (ii)) of the immediately preceding sentence, each Secured Party may assign or otherwise transfer its respective rights and obligations under this Agreement and any other Credit Document to any other Person pursuant to the terms of the Loan Agreement, and such other Person shall thereupon become vested with all of the benefits in respect thereof granted to the Secured Parties herein or otherwise. Upon any such assignment or transfer, all references in this Agreement to any Secured Party shall mean the assignee of any such Secured Party. None of the rights or obligations of the Grantor hereunder may be assigned or otherwise transferred without the prior written consent of the Collateral Agent, and any such assignment or transfer shall be null and void.

(d)      After the occurrence of the Termination Date, (i) subject to paragraph (e) below, this Agreement and the security interests and licenses created hereby shall terminate and all rights to the Collateral shall revert to the Grantor,  and (ii) the Collateral Agent will, upon the Grantor's request and at the Grantor's cost and expense, (A) request the cancelation of the registration of the security interest over the Costa Rican Collateral before the Moveable Asset Security System (B) promptly return to the Grantor (or whomsoever shall be lawfully entitled to receive the same or as a court of competent jurisdiction shall direct) such of the Collateral as shall not have been sold or otherwise disposed of or applied pursuant to the terms hereof, and (C) promptly execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such termination, without representation, warranty or recourse of any kind.  In addition, upon any sale or disposition of any item of Collateral in a transaction expressly permitted under the Loan Agreement, the Collateral Agent agrees to execute a release of its security interest in such item of Collateral, and the Collateral Agent shall, upon the reasonable written request of the Grantor and at the Grantor's cost and expense, execute and deliver to the Grantor such documents as the Grantor shall reasonably request to evidence such release, without representation, warranty or recourse of any kind.

(e)      This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment, or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

(f)      **THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).**

(g)    In addition to and without limitation of any of the foregoing, this Agreement shall be deemed to be a Credit Document and shall otherwise be subject to all of terms and conditions contained in Sections 8.5, 8.6, 8.7 and 8.9 of the Loan Agreement, *mutatis mutandi*.

(h)    Each party to this Agreement irrevocably consents to service of process in the manner provided for in Section 8.10 of the Loan Agreement. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

(i)    The Grantor irrevocably and unconditionally waives any right it may have to claim or recover in any legal action, suit or proceeding with respect to this Agreement any special, exemplary, punitive or consequential damages.

(j)    Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining portions hereof or affecting the validity or enforceability of such provision in any other jurisdiction.

(k)    Section headings herein are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose.

(l)    This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which shall be deemed an original, but all of such counterparts taken together shall constitute one and the same agreement. Delivery of an executed counterpart of this Agreement by facsimile or electronic mail shall be equally effective as delivery of an original executed counterpart.

(m)    Any reference to the Collateral Agent in this Agreement shall be construed as a reference to the Collateral Agent acting as agent for and on behalf of the Secured Parties and in accordance with the terms of the Loan Agreement, and in each case acting on instructions of Lenders given under the Loan Agreement. The Collateral Agent shall be entitled to all of the rights, benefits, privileges, protections and indemnities provided to it in the Loan Agreement as if specifically set forth herein.

**[REMAINDER OF THIS PAGE INTENTIONALLY LEFT BLANK]**

IN WITNESS WHEREOF, the Grantor and the Collateral Agent have caused this Agreement to be executed and delivered by their respective officers thereunto duly authorized, as of the date first above written.

USAVFLOW LIMITED, as Grantor

By: _____
    Name:
    Title:

Citibank, N.A. as Collateral Agent

By:_____
    Name:
    Title:


By:_____
    Name:
    Title:

## SCHEDULE I

### LEGAL NAME; JURISDICTION OF ORGANIZATION;
### TYPE OF ORGANIZATION; LOCATIONS

| Legal Name | Jurisdiction of Incorporation | Type of Company | Location of Principal Place of Business | Address where the Grantor keeps its Records concerning Accounts and all originals of all Chattel Paper, in each case, that relate to the Collateral. |
|---|---|---|---|---|
| USAVflow Limited | Cayman Islands | Exempted Company with Limited Liability | Offices of MaplesFS Limited<br><br>Queensgate House<br><br>Grand Cayman, KY1-1102<br><br>Cayman Islands | Offices of the Servicer<br><br>Centro Administrativo Avenida Calle 26 No. 59-15 Piso 10<br><br>Bogotá, D.C., Colombia<br><br>Attn: Vicepresidente Financiero |

<u>Exhibit A</u>
Form of Notice of Registration of Costa Rican Collateral

Information to be included by the Collateral Agent in the Security Registration Forms

**Lender Information**
*Name:* Citibank, N.A.
*Identification Type:* Corporate identification number.
*Identification Number:* 3-012-114186.
*Country of Residence:* Costa Rica.
*Address of Residence:* San José, Costa Rica.

**General Information**
*Initial Date:* <u>December 12, 2017</u>
*Termination Date:* <u>December 12, 2022</u>
*Country of Currency:* United States of America.
*Currency:* United States Dollars.
*Amount:* 150,000,000.00.
*Standard Interest:* <u>4.75%</u>
*Default Interest:* <u>6.75%</u>
*Maximum Guaranteed Amount:* 150,000,000.00.
*Execution (Judicial or Extrajudicial):* Extrajudicial.
*Observations:* <u>The standard and default interest rates are in addition to LIBOR, as defined in the Loan Agreement. Definition of interest to be paid is made in accordance to Section 2.5 of the Loan Agreement</u> and that clause will govern all matters related to the interest rate to be paid.
*Form of payment, payment schedule*: Payment will be made according to Section 2.4 of the Loan Agreement.
*Operation number:* N/A.

**Collateral**

*\*Type of Inclusion:* <u>Assignment of Economic Rights</u>.
*Observations:* <u>All of USAV Flow's rights over the (i) Contract Rights, (ii) the Receivables and (iii) the Collections arising out of the Credomatic Contract as well as all rights USAV flow may have as a secured party under the Costa Rican Back-Up Security Agreement</u>.

*\*Classification of Collateral:* <u>Accounts Receivable</u>.
*Description of Collateral:* <u>Credomatic Contract by and among Taca International Airlines S.A., Aerovias del Continente Americano, S.A. AVIANCA, and Bac International Bank Inc. dated as of June 10, 2015, as amended to this date</u>.
Costa Rican Back Up Security Agreement by and among Aerovias del Continente Americano, S.A. AVIANCA and USAVFLOW Limited, dated as of December 12, 2017, with registration number in the Moveable Asset Security System _____.

**Parties Associated to the Collateral**

*\*Borrower/Assignor:*
*Identification Type:* Corporate identification number.

*Identification Number:* 3-012-749743
*Name:* USAVFLOW LIMITED
*Country of Residence:* Cayman Islands
*Phone Number:* 40362800
*Email:* info@maplesfinance.com
*Address of Residence:* P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman, Cayman Islands.
*Other Information:* to contact via phone number, contact at the Cayman Islands phone number (345) 945-7099.
*Contractual Address:* Cayman Islands, P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman
*Exact Address:* P.O. Box 1093GT, Queensgate House, South Church Street, Georgetown, Grand Cayman, Cayman Islands
*Type of entity:* Assignor
*Economic Activity:* Commercial

**EXHIBIT G**
**FORM OF COMPLIANCE CERTIFICATE**

**HOLDINGS COMPLIANCE CERTIFICATE**

The undersigned, [OFFICER'S NAME], [TITLE] of AVIANCA HOLDINGS S.A., a company organized under the laws of Panama (the "**Company**") hereby certifies on behalf of the Company, pursuant to Section 5.6.3(b) of the Loan Agreement, dated as of December 12, 2017 (the "**Loan Agreement**"), by and among USAVFLOW LIMITED, as Borrower, the Company, as a guarantor, the other guarantors party thereto, the Lenders party thereto and Citibank, N.A., as Administrative Agent and Collateral Agent that:

1.      Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Loan Agreement.

2.      Attached hereto and set forth in reasonable detail are computations evidencing compliance with the covenants contained in Sections 5.8.2 and 5.8.3 of the Loan Agreement as of the date of the financial statements delivered herewith or for the relevant period provided in the Loan Agreement, as applicable. The information furnished in the calculations attached hereto was true, accurate, correct and complete as of the last day of such period and for such period, as the case may be.

3.      I reviewed the Loan Agreement and the Credit Documents and have made or caused to be made such investigations as are necessary or appropriate for the purposes of this certificate and hereby certify that:

(a)      each Obligor during such period has observed and performed all of the covenants and other agreements, and satisfied every condition contained in the Loan Agreement and the other Credit Documents to which it is a party to be observed, performed or satisfied by it [except as has heretofore been notified to the Administrative Agent by the Company in writing or except as described in Schedule [X] hereto];

(b)      the [quarterly] [annual] financial statements delivered to the Lenders and the Administrative Agent herewith were prepared in accordance with IFRS and fairly represent the financial position of the Company and its Subsidiaries as of the date hereof;

(c)      no event has occurred and is continuing that constitutes a Default or Event of Default [except as has heretofore been notified to the Administrative Agent by the Company in writing or except as described in Schedule [X] hereto];

(d)      the representations and warranties of the Company contained in the Loan Agreement or in any other Credit Document to which it is a party are true and correct in all respects (in the case of any representation or warranty qualified by materiality or Material Adverse Effect) or in all material respects (in the case of any representation or warranty not qualified by materiality or Material Adverse Effect) on and as of the date hereof (except those representations and warranties that address matters only as of a specified date, the accuracy of which shall be determined as of that specified date in all respects).

IN WITNESS WHEREOF, the undersigned has executed this Compliance Certificate on behalf of the Company as of this [DAY OF MONTH] day of [MONTH], [YEAR].

AVIANCA HOLDINGS S.A.

By:_____

Name:_____

Title:_____

**EXHIBIT H**
**NOTICE OF BORROWING**

Date: December __, 2017

To: Citibank, N.A., as Administrative Agent

Ladies and Gentlemen:

1.      Reference is made to that certain Loan Agreement to be entered into on or about December 12, 2017 (as amended, restated or otherwise modified from time to time, the "**Loan Agreement**"; terms defined therein, unless otherwise defined herein, being used herein as defined in the draft of the Loan Agreement attached hereto), among you, the other agents party thereto, the lenders party thereto, the guarantors party thereto and the undersigned.

2.      The undersigned hereby requests a borrowing of Loans on December __, 2017 (a Business Day) (the "**Borrowing Date**") in the amount of U.S. $150,000,000.

In the event of the failure to borrow a Loan from any Lender on the date specified herein (other than as a result of a default by the Lender), then, in any such event, the Borrower shall compensate such Lender for the actual losses, costs and expenses attributable to such event (excluding loss of anticipated margin or profit).  Such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest that would have accrued on the principal amount of the Loan had such event not occurred, at the interest rate that would have been applicable to the Loan, for the period from the date of such event to the last day of the then-current Interest Period therefor (or, in the case of a failure to borrow or continue, for the period that would have been the Interest Period for the Loan), over (ii) the amount of interest that would accrue on such principal amount for such period at the interest rate that such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the London interbank market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant hereto shall be delivered to the Borrower, with a copy to the Administrative Agent, and shall be conclusive absent manifest error.  The Borrower shall pay such Lender the amount shown due on any such certificate within 10 days after receipt thereof.

Very truly yours,

USAVflow Limited

By_____

Name:

Title:

**SCHEDULE 1.1**
**COMMITMENTS**

| Lender | Commitment |
|---|---|
| Deutsche Bank AG, London Branch | U.S.$ 33,500,000 |
| Banco de Credito del Peru, Miami Agency | U.S.$ 26,000,000 |
| First Citizens Bank Limited | U.S.$ 22,000,000 |
| BankUnited NA | U.S.$ 17,500,000 |
| Metrobank SA | U.S.$ 17,500,000 |
| Moneda Deuda Latinoamericana Fondo de Inversion | U.S.$ 13,000,000 |
| Moneda Latinoamerica Deuda Local Fondo de Inversion | U.S.$ 12,000,000 |
| Prival Bank, SA | U.S.$ 8,500,000 |
| Total: | U.S.$150,000,000 |

## SCHEDULE 4.1.8
## CORPORATE STRUCTURE OF THE GUARANTORS



Schedule 4.1.8

**SCHEDULE 5.12**
**PERMITTED LIENS**

| Mortgagor | Property | Mortgagee |
| --- | --- | --- |
| Taca Intl. Airlines | Corporate Office Building located at Av. El Espino entre Blvd. Sur y Calle El Almendro, Urbanizacion Madreselva, Antiguo Cuscatlan, El Salvador | BCIE |
| Avianca SA | Corporate Office Building located at Av. Calle 26 # 59-15 Bogota, Colombia | BANCO DE BOGOTA |

Schedule 5.12

AMERICAS 93498206

**SCHEDULE 8.3.3**
**APPLICABLE LENDING OFFICES AND ADDRESSES FOR NOTICES**

| Institution Name | Banco de Crédito del Perú, Miami Agency |
|---|---|
| **Admin/Operations Matters Contact** | **Primary**<br>Cecilia Recinos<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 33134<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: crecinos@bcpmiami.com<br><br>**Secondary**<br>Rosa Bardelas<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 15074<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: rbarderlas@bcpmiami.com |
| **Disclosure Contact** | Paola Cueva<br>121 Alhambra Plaza, Suite 1200<br>Coral Gables<br>Miami, FL 33134<br>Country: USA<br>Tel: 305-448-0971<br>E-mail: pcueva@bcpmiami.com |
| **Routing Instruction** | **Correspondent Bank Name**: Standard Chartered Bank<br>**ABA/CHIPS #**: 026002561<br>**Account Name**: Banco de Credito del Peru Miami Agency<br>**Account#**: 3544031768002<br>**Reference**: Avianca Holdings SA<br>**Attention**: Credit Services Department |

Schedule 8.3.3

| Institution Name | Metrobank, S.A. |
|---|---|
| Admin/Operations Matters Contact | **Primary**<br>María José Orozco<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-204-9138<br>Fax: 507-204-9001<br>E-mail: maria.orozco@metrobanksa.com<br><br>**Secondary**<br>María Luisa Muñoz<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-831-2429<br>Fax: 507-204-9001<br>E-mail: marialuisa.munoz@metrobanksa.com |
| Disclosure Contact | Lil Patricia Vásquez<br>Calle Isaac Hanono Missri, Torre<br>Metrobank, Piso 4, Punta Pacífica<br>Panama City, Panama 0816-02041<br>Country: Panama<br>Tel: 507-204-9103<br>Fax: 507-204-9001<br>E-mail: lilpatricia.vasquez@metrobanksa.com |
| Routing Instruction | **Correspondent Bank Name**: The Bank of New York<br>225 Liberty Street<br>New York, NY 10286<br>**Swift**: IRVTUS3N    / Swift: METOPAPA<br>**ABA/CHIPS #**: 021000018<br>**Account Name**: Metrobank, S.A.   Panama City,  Panama<br>**Account#**: 8901331848<br>**Benef. Acct. Name**: Transitoria Depto. Préstamos<br>**Benef. Acct. #**: 2230370100020000<br>**Reference**: Avianca<br>**Attention**: Lil Patricia Vásquez |

Schedule 8.3.3

| Institution Name | Deutsche Bank AG, London Branch |
|---|---|
| **Admin/Operations Matters Contact** | **Primary**<br>2, Boulevard Konrad Adenauer<br>1115<br>Country: Luxembourg<br>E-mail: loan.admin-uk@db.com |
| **Disclosure Contact** | Joaquin Arias / Rodrigo Nonaka<br>60 Wall Street<br>New York, NY 10005<br>Country: USA<br>Tel:+1 (212) 250-3653<br>E-mail: joaquin.arias@db.com / rodrigo.nonaka@db.com |
| **Routing Instruction** | New York, NY 10005<br>**ABA/CHIPS #**: 021-001-033, Chips ABA 0103, Chips UID 096804<br>**Account Name**: Deutsche Bank Trust Co Americas<br>**Account#**: 04-411-739<br>**Benef. Acct. Name:** Deutsche Bank, London Branch<br>**Benef. Acct. #:** Deutsche Bank, London Branch |

Schedule 8.3.3

AMERICAS 93498206

| Institution Name | BankUnited, NA |
|---|---|
| **Admin/Operations Matters Contact** | **<u>Primary</u>**<br>Maria Ledesma<br>7815 NW 148th Street – 2-CMMLO-6802<br>Miami Lakes, Florida 33016<br>Country: USA<br>Tel: 305-569-2039<br>Fax: 877-208-8066<br>E-mail: mledesma@bankunited.com<br><br>**<u>Secondary</u>**<br>7815 NW 148th Street – 2-CMMLO-6802<br>Miami Lakes, Florida 33016<br>Country: USA<br>Tel: 305-461-6847<br>Fax: 877-208-8066<br>E-mail: srodriguez@bankunited.com |
| **Routing Instruction** | **Correspondent Bank Name**: BankUnited<br>                                    7815 NW 148th Street – 2-CMMLO-6802<br>                                    Miami Lakes FL 33016<br>**ABA/CHIPS #**: 267 090 594<br>**Account Name**: Loan Payment in Process<br>**Account#**: 09998-134028<br>**Reference**: Loan Name and Account number |

Schedule 8.3.3

| | |
|---|---|
| **Institution Name** | First Citizens Bank Limited |
| **Admin/Operations Matters Contact** | **Primary**<br>Jo-anne Ward<br>9 Queen's Park East<br>Port of Spain<br>Country: Trinidad<br>Tel: (1) 868 624 3178 ext. 3025<br>Fax: (1) 868-624-0818<br>E-mail: jo-anne.ward@firstcitizenstt.com<br><br>**Secondary**<br>Marilyn Pahal-Prince<br>9 Queen's Park East<br>Port of Spain<br>Country: Trinidad<br>Tel: (1) 868 624 3178 ext. 3028<br>Fax: (1) 868-624-0818<br>E-mail: marilyn.pahal@firstcitizenstt.com |
| **Disclosure Contact** | Felipe Castro<br>Oficentro Eurocenter Diursa<br>Heredia<br>Country: Costa Rica<br>Tel: +506-2239-5581 (Office)<br>     +506-8708-7285 (Mobile)<br>Fax:+506-2239-5860<br>E-mail: felipe.castro@firstcitizenstt.com |
| **Routing Instruction** | **Correspondent Bank Name**: Wells Fargo Bank NA<br>                              Philadelphia, Pennsylvania 19101-3866<br>**ABA/CHIPS #**: 026 005 092<br>**Benef. Acct. Name**: First Citizens Bank Limited<br>**Benef. Acct. #**: 2000090600010<br>**Reference**: Avianca<br>**Attention**: Cibu – Dereck Ramlal |

Schedule 8.3.3

| | |
|---|---|
| **Institution Name** | Moneda Deuda Latinoamericana<br>Fondo de Inversión |
| **Admin/Operations Matters Contact** | **<u>Primary</u>**<br>Natalia Martinez<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-2337-7929<br>E-mail: Funds-MO@moneda.cl<br><br>**<u>Secondary</u>**<br>Susana San Martin<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-29280-288<br>E-mail: Funds-MO@moneda.cl |
| **Disclosure Contact** | Martin Cipriani<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +56223377929<br>E-mail: Funds-MO@moneda.cl |
| **Routing Instruction** | **Correspondent Bank Name**: JP Morgan Chase<br>New York, NY<br>**ABA/CHIPS #**: 021000021<br>**Account Name**: JPM Securities LLC<br>**Account#**: 066001633<br>**Benef. Acct. Name:** Moneda Deuda<br>Latinoamericana FI<br>**Benef. Acct. #:** 102-21946 |

Schedule 8.3.3

| Institution Name | Moneda Latinoamericana Deuda Local Fondo de Inversión |
| --- | --- |
| Admin/Operations Matters Contact | **Primary**<br>Natalia Martinez<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-2337-7929<br>E-mail: Funds-MO@moneda.cl<br><br>**Secondary**<br>Susana San Martin<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +562-29280-288<br>E-mail: Funds-MO@moneda.cl |
| Disclosure Contact | Martin Cipriani<br>Isidora Goyenechea 3621 piso 8<br>Las Condes<br>Santiago, RM<br>Country: Chile<br>Tel: +56223377929<br>E-mail: Funds-MO@moneda.cl |
| Routing Instruction | **Correspondent Bank Name**: JP Morgan Chase<br>New York, NY<br>**ABA/CHIPS #**: 021000021<br>**Account Name**: JPM Securities LLC<br>**Account#**: 066001633<br>**Benef. Acct. Name:** Moneda Latinoamericana Deuda Local FI<br>**Benef. Acct. #:** 102-39884 |

Schedule 8.3.3

| | |
|---|---|
| **Institution Name** | Prival Bank, S.A. |
| **Admin/Operations Matters Contact** | **<u>Primary</u>**<br>Magda Mendoza<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1932 / 507-303-1900<br>E-mail: mmendoza@prival.com<br><br>**<u>Secondary</u>**<br>Eva Duarte<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1932 / 507-303-1900<br>E-mail: eduarte@prival.com |
| **Disclosure Contact** | Vilma Durling<br>Calle 50 y 71 San Francisco<br>Panama, Panama 0832-00396<br>Country Panama<br>Tel: 507-303-1966 / 507-303-1900<br>E-mail: vduling@prival.com |
| **Routing Instruction** | **Correspondent Bank Name**: Deustsche Bank Trust Company Americas<br>New York, NY<br>**ABA/CHIPS #**: 021001033<br>**Account Name**: Prival Bank, S.A.<br>**Account#**: 04453509<br>Reference: USAVflow Limited / Prestamo Sindicado<br>Attention: Vilma Durling / Magda Mendoza |

Schedule 8.3.3

**EXHIBIT C**

EXECUTION VERSION

**Dated 12/12/2017**

# Cash Management Agreement

among

## Aerovías del Continente Americano S.A. Avianca

as the Seller and the Servicer

## USAVflow Limited

as the Purchaser

and

## Citibank, N.A.

as the Administrative Agent

and

## Citibank, N.A.,

as Collateral Agent

White & Case LLP
1221 Avenue of the Americas
New York, New York 10020

AMERICAS 93591607

# Table of Contents

**Page**

Article I Definitions and interpretation ........................................................................................ 1
Section 1.01    Definitions ........................................................................................................ 1
Section 1.02    Other Interpretive Provisions ......................................................................... 11

Article II Priority of Payments, Calculations and Notices .............................................................. 12
Section 2.01    Standard Daily Priority of Payments ............................................................... 12
Section 2.02    Standard Payment Date Priority of Payments ................................................. 13
Section 2.03    Adjustment Event Priority of Payments .......................................................... 14
Section 2.04    Trigger Event Priority of Payments ................................................................ 15
Section 2.05    Payments to the Purchaser .............................................................................. 15
Section 2.06    LIBOR, Debt Service Collections and Other Reports ...................................... 15
Section 2.07    Determination of Amounts Due the Parties ..................................................... 16
Section 2.08    Notice of Break Costs ..................................................................................... 17
Section 2.09    Notice of Retention Events, Adjustment Events and Trigger Events .............. 17
Section 2.10    Disbursements from Debt Service Reserve Account ....................................... 17
Section 2.11    Payments upon Discharge of Purchaser Financing .......................................... 18

Article III Miscellaneous .............................................................................................................. 18
Section 3.01    Rights Confined to Parties ............................................................................... 18
Section 3.02    Amendment or Waiver .................................................................................... 18
Section 3.03    Binding Upon Assigns .................................................................................... 18
Section 3.04    Waiver of Immunity ....................................................................................... 18
Section 3.05    Notices ............................................................................................................ 19
Section 3.06    Construction .................................................................................................... 20
Section 3.07    Severability ..................................................................................................... 20
Section 3.08    Law and Jurisdiction. ...................................................................................... 20
Section 3.09    Use of English Language ................................................................................ 21
Section 3.10    Currency .......................................................................................................... 21
Section 3.11    Counterparts .................................................................................................... 21
Section 3.12    Limited Recourse ............................................................................................ 21
Section 3.13    Indemnities ...................................................................................................... 21
Section 3.14    Patriot Act ....................................................................................................... 22
Section 3.15    Acknowledgement and Consent to Bail-In of EEA Financial Institutions ...... 22
Section 3.16    Rights of the Agents ........................................................................................ 23
Section 3.17    Service of Process ........................................................................................... 23

Exhibit A    Form of Notice

## CASH MANAGEMENT AGREEMENT

**THIS CASH MANAGEMENT AGREEMENT**, dated December 12, 2017 (this "<u>Agreement</u>"), is made by and among **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Seller (the "<u>Seller</u>"), **USAVflow LIMITED**, an exempted company incorporated in the Cayman Islands with limited liability (the "<u>Purchaser</u>"), **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the Servicer, and **CITIBANK, N.A.**, as the Administrative Agent (together with its successors in such capacity, the "<u>Administrative Agent</u>") and **CITIBANK, N.A.**, as the Collateral Agent (together with its successors in such capacity, the "<u>Collateral Agent</u>" and, together with the Seller, the Purchaser, the Servicer and the Administrative Agent, the "<u>Parties</u>" and each, individually, a "<u>Party</u>").

## R E C I T A L S:

The Seller is engaged in the business of air transportation of passengers and cargo and related services and provides its customers with the means of purchasing its goods and services through the use of Cards by having in place Card Processing Agreements with Card Processors. Such agreements provide for the processing of payments on behalf of the Seller of the goods and services that are purchased through the use of Cards;

The Seller, the Purchaser and the Servicer have entered into that certain Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of the date hereof (the "<u>RSPA</u>") pursuant to which the Seller sold and transferred certain Contract Rights and Receivables (each as defined therein) under the Card Processing Agreements to the Purchaser; and

Pursuant to the terms of the RSPA, the Seller, the Purchaser and the Servicer have agreed to enter into this Agreement;

**NOW, THEREFORE**, in consideration of the mutual covenants and premises herein contained, the Parties hereby agree as follows:

## ARTICLE I
## DEFINITIONS AND INTERPRETATION

**Section 1.01**    **Definitions**.  Except as otherwise provided herein, capitalized terms used herein (including in the foregoing Recitals) and not otherwise defined herein shall have the following meanings:

"<u>Account Control Agreement</u>" means that certain Deposit Account Control Agreement, to be dated on or about the date hereof, among the Purchaser, the U.S. Account Bank and the Collateral Agent.

"<u>Additional Card Processing Agreement</u>" means a Card Processing Agreement that is the subject of any Contract Rights and Receivables Addition.

"<u>Additional Card Processor</u>" means each Person who enters into a Notice and Consent with the Seller in connection with a Contract Rights and Receivables Addition.

"<u>Additional Purchase Price</u>" means, with respect to each Interest Period, the amount, if any, by which the Monthly Net Activity Amount for such Interest Period exceeds the amount that will be required to be retained in the Collections Account or the Debt Service Reserve Account or disbursed from the Collections Account to Persons other than the Seller pursuant to Sections 2.01, 2.02, 2.03 and 2.04 with respect to such Interest Period.

"<u>Adjustment Event</u>" means:

(a)        a Retention Event that has continued for three consecutive months;

(b)        any default, early amortization event or similar event shall occur with respect to any Indebtedness of the Seller or the Servicer, Holdings or any Specified Subsidiary that exceeds in aggregate U.S. $20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) if the effect thereof is to accelerate the maturity thereof, or to permit the holder(s) of such Indebtedness, or an agent or trustee on its or their behalf, to accelerate the maturity thereof or to require the mandatory prepayment, defeasance or redemption thereof; or

(c)        any final judgment or decree by a court or other adjudicatory authority of competent jurisdiction (not subject to appeal) for the payment of money in excess of U.S. $20,000,000 (including the Dollar equivalent of Indebtedness in any other currency) is entered against the Seller or the Servicer, Holdings or any Specified Subsidiary and remains outstanding for a period of 30 days following such final judgment and is not discharged, waived or stayed.

"Adjustment Event Payment Date" has the meaning specified in Section 2.03 hereof.

"Adjustment Event Priority of Payments" means the priority of payments set forth in Section 2.03.

"Administration Agreement" means the administration agreement dated the date hereof entered into between the Borrower and the Administrator.

"Administrator" means MaplesFS Limited.

"Administrative Agent" has the meaning specified in the introductory paragraph hereof.

"Administrative Agent's Account" means the account maintained at Citibank, N.A., New York, New York USA, ABA No. 02100089, SWIFT: CITIUS33, Account No. 36852248, Account Name: Medium Term Finance, Ref: Avianca, or such other account as from time to time may be designated by the Administrative Agent to the Borrower in writing.

"Advance Payment" means the amount of U.S. $150,000,000, which is due and payable by the Purchaser to the Seller on the Effective Date, as provided in Section 3.01(a)(i) of the RSPA, on account of the Transfer and Sale of the Contract Rights and the Receivables.

"Affiliate" means (i) with respect to the Seller and Holdings means any Subsidiary of Holdings, and (ii) with respect to any other Person that, directly or indirectly, controls or is controlled by, or is under common control with, such Person.  For purposes of this definition, the term "control" (including the terms "controlling," "controlled by," and "under common control with") as used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise.

"Agent Amounts Due" means all unpaid Agent Fees Due and all other fees, expenses and indemnities incurred by or claimed by the Agents, the Collateral Trustee, any Receiver and any Delegate and subject to reimbursement to, or required to be paid to, the Agents, the Collateral Trustee, any Receiver and any Delegate under, or in connection with, any Credit Document as have been notified in writing to the Administrative Agent at least two Business Days prior to the applicable date of payment.

"Agent Fees Due" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Agents" means the Administrative Agent and the Collateral Agent.

"AMEX" means American Express Travel Related Services Company, Inc. and American Express Payment Services Limited.

"AMEX Contract" has the meaning assigned to such term in the RSPA.

"AMEX Notice and Consent" means the written agreement, dated as of, or on or about, the date hereof, among the Seller, AMEX, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit A to the Purchaser Credit Agreement, pursuant to which (i) the transfer of the Contract Rights from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce; and (ii) pursuant to New York law notice of such transfer will be given to, and such transfer will be consented to by, AMEX.

"Applicable Law" means any applicable statute, law, regulation, ordinance, rule, judgment, rule of common law, order, decree, approval, concession, grant, franchise, license, agreement, directive, guideline, policy, requirement, or other governmental restriction or any similar form of decision of, or determination by (or any interpretation or administration of any of the foregoing by), any Governmental Authority, whether in effect as of the date hereof or hereafter.

"ARC" means Airlines Reporting Corporation or any successor or replacement thereof.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time which is described in the EU Bail-In Legislation Schedule.

"Break Costs" means the amount (if any), of break funding payments as notified to the Administrative Agent with a copy to the Collateral Agent by any Lenders pursuant to Section 2.10 of the Purchaser Credit Agreement.

"Business Day" means a day (other than Saturday or Sunday) on which commercial banks are not authorized or required to close in (i) London, United Kingdom, (ii) New York City, New York, or (iii) Bogotá, D.C., Colombia.

"Capital Lease Obligations" means an obligation that is required to be classified and accounted for as a capital lease for financial reporting purposes in accordance with IFRS, and the amount of Indebtedness represented by such obligation shall be the capitalized amount of such obligation determined in accordance with IFRS; and the stated maturity thereof shall be the date of the last payment of rent or other amount due under such lease prior to the first date upon which lease may be terminated by the lessee without payment of penalty.

"Card Processing Agreements" means the Credomatic Contract, the AMEX Contract, and each Additional Card Processing Agreement.

"Card Processors" means Credomatic, AMEX, and each Additional Card Processor.

"Cards" means credit, debit, charge and ATM cards under which cardholders purchase goods and services of the Seller and its Affiliates.

"Collateral Agent" has the meaning specified in the introductory paragraph hereof.

"Collateral Trustee" means Citibank, N.A. London Branch, or any successor, as collateral trustee for the Lenders.

3

"Collections" means all cash collections and other cash proceeds derived from the Contract Rights or the Receivables, whether received by the Seller, the Purchaser, or any other Person.

"Collections Account" means the Dollar deposit account with account number GB91CITI18500818821135 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Collections Coverage Ratio" means the ratio, as calculated by the Administrative Agent on the second Business Day after each Payment Date, of (a) the amount of Collections deposited in the Collections Account during the immediately preceding Interest Period ending on such Payment Date to (b) the sum of the Interest Amount plus the Principal Payment Amount payable on the next succeeding Payment Date.

"Colombian Back-Up Security Agreement" means that certain Pledge over Contract Rights and Future Revenues (*Contrato de Prenda sobre Derechos Contractuales e Ingresos Futuros*), to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time) between the Seller and the Purchaser.

"Contract Rights" means the contract rights of the Seller under the Card Processing Agreements to (i) receive any kind of payments, indemnities or economic compensations derived therefrom on account of Specified Sales, including the right, among other things, to receive all future Collections derived therefrom; and (ii) to enforce the rights referred to in (i) against the respective Card Processors thereunder.  For the avoidance of doubt, the Contract Rights shall not include (a) any obligation or liability of the Seller under the Card Processing Agreements or arising in any manner therefrom; or (b) the rights of the Seller:

      (a)      to honor Cards or conduct any Card sale as payment for travel costs or otherwise, or to request authorization to honor Cards;

      (b)      to submit Sales Slips for billing or issue credit slips in any manner provided by the applicable Card Processing Agreement;

      (c)      to request, to treat or to have access to confidential information pertaining to cardholder account information;

      (d)      to request or receive a restricted card list pursuant to the relevant Card Processing Agreement;

      (e)      to grant consent to a Card Processor to display or show the trademarks, logos or company names of the Seller in promotion, advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

      (f)      to use trademarks and service marks of a card association in its advertising, press releases or otherwise pursuant to the applicable Card Processing Agreement;

      (g)      to handle all claims or complaints by a cardholder with respect to Card transactions;

      (h)      to receive documentation from a Card Processor that is required in connection with the defense of any claim of a cardholder asserted in connection with the applicable Card Processing Agreement; or

      (i)      to receive any Collections derived from sales which are not Specified Sales.

4

"Contract Rights and Receivables Addition" has the meaning specified in Section 2.03(b) of the RSPA.

"Contract Rights and Receivables Addition Date" means the date on which any Contract Rights and Receivables Addition is completed pursuant to Section 2.03 of the RSPA.

"Costa Rican Assignment Agreement" means that certain Costa Rican law governed RSPA Assignment Agreement, dated as of the date hereof, between the Seller and the Purchaser, substantially in the form of Exhibit E to the RSPA.

"Costa Rican Back-Up Security Agreement" means that certain Costa Rican Back-Up Security Agreement, to be dated on or about the date hereof (as amended, amended and restated, supplemented or otherwise modified from time to time) between the Seller and the Purchaser.

"Credit Documents" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Credomatic" means BAC International Bank, Inc. and its Subsidiaries.

"Credomatic Contract" has the meaning assigned to such term in the RSPA.

"Credomatic Notice and Consent" means, collectively, one or more written agreements, instruments, or other documents dated as of, or on or about, the date hereof among the Seller, Credomatic, the Purchaser, the Collateral Agent and the other parties thereto, substantially in the form of Exhibit B to the Purchaser Credit Agreement, pursuant to which (i) the transfer of the Contract Rights under the Credomatic Contract from the Seller to Purchaser will be perfected as provided under Article 887 et. seq. of the Colombian Code of Commerce; and (ii) pursuant to Costa Rican and Florida law notice of such transfer will be given to, and consented to by, Credomatic.

"Daily Payment Date" has the meaning specified in Section 2.01 hereof.

"Debt Service Reserve Account" means the Dollar deposit account with account number GB69CITI18500818821143 established and maintained by the Purchaser at the U.K. Account Bank in London, England, or any successor or replacement account, which account will be under the control of the Collateral Trustee pursuant to the U.K. Account Charge.

"Debt Service Required Amount" has the meaning assigned to such term in the Purchaser Credit Agreement.

"Delegate" has the meaning assigned to such term in the Security Trust Deed.

"Dollars" and "$" mean lawful money of the United States.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent.

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"<u>Effective Date</u>" means the date first set forth above.

"<u>EU Bail-In Legislation Schedule</u>" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"<u>Expenses Agreement</u>" means the Expenses Agreement dated December 12, 2017, between the Purchaser and the Seller, providing for the Seller to pay certain fees to the Purchaser and to pay various fees and expenses incurred by or payable to the Purchaser, Maples and Calder, and MaplesFS Limited, including all costs, fees and expenses incurred by the Purchaser and any other person contracted to provide services in relation to the Contract Rights and the Receivables, and other fees and expenses in connection with the organization, maintenance, and business of the Purchaser.

"<u>Governmental Authority</u>" means any national, state or local government or any agency, department, ministry, authority, regulatory authority, statutory corporation or other statutory body or juridical entity of any government or any political subdivision thereof or therein, now existing or hereafter created.

"<u>Guarantee</u>" means any obligation, contingent or otherwise, of any Person directly or indirectly guaranteeing any Indebtedness of any other Person and any obligation, direct or indirect, contingent or otherwise, of such other Person (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness (whether arising by virtue of partnership arrangements or by agreements to keep-well, to purchase assets, goods, securities or services, to take-or-pay or to maintain financial statement conditions or otherwise), or (b) entered into for the purpose of assuring in any other manner the obligee of such Indebtedness of the payment thereof or to protect such obligee against loss in respect thereof (in whole or in part); provided, however, that the term "<u>Guarantee</u>" shall not include endorsements for collection or deposit in the ordinary course of business. The term "<u>Guarantee</u>" used as a verb has a corresponding meaning.

"<u>Hedging Obligations</u>" of any Person means the obligations of such Person pursuant to any interest rate swap, currency swap, credit default swap or other derivative transaction (where the primary purpose is to hedge or minimize some business, interest, currency or credit risk).

"<u>Holdings</u>" means Avianca Holdings S.A., a Panamanian company.

"<u>Indebtedness</u>" means with respect to any Person on any date of determination (without duplication):

      (a)     the principal in respect of (i) indebtedness of such Person for money borrowed and (ii) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable, including, in each case, any premium on such indebtedness to the extent such premium has become due and payable;

      (b)     all Capital Lease Obligations of such Person;

      (c)     all obligations of such Person issued or assumed as the deferred purchase price of property, all conditional sale obligations of such Person and all obligations of such Person under any title retention agreement (but excluding trade accounts payable arising in the ordinary course of business and other monetary obligations to trade creditors existing on the Effective Date);

      (d)     all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction (other than obligations with respect to letters of credit securing obligations (other than obligations described in clauses (a) through (c) above) entered into in the ordinary course of business of such Person to the extent such letters of

6

credit are not drawn upon or, if and to the extent drawn upon, such drawing is reimbursed no later than the 20th Business Day following payment on the letter of credit);

(e)        the amount of all obligations of such Person with respect to the redemption, repayment or other repurchase of any capital stock or, with respect to any Subsidiary of such Person, the liquidation preference with respect to any capital stock (but excluding, in each case, any accrued dividends);

(f)        all obligations of the type referred to in clauses (a) through (e) of other Persons and all dividends of other Persons for the payment of which, in either case, such Person is responsible or liable, directly or indirectly, as obligor, guarantor or otherwise, including by means of any Guarantee;

(g)        all obligations of the type referred to in clauses (a) through (f) of other Persons secured by any Lien on any property or asset of such Person (solely if such obligation is not assumed by such Person), the amount of such obligation being deemed to be the lesser of the value of such property or assets or the amount of the obligation so secured; and

(h)        to the extent not otherwise included in this definition, Hedging Obligations of such Person.

The amount of Indebtedness of any Person at any date shall be the outstanding balance at such date of all unconditional obligations as described above and the maximum liability, upon the occurrence of the contingency giving rise to the obligation, of any contingent obligations at such date; provided, however, that (i) the amount outstanding at any time of any Indebtedness issued with original issue discount is the amount of the liability in respect thereof determined in accordance with IFRS and (ii) Indebtedness shall not include any liability for foreign, federal, state, local or other taxes.

"Indemnified Person" has the meaning specified in Section 3.13(a).

"Interest Accrued" means accrued and unpaid interest on the principal amount of the Loan being repaid, which amount is calculated by the Administrative Agent pursuant to Section 2.5 of the Purchaser Credit Agreement.

"Interest Amount" has the meaning set forth in Section 2.5.1 of the Purchaser Credit Agreement.

"Interest Period" has the meaning set forth in Section 2.5.2 of the Purchaser Credit Agreement.

"Lender" has the meaning set forth in the Purchaser Credit Agreement.

"LIBOR" has the meaning set forth in Section 2.5.3 of the Purchaser Credit Agreement.

"Lien" means any *caución* (as defined in the Colombian Civil Code), *garantía mobiliaria*, lien, security interest, hypothecation, assignment, pledge, mortgage, deed of trust, or other charge, encumbrance, or claim of any kind, including any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any lease or other conveyance in the nature thereof, having substantially the same economic effect as any of the foregoing and any filing of or agreement to give any public notice under any Applicable Law of any jurisdiction to evidence any of the foregoing.

"Liquidated Damages" has the meaning specified in Section 6.02 of the RSPA.

"Loan" has the meaning set forth in the Purchaser Credit Agreement.

"Loss" means any liability, damages, cost, loss or expense (including legal fees, costs and expenses and any value-added tax thereon) related to, or arising from, the inaccuracy or alleged

inaccuracy of any representation and warranty made by the Seller or Servicer under the RSPA or under the other Transaction Documents or any breach, or alleged breach, by the Seller or Servicer of any of its undertakings in the RSPA or any of the Transaction Documents or the occurrence of any Trigger Event or Adjustment Event, or otherwise as a result of the transactions contemplated hereby, including in pursuant to the Purchaser Finance Documents.

"Monthly Amortization" means, with respect to each Interest Period, the sum of the amounts that will be required to be disbursed pursuant to Section 2.02(a)(i), (b), and (c) for such Interest Period.

"Monthly Net Activity Amount" means, with respect to any Interest Period, the sum of all Collections paid to the Collections Account in such Interest Period on account of Net Activity with respect to the Receivables or Contract Rights.

"Net Activity" means with respect to any Card Processor and the applicable Contract Rights in respect of any Card Processing Agreement, on any day or during any period, the total net amount that is payable to the Purchaser, which amount shall be equal to the sum of the total face value of all charges made by holders of Cards processed under such Card Processing Agreement relating to the Contract Rights in such period, minus all discounts, credits, and other amounts deducted by such Card Processor from the amounts due to the Purchaser on such day or during such period under such Card Processing Agreement pursuant to such Card Processing Agreement.

"New York Pass-Through Account" means the Dollar deposit account with account number 11925000 established and maintained by the Purchaser at the U.S. Account Bank in New York, New York, or any successor or replacement account, which account will be under the control of the Collateral Agent pursuant to the Account Control Agreement.

"Notice and Consents" means, collectively, the Credomatic Notice and Consent, the AMEX Notice and Consent and each Supplemental Notice and Consent.

"Notice Party" means the Administrative Agent (in accordance with Section 2.09(b) hereof or acting at the direction of any Lender), the Purchaser, the Seller, the Servicer or any Lender.

"Party" has the meaning specified in the introduction to this Agreement.

"Payment Date" has the meaning assigned to such term in Section 2.5.1 of the Purchaser Credit Agreement.

"Person" means any legal person or entity, including any individual, partnership, joint venture, corporation, association, joint-stock company, trust, limited liability company, limited liability partnership, unincorporated organization, governmental entity or other entity of similar nature.

"Principal Payment Amount" has the meaning set forth in the Purchaser Credit Agreement.

"Priority of Payments" means the Standard Daily Priority of Payments, the Standard Payment Date Priority of Payments, the Adjustment Event Priority of Payments or the Trigger Event Priority of Payments, as the context may require.

"Process Agent" means National Registered Agents, Inc., 111 Eighth Avenue, New York, NY 10011.

"Purchaser" has the meaning specified in the introductory paragraph hereof.

"Purchaser Credit Agreement" means that certain Loan Agreement, dated as of the date hereof, among the Purchaser, as borrower, the guarantors party thereto, the Administrative Agent, the Collateral Agent and the lenders party thereto from time to time.

"Purchaser Finance Documents" means the Purchaser Credit Agreement, all Credit Documents (as defined in the Purchaser Credit Agreement) and all other documents and instruments executed and/or delivered in connection therewith.

"Purchaser Finance Parties" means the Person(s), including, but not limited to, the Administrative Agent, the Collateral Agent, the Collateral Trustee, any Receiver, any Delegate and any Lender, from time to time (i) providing Purchaser Financing, (ii) arranging Purchaser Financing, or (iii) acting as an agent with respect to Purchaser Financing.

"Purchaser Financing" means the financing arrangements, including the Purchaser Credit Agreement, which may be in the form of a loan, note or bond, pursuant to which the Purchaser funds or refinances from time to time the Advance Payment paid to the Seller under the RSPA.

"Receivables" means any and all Collections accrued under the Card Processing Agreements that are due on account of Specified Sales from (a) AMEX or Credomatic to the Seller immediately prior to giving effect to the RSPA on the Effective Date (and due to the Purchaser immediately upon giving effect to the RSPA on the Effective Date) and (b) each Additional Card Processor to the Seller immediately prior to giving effect to the RSPA and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date (and due to the Purchaser immediately upon giving effect to the RSPA and the applicable Notice and Consent on the applicable Contract Rights and Receivables Addition Date).

"Receiver" has the meaning assigned to such term in the U.K. Account Charge.

"Related Party" means, in respect of any Person, any Affiliate of that Person or any officer, director, employee, advisors or agent of that Person or any such Affiliate or any Person by whom any of them is controlled.

"Required Lenders" has the meaning specified in the Purchaser Credit Agreement.

"Retention Event" means the Collections Coverage Ratio is less than 2.5:1.0 on any date of determination.

"RSPA" has the meaning specified in the introductory paragraph hereof.

"RSPA Security Documents" means the Colombian Back-Up Security Agreement, the Costa Rican Back-Up Security Agreement, all additional security documents as might be required for any necessary Contract Rights and Receivables Addition and all other documents, instruments and filings to be executed and delivered by the Seller and/or the Purchaser, in connection with such agreements and the transactions contemplated thereby.

"Sale" means the transaction occurring on account of the Seller's selling, assigning, and transferring to the Purchaser the Receivables under the RSPA.

"Sales Slip" means a sales slip under a Card evidencing a payment obligation of the holder of the Card in respect of goods or services purchased by such holder using such Card.

"Security Trust Deed" means the Security Trust Deed to be entered into on or about the date hereof among the Lenders, the Collateral Trustee and the Borrower.

"Seller" has the meaning specified in the introductory paragraph hereof.

"Seller's Account" means account of the Seller no. 964258057 maintained at JPMORGAN CHASE BANK, N.A., ABA No. 021000021; Reference: Aerovías del Continente Americano S.A. Avianca.

"<u>Servicer</u>" means, initially, the Seller, in its capacity as the Servicer under the Undertaking Agreement, and, thereafter, its successors and permitted assigns and designees appointed in accordance with the terms of the Undertaking Agreement to carry out the duties and responsibilities provided in Article III of the Undertaking Agreement.

"<u>Specified Sales</u>" means the sales, including future sales, made by travel agencies in the United States and cleared through ARC of airline tickets or related services provided by the Seller where payment in the case of any such sale is made by a MasterCard® Card, Visa® Card, or American Express® Card, however branded, or any one or more of such Cards, including all such sales identified by those certain merchant codes set forth in any Notice and Consent or any notice given by a Card Processor to the Purchaser and the Collateral Agent from time to time as provided in the Notice and Consent by and among, inter alia, the Purchaser, the Seller, the Collateral Agent, and such Card Processor; provided that with respect to each Card Processing Agreement, "<u>Specified Sales</u>" shall include only "Specified Sales" as defined in the Notice and Consent relating to such Card Processing Agreement.

"<u>Specified Subsidiary</u>" means each of TACA International Airlines, S.A., a company organized under the laws of El Salvador, Avianca Costa Rica S.A. (f/k/a Lines Aéreas Costarricenses S.A.), a company organized under the laws of Costa Rica, and Trans American Airlines, S.A., a company organized under the laws of Peru, and any successors or assigns of each of the foregoing.

"<u>Standard Daily Priority of Payments</u>" means the priority of payments set forth in <u>Section 2.01</u>.

"<u>Standard Payment Date Priority of Payments</u>" means the priority of payments set forth in <u>Section 2.02</u>.

"<u>Subsidiary</u>" means, in respect of any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of capital stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers or trustees thereof is at the time owned or controlled, directly or indirectly, by (a) such Person, (b) such Person and one or more Subsidiaries of such Person, or (c) one or more Subsidiaries of such Person.

"<u>Supplemental Notice and Consent</u>" means a Notice and Consent among the Card Processor and its applicable Affiliates, the Seller and its applicable Affiliates, the Purchaser and the Collateral Agent, with respect to any Card Processor in connection with any Contract Rights and Receivables Addition.

"<u>Transaction Documents</u>" means, collectively, the RSPA, the Costa Rican Assignment Agreement, the Expenses Agreement, the Administration Agreement, the Undertaking Agreement, the RSPA Security Documents, this Agreement, the Card Processing Agreements, each Notice and Consent, and each other transfer, assignment or other document executed and delivered by the Seller and/or the Servicer in connection with the foregoing.

"<u>Transfer</u>" means (i) in respect of the Contract Rights, the "*cesión de contrato*" set forth in article 887 of the Colombian Code of Commerce; and (ii) in respect of the Receivables, the "*cesión*" set forth in article 1959 of the Colombian Civil Code, all of which, pursuant to the term of the RSPA.

"<u>Trigger Event</u>" means each of the events specified in Section 6.01 of the RSPA.

"<u>Trigger Event Priority of Payments</u>" means the priority of payments set forth in <u>Section 2.04</u>.

"<u>U.K. Account Bank</u>" means the Collateral Agent, in its capacity as account bank under the U.K. Account Charge, or any other financial institution satisfactory to the Required Lenders (as defined in the Purchaser Credit Agreement).

"U.K. Account Charge" means the English law security agreement dated as of the date hereof and entered into between the Purchaser as chargor, the Collateral Trustee and the U.K. Account Bank.

"U.S. Account Bank" means the Collateral Agent, in its capacity as account bank under the Account Control Agreement, or any other financial institution satisfactory to the Required Lenders.

"Undertaking Agreement" means the Receivables Maintenance Agreement, dated the date hereof, by and among the Seller, the Servicer and the Purchaser.

"United States" and "U.S." means the United States of America and the territories and possessions thereof.

"Unsettled Balance" means, at any date of determination, the difference equal to (a) the aggregate principal amount of the Loan on the funding date thereof minus (b) the aggregate Principal Payment Amounts remitted to the Administrative Agent for the benefit of the Lenders in accordance with the applicable Priority of Payments and by the Administrative Agent to the Lenders in accordance with the Purchaser Credit Agreement.

"Unwind Amount" means an amount equal to, at any date of determination, the sum, without duplication, of (a) the Unsettled Balance, plus (b) the accrued and unpaid Interest Accrued on the Unsettled Balance through the date of payment of the Unsettled Balance in full, plus (c) all other amounts (including enforcement costs and expenses) due and payable to the Agents and the Collateral Trustee (for their own accounts or for the account or benefit of any other Person), including the Indemnified Persons (other than the Purchaser), plus (d) any Break Costs.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

**Section 1.02    Other Interpretive Provisions**.

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Agreement as a whole and not to any particular provision of this Agreement, and any subsection, Section, Article, Schedule, and Exhibit references are to this Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices, and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

11

(g)     Unless otherwise expressly provided herein:   (i) references to agreements (including this Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any Transaction Document, and (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting or implementing such Applicable Law.

(h)     The Transaction Documents are the result of negotiations among the parties thereto and have been reviewed by counsel to them and are the products of all of such parties. Accordingly, they shall not be construed against any party thereto merely because of any such party's involvement in their preparation.

(i)     The specification of dollar amounts hereunder in U.S. Dollars shall be deemed to include U.S. Dollars and the equivalent thereof in other currencies.

## ARTICLE II
## PRIORITY OF PAYMENTS, CALCULATIONS AND NOTICES

**Section 2.01**     <u>Standard Daily Priority of Payments</u>.  Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on any Business Day of an Interest Period that is not the Payment Date with respect to such Interest Period (each such day, a "<u>Daily Payment Date</u>") received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice of such Trigger Event has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with <u>Section 2.09(b)</u> hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Daily Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account as follows:

(a)     First, disburse the cash to the Debt Service Reserve Account, until the amount standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(b)     Second, leave undisbursed and remaining in the Collections Account the remaining cash until the Business Day in the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to the Interest Period;

(c)     Third, on the Business Day of the Interest Period when the amount of such remaining cash first exceeds the Monthly Amortization with respect to such Interest Period, and each subsequent Business Day in the Interest Period to, but excluding, the Payment Date of such Interest Period, leave undisbursed and remaining in the Collections Account such remaining cash in an amount equal to the Monthly Amortization with respect to the Interest Period and, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse to the Seller's Account such remaining cash in excess of such Monthly Amortization as a payment of the Additional Purchase Price; and

(d)    Fourth, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Daily Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Daily Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Section 2.02    Standard Payment Date Priority of Payments**.  Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on the Payment Date with respect to any Interest Period received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, on such Payment Date the Collateral Agent shall disburse (or leave undisbursed) the cash standing to the credit of the Collections Account (and for purposes of clauses (a), (b) and (c) below, if cash standing to the credit of the Collections Account is insufficient to make such payments, cash standing to the credit of the Debt Service Reserve Account) as follows:

(a)    First, (i) first, disburse to the Agents, the Collateral Trustee, any Receiver and any Delegate the cash required to pay, pro rata and *pari passu*, to the Agents, the Collateral Trustee, any Receiver and any Delegate all Agent Amounts Due for such period, and then, after full and final discharge of the former, (ii) second, disburse to the Administrator (A) all amounts owing to the Administrator pursuant to the Administration Agreement and (B) all amounts owing to the Purchaser pursuant to the Expenses Agreement, in each case as notified by the Administrator to the Administrative Agent and the Collateral Agent in writing two Business Days prior to such Payment Date;

(b)    Second, disburse to the Administrative Agent's Account an amount of the cash equal to the Interest Amount with respect to such Payment Date, together with the Interest Amount with respect to each prior Payment Date, if any, for which there was insufficient cash standing to the credit of the Collections Account or the Debt Service Reserve Account for the Collateral Agent to make the disbursement to the Administrative Agent's Account of the Interest Amount with respect to such Payment Date as provided in this clause (b);

(c)    Third, disburse to the Administrative Agent's Account an amount of the cash equal to the Principal Payment Amount with respect to such Payment Date, together with the Principal Payment Amount with respect to each prior Payment Date, if any, for which there was insufficient cash standing to the credit of the Collections Account or the Debt Service Reserve Account for the Collateral Agent to make the disbursement to the Administrative Agent's Account of the Principal Payment Amount with respect to such Payment Date as provided in this clause (c);

(d)    Fourth, disburse to the Persons entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to the Persons entitled thereto all unpaid fees, expenses and indemnities incurred by or claimed through such Person and subject to reimbursement to, or required to be paid to, such Person under or in connection with any Transaction Document, to the extent such amount has been notified to the Administrative Agent and the Collateral Agent two Business Days prior to such Payment Date;

13

(e)      Fifth, disburse to the Debt Service Reserve Account such cash, until the amount of cash standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(f)      Sixth, unless the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, disburse all remaining cash to the Seller's Account as a payment of the Additional Purchase Price; and

(g)      Seventh, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Payment Date received notice from a Notice Party that a Retention Event has occurred and is continuing, and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, leave undisbursed and remaining in the Collections Account all such remaining cash.

**Section 2.03      Adjustment Event Priority of Payments**. Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on any Business Day of an Interest Period received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing, and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on the Adjustment Event Payment Date (as defined below) that such written notice has been revoked or is otherwise no longer of further force or effect,  or (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, if the Collateral Agent has prior to 10:00 a.m. (New York time) on such Business Day received written notice from a Notice Party that an Adjustment Event has occurred and is continuing (any such Business Day, an "<u>Adjustment Event Payment Date</u>"), and has not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) prior to 10:00 a.m. (New York time) on such Adjustment Event Payment Date that such written notice has been revoked or is otherwise no longer of further force or effect, the Collateral Agent shall disburse the cash standing to the credit of the Collections Account as follows on such Adjustment Event Payment Date:

(a)      First, (i) first, disburse to the Agents, the Collateral Trustee, any Receiver and any Delegate the cash required to pay, pro rata and pari passu, to the Agents, the Collateral Trustee, any Receiver and any Delegate all Agent Amounts Due, and then, after full and final discharge of the former, (ii) second, disburse to the Administrator (A) all amounts owing to the Administrator pursuant to the Administration Agreement and (B) all amounts owing to the Purchaser  pursuant to the Expenses Agreement, in each case as notified by the Administrator to the Administrative Agent and the Collateral Agent in writing two Business Days prior to such Payment Date;

(b)      Second, disburse to the Debt Service Reserve Account such cash, until the amount of cash standing to the credit of the Debt Service Reserve Account is equal to the Debt Service Required Amount;

(c)      Third, to the Administrative Agent's Account the cash for application to the Principal Payment Amount with respect to each Payment Date occurring on or after such Business Day, in inverse order of maturity, until the amount of all such Principal Payment Amounts has been disbursed to the Administrative Agent's Account, together with an amount of cash equal to the Interest Accrued and unpaid with respect to and any Break Costs relating to each such payment of any Principal Payment

Amount, and all other amounts payable in connection with such payments, in each case as calculated by or notified to (as applicable) the Administrative Agent pursuant to the Purchaser Credit Agreement;

(d)    Fourth, disburse to any Person entitled thereto, as applicable, the cash required to pay, pro rata and pari passu, to such Person all unpaid fees, expenses and indemnities incurred by, or claimed through, such Person and subject to reimbursement to, or required to be paid to, such Person under, or in connection with, any Transaction Document until receipt from the Administrative Agent of notice confirming that the Administrative Agent has received confirmation from the Agents, the Collateral Trustee, any Receivers, any Delegates and each Lender of the payment in full of all such obligations to the Person; and

(e)    Fifth, upon payment in full of all obligations owed by to the Purchaser Finance Parties pursuant to clause (d) above, leave any amounts remaining in the Collections Account, until instructed by the Purchaser to disburse such amounts, to be applied by the Purchaser to make payments to the Seller in accordance with the RSPA.

**Section 2.04    Trigger Event Priority of Payments**.  If the Collateral Agent and the Collateral Trustee have prior to 10:00 a.m. (New York time) on any Business Day received written notice from the Administrative Agent that (1) a Trigger Event has occurred and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), or (2) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, and have not received written notice from the Administrative Agent (acting at the direction of the Required Lenders) by 10:00 a.m. on such Business Day that such notice has been revoked or is otherwise of no further force or effect, (i) the Collateral Agent shall, pursuant to Section 2.3.2 of the Loan Agreement, disburse the cash standing to the credit of the New York Pass-Through Account to the Collections Account and provide notice to the Collateral Trustee of such disbursement, and (ii) following the disbursement set forth in clause (i) above, the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

**Section 2.05    Payments to the Purchaser**.  Notwithstanding anything to the contrary herein, the parties hereto hereby agree that any payments made to or to be disbursed in accordance with any Priority of Payments in respect of any Interest Amount, Principal Payment Amount or other principal or interest payments or Break Costs, and any portion of the Unwind Amount relating to the foregoing amounts, shall be made to the Administrative Agent; *provided* that any amounts to be paid in connection with any fees, expenses or indemnities or other amounts shall be paid as directed by the intended final recipient of such amount (solely to the extent that the Collateral Agent has received written notice of any such amounts to be paid in accordance with Section 2.07(b)).

**Section 2.06    LIBOR, Debt Service Collections and Other Reports**.

(a)    The Administrative Agent shall provide a copy to Seller, the Servicer and the Purchaser by email of each notice provided by its pursuant to Section 2.5.5 of the Purchaser Credit Agreement setting forth the LIBOR rate, the Debt Service Required Amount, and the applicable Agent Amounts Due, Interest Amount and Principal Payment Amount due on then succeeding Payment Date.

(b)    Within one Business Day after each Payment Date, the Collateral Agent shall deliver by email to the Administrative Agent, the Purchaser, the Seller and the Servicer, a monthly statement setting forth the Collections received from the Card Processors in the Collections Account during the Interest Period ending on such Payment Date and describing the application of funds from the Collections Account during such Interest Period, including the amount transferred to the Seller's Account during such Interest Period.

(c)    The Administrative Agent shall deliver by email to the Collateral Agent, the Purchaser, the Seller and the Servicer the Collections Coverage Ratio on the date of any such determination.

(d)    In the event that the Collateral Agent receives written notice as provided in Section 2.01, Section 2.02, Section 2.03, or Section 2.04 that (i) a Trigger Event has occurred and is continuing, and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement), or (ii) the Liquidated Damages is automatically payable pursuant to Section 6.03 of the RSPA, or (iii) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with Section 2.09(b) hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), or (iv) a Retention Event has occurred and is continuing, and the Administrative Agent receives written notice from the Required Lenders that such Trigger Event has been waived or rescinded or is otherwise no longer of force or effect, such Liquidated Damages is no longer payable, such Adjustment Event is no longer continuing or is no longer of force or effect, or such Retention Event is no longer continuing, as the case may be, the Administrative Agent will promptly (and in any event within five (5) Business Days after its receipt of actual notice thereof), give written notice to the Collateral Agent of such fact or circumstance for the purpose of restoring the application of the Standard Daily Priority of Payments and the Standard Payment Date Priority of Payments or eliminating the retention of cash in the Collection Account as provided in Section 2.01(d) or Section 2.02(g).

(e)    In the event that the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) provides notice of a Trigger Event to any Notice Party, (i) the Administrative Agent shall concurrently provide a copy of such notice to the Collateral Trustee and (ii) the Administrative Agent shall promptly send a notice to the Collateral Trustee and the Notice Parties stating the amount of (x) the Agent Amounts Due, (y) the Unwind Amount (including account details to which each portion of the Unwind Amount is requested to be paid) and (z) all unpaid fees, expenses and indemnities incurred by, or claimed through, a Purchaser Finance Party and subject to reimbursement to, or required to be paid to, such Purchaser Finance Party under, or in connection with, any Transaction Document, in each case to the extent the Administrative Agent has received notice in writing at least two Business Days prior of such unpaid fees, expenses or indemnities.

**Section 2.07    Determination of Amounts Due the Parties**.

(a)    The Administrative Agent shall notify the Parties hereto by 10:00 a.m. (New York time) within one Business Day after receiving notice under the Purchaser Credit Agreement of any unpaid fees, expenses, and indemnities incurred by or claimed through or disbursable to the Purchaser or the Administrative Agent or any other Person, including any Agent Amounts Due, and subject to reimbursement by, or required to be paid by, the Seller to such Person under or in connection with any Transaction Document.

(b)    In connection with any application of cash standing to the credit of the Collections Account or the Debt Service Reserve Account pursuant to Section 2.02, Section 2.03, Section 2.04, or retention of amounts in the Collections Account pursuant to Section 2.01, for unpaid fees, expenses and indemnities incurred by or claimed through any Person and subject to reimbursement to, or required to be paid to, such Person under or in connection with any Transaction Document, the Collateral Agent shall only be required to make such payments, or retain such amounts, if it has received notice of such unpaid fees, expenses and indemnities by 10:00 a.m. (New York time) one Business Day prior to the applicable date of payment or retention, as applicable; if the Collateral Agent receives notice of such amount after such time, such amounts shall be payable on the next succeeding Payment Date or Business Day on which such Person is entitled to payment under Section 2.02, Section 2.03 or Section 2.04, as

applicable, or such amounts shall be retained on the next succeeding Business Day on which such amount is permitted to be retained under <u>Section 2.01</u>.

Section 2.08    <u>Notice of Break Costs</u>.  If the Administrative Agent shall receive written notice from any Lender of the amount of any Break Costs, the Administrative Agent shall promptly send a notice to the Seller, the Purchaser, the Servicer and the Collateral Agent by email containing the amount of such Break Costs.

Section 2.09    <u>Notice of Retention Events, Adjustment Events and Trigger Events</u>.

(a)    Upon the occurrence of an Adjustment Event pursuant to clause (b) and (c) of the definition thereof or a Trigger Event, the Seller and the Purchaser shall promptly, and in any event within one Business Day, notify the Collateral Agent and the Administrative Agent that an Adjustment Event or a Trigger Event (as applicable) has occurred and, provided, the Collateral Agent has received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith.

(b)    Upon the occurrence of a Retention Event or an Adjustment Event pursuant to clause (a) of the definition thereof, the Administrative Agent shall promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Seller, the Servicer and the Purchaser that a Retention Event or an Adjustment Event (as applicable) has occurred and, provided that the Collateral Agent has received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith.

(c)    Upon receipt of notice from any Notice Party of a Trigger Event, the Administrative Agent shall (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) promptly, and in any event within one Business Day, deliver a notice, substantially in the form of Exhibit A hereto, to the Collateral Agent, the Collateral Trustee, the Seller, the Servicer and the Purchaser that a Trigger Event has occurred and, provided that the Collateral Agent and the Collateral Trustee have received such notice as provided in this Section 2.09, or received notice from any other Notice Party, on or before 10:00 a.m. (New York time) of the date of any payment pursuant to the Priority of Payments, as applicable, the Collateral Agent shall adjust the payments made to conform to the applicable Priority of Payments in accordance herewith and the cash standing to the credit of the Collections Account and the Debt Service Reserve Account shall be disbursed by the Collateral Trustee (or by the U.K. Account Bank as instructed by the Collateral Trustee) pursuant to Section 3.1 of the Security Trust Deed.

Section 2.10    <u>Disbursements from Debt Service Reserve Account</u>.

(a)    If the amount in the Collections Account is insufficient to make the disbursements required pursuant to <u>Section 2.02(a)</u>, <u>(b)</u> and <u>(c)</u> then the Collateral Agent shall transfer any additional required amount from the Debt Service Reserve Account, to the extent of available funds in such account, in order to make such disbursements.

(b)    Unless the Collateral Agent has prior to 10:00 a.m. (New York time) on a Payment Date received written notice from any Notice Party that (1) a Trigger Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.02 of the RSPA or by the Administrative Agent (at the direction of the Required Lenders pursuant to the Purchaser Credit Agreement) pursuant to Section 2.09(c), (2)  the Liquidated Damages is automatically payable pursuant to

Section 6.03 of the RSPA, or (3) an Adjustment Event has occurred and is continuing and notice has been given by the Purchaser pursuant to Section 6.04 of the RSPA or by the Administrative Agent (in accordance with <u>Section 2.09(b)</u> hereof or at the direction of the Required Lenders in accordance with the Purchaser Credit Agreement), on such Payment Date, the Collateral Agent shall disburse to the Collections Account from the Debt Service Reserve Account the excess of any amount held in the Debt Service Reserve Account over the Debt Service Required Amount.

**Section 2.11    Payments upon Discharge of Purchaser Financing** . Upon payment in full of all obligations owed to the Purchaser Finance Parties pursuant to Section 2.04(ii) hereof, the Purchaser shall instruct the Collateral Trustee to disburse any amounts remaining in the Collections Account and the Debt Service Reserve Account to the New York Pass-Through Account, to be applied by the U.S. Account Bank (as instructed by the Purchaser) to make payments to the Seller in accordance with the RSPA.

## ARTICLE III
## MISCELLANEOUS

**Section 3.01    Rights Confined to Parties**.  Nothing expressed or implied herein is intended or shall be construed to confer upon or to give to any Person, other than the Parties and their successors and assigns, any right, remedy or claim under or by reason of this Agreement, and the terms, covenants, conditions, promises and agreements contained herein shall be for the sole and exclusive benefit of the Parties and their respective successors and permitted assigns.  Notwithstanding anything in the foregoing to the contrary, the Parties hereto acknowledge and agree that (a) the Seller may not assign its rights or obligations hereunder, (b) pursuant hereto the Purchaser may assign all its rights hereunder in accordance with the terms of the Purchaser Finance Documents and the transactions in connection therewith, and (c) as a result of such assignment by the Purchaser, the rights of the Purchaser under this Agreement may be enforced by the Collateral Agent on behalf of the Purchaser Finance Parties.

**Section 3.02    Amendment or Waiver**.  Any provision of this Agreement may be amended or waived only with the written consent of each of the Seller, the Purchaser, the Administrative Agent and the Collateral Agent; *provided* that any amendment that affects the rights or obligations of the Servicer hereunder shall require also the written consent of the Servicer; *provided further* that any amendment that affects the rights or obligations of the Collateral Trustee hereunder or under the Security Trust Deed shall require also the written consent of the Collateral Trustee; *provided*, *further*, upon receipt by the Seller, the Servicer and the Purchaser from the Administrative Agent, acting at the direction of the Required Lenders, of a written notice that all obligations under Purchaser Finance Documents are paid in full, the Administrative Agent and the Collateral Agent shall no longer be parties to this Agreement (without limiting any indemnity or expense obligations, which shall survive the removal of the Administrative Agent and the Collateral Agent), and that after delivery of such the remaining Parties hereto may amend this Agreement among themselves to account for the removal of the Administrative Agent and the Collateral Agent.

**Section 3.03    Binding Upon Assigns**.  Except as otherwise provided herein, the provisions of this Agreement (including any amendments, modifications and waivers hereof properly adopted) shall be binding upon and shall inure to the benefit of the Parties and their respective successors and assigns. Neither the Purchaser nor the Seller nor the Servicer may assign or otherwise transfer any of its respective rights or obligations hereunder without the prior written consent of the Administrative Agent (at the direction of the Required Lenders).

**Section 3.04    Waiver of Immunity**.  This Agreement and any other documents delivered pursuant hereto, and any actions taken hereunder, constitute commercial acts by the Seller and the Purchaser.  To the extent that the Seller or the Purchaser, or any of their respective assets, may have, or

may hereafter become entitled to or have attributed to it, any right of immunity, on the grounds of sovereignty or otherwise, from any legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of any competent court, from service of process upon it or any agent, from attachment prior to judgment, from attachment upon or in aid or execution of judgment, or from execution of judgment or other legal process or proceeding for the giving of any relief or for the enforcement of judgments, in any jurisdiction, each of the Seller and the Purchaser hereby irrevocably and unconditionally and to the fullest extent permitted by law waives, and agrees not to plead or claim, any such immunity for itself or any of its property, assets or revenues wherever located with respect to its obligations, liabilities or any other matter under or arising out of or in connection with this Agreement, any of the other Transaction Documents, or any document delivered pursuant hereto or thereto; it being intended that the foregoing waiver and agreement shall be effective, irrevocable and not subject to withdrawal in any and all jurisdictions.

**Section 3.05    Notices**. All notices, requests, instructions, directions and other communications provided for herein (including any modifications of, or waivers, requests or consents under, this Agreement) shall be given or made in writing (including by electronic mail) delivered to the intended recipient as follows:

(a)    if to the Purchaser, to it at c/o P.O. Box 1093, Boundary Hall, Cricket Square, Grand Cayman KY1-1102, Cayman Islands; Attention: The Directors; Facsimile No.: (345) 945-7100; Tel.: (345) 945-7099; email: info@maplesfS.com;

with copies to:

Citibank, N.A.
388 Greenwich Street
New York, NY 10013Attn: Miriam Y. Molina
Tel.: (212) 816-5576
email: miriam.molina@citi.com;

and

(b)    if to the Seller, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.: (571) 413-9809; Tel.: (571) 295-6765; email: Lucia.avila@Avianca.com;

and

(c)    if to the Servicer, to it at Aerovías del Continente Americano S.A. Avianca, Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10, Bogotá, D.C., Colombia; Attention: Vicepresidente Financiero; Facsimile No.: (571) 413-9809; Tel.: (571) 295-6765; email: Lucia.avila@Avianca.com;

and

(d)    if to the Administrative Agent, to it at Citibank, N.A., 388 Greenwich Street, New York, NY 10013, USA, Attn: Miriam Y. Molina, Tel.: (212) 816-5576, email: miriam.molina@citi.com;

and

(e)    if to the Collateral Agent, to it at 388 Greenwich Street, New York, NY 10013, USA, Attn: Karen Abarca, Tel.: (212) 816-7759, email: karen.abarca@citi.com / cts.spag@citi.com;

and

(f)    if to the Collateral Trustee, to it at Citibank, N.A., London Branch, 6th floor, CGC-1, Citigroup Centre, Canada Square, Canary Wharf, London E14 5LB, United Kingdom, E-mail: issuerpfla@Citi.com, Fax: +44 207 500 5877

Except as otherwise provided in this Agreement, all such communications shall be effective upon receipt at the address or email specified herein.

**Section 3.06    Construction**.    The Table of Contents hereto and the Article and Section headings herein are for convenience only and shall not affect the construction hereof.

**Section 3.07    Severability**.    To the extent permitted by law, any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**Section 3.08    Law and Jurisdiction**.

(a)    GOVERNING LAW. THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK (NOT INCLUDING SUCH STATE'S CONFLICT OF LAWS PROVISIONS OTHER THAN SECTION 5-1401 OF THE NEW YORK GENERAL OBLIGATIONS LAW).

(b)    Jurisdiction. Each of the parties hereto hereby irrevocably consents to the exclusive jurisdiction of any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, and any appellate court from any thereof in respect of any actions or proceedings brought against it hereunder, and hereby waives its rights to any other jurisdiction that may apply by virtue of its present or any other future domicile or for any other reason. Each of the parties hereto hereby irrevocably waives, to the fullest extent permitted by law, any objection to any suit, action, or proceeding that may be brought in connection with the Transaction Documents in such courts whether on the grounds of venue, residence or domicile or on the ground that any such suit, action or proceeding has been brought in an inconvenient forum. Additionally, each of the parties hereto hereby waives the right to assert counterclaims in any such proceedings and agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon such party and may be enforced in any court of the jurisdiction to which such party is subject by a suit upon such judgment.

(c)    WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION OR LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO ANY TRANSACTION DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH OF THE PARTIES HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED

TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

**Section 3.09     Use of English Language**.  All certificates, reports, notices, and other documents and communications given or delivered pursuant to this Agreement shall be in the English language or accompanied by a certified English translation thereof.

**Section 3.10     Currency**.  All amounts payable by the Purchaser, the Seller or any other Person under this Agreement shall be made in United States Dollars.

**Section 3.11     Counterparts**.  This Agreement may be executed in two or more counterparts (including via facsimile), each of which shall be deemed an original, and it shall not be necessary in making proof of this Agreement to produce or account for more than one such counterpart.

**Section 3.12     Limited Recourse**.  Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Purchaser's obligations under this Agreement shall be limited recourse obligations of the Purchaser, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) of the Purchaser at such time available for application by or on behalf of the Purchaser in making payments in accordance with this Agreement.  The parties hereby acknowledge and agree that the Purchaser's obligations under this Agreement are solely the corporate obligations of the Purchaser, and that none of the officers, directors, shareholders or agents of the Purchaser, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Purchaser hereunder.  After the Purchaser's assets (other than the ordinary share capital and any transaction fee charged by the Purchaser pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of the Purchaser's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Purchaser and its liability hereunder, and the parties hereto shall not have the right to proceed against the Purchaser or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Purchaser or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 3.12 shall survive termination of this Agreement.

**Section 3.13     Indemnities**.

(a)     The Seller undertakes to each of the Purchaser and the Administrative Agent, for the benefit of the Purchaser Finance Parties, that the Seller will indemnify and hold harmless the Purchaser, the Administrative Agent, the Collateral Agent, the Purchaser Finance Parties and their Related Parties (each an "Indemnified Person") from and against any and all Loss that any of them may incur or that may be made against any of them, and will reimburse each Indemnified Person for all costs, charges and expenses that any Indemnified Person may pay or incur in connection with investigating, disputing or defending any action or claim in respect of any such Loss; provided that such Loss does not result from such Indemnified Person's gross negligence or willful misconduct, as determined by a court of competent jurisdiction by final and nonappealable judgment.  This indemnity will be in addition to any liability that the Seller may otherwise have, and is in addition to (and shall not limit) any liability that the Purchaser may have to the Purchaser Finance Parties under the terms of the Credit Documents.  The

21

Purchaser Finance Parties shall not have any duty or other obligation, whether as fiduciary or trustee for any of its Related Parties or otherwise, to recover any such payment or to account to any other Person for any amounts paid to it under this Section 3.13.

(b)    Dollars are the sole currency of account and payment for all sums payable by the Seller in respect of this Agreement, including damages.  Any amount received or recovered in a currency other than Dollars (whether as a result of, or of the enforcement of, a judgment, order of a court of any jurisdiction or otherwise) by the Purchaser or any other Indemnified Person in respect of any sum expressed to be due to them from the Seller under this Agreement shall only constitute a discharge to the extent of the amount in Dollars that the Purchaser or such other Indemnified Persons are able to purchase in accordance with normal banking procedures with the amount so received or recovered in that other currency on the date of that receipt or recovery (or, if it is not practicable to make that purchase on that date, on the first date on which it is practicable to do so).  If that amount is less than the amount in Dollars expressed to be due to the Purchaser or such other Indemnified Person in respect of this Agreement, the Seller shall indemnify the Purchaser or such other Indemnified Person against any loss sustained by the Purchaser or such other Indemnified Person as a result.  In any event, the Seller shall indemnify the Purchaser or such other Indemnified Person against any cost of making such purchase.  These indemnities constitute a separate and independent obligation from the Seller's other obligations, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Purchaser or any other Indemnified Person and shall continue in full force and effect despite any other judgment, order, claim or proof for a liquidated amount in respect of any sum due in respect of this Agreement or any other judgment or order.  Any such loss aforesaid shall be deemed to constitute a loss suffered by the Purchaser or any such other Indemnified Person and no proof or evidence of any actual loss will be required by the Seller.

(c)    To the extent permitted by Applicable Law, no party hereto shall assert, and hereby waives, any claim against any other party hereto, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby; provided, however, that the foregoing shall not apply to any damages in respect of any indemnity under this Section 3.13 or to any other indemnification or amounts payable to the Purchaser Finance Parties hereunder or under any other Transaction Document or Purchaser Finance Document.

(d)    All amounts due under this Section 3.13 shall be payable not later than three Business Days after written demand therefor.

(e)    The provisions of this Section 3.13 shall survive the termination of this Agreement and the resignation or removal of any Agents or the Collateral Trustee.

**Section 3.14    Patriot Act**.  In order to comply with the laws, rules, regulations and executive orders in effect from time to time applicable to banking institutions, including, without limitation, those relating to the funding of terrorist activities and money laundering, including Section 326 of the USA PATRIOT Act of the United States, the Administrative Agent is required to obtain, verify, record and update certain information relating to the individuals and entities which maintain a business relationship with the Administrative Agent.  Accordingly, each of the Parties agree to provide to the Administrative Agent, upon request and from time to time such identifying information and documentation as may be available for such party in order to enable the Administrative Agent to comply with such law.

**Section 3.15    Acknowledgement and Consent to Bail-In of EEA Financial Institutions**. Notwithstanding anything to the contrary in any Transaction Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Transaction Document, to the extent such liability is

unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a)    the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b)    the effects of any Bail-In Action on any such liability, including, if applicable:

(i)    a reduction in full or in part or cancellation of any such liability;

(ii)    a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent undertaking, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Transaction Document; or

(iii)    the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 3.16    **Rights of the Agents**.    Each of the Agents shall be entitled to the rights, protections, immunities and indemnities set forth in the Purchaser Credit Agreement, as if specifically set forth herein.

Section 3.17    **Service of Process**.    Each of the Seller and the Servicer agrees that service of all writs, processes and summonses in any suit, action or proceeding brought in connection with the Transaction Documents or the Purchaser Finance Documents against the Seller or the Servicer in any court of the State of New York or any United States federal court sitting in the Borough of Manhattan, New York City, New York, United States, may be made upon the Process Agent, whom each of the Seller and the Servicer irrevocably appoints as its authorized agent for service of process.    Each of the Seller and the Servicer represents and warrants that the Process Agent has agreed to act as the agent for service of process for the Seller and the Servicer.    Each of the Seller and the Servicer agrees that such appointment shall be irrevocable until one year after the Maturity Date (as defined in the Loan Agreement, dated December 12, 2017 among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent) or until the irrevocable appointment by the Seller and the Servicer of a successor in the City of New York as their authorized agent for such purpose and the acceptance of such appointment by such successor.    Each of the Seller and the Servicer further agrees to take any and all action, including the filing of any and all documents and instruments, that may be necessary to continue such appointment in full force and effect as aforesaid.    If the Process Agent shall cease to act as the agent for service of process for Seller or Servicer, Seller or Servicer (as applicable) shall appoint without delay another such agent and provide prompt written notice to the Administrative Agent and the Purchaser of such appointment.    With respect to any such action in any court of the State of New York or any United States federal court in the Borough of Manhattan, New York City, New York, United States, service of process upon the Process Agent, as the authorized agent of the Seller and the Servicer for service of process, and written notice of such service to the Seller or the Servicer, as applicable, shall be deemed, in every respect, effective service of process upon the Seller or the Servicer, as applicable.    Nothing in this Section 3.17 shall affect the right of any party to serve legal process in any other manner permitted by law.

[signature page follows]

**IN WITNESS WHEREOF,** the Parties have caused their names to be signed hereto by their respective officers thereunto duly authorized as of the day and year first above written.

**USAVflow Limited, as the Purchaser**

By:
Name: Peter Lundin
Title:  Director

**Aerovías del Continente Americano S.A. Avianca, as the Seller**

By:
Name: ROBERTO HELD
Title:

*Signature page to Cash Management Agreement*

Aerovias del Continente Americano S.A. Avianca, as the Servicer

By:
Name: ROBERTO KED>
Title:

*Signature page to Cash Management Agreement*

**Citibank N.A.,**
as the Administrative Agent


By: _____
Name:        Miriam Molina
Title:         Vice President


By: _____
Name:        Karen Abarca
Title:         Vice President


*Signature page to Cash Management Agreement*

**Citibank, N.A.,**
as the Collateral Agent

By:
Name:    Karen Abarca
Title:    Vice President


By:
Name:    Miriam Molina
Title:    Vice President

*Signature page to Cash Management Agreement*

Exhibit A
Form of Notice

**CITIBANK, N.A.**, as Collateral Agent (the "Collateral Agent")
388 Greenwich Street
New York, NY 10013
USA
Attn: Karen Abarca
Tel.: (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

**CITIBANK, N.A., LONDON BRANCH**, as Collateral Trustee (the "Collateral Trustee")
6th Floor, CGC-1
Citigroup Centre
Canada Square
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com,
Fax: +44 207 500 5877

**USAVflow LIMITED**, as Purchaser (the "Purchaser")
c/o P.O. Box 1093GT, Queensgate House,
South Church Street,
Georgetown, Grand Cayman,
Cayman Islands;
Attention: The Directors;
Facsimile No.: (345) 945-7100;
Tel.: (345) 945-7099;
email: info@maplesfinance.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Seller (the "Seller")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Servicer (the "Servicer")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

Exhibit A

AMERICAS 93591607

[●], 20[●]

NOTICE OF [RETENTION EVENT/ADJUSTMENT EVENT/TRIGGER EVENT]

[DATE]

Ladies and Gentlemen,

Reference is made to (a) the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "RSPA"), among the Seller, the Purchaser and the Servicer, (b) the Receivables Maintenance Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Undertaking Agreement"), among the Seller, the Purchaser and the Servicer, (c) the Cash Management Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Cash Management Agreement"), among the Seller, the Purchaser, the Servicer, the Collateral Agent and Citibank, N.A. as Administrative Agent (the "Administrative Agent"), (d) the Loan Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Loan Agreement") among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent and (e) the Security Trust Deed, dated December 12, 2017, among the Lenders, the Collateral Trustee and the Borrower. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Cash Management Agreement.

The Administrative Agent, [at the direction of the Required Lenders/pursuant to Section 2.09(b) of the Cash Management Agreement], hereby notifies the Seller, the Purchaser, the Servicer, the Collateral Agent [and the Collateral Trustee] that a [Retention Event/Adjustment Event/Trigger Event] has occurred and is continuing.

Yours sincerely,

**Citibank N.A.,**
as the Administrative Agent

_____
By:
Name:
Title:

_____
By:
Name:
Title:

Exhibit A

**EXHIBIT D**

EXECUTION VERSION

---

## PLEDGE OVER CONTRACT RIGHTS AND FUTURE REVENUES

by and between

### AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA,

as the Grantor

and

### USAVFLOW LIMITED,

as the Secured Party

*December 12, 2017*

---



GPZ-286869-v1A                    SGR-016312898.







# TABLE OF CONTENTS

**ARTICLE I DEFINED TERMS** ................................................................ 1

    SECTION 1.01.   Definitions and Interpretation. ................................ 1

    **SECTION 1.02.  Other Defined Terms.** ........................................ 1

    **SECTION 1.03.  Other Interpretive Provisions.** ............................ 3

**ARTICLE II GRANT OF PLEDGE** ........................................................ 4

    **SECTION 2.01.  Grant of Pledge.** .............................................. 4

    **SECTION 2.02.  Obligations and Registration.** ............................ 4

    **SECTION 2.03.  Grantor to Remain Liable.** ................................ 5

**ARTICLE III REPRESENTATIONS AND WARRANTIES** ................ 5

    **SECTION 3.01.  Existence; Qualification to Do Business.** ............ 5

    **SECTION 3.02.   Licenses and Approvals.** .................................. 5

    **SECTION 3.03.  Power and Authority.** ...................................... 5

    **SECTION 3.04.  Binding Obligation.** ........................................ 6

    **SECTION 3.05.  No Violation.** .................................................. 6

    **SECTION 3.06.  No Consents.** .................................................. 6

    **SECTION 3.07.  Title; No Other Liens.** .................................... 6

    **SECTION 3.08.  Material Adverse Effect.** .................................. 6

    **SECTION 3.09.  Solvent.** .......................................................... 6

**ARTICLE IV COVENANTS** .................................................................... 6

    **SECTION 4.01.  Funds Remittance.** .......................................... 6

    **SECTION 4.02.  Performance of Obligations.** ............................ 7

    **SECTION 4.03.  Negative Covenants.** ...................................... 7

    **SECTION 4.04.  Notices.** .......................................................... 7

    **SECTION 4.05.  Maintenance of Perfected Pledge; Further Documentation.** ......... 7

    **SECTION 4.06.  [RESERVED].** .............................................. 7

    **SECTION 4.07.  Further Assurances.** ........................................ 8

**ARTICLE V TRIGGER EVENTS; ENFORCEMENT** .......................... 8

    **SECTION 5.01.  Enforcement.** .................................................. 8

    **SECTION 5.02.  Delay or Omission Not Waiver.** ........................ 8

    **SECTION 5.03.  Action on the Obligations.** .............................. 8

SGR/16512898.4





## TABLE OF CONTENTS
(continued)

SECTION 5.04.   Amendments, Etc., with Respect to the Obligations; Waiver of Rights. ............................................................. 9

ARTICLE VI PLEDGE AGREEMENT TERM; PLEDGE ........................ 10

SECTION 6.01.   Absolute Pledge. .............................................. 10

SECTION 6.02.   Pledge Agreement Term; Cancellation proceedings. .................. 10

SECTION 6.03.   Continuing Pledge; Successors and Assigns ........................ 10

ARTICLE VII MISCELLANEOUS ................................................... 10

SECTION 7.01.   Amendments in Writing. ...................................... 10

SECTION 7.02.   *bis* Subordination. .......................................... 10

SECTION 7.03.   Notices. ................................................... 10

SECTION 7.04.   No Waiver by Course of Conduct; Cumulative Remedies. .......... 11

SECTION 7.05   Indemnities by Grantor. ....................................... 11

SECTION 7.06   [Reserved]. ................................................. 12

SECTION 7.07   Benefits of Pledge Agreement. ................................. 12

SECTION 7.08   Counterparts. ............................................... 12

SECTION 7.09   Severability. ................................................ 12

SECTION 7.10   Section Headings. ............................................ 12

SECTION 7.11   Integration. ................................................. 12

SECTION 7.12   Governing Law. ............................................. 12

SECTION 7.13   Limited Recourse. ........................................... 13







## PLEDGE OVER CONTRACT RIGHTS AND FUTURE REVENUES

This **PLEDGE OVER CONTRACT RIGHTS AND FUTURE REVENUES** dated as of December 12, 2017 (this "**Pledge Agreement**"), is entered among **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, a Colombian *sociedad anónima*, as the grantor (the "**Grantor**"), and **USAVFLOW LIMITED**, an exempted company incorporated in the Cayman Islands with limited liability, as the secured party (the "**Secured Party**" and, together with the Grantor, the "**Parties**" and each, individually, **Party**").

### R E C I T A L S:

The Grantor and the Secured Party are a party to that certain Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated as of December 12, 2017 (the "**RSPA**"), pursuant to which the Grantor sold and assigned to the Secured Party, as absolute owner, all of the Grantor's rights under the Contract Rights and the Receivables, subject to the terms and conditions of the RSPA.

The Grantor and the Secured Party are a party to that certain Receivables Maintenance Agreement, dated as of December 12, 2017 (the "**Undertakings Agreement**" and, together with the RSPA, the "**Secured Contracts**"), pursuant to which the Grantor agreed to make the warranties, covenants, and other agreements set forth therein with regard to the maintenance, preservation, and performance of the Grantor's obligations under the RSPA in respect of the Contract Rights and the Receivables transferred and sold to the Secured Party.

Pursuant to the terms of the Secured Contracts, the Grantor agreed, among others, to (i) to replace the Credomatic Contract and the AMEX Contract with Additional Card Processing Agreements, under certain circumstances; (ii) comply with Section 2.03(b) of the RSPA; (iii) transfer the Collections to the Secured Party should they be received by the Grantor after the date of execution of the RSPA and (iv) all other obligations set forth in the Secured Contracts (the "**Secured Obligations**").

In order to induce the Secured Party to enter into the RSPA and the Undertakings Agreement, the Grantor has entered into this Pledge Agreement, pursuant to which the Grantor grants the Secured Party a pledge over the Contract Rights and the Receivables to secure the Secured Obligations.

**NOW, THEREFORE**, in consideration of the Recitals, the Grantor hereby agrees with the Secured Party, as follows:

### ARTICLE I
### DEFINED TERMS

**SECTION 1.01.    Definitions and Interpretation.**  Capitalized terms used herein but not otherwise defined herein have the meanings ascribed to such terms in the Secured Contracts.

**SECTION 1.02.    Other Defined Terms.**  The following terms have the following meanings:

"**Appraiser**" means the expert appraiser from the list created by the Superintendence of Corporations (*Superintendencia de Sociedades*) in charge of the Pledged Rights and Assets valuation during the Direct Payment Procedure.

1





"**Authorized Person**" means a person that has been authorized to execute, sign or undertake general proceedings in relation to this Pledge Agreement or any document, certificate, or notice to be executed or signed under or in connection with any Secured Contract.

"**Cancellation Notice**" has the meaning set forth in **Section 6.02.**

"**Direct Payment Procedure**" means the procedure related to the enforcement of said Pledge, and defined in article 2.2.2.4.2.3 of Decree 1074 of 2015.

"**Disagreement Communication**" has the meaning set forth in **Section 5.01(g).**

"**Enforcement Form**" means the form to be filled in and registered upon the Registration System before commencing the enforcement procedure as it is defined in article 2.2.2.4.2.3 of Decree 1074 of 2015.

"**Form of Notice of Enforcement**" has the meaning set forth in **Section 5.01.**

"**Future Revenues**" means the Collections accrued under the Card Processing Agreements on account of Specified Sales from (i) the early termination date of the RSPA, if any, (ii) the date of execution of the RSPA, if the RSPA is rescinded, nullified, abrogated or declared void (*rescisión, inexistencia, nulidad, resolución* and *ineficacia,* as such terms are understood under Colombian law), until the date on which the Secured Party files the Form of Notice of Enforcement in the Registration System, as set forth in Section 5.01 of this Pledge Agreement or (iii) under the Additional Card Processing Agreements, should any such Collections not be transferred to the Secured Party pursuant to the provisions of the RSPA.

"**Indemnified Amount**" has the meaning set forth in **Section 7.4(a).**

"**Indemnified Party**" has the meaning set forth in **Section 7.4(a).**

"**Interested Party**" has the meaning set forth in **Section 5.01(g).**

"**Law 1676**" means Law 1676 of 2013 that regulates the legal figure of the guarantee over movable assets in Colombia, jointly with the administrative decrees that regulate the matter.

"**List**" has the meaning set forth in **Section 5.01(g).**

"**Other Party**" has the meaning set forth in **Section 5.01(g).**

"**Pledge**" has the meaning set forth in **Section 2.01.**

"**Pledge Agreement**" means this Pledge Agreement, as the same may be amended, supplemented, or otherwise modified from time to time.

"**Pledged Rights and Assets**" has the meaning set forth in **Section 2.01.**

"**Registration**" has the meaning set forth in **Section 2.02.**

"**Registration System**" means the *Registro de Garantías Mobiliarias,* as defined in article 2.2.2.4.1.1 of Decree 1074 of 2015.

2





"**Replacement and Additional Contract Rights**" means the Grantor's contract rights originated from the replacement of AMEX or Credomatic from the original Card Processing Contracts, if applicable.

"**RSPA**" has the meaning set forth in the recitals hereto.

"**Secured Obligations**" has the meaning set forth in the recitals hereto.

"**Transfer Request**" has the meaning set forth in **Section 5.01 (b)**.

"**Undertakings Agreement**" has the meaning set forth in the recitals hereto.

"**Valuation Standards**" has the meaning set forth in **Section 5.01 (d)**.

**SECTION 1.03.    Other Interpretive Provisions.**

(a)    The meanings of defined terms are equally applicable to the singular and plural forms of the defined terms.

(b)    The words "hereof," "herein," "hereunder" and similar words refer to this Pledge Agreement as a whole and not to any particular provision of this Pledge Agreement, and any subsection, Section, Article, Schedule, and Exhibit references are to this Pledge Agreement unless otherwise specified.

(c)    The term "documents" includes any and all documents, instruments, written agreements, certificates, indentures, notices, and other writings, however evidenced (including electronically).

(d)    The term "including" is not limiting and (except to the extent specifically provided otherwise) shall mean "including without limitation."

(e)    Unless otherwise specified, in the computation of periods of time from a specified date to a later specified date, the word "from" shall mean "from and including," the words "to" and "until" each shall mean "to but excluding," and the word "through" shall mean "to and including."

(f)    The terms "may" and "might" and similar terms used with respect to the taking of an action by any Person shall reflect that such action is optional and not required to be taken by such Person.

(g)    Unless otherwise expressly provided herein: (i) references to agreements (including this Pledge Agreement) and other documents shall be deemed to include all subsequent amendments and other modifications thereto, but only to the extent that such amendments and other modifications are not prohibited by any Secured Contract, (ii) references to any Applicable Law are to be construed as including all statutory and regulatory provisions or rules consolidating, amending, replacing, supplementing, interpreting, or implementing such Applicable Law, and (iii) references to Articles, Sections, or other subdivisions or Exhibits are references to Articles, Sections or other subdivisions or Exhibits to this Pledge Agreement.

(h)    This Pledge Agreement is the result of negotiations among and have been reviewed by counsel to the Grantor and the Secured Party and are the products of both



3





Parties. Accordingly, they shall not be construed against either Party merely because of any such Party's involvement in their preparation.

(i)   The reference to any act undertaken by the Secured Party in relation to the Registration proceedings, shall be understood as an act developed directly by it or by any Authorized Person.

**ARTICLE II**
**GRANT OF PLEDGE**

**SECTION 2.01.**   <u>Grant of Pledge</u>.   To secure the full, complete and indefeasible performance of the Secured Obligations and pursuant to the terms of articles 1207 of the Colombian Code of Commerce and Law 1676, the Grantor hereby grants to the Secured Party a movable guarantee (*garantia mobiliaria*) in the form of a first priority pledge (the "**Pledge**") on the following future assets and rights, should they belong to the Grantor in the following circumstances (the "**Pledged Rights and Assets**"):

(a)   The Collections should they be wired to, or received by, the Grantor;

(b)   The Contract Rights under any Additional Card Processing Agreement, and the Future Revenues and Collections derived therefrom, should any such Contract Rights, Future Revenues and Collections not be transferred to the Secured Party pursuant to the provisions of the RSPA (the "**Replacement and Additional Contract Rights**");

(c)   The Contract Rights under any Card Processing Agreements, and the Future Revenues and Collections derived therefrom, should the RSPA be declared illegal or invalid or, for any reason whatsoever, if the RSPA ceases to exist or the sale and purchase under the RSPA is held to be or becomes ineffective or for any other reason the Secured Party fails to have title to the Contract Rights under any Card Processing Agreements, or the Future Revenues or the Collections derived therefrom; and

(d)   To the extent not otherwise included, all substitutions, replacements, accessions, products, and Proceeds of any or all of the foregoing (*bienes derivados y atribuibles*).

**SECTION 2.02.**   <u>Obligations and Registration</u>.   The Secured Party will file this Pledge Agreement for registry with the Registration System. The Secured Party will also file for registry any modifications, amendments or early termination of this Pledge Agreement.

The Secured Party will have the right to request the Grantor to deliver or execute, upon such request, the documents and information related to the Registration of the Pledge, as may be necessary or desirable in the reasonable judgement of the Secured Party.

For the exclusive purposes of article 14 of Law 1676 the following information is provided:



4





EN BLANCO
NOTARIA 16
DEL CIRCULO DE BOGOTÁ, D.C.

| Secured maximum amount: | USD$170,000,000. |
| --- | --- |
| Pledged assets: | The Pledged Rights and Assets. |
| Term: | 7 years renewable in accordance with Law 1676 as set forth in **Section 6.02.** |
| Secured Obligations: | The Secured Obligations. |
| Grantor: | AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA |
| Beneficiary: | USAVFLOW LIMITED |

**SECTION 2.03.**   <u>Grantor to Remain Liable</u>. The Pledge is granted as security only and shall not subject the Secured Party to, or in any way alter or modify, any obligation or liability of the Grantor with respect to or arising out of the Secured Contracts. It is expressly agreed the Grantor shall remain liable under the Secured Contracts to perform all the obligations assumed by it thereunder, all in accordance with and pursuant to the terms and provisions thereof, nor shall the Secured Party be required or obligated in any manner to perform or fulfill any obligation of the Grantor under or pursuant to the Secured Contracts or to make any payment, to make any inquiry as to the nature or sufficiency of any payment received by it, to present or file any claim or to take any action to collect or enforce the payment of any amounts which may have been assigned to it or to which it may be entitled at any time or times.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

As of the date hereof, the Grantor represents and warrants to the Secured Party, and with respect to **Section 3.06**, on each other date on which any Pledged Rights and Assets is acquired by the Grantor, the Grantor shall be deemed to have represented and warranted to the Secured Party with respect to any Pledged Rights and Assets as of such date (after giving effect to all acquisitions of Pledged Rights and Assets to be made on such date), as follows (and each such actual or deemed representation and warranty shall survive the execution and delivery of this Pledge Agreement).

**SECTION 3.01.**   <u>Existence; Qualification to Do Business</u>. The Grantor is duly organized and validly exists as a *sociedad anónima* in good standing under the laws of Colombia, has the corporate power and authority to conduct the business in which it is currently engaged and has its principal office at Avenida Calle 26, No. 59-15 Piso 10, Bogotá, D.C., Colombia.

**SECTION 3.02.**   <u>Licenses and Approvals</u>. The Grantor is duly qualified to transact business and has obtained all necessary licenses and approvals in each jurisdiction in which the conduct of its business requires such qualification, licenses, and approvals.

**SECTION 3.03.**   <u>Power and Authority</u>. The Grantor has the power and authority and legal right to execute and deliver the Pledge Agreement and to perform and observe the terms hereof. The execution, delivery, and performance of the Pledge Agreement by the Grantor have been duly authorized by the Grantor by all necessary action, and the Grantor has duly executed and delivered the Pledge Agreement.

5

SGR/165/2020





ESPACIO EN BLANCO

NOTARÍA 16

EL CÍRCULO DE BOGOTÁ, D.C.

**SECTION 3.04.    Binding Obligation.**  The Pledge Agreement constitutes a legal, valid, and binding obligation of the Grantor, enforceable in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium, or other similar laws now or hereafter in effect relating to creditors' rights. Subject to the preceding sentence and except for the registration of the Pledge Agreement in the Registration System to be made by the Secured Party, all formalities required in Colombia for the validity and enforceability (including any necessary registration, recording or filing with any court or other Governmental Authority) of this Pledge have been accomplished, and no Taxes are required to be paid for the validity and enforceability thereof.

**SECTION 3.05.    No Violation.**  The execution, delivery, and performance of the Pledge Agreement and the fulfillment of the terms hereof by the Grantor do not conflict with, result in any breach of any of the terms and provisions of, or constitute (with or without notice or lapse of time), a default under, or require the consent of any third party that has not been obtained under (i) the Grantor's constitutive documents or (ii) any indenture, credit agreement or other agreement or instrument to which the Grantor is a party or by which it or any of its property is bound.

**SECTION 3.06.    No Consents.**  Except as otherwise set forth herein, no authorization, consent, license, order, or approval of, or registration or declaration with, any Governmental Authority or other Person is required to be obtained, effected or made by the Grantor in connection with the execution and delivery by the Grantor of the Pledge Agreement or the performance of its obligations hereof or the transaction contemplated hereby, or for the exercise by the Secured Party of its rights hereunder or thereunder, except for filings required hereunder and those that have been obtained, effected, or made.

**SECTION 3.07.    Title; No Other Liens.**  By virtue of the Notices and Consents, the Grantor has received all consents and approvals required to grant the Pledge. Other than Pledge created pursuant to this Pledge Agreement and, the Grantor has not created any other Lien over the Pledged Rights and Assets, except in favor of Secured Party.

**SECTION 3.08.    Material Adverse Effect.**  As of the date of this Pledge Agreement, there have been no events, circumstances, developments or other changes in facts that, individually or in the aggregate, would have or could reasonably be expected to result in a Material Adverse Effect.

**SECTION 3.09.    Solvent.**  Both before and after giving effect to this Pledge Agreement and the other Secured Documents and the entering into of the transactions contemplated hereby and thereby, the Grantor was and is Solvent.

## ARTICLE IV
## COVENANTS

The Grantor hereby covenants and agrees with the Secured Party that, from and after the date of this Pledge Agreement and until the Secured Obligations (other than obligations arising under **Section 7.04** that have not yet been asserted) are fully, completely, and indefeasibly paid and performed:

**SECTION 4.01.    Funds Remittance.**  If any funds are received by the Grantor from time to time in respect of Collections, the Grantor shall: (a) promptly (and, in any event, within two Business Days) after its receipt thereof, remit such funds to the Collections Account (and until so remitted, hold such funds in trust for the benefit of the Collateral Agent) and (b) promptly (and, in any event, by no later than the Business Day after any such remittance): (i) notify the Secured Party (and authorize the Secured party to notify the Collateral Agent) of its receipt of any such funds and of each such remittance by it (or on its behalf) into the Collections Account (specifying the amount and date of the remittance and the Card Processing Agreement, if any, with respect to which it received such funds) and (ii) de

6





to the Secured Party (and authorize the Secured Party to deliver to the Collateral Agent) evidence that it has sent a notice to the applicable Card Processor that all future payments on Collections are to be deposited into the Collections Account.

**SECTION 4.02.    Performance of Obligations**. The Grantor shall, in all material respects, timely and fully (a) perform and comply with all provisions, covenants, and other promises required to be observed by it under the Secured Contracts to which it is a party, (b) take, or request each party to a Secured Contract other than the Secured Party to take, all such action to enforce its rights and remedies under each Secured Contract as may be from time to time reasonably requested by the Secured Party, and make or request each party to a Secured Contract other than the Secured Party to make to each other party to each such Secured Contract such demands and requests for action as the Grantor is entitled to make thereunder which may be from time to time reasonably requested by the Secured Party.

**SECTION 4.03.    Negative Covenants.**    The Grantor shall not, without the prior written consent of the Secured Party:

(a)  sell, transfer, exchange or otherwise dispose of, or create, incur, assume or suffer to exist any Lien on any part of the Pledged Rights and Assets, except as expressly permitted by the Secured Contracts or this Pledge Agreement;

(b)  terminate, or take or permit any action that would reasonably be likely to cause the termination of, any Secured Contract other than in accordance with the terms thereof or as permitted by the terms of the Secured Contracts; or

(c)  permit that this Pledge Agreement be impaired, or permit the Pledge created by this Pledge Agreement to be amended, terminated, or discharged; (ii) permit any Lien to be created on or extend to or otherwise arise upon or burden the Pledged Rights and Assets or any part thereof, any interest therein, or the proceeds thereof, except as may be expressly permitted by the Secured Contracts or this Pledge Agreement, or (iii) take any action that would permit the Pledge created by this Pledge Agreement not to constitute a first priority Pledge in the Pledged Rights and Assets.

**SECTION 4.04.    Notices**.    The Grantor shall give written notice to the Secured Party promptly, but in any event within ten (10) Business Days, upon the Grantor's acquiring actual knowledge of:

(a)  the occurrence of any Trigger Event or Retention Event;

(b)  the submission of any claim or the initiation or threat of any legal process or proceeding, or rule making or disciplinary proceeding by or against the Grantor, or the promulgation of any proceeding or any proposed or final rule which would reasonably be expected to have, a Material Adverse Effect; and/or

(c)  any Lien (other than the Pledge) on any of the Pledged Rights and Assets.

**SECTION 4.05.    Maintenance of Perfected Pledge; Further Documentation**. The Grantor shall maintain the Pledge created by this Pledge Agreement as a perfected Pledge and shall defend such Pledge against the claims and demands of all Persons whomsoever.

**SECTION 4.06.    [RESERVED]**.

7



**SECTION 4.07.** **Further Assurances**. Upon the reasonable request of the Secured Party, the Grantor shall duly execute and deliver, or cause to be duly executed and delivered, at the cost and expense of the Grantor, such further instruments as may be necessary or desirable in the reasonable judgment of the Secured Party to carry out the provisions and purposes of this Pledge Agreement and the other Secured Contracts. In addition, the Grantor shall pay upon request of the Secured Party and directly to it, all the expenses associated with the Direct Payment Procedure.

**ARTICLE V**
**TRIGGER EVENTS; ENFORCEMENT**

**SECTION 5.01.** **Enforcement**. Upon breach of the Secured Obligations the Secured Party shall have the right to enforce the Pledge Agreement by following the Direct Payment Procedure, according to article 60 of Law 1676 and article 2.2.2.4.2.3 of Decree 1074 of 2015, taking into consideration the following:

(a) When the Secured Party files the Enforcement Form in the Registration System, the notice of said filing to the Grantor will be done using the notification addresses set forth in this Pledge Agreement, substantially in the form of the Schedule 5.01(a) (Form of Notice of Enforcement*)*;

(b) Once the Enforcement Form is filed, the Secured Party may request in writing to the Grantor to (i) wire any Collections received and not previously wired or transferred at that moment to the Collections Account; and (ii) assign the Contract Rights not previously assigned to the Secured Party (the "Transfer Request"). The Transfer Request will include a specific reasonable date in which the Collections and the Contract Rights must be transferred or assigned, as the case may be. For such purposes the parties will follow the transfer procedures set forth in the RSPA.

(c) If the Grantor does not comply with the terms of the Transfer Request, the Secured Party shall request the Superintendence of Corporations (Superintendencia de Sociedades) the appointment of an Appraiser.

(d) Once the Appraiser has been appointed, any of the Parties may inform the Appraiser that they have chosen the following valuation standards for purposes of the appraisal (the "Valuation Standards"): discounted cash flows projected based on the amount of Collections received under the Card Processing Agreements during the last 3 years.

(e) The Parties hereto irrevocably acknowledge and agree to waive any right they may have under article 2.2.2.4.2.3 of Decree 1074 of 2015 to make comments to the appraisal unless there is a manifest error in the valuation.

(f) Once the Appraiser has delivered the appraisal of the Pledged Rights and Assets to both parties, such Pledged Rights and Assets shall be transferred to the Secured Party. For such purposes, the Grantor hereby agrees to deliver, within 10 Business Days of the date hereof, to the Secured Party a power of attorney to sign on its behalf the document included as Schedule 5.01(f)(Form of Power of Attorney) hereto, for purposes of the transfer of such Pledged Rights and Assets to the Secured Party.

(g) If either one or both of the Parties does not agree with the appraisal, the disagreement will be subject to the following mechanism according to article 78 of Law 1676 and articles 59, 60 and 61 of Law 1563 of 2012:

(i) The party that disagrees with the appraisal (the "**Interested Party**") send a written communication to the other party (the "**Other Party**") notifying such disagreement

8





appointing an *amigable componedor* from the list set forth in Schedule 5.01(g)(i) (the "**List**").

(ii) Within the 3 Business Days following the appointment of the *amigable componedor*, the Interested Party shall send a written communication to the *amigable componedor*, with a copy to the Other Party, describing the reasons behind the disagreement, together with all relevant documentation to evidence such disagreement (the "**Disagreement Communication**").

(iii)    Within 5 Business Days following the date in which the Disagreement Communication is received by the Other Party, the Other Party shall send, by a written communication to the *amigable componedor* and the Interested Party, any comments to the Disagreement Communication.

(iv) Within 10 Business Days following the receipt of the comments by the Other Party or the expiration of the 5 Business Days set forth above, the appointed *amigable componedor* shall make a decision and communicate such decision to the Parties by a written communication.

(v) Pursuant to Article 2.2.2.4.2.3. of Decree 1074 of 2015 and paragraph of Article 66 of Law 1676, the decision of the *amigable componedor* does not affect the Direct Payment Procedure.

**SECTION 5.02.    Delay or Omission Not Waiver**. No delay or omission of the Secured Party to exercise any right or remedy shall impair any such right or remedy or constitute a waiver thereof or an acquiescence therein. Every right and remedy given by any Secured Contract or by law to the Secured Party may be exercised from time to time, and as often as may be deemed expedient, by the Secured Party.

**SECTION 5.03.    Action on the Obligations**.  The Secured Party's right to seek and recover judgment on the Secured Contracts or under this Pledge Agreement shall not be affected by the seeking or obtaining of or application for any other relief under or with respect to this Pledge Agreement. Neither the Pledge created by this Pledge Agreement nor any rights or remedies of the Secured Party shall be impaired by the recovery of any judgment by the Secured Party.

**SECTION 5.04.    Amendments, Etc., with Respect to the Obligations; Waiver of Rights**. The Grantor shall remain obligated hereunder notwithstanding that, without any reservation of rights against the Grantor and without notice to or further assent by the Grantor, (a) any demand for payment of any of the Secured Obligations made by the Secured Party may be rescinded by such party and any of the Secured Obligations continued, (b) the Secured Obligations, or the liability of any other Person upon or for any part thereof, or any collateral security or guarantee therefor or right of offset with respect thereto, may, from time to time, in whole or in part, be renewed, extended, amended, modified, accelerated, compromised, waived, surrendered or released by the Secured Party, (c) the Secured Contracts and any other documents executed and delivered in connection therewith may be amended, modified, supplemented, or terminated, in whole or in part, as the applicable Secured Party may deem advisable from time to time, and (d) any collateral security, guarantee, or right of offset at any time held by the Secured Party for the payment of the Secured Obligations may be sold, exchanged, waived, surrendered or released.  The Secured Party shall not have any obligation to protect, secure, perfect, or insure any Lien at any time held by it as security for the Secured Obligations or under this Pledge Agreement or any property subject thereto. When making any demand hereunder against the Grantor, the Secured Party may, but shall be under no obligation to, make a similar demand on any other Person, and any failure by the Secured Party to make any such demand or to collect any payments from any other Person or release of any other Person shall not relieve the Grantor in respect of which a demand or collect is made or the Grantor not so released of its several obligations or liabilities hereunder, and shall

9

SGR/1684286 2 1



ESPACIO EN BLANCO
NOTARÍA 16
DEL CÍRCULO DE BOGOTÁ, D.C.

or affect the rights and remedies, express or implied, or as a matter of law, of the Secured Party against the Grantor. For the purposes hereof "demand" shall include the commencement and continuance of any legal proceedings.

## ARTICLE VI
## PLEDGE AGREEMENT TERM; PLEDGE

**SECTION 6.01.    Absolute Pledge**. All rights of the Secured Party hereunder, the Pledge, and all obligations of the Grantor hereunder shall be absolute and unconditional.

**SECTION 6.02.    Pledge Agreement Term; Cancellation proceedings**.  In accordance with article 42 of Law 1676, the period for which the Registration will remain in full force corresponds to 7 years following the initial registration date. Notwithstanding, said term can be renewed in the terms of article 42 of Law 1676 (the "**Pledge Agreement Term**").

When the full, complete and indefeasible performance of the Obligations is accomplished, having complied with the terms considered herein, the Grantor shall have the right to deliver a cancellation notice to the Secured Party, for the latter to proceed with the Registration cancellation related procedures (the "**Cancellation Notice**"). This right shall not be exercised by the Grantor in the event of the partial accomplishment of the Obligations.

**SECTION 6.03.    Continuing Pledge; Successors and Assigns**. This Pledge Agreement shall remain in full force and effect and be binding in accordance with and to the extent of its terms upon the Grantor and the successors and assigns thereof (except that the Grantor may not assign, transfer, or delegate any of its rights or obligations under this Pledge Agreement without the prior written consent of the Secured Party) and shall inure to the benefit of the Secured Party, its successors, endorsees, transferees, and assigns until all Obligations (other than obligations arising under **Section 7.04** that have not yet been asserted) shall have been fully, completely and indefeasibly paid and performed.

## ARTICLE VII
## MISCELLANEOUS

**SECTION 7.01.    Amendments in Writing**. None of the terms or provisions of this Pledge Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Grantor and the Secured Party and with the consent of the Administrative Agent (at the direction of the Required Lenders).

**SECTION 7.02.    *bis* Subordination**.  The Secured Party acknowledges its intent to, at a later date, enter into a separate security agreement with Citibank N.A. (the "Collateral Agent") pursuant to which the Secured Party will grant the Collateral Agent a security interest over the Pledged Rights and Assets and this Pledge Agreement.  The Secured Party hereby agrees to subordinate all of its rights over the Pledged Rights and Assets in favor of the Collateral Agent.

**SECTION 7.03.    Notices**.  For the purposes contemplated in this Pledge Agreement the Parties establish as their notification addresses, the following:

**Secured Party**

USAVflow Limited
c/o P.O. Box 1093
Boundary Hall





ESPACIO EN BLANCO
NOTARÍA 16
DEL CÍRCULO DE BOGOTÁ, D.C.



Cricket Square
Grand Cayman
KY1-1102
Cayman Islands
Facsimile No.: (345) 945-7100;
Telephone No.: (345) 945-7099;
email: info@maplesfs.com

**Grantor**

Aerovías del Continente Americano S.A. Avianca,
Centro Administrativo,
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C.,
Colombia;
Attention: Vicepresidente Financiero;
Facsimile No.: (571) 413-9809;
Telephone No.: (571) 295-6765;
email: Lucia.avila@Avianca.com;

**SECTION 7.04.     No Waiver by Course of Conduct; Cumulative Remedies.** The Secured Party shall not by any act (except by a written instrument pursuant to **Section 7.01**), delay, omit, or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Secured Party, any right, power, or privilege hereunder shall operate as a waiver thereof. No single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Secured Party would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

**SECTION 7.05     Indemnities by Grantor.**

(a)          Subject to **Section 7.04(b)**, without limiting any other rights which any of the Secured Party, its successors and assigns, and their respective directors, officers, employees, and agents (each, an "**Indemnified Party**") may have hereunder or under Applicable Law, the Grantor hereby agrees to indemnify each Indemnified Party from and against any and all damages, losses, liabilities and reasonable and documented out-of-pocket expenses (including reasonable fees and disbursements of outside counsel) (all of the foregoing being collectively referred to as "**Indemnified Amounts**") arising out of, or relating to, or in connection with the execution, negotiation, delivery or administration of, the transactions contemplated by, or enforcement of any rights or obligations set forth in or created by, this Pledge Agreement. Without limiting the foregoing, such indemnity shall apply to any Indemnified Amounts arising out of (a) any representation or warranty made by the Grantor under this Pledge Agreement which shall have been incorrect in any material respect when made or (b) a failure of the Grantor to perform or observe its respective covenants or other material obligations under this Pledge Agreement. Without limiting or being limited by the foregoing, the Grantor agrees to pay, on demand, to each Indemnified Party any and all amounts necessary to indemnify such Indemnified Party from and against any and all Indemnified Amounts relating to or resulting from any legal proceeding related to any of the matters referred to above in this **Section 7.04** or any investigation, litigation or proceeding with

11



respect to any action, or failure to act, by the Grantor under any of the Secured Contracts to which it is a party or any of the transactions contemplated thereby.

(b)         Notwithstanding anything in this **Section 7.04** to the contrary, the Grantor shall have no obligation to indemnify any Indemnified Party under this **Section 7.04** in respect of Indemnified Amounts to the extent resulting from (a) the gross negligence or willful misconduct on the part of such Indemnified Party or its directors, officers, employees or agents as determined by the final judgment of a court of competent jurisdiction no longer subject to appeal or (b) litigation between Indemnified Parties not involving an actual or alleged act or omission of the Grantor or any of the Grantor's Affiliates. Promptly after receipt by an Indemnified Party of notice of the commencement of any action or proceeding involving a claim referred to in subsection (a) above, such Indemnified Party shall, if a claim in respect thereof is to be made against the Grantor under such subsection (a), promptly give notice to the Grantor of the commencement of such action or proceeding; provided, however, that the failure of such Indemnified Party to give any such notice shall not (i) relieve the Grantor of its obligations under such subsection (a), except to the extent that such failure results in the forfeiture of rights or defenses and the Grantor incurs an increased obligation to such Indemnified Party under such subsection on account of such failure, or otherwise prejudices the Grantor, and (ii) in any event relieve the Grantor from any liability with respect to such Indemnified Party which the Grantor may have otherwise on account of this Pledge Agreement or any other Secured Contract.

SECTION 7.06    [Reserved].

SECTION 7.07    Benefits of Pledge Agreement. Nothing in this Pledge Agreement or in the other Secured Contracts, expressed or implied, shall give to any Person, other than the Parties and their successors hereunder and the Administrative Agent, any benefit or any legal or equitable right, remedy, or claim under this Pledge Agreement

SECTION 7.08    Counterparts. This Pledge Agreement may be executed by one or more of the Parties on any number of separate counterparts (including by facsimile or other electronic transmission), and all of said counterparts taken together shall be deemed to constitute one and the same instrument.

SECTION 7.09    Severability. Any provision of this Pledge Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction. The parties hereto shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

SECTION 7.10    Section Headings. Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Pledge Agreement, and are not to affect the construction of, or to be taken into consideration in interpreting, this Pledge Agreement.

SECTION 7.11    Integration. This Pledge Agreement represents the entire agreement of the Parties with respect to the subject matter hereof, and there are no promises, undertakings, representations, or warranties by the Secured Party relative to the subject matter hereof not expressly set forth or referred to herein.

SECTION 7.12    Governing Law. THIS PLEDGE AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS PLEDGE AGREEMENT SHALL BE GOVERNED



CASE EN BLANCO
NOTARÍA 16
DEL CÍRCULO DE BOGOTÁ, D.C.

BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE REPUBLIC OF COLOMBIA.

**SECTION 7.13    Limited Recourse.**    Notwithstanding any other provision of this Pledge Agreement, each party hereto hereby agrees that the Secured Party's obligations under this Pledge Agreement shall be limited recourse obligations of the Secured Party, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Secured Party pursuant to the Administration Agreement) of the Secured Party at such time available for application by or on behalf of the Secured Party in making payments in accordance with this Pledge Agreement.  The parties hereby acknowledge and agree that the Secured Party's obligations under this Pledge Agreement are solely the corporate obligations of the Secured Party, and that none of the officers, directors, shareholders or agents of the Secured Party, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Secured Party hereunder.  After the Secured Party's assets are realized and exhausted, all sums due but still unpaid in respect of the Secured Party's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Secured Party and its liability hereunder, and the parties hereto shall not have the right to proceed against the Secured Party or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Secured Party or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 7.13 shall survive termination of this Pledge Agreement.

[SIGNATURE PAGES FOLLOW]

13



SGR/16512698.4



**IN WITNESS WHEREOF**, each of the Parties has caused this Pledge Agreement to be duly executed and delivered as of the date first above written.

AEROVÍAS DEL CONTINENTE AMERICANO
S.A. AVIANCA, as the Grantor

By: _____

Name: Roberto Held.

Title: CEO

USAVFLOW LIMITED, as the Secured Party

By: _____

Name: Maria Camila Quintero.

Title: POA.





NOTARÍA DIECISEIS DEL CÍRCULO DE BOGOTÁ D.C.

**DILIGENCIA DE AUTENTICACIÓN DE FIRMA**

Ante mi, EDUARDO VERGARA WIESNER NOTARIO 16 DE BOGOTA D.C., Compareció:

**QUINTERO LEGUIZAMO MARIA CAMILA**

Quien se identificó con: **C.C.  1019009264** y manifestó que reconoce como suya la firma que aparece en el presente documento, la que es de su puño y letra. De conformidad con el Art. 73 del Decreto Ley 960 de 1970.

Verifique los datos en: www.notariaenlinea.com

91GM05F0Z55UEQNHZ

5t57tt7nmy9hsgnt5j

CDS

Bogotá D.C. 12/12/2017 a las 10:02:54 a.m.

**EDUARDO VERGARA WIESNER**
**NOTARIO 16 DE BOGOTA D.C.**

FIRMA





SGR/16512898.4



**NOTARÍA DIECISEIS DEL CÍRCULO DE BOGOTÁ D.C.**

**16** Notaría
Del Círculo de Bogotá

DILIGENCIA DE AUTENTICACIÓN DE FIRMA

Ante mí, EDUARDO VERGARA WIESNER NOTARIO 16 DE BOGOTA D.C., Compareció:

**HELD OTERO ROBERTO**
Quien se identificó con: C.C. 79783632 y manifestó que reconoce como suya la firma que aparece en el presente documento, la que es de su puño y letra. De conformidad con el Art. 73 del Decreto Ley 960 de 1970.

h6hygngb4b4bbr4h

Bogotá D.C. 12/12/2017 a las 09:38:50 a.m.

Verifique los datos en:
www.notariaenlinea.com

9GLMPIEW9ONA2J84

CDS

EDUARDO VERGARA WIESNER
NOTARIO 16 DE BOGOTA D.C.

**Schedule 5.01(a)**
*Form of Notice of Enforcement*

[Date]

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**
Avenida Calle 26 No. 59-15 Piso 10,
Bogotá, D.C., Colombia;

At.: [ ]
Vicepresidente Financiero

Ref.: **Notice of Enforcement**

Dear Sirs,

Pursuant to Section 5.01 of the Pledge Over Contract Rights and Future Revenues (the "Pledge Agreement") entered into by and between Aerovías del Continente Americano S.A. Avianca (the "Grantor") and USAVflow Limited (the "Secured Party") on [ ], and considering that on [ ] the Grantor failed to comply with its Secured Obligations, the Secured Party hereby notifies the Grantor of the following:

i.     the Secured Party intends to exercise its right to enforce the Pledge Agreement by following the Direct Payment Procedure, according to article 60 of Law 1676 and article 2.2.2.4.2.3 of Decree 1835 of 2015 and execute the Pledge Agreement; and

ii.    therefore, on [ ] the Secured Party filed the Enforcement Form in the Registration System.

Capitalized terms used herein but not otherwise defined have the meanings ascribed to such terms in the Pledge Agreement.

Best regards,

[ ]



SGR/16512898.4





**Schedule 5.01(f)**
*Form of Power of Attorney*

In the City of Bogota, at December [_], 2017 the undersigned [_____], in my capacity as Legal Representative of **AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA** (the "Company"), a stock company incorporated and existing under the laws of the Republic of Colombia, identified with Tax Identification No. [_____], as said legal capacity is certified by the Certificate of Existence and Legal Representation issued by the Chamber of Commerce of Barranquilla attached herein, I do hereby confer special power of attorney to **USAVFLOW LIMITED**, an exempted company incorporated in the Cayman Islands registered and filed as No. 324668 (the "Attorney-in-Fact" and together with the Company, the "Parties"), to act in the name and on behalf of the Company, to transfer the Pledged Rights and Assets on his own behalf, as provided under the Section 5.01(f) of the Pledge Over Contract Rights and Future Revenues entered into by and between the Parties on [___] (the "Pledge Agreement"), and do all necessary acts, execute all documents and file all petitions required or necessary to execute, perfect and perform the abovementioned transfer of Pledged Rights and Assets.

This power of attorney will be valid as long as the Pledge Agreement is in force, unless earlier revoked throughout a written agreement executed by the Parties.

This power of attorney contains a Spanish and an English version. In case of doubt, the Spanish version shall prevail.

This power of attorney and any non-contractual obligations arising out of or in connection with it are governed by the laws of the Colombia and will be construed in accordance with Colombian law.

The courts of Colombia have exclusive jurisdiction to settle any dispute arising out of or in connection with this power of attorney (including a dispute regarding the existence, validity or termination of this power of attorney or any non-contractual obligation arising out of or in connection with this power of attorney).

Capitalized terms used herein shall have the meaning granted on the Pledge Agreement.

_____
[Name]
AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA





**Schedule 5.01(g)(i)**

*List*



1. Inverlink S.A. y Bancapital S.A.S.
2. Bonus Banca de Inversión S.A.S.
3. BBVA Valores Colombia S.A.
4. Nexus Banca de Inversión S.A.
5. Structure S.A.







**EXHIBIT E**

EXECUTION VERSION

## COSTA RICAN BACK-UP SECURITY AGREEMENT

This SECURITY AGREEMENT dated as of December 12, 2017, as amended, supplemented or modified from time to time (this "**Agreement**"), is made by and between Aerovías del Continente Americano, S.A. AVIANCA, a company incorporated according to the laws of Colombia, represented by Roberto Held, (the "**Grantor**") and USAVFlow Limited, an exempted company incorporated and registered under the laws of the Cayman Islands, represented in this act by Peter Lundin, (the "**Secured Party**"), together the "**Parties**" and each individually, a "**Party**".

RECITALS

WHEREAS, reference is made to the AVIANCA-BAC CREDOMATIC Regional Agreement for the Processing of Credit Card Transactions in Affiliated Commercial Establishments, dated as of June 10, 2015, between the Grantor, Taca International Airlines, S.A. ("**TACA**") and BAC International Bank, Inc. ("**Credomatic**") (the "**Credomatic Master Agreement**") pursuant to which Credomatic serves as Taca's and Avianca's card processing agent for sales generated through the cards and in the locations and/or channels specified in the Credomatic Master Agreement.

WHEREAS, reference is made to the Merchant Application & Agreement dated March 17, 2016 among Avianca, Inc., a corporation organized under the laws of the State of New York ("**Avianca Inc.**") and Credomatic of Florida, Inc. (the "**Credomatic Supplement**"), a "Local Contract" as defined under the Credomatic Master Agreement (together with the Credomatic Master Agreement, the "**Secured Contracts**").

WHEREAS, reference is made to the Assignment of Rights Agreement, dated as of the date hereof, 2017 among Avianca, Taca International Airlines S.A. ("**Taca**"), and Credomatic (the "**Taca Assignment**") pursuant to which Avianca's and Taca's rights under the Secured Contracts were divided into "Avianca Contract Rights" and "Taca Contract Rights" and where Taca assigned all Avianca Contract Rights to Avianca and Avianca assigned all Taca Contract Rights to Taca.

WHEREAS, reference is made to the Contract Rights Receivables Sale, Purchase and Servicing Agreement, dated as of the date hereof between Grantor and the Secured Party (the "**RSPA**") pursuant to which Grantor will sell and the Secured Party will purchase all of Avianca's Contract Rights and the Receivables under the Secured Contracts.

WHEREAS, reference is made to that certain Receivables Maintenance Agreement, dated as of the date hereof (the "**Undertakings Agreement**"), pursuant to which the Grantor will agree to make the warranties, covenants, and other agreements set forth therein with regard to the maintenance, preservation, and performance of the Grantor's obligations under the RSPA in respect of the Contract Rights and the Receivables sold to the Secured Party.

1

Pursuant to the terms of the RSPA and the Undertakings Agreement, the Grantor will agree, among others, to (i) replace the Credomatic Contract and the AMEX Contract with Additional Card Processing Agreements, under certain circumstances; (ii) comply with Section 2.03(b) of the RSPA; (iii) transfer the Collections to the Secured Party should they be received by the Grantor after the date of execution of the RSPA and (iv) perform all other obligations set forth in the RSPA and the Undertaking Agreement (the "**Secured Obligations**").

WHEREAS, to induce the Secured Party to enter into the RSPA and the Undertaking Agreement, the Grantor has entered into this Agreement, pursuant to which the Grantor grants the Secured Party a pledge over the Contract Rights and Receivables (the "**Collateral**").

NOW, THEREFORE in consideration of the Recitals, the Grantor hereby agrees with the Secured Party, as follows:

## 1. <u>Definitions and Interpretation</u>

Capitalized terms used herein but not otherwise defined herein have the meanings ascribed to such terms in the RSPA. The interpretative provisions set forth in Section 1.02 of the RSPA apply to this Agreement.

With respect to the enforcement of the Collateral, the Parties agree to supplement any applicable procedure with the Law on Security over Movable Assets and any applicable law including the Costa Rican Code of Civil Procedure. In any event, unless legally mandated or otherwise established in this Agreement, the maximum term that may be granted by the Enforcement Agent for any notice or proceeding is of five (5) business days.

Additionally, the following terms have the following meanings:

"**Costa Rican Security**" means the security granted over the secured assets (bien dado en garantía) as understood under the Law on Security over Moveable Assets and incorporating all the rights and obligations that the Law on Security over Moveable Assets grants in relation to such secured assets.

"**Law on Security over Movable Assets**" means Ley de Garantías Mobiliarias, law number 9246 and its bylaws.

"**Judicial Enforcement**" means the enforcement procedure established under article 59 of the Law on Security over Movable Assets, or, in any event, the current legally mandated judicial proceeding for the enforcement of executive titles in the applicable jurisdiction for the Republic of Costa Rica.

"**Moveable Asset Security System**" means el Sistema de Garantias Mobiliarias as understood under the Law on Security over Moveable Assets.

"**Notary Public**" Means a Costa Rican Notary Public, in good standing, and with no legal impediments to act as the enforcer of the pledged Collateral in accordance with the Law on Security over Movable Assets and this Agreement.

2

EXECUTION VERSION

"**Out of Court Enforcement**" means the enforcement procedure agreed to in this Agreement established in accordance to Articles 57 and 58 of the Law on Security over Movable Assets.

"**Security Enforcement Form**" means the form or forms required under the Law on Security over Movable Assets or any other law, regulation, bylaw or otherwise required by the Mobile Guaranty System, the National Registry or any other public or private entity, including any courts or other authority appointed to review the terms of this Agreement, to enforce the security interest. This term includes the "formulario de ejecución" as utilized in Article 57 of the Law on Security over Movable Assets.

"**Security Registration Forms**" means the form or forms required by under the Law on Security over Movable Assets or any other law, regulation, bylaw or otherwise required by the Mobile Guaranty System, the National Registry or any other public or private entity to register and perfect the security interest in the Collateral in favor of the Secured Party. This term includes the "formulario de inscripción inicial al Sistema de Garantías Mobiliarias y demás formularios de inscripción posteriores" and the "formulario de registro en el Sistema de Garantía Mobiliaria" as utilized in articles 11, 43 and 44 of the Law on Security over Moveable Assets.

"**Trustee**" means any legally appointed trustee ("fiduciario") in good standing according to the laws of Costa Rica and able to perform the duties required of a trustee as enforcer of security interests under the Law on Security over Moveable Assets.

## 2.  Grant of Security Interest

Notwithstanding the mutual intent of the parties to treat the sale of the Contract Rights and the Receivables under the RSPA as a true sale to Secured Party, and without limitation of such sale, Grantor hereby (i) based on Law on Security over Movable Assets and (ii) constituting a Costa Rican Security grants, effective as of the date hereof, to the Secured Party a security interest in the Collateral to secure full, complete and indefeasible performance of the Secured Obligations. With respect to such grant of a security interest, the Secured Party may at its option exercise from time to time any and all rights and remedies under this Agreement, the Law on Security over Moveable Assets or otherwise.

## 3.  Guaranteed Amount.

The guaranteed amount under this Agreement corresponds to USD $170,000,000 (One Hundred Seventy Million Dollars).

## 4.  Term

The security interest set forth herein shall remain in force and effect until all of Grantor's obligations under the Secured Obligations have been paid or otherwise performed in full (the "**Termination Date**").

## 5.  Enforcement

EXECUTION VERSION

### 5.1.   Forced Assignment of Collections and Contract Rights

If a Trigger Event has occurred and is continuing, the Secured Party, subject to the terms of the RSPA and the Undertaking Agreement, may provide notice to the Grantor and at the same time, or immediately thereafter, submit the Security Enforcement Form before the relevant Costa Rican authorities under the Law on Security over Moveable Assets.

Once the Security Enforcement Form is filed, the Secured Party may request in writing to the Grantor to (i) wire any Collections received and not previously wired or transferred at that moment to the Collections Account and (ii) to assign the Contract Rights not previously assigned to the Secured Party (the "**Transfer Request**"). The Transfer Request will include a specific date in which the Collections and the Contract Rights must be transferred or assigned.

The Secured Party may also notify Grantor's counterparties in the Secured Contracts of the assignment of the Collateral and instruct them to (i) wire any Collections to be sent to Grantor to the Collections Account and (ii) to take note of and implement the assignment of Contract Rights in favor of the Secured Party.

### 5.2.   Out of Court Enforcement

The Parties fully and irrevocably agree that after a Trigger Event has occurred and is continuing, the Secured Party may, in its sole discretion, and in addition to the assignment of Collections and Contract Rights outlined in Clause 5.1 above, and in addition to any other rights and remedies provided for herein or otherwise available to it, exercise all of the rights and remedies of a secured party upon default under the Law on Security over Moveable Assets, including the forced sale of the Collateral either through (i) Judicial Enforcement or (ii) Out of Court Enforcement.

### 5.2.1   Appointment of Enforcement Agent

With the registration of the Security Enforcement Form, the Secured Party may immediately appoint a Notary Public or a Trustee to serve as the person designated to enforce its security interest in the Collateral through the Out of Court Enforcement (the "**Enforcement Agent**").

### 5.2.2   Notice

Within two (2) business day of being appointed as such, the Enforcement Agent will provide notice to the Grantor so that it can, within a term of five (5) business days after receiving such notice, provide documentation evidencing payment of all Secured Obligations and any additional amounts due under the RSPA and the Undertaking Agreement ("**Full Performance**").

If Full Performance is not properly evidenced at the end of such term, the Enforcement Agent shall proceed with the forced sale of the Collateral.

Grantor expressly recognizes the Secured Party's right to act in accordance with what is established herein and, therefore, upon the provision of such notice as contemplated above, undertakes to stop exercising any of its rights, as applicable, over the Collateral.

### 5.2.3   Forced Sale or Auction of Collateral

If the Enforcement Agent is instructed by the Secured Party to proceed with the forced sale or auction of the Collateral, it shall publish a notice of sale in a newspaper of national circulation with at least 8 days' notice prior to the date of the sale or auction. Such notice must indicate the time, place and date of the sale as well as a brief description of the assets to be sold, a base price and parameters for additional base prices were they to be adjusted for the auction.

Written notice of the sale must also be provided to all interested parties which have a legal right over the Collateral in accordance with article 57 of the Law on Security over Moveable Assets.

From the sale or auction, the Enforcement Agent will prepare an affidavit to be signed by the Enforcement Agent and the purchaser of the Collateral. Upon payment of the price in the sale or auction, the Enforcement Agent shall grant evidence of title to the purchaser. If the price paid is not enough to cover the Secured Obligations, the Collateral Agent may proceed to collect the remaining amounts through Judicial Enforcement.

The transfer of title over the Collateral in the event of a forced sale or auction will be free of any liens established pursuant to this Agreement.

### 6.   **Authorizations**

The Grantor hereby authorizes the Secured Party to file the Security Registration Forms before the relevant entities. The Secured Party may appoint anyone it deems appropriate to act on its behalf to file the Security Registration Forms.

### 7.   **Notices**

All notices and other communications made in relation to this Agreement shall be sent in writing to the following addresses. Notwithstanding, if a Party is properly served a notice under the RSPA and/or the Undertakings Agreement, it will be valid for purposes of this Agreement.

Grantor:

Aerovías del Continente Amerciano S.A., Avianca
Centro Administrativo, Avenida Calle 26 No. 59-15 Piso 10
Bogotá D.C. Colombia
Attention: Vicepresidente Financiero
Facsimile No.: 571-413-9809
Telephone No.: 571-295-6765
E-mail: Lucia.avila@avianca.com


Secured Party:

USAVflow Limited
c/o PO Box 1093
Boundary Hall

EXECUTION VERSION

Cricket Square
Grand Cayman
KY1-1102
Cayman Islands
Facsimile No.: (345) 945-7100
Telephone No.: (345) 945-7099
E-mail: info@maplesfS.com

with a copy to

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Miriam Y. Molina
Tel.:  (212) 816-5576
email: miriam.molina@citi.com

and with a copy to

Citibank, N.A.
388 Greenwich Street
New York, NY 10013
Attn:  Karen Abarca
Tel.:  (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

## 8. <u>**Representations and Warranties**</u>

The Grantor certifies that the representations and warranties, as applicable to Grantor, set forth in the RSPA are true and correct in all material respects as of the date hereof.

The Grantor certifies it has not granted a prior security interest in the Collateral to any other person.

The Grantor certifies that its counterparties in the Secured Contracts will be able to honor their obligations therein and agrees to indemnify and hold the Secured Party harmless against any loss due to the noncompliance of any counterparty in such Secured Contracts.

The Grantor shall indemnify and hold the Secured Party harmless against any loss, as well as against any costs or expenses (including legal fees and expenses), which the Secured Party sustains or incurs due to any Trigger Event or any other amount payable hereunder, or under the Secured Contracts.

## 9. <u>**Modifications**</u>

Subject to the terms of the RSPA and the Undertakings Agreement, and except as otherwise provided therein or herein, any modification of any part of this Agreement shall require the

consent in writing of all the parties to the RSPA and the Administrative Agent (at the direction of the Required Lenders).

10. **Successors and Assigns**

This agreement shall be binding upon and shall inure to the benefit of the Parties hereto and their respective successors and permitted assigns.

None of the Grantor's rights or obligations hereunder nor any interests herein may be assigned by the Grantor unless it is established in the RSPA or related documents or with the consent of all the parties to the RSPA and the Administrative Agent (at the direction of the Required Lenders).

11. **No Waiver**

No failure or delay by the Secured Party in exercising any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof.

12. **[RESERVED]**

13. **Assignment**

The Secured Party may assign, indorse, or transfer any instrument evidencing all or any part of this Agreement as provided in, and in accordance with the RSPA and the holder of such instrument shall be entitled to the benefits of this Agreement.

14. **Severability**

In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality, and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby. The Parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

15. **Discharge**

Upon the Termination Date, (i) subject to Section 17, this Agreement and the security interests and licenses created hereby shall terminate and all rights to the Collateral shall revert to Grantor, (ii) the Secured Party agrees to request the cancelation of the registration of the security interest before the Moveable Asset Security System. If the Secured Party does not proceed with such cancelation within a period of fifteen (15) days of written notice to the Secured Party, the Grantor may either (i) go before a Notary Public, who must request the Secured Party's signature in a public affidavit to proceed with the cancellation before the National Registry or (ii) go before a civil judge in the applicable jurisdiction so that the judge may order the cancellation through a summary process.

16. **Applicable Law**

This Agreement shall be governed and enforced in accordance with the laws of the Republic of Costa Rica and may be translated into Spanish by an official translator in accordance to Article 395 of the Costa Rican Civil Code.

17. **Reinstatement**

This Agreement shall remain in full force and effect and continue to be effective should any petition be filed by or against the Grantor for liquidation or reorganization, should the Grantor become insolvent or make an assignment for the benefit of any creditor or creditors or should a receiver or trustee be appointed for all or any significant part of the Grantor's assets, and shall continue to be effective or be reinstated, as the case may be, if at any time payment or performance of the Secured Obligations, or any part thereof, is, pursuant to applicable law, rescinded or reduced in amount, or must otherwise be restored or returned by any obligee of the Secured Obligations, whether as a "voidable preference," "fraudulent conveyance," or otherwise, all as though such payment or performance had not been made.  In the event that any payment or any part thereof, is rescinded, reduced, restored or returned, the Secured Obligations shall be reinstated and deemed reduced only by such amount paid and not so rescinded, reduced, restored or returned.

18. **Amendments in Writing**

None of the terms or provisions of this Agreement may be waived, amended, supplemented or otherwise modified except by a written instrument executed by the Grantor and the Secured Party and with the consent of the Administrative Agent (at the direction of the Required Lenders).

19. **No Waiver by Course of Conduct; Cumulative Remedies.**

The Secured Party shall not by any act (except by a written instrument pursuant to Section 1), delay, omit, or otherwise be deemed to have waived any right or remedy hereunder or to have acquiesced in any breach of any of the terms and conditions hereof. No failure to exercise, nor any delay in exercising, on the part of the Secured Party, any right, power, or privilege hereunder shall operate as a waiver thereof.  No single or partial exercise of any right, power, or privilege hereunder shall preclude any other or further exercise thereof or the exercise of any other right, power or privilege. A waiver by the Secured Party of any right or remedy hereunder on any one occasion shall not be construed as a bar to any right or remedy that the Secured Party would otherwise have on any future occasion. The rights, remedies, powers and privileges herein provided are cumulative, may be exercised singly or concurrently and are not exclusive of any other rights or remedies provided by law.

20. **Limited Recourse.**

Notwithstanding any other provision of this Agreement, each party hereto hereby agrees that the Secured Party's obligations under this Agreement shall be limited recourse obligations of the Secured Party, with recourse being limited to the assets (other than the ordinary share capital and any transaction fee charged by the Secured Party pursuant to the Administration Agreement) of the Secured Party at such time available for application by or on behalf of the Secured Party in

EXECUTION VERSION

making payments in accordance with this Agreement.   The parties hereby acknowledge and agree that the Secured Party's obligations under this Agreement are solely the corporate obligations of the Secured Party, and that none of the officers, directors, shareholders or agents of the Secured Party, any of its Affiliates or any other Person shall be personally liable to make any payments of principal, interest or any other sum now or hereafter owing by the Secured Party hereunder.   After the Secured Party's assets (other than the ordinary share capital and any transaction fee charged by the Secured Party pursuant to the Administration Agreement) are realized and exhausted, all sums due but still unpaid in respect of the Secured Party's obligations hereunder shall be extinguished and shall not thereafter revive with respect to the Secured Party and its liability hereunder, and the parties hereto shall not have the right to proceed against the Secured Party or any of its Affiliates or any of its officers, directors, shareholders or agents for the satisfaction of any monetary claim or for any deficiency judgment remaining after foreclosure of any of its assets.

No party hereto shall take any steps for the purpose of procuring the appointment of any examiner, administrator, receiver, liquidator, provisional liquidator, bankruptcy trustee or administrative receiver or the making of any administrative order or court order or   application or for instituting any bankruptcy, examinership, reorganization, arrangement, insolvency, winding up, liquidation, composition or any like proceedings under Applicable Law in respect of the Secured Party or its Affiliates or in respect of any of their liabilities, including, without limitation, as a result of any claim or interest of such parties.

The provisions of this Section 20 shall survive termination of this Agreement.

[Signature pages follow]

9

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written and in the location shown below.

Aerovias del Continente Americano S.A. Avianca
Grantor

Name: Roberto Held
Title:
Location:

Costa Rican Back-Up Security Agreement – Signature Page

Secured Party
USAVflow Limited

Name: Peter Lundin
Title: Director
Location: Grand Cayman, Cayman Islands

**EXHIBIT F**

Exhibit A
Form of Notice

**CITIBANK, N.A.**, as Collateral Agent (the "Collateral Agent")
388 Greenwich Street
New York, NY 10013
USA
Attn: Karen Abarca
Tel.: (212) 816-7759
email: karen.abarca@citi.com / cts.spag@citi.com

**CITIBANK, N.A., LONDON BRANCH**, as Collateral Trustee (the "Collateral Trustee")
6th Floor, CGC-1
Citigroup Centre
Canada Square
London E14 5LB
United Kingdom
E-mail: issuerpfla@Citi.com,
Fax: +44 207 500 5877

**USAVflow LIMITED**, as Purchaser (the "Purchaser")
c/o P.O. Box 1093GT, Queensgate House,
South Church Street,
Georgetown, Grand Cayman,
Cayman Islands;
Attention: The Directors;
Facsimile No.: (345) 945-7100;
Tel.: (345) 945-7099;
email: info@maplesfinance.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Seller (the "Seller")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

**AEROVÍAS DEL CONTINENTE AMERICANO S.A. AVIANCA**, as Servicer (the "Servicer")
Centro Administrativo
Avenida Calle 26 No. 59-15 Piso 10
Bogotá, D.C.
Colombia
Attention:  Vicepresidente Financiero
Facsimile No.: (571) 413-9809
Tel.: (571) 295-6765
email:  Lucia.avila@Avianca.com

AMERICAS 93591607

NOTICE OF RETENTION EVENT

May 11, 2020

Ladies and Gentlemen,

Reference is made to (a) the Contract Rights and Receivables Sale, Purchase and Servicing Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "RSPA"), among the Seller, the Purchaser and the Servicer, (b) the Receivables Maintenance Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Undertaking Agreement"), among the Seller, the Purchaser and the Servicer, (c) the Cash Management Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Cash Management Agreement"), among the Seller, the Purchaser, the Servicer, the Collateral Agent and Citibank, N.A. as Administrative Agent (the "Administrative Agent"), (d) the Loan Agreement, dated December 12, 2017 (as amended, amended and restated, supplemented, or otherwise modified from time to time, the "Loan Agreement") among the Purchaser, the guarantors party thereto, the lenders party thereto from time to time, the Administrative Agent and the Collateral Agent and (e) the Security Trust Deed, dated December 12, 2017, among the Lenders, the Collateral Trustee and the Borrower. Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Cash Management Agreement.

The Administrative Agent, at the direction of the Required Lenders/pursuant to Section 2.09(b) of the Cash Management Agreement, hereby notifies the Seller, the Purchaser, the Servicer, the Collateral Agent and the Collateral Trustee that a Retention Event has occurred and is continuing.

Yours sincerely,

**Citibank N.A.**,
as the Administrative Agent

By: _____
Name: Miriam Molina
Title: Senior Trust Officer

By: _____
Name Karen Abarca
Title:  Senior Trust Officer

Exhibit A